UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

– – –

HONORABLE JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE PRESIDING
– – –

UNITED STATES OF AMERICA,  )
                           )
          PLAINTIFF,       )
                           )
VS.                        ) NO. 8:15-cr-183-T-30AEP
                           )
D. ANDA NORBERGS,          )
                           )
          DEFENDANT.       )
_____)

**TRIAL – DAY 1**

REPORTER'S TRANSCRIPT OF PROCEEDINGS
**NOVEMBER 7, 2016**
TAMPA, FLORIDA

MELISSA A. PIERSON, CA CSR 12499,
IL CSR 084.003138, RPR
FEDERAL OFFICIAL COURT REPORTER
801 N. FLORIDA AVENUE, 2ND FLOOR
TAMPA, FLORIDA 33602
PH:  (813)301-5336
USDCtranscripts@gmail.com

```
 1    APPEARANCES OF COUNSEL:

 2    ON BEHALF OF PLAINTIFF:
               A. LEE BENTLEY, III
 3             UNITED STATES ATTORNEY
               BY:  MR. ADAM SALTZMAN, ESQ.
 4             BY:  MR. JAY TREZEVANT, ESQ.
               ASSISTANT UNITED STATES ATTORNEYS
 5             400 N. TAMPA STREET
               ST. 3200
 6             TAMPA, FL 33602
               (813) 274-6000
 7             ADAM.SALTZMAN@USDOJ.GOV
               JAY.TREZEVANT@USDOJ.GOV
 8

 9

10    ON BEHALF OF DEFENDANT:
               TRAGOS, SARTES & TRAGOS, PLLC
11             BY:  MR. GEORGE E. TRAGOS, ESQ.
               BY:  MR. PETER SARTES, ESQ.
12             601 CLEVELAND STREET
               ST. 800
13             CLEARWATER, FL 33755
               (727) 441-9030
14             george@greeklaw.com
               peter@greeklaw.com
15

16

17

18

19

20

21

22

23

24

25
```

1                              **I-N-D-E-X**

2    **WITNESS:**

3    Dr. Mary Mayleben

4        Direct Examination by Mr. Trezevant:          134
         Cross-Examination by Mr. Tragos:             192

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **E X H I B I T S**              **ADM**

2

3    Government's Exhibit No. 1A                    147
     Government's Exhibit No. 1B                    147
4    Government's Exhibit No. 1C                    147
     Government's Exhibit No. 1D                    163
5    Government's Exhibit No. 31A                   186
     Government's Exhibit No. 35A                   186

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                TAMPA, FLORIDA; NOVEMBER 7, 2016

 2                           - - -

 3                (COURT IN SESSION AT 9:01 P.M.)

 4                         *   *   *   *

 5          THE COURT:  Good morning.  There are some issues

 6   that someone wanted to discuss?

 7          MR. TRAGOS:  Yes, your Honor.  They fall into

 8   several categories.  One is during our hearing Thursday

 9   morning, the Government wants to introduce -- talking about

10   the Government wanting to introduce an article on counterfeit

11   Avastin.  Actually, I think it was a letter or notice.  A

12   notice not sent to my client, and a notice that had nothing

13   to do with this case because Avastin is not involved in this

14   case, and the drugs in this case are not alleged to be

15   counterfeit drugs.  The Government just wanted to put it in

16   to talk about what is a real drug or not.  The Court said,

17   "Is the Defendant arguing that she's allowed to use

18   non-FDA-approved drugs," and my answer to the Court is, the

19   Defendant is not arguing that.  The Defendant understands

20   we're supposed to use FDA-approved drugs.  The Government was

21   supposed to draft a stip to that effect, and the -- there is

22   some dispute because the Government's stip still wants to

23   introduce the evidence, and not just that we agree that she's

24   supposed to use FDA-approved drugs, and the article doesn't

25   come in, which is what the Court said, but the Government is
```

1  disputing that at this point.  So we have an issue with

2  regards to that.

3              And it's a broader issue because I noticed the

4  Government gave us late last night and I saw it first thing

5  this morning, copies of a PowerPoint that it plans to use in

6  opening, and in that PowerPoint it talks about a subpoena on

7  the Defendant in September 2011.  And what happened was the

8  Government was conducting a criminal investigation in

9  California on a company named Oberlin, and they had some

10  other names, but Oberlin.  They subpoenaed the Defendant for

11  any record that she had of Oberlin.  The drugs contained in

12  the Oberlin subpoena are not these drugs, and the Defendant

13  was merely a witness in that case, and has nothing to do with

14  any of the activity in this case because they are alleging

15  QSP is the company in this case, which is unrelated to

16  Oberlin.  They just, again, are dumping a bunch of documents

17  in this case that have nothing to do with this case.  But in

18  their opening they are going to say because she got a

19  subpoena on another investigation that she should have --

20  that that is evidence of her fraudulent intent in this case.

21  Again, unrelated companies, unrelated drugs, nothing to do

22  with any of the activities that are charged in the

23  indictment.

24              THE COURT:  Response?

25              MR. SALTZMAN:  Good morning, Judge.  So I'm going

1     to take the issue that came up on Thursday first.  The

2     stipulation that was discussed on Thursday really only

3     addressed one of two or three issues that the exhibits --

4     what the probative value of those exhibits are.

5            Over the weekend and on Friday, I sent over a

6     couple of proposed stipulations to Defense, which were all

7     rejected.  I also sent over proposed redacted versions of the

8     exhibits, which I have a copy for the Court, if I could hand

9     them up?  I think you'll see that -- may I approach?

10            THE COURT:  Yes.

11            MR. SALTZMAN:  Your Honor, I provided the last

12     stipulation that was sent over along with the exhibits that

13     are at issue in this case.  And the value of -- the probative

14     value of these exhibits, and you could especially see that

15     with the redactions, is that Dr. Norbergs was on notice that

16     she was, in fact, buying foreign unapproved drugs.  Not that

17     the -- anything having to do with the counterfeit Avastin

18     situation.

19            The redactions, as they are right now, completely

20     excise any references to counterfeit drugs, completely excise

21     any reference to Avastin or Altuzan.  The purpose of these

22     exhibits is that it tells Dr. Norbergs and it shows that Dr.

23     Norbergs had knowledge of about what unapproved drugs looked

24     like.

25            It also, in the article, which I believe would be

1    the -- the first article that is in your stack, and that

2    article -- it specifically says that one of the distributors,

3    which is called Quality Specialty Products, was a foreign

4    supplier, and it says that the FDA has requested that medical

5    practices, all medical practices, not just the ones that it's

6    referencing received notice from the FDA, stop using any

7    remaining products from these suppliers.  All products.  Not

8    just Altuzan.  Not just Avastin.  All products.  Dr. Norbergs

9    actually bought from Quality Specialty Products, and there

10   will be evidence that we will show in this case that after

11   this article was provided to her, she still continued to use

12   products from QSP, even though the evidence will show that

13   the FDA had provided guidance through media publicity, which

14   did eventually get to her, as the evidence will show, that

15   this was something that she should not be doing.

16            On the notice that was provided from Genentech in

17   the redacted form and completely excises, again, anything

18   related to counterfeit drugs.  This notice says -- it

19   describes what true and authentic FDA approved drugs look

20   like.  It says, "All FDA-approved drugs have English on

21   them," because all FDA approved drugs are required to have

22   English, whereas there is evidence in this case that there

23   were drugs that Dr. Norbergs received that were not in

24   English.

25            On the -- another article that was found in

```
1   Dr. Norbergs' office, this would be the third, I believe, in
2   the stack that the Court has, it says that, um, "The FDA had
3   provided notice to 19 different oncology practices that they
4   purchased drugs from a source that was not approved," and
5   that source is stated to be Quality Specialty Products, which
6   is, again, a source that Dr. Norbergs bought from.
7           So these -- these -- and the way that we redacted
8   this, it has nothing to do with counterfeit drugs.  It does
9   not talk about counterfeit drugs in any way.  It has nothing
10  to do with unapproved drugs.  Sorry, it has nothing to do
11  with Altuzan or Avastin.  It only has to do with what it --
12  it's highly probative.  It is essential to our case, and
13  there is absolutely no prejudice or -- unfair prejudice that
14  would come by actually putting these documents into evidence.
15          The last letter --
16          THE COURT:  How do you tie these articles to
17  Dr. Norbergs?
18          MR. SALTZMAN:  The -- the first article, which is
19  the one from the St. Pete Times, will have witness testimony
20  that it was provided to her by someone in the office.  That
21  they saw it in the St. Pete Times, brought it into the office
22  the next day, and gave it to someone else who gave it to
23  Dr. Norbergs.
24          The Genentech notice, which is the highly redacted
25  document, that one will have testimony that from the actual
```

1   company that distributed the notice on behalf of Genentech,

2   that she was a recipient of the document, and that the

3   document was not "returned mail," indicating that it actually

4   was sent and received by Dr. Norbergs.

5          The article that is -- typed at the top it says,

6   healthcancerMSNBC.com, you can see there is handwriting on

7   there that says QSP.  This was found in the actual search

8   warrant in the office.  It was so significant to one of our

9   witnesses in this case that she kept it.  She provided it to

10  Dr. Norbergs, and then kept it, and it was found when the

11  search warrant was executed, and she will say that this

12  document was provided to Dr. Norbergs and that she saw it.

13         THE COURT:  Which search warrant?

14         MR. SALTZMAN:  I'm sorry.  There was a search

15  warrant executed in this case by the FDA.  It was in

16  February 2013, and I will go back to the subpoena issue in a

17  moment.

18         Then, the last piece of evidence is an April 2012

19  letter that was sent directly to Dr. Norbergs.  As you can

20  see in the "subject line" of the letter, it makes no

21  reference, with the redactions, to counterfeit drugs.  It

22  says, "Purchasing medication from foreign or unlicensed

23  suppliers could result in serious harm to patients."  That

24  has nothing to do with -- that would not be captured by a

25  stipulation that Dr. Norbergs had knowledge that she could

 1    only buy FDA-approved drugs.  This is telling her that buying

 2    from foreign or unlicensed sources could cause serious harm

 3    to patients.  It then continues to say that doing so is

 4    illegal.

 5         So this is showing that she has knowledge that it

 6    is illegal to do so.  This document is critical to the

 7    Government's case to show that she had the intent to defraud

 8    and mislead patients, as well as the Government in exercising

 9    their consumer protection function by her continued use of

10    drugs, which we have evidence that after she got this letter,

11    which is addressed directly to her, it was found in her

12    office at the time of the search warrant that was conducted

13    in this case.  And we will also have testimony from a witness

14    that said that they provided her with this, or that they know

15    that she saw this letter.

16         It also then says --

17         THE COURT:  I'll overrule the objections.

18         How about the other issue about the search warrant

19    concerning Oberlin?

20         MR. SALTZMAN:  The subpoena that was regarding

21    Oberlin is actually intrinsic to this case, your Honor.  The

22    charged healthcare fraud scheme spans May 2009 through

23    January 2013.  The subpoena was served in September 2011.

24    The superseding and second superseding indictment refers to

25    purchasing of foreign drugs from multiple sources, not just

1    Cancer Drugs Online and Quality Specialty Products.  Those

2    are specifically referenced in the indictment, but it also

3    says that she was purchasing drugs from other distributors.

4         At the time of the search warrant that was executed

5    in this case, there were documents found in the office that

6    would show that, at least in Dr. Norbergs' mind, she grouped

7    Oberlin and QSP together, these two foreign unapproved

8    distributors.  They both -- there was a binder that was

9    titled, "Oberlin and QSP."  She thought of them as either one

10   in the same or of the same ilk.  It wasn't as if she was

11   putting anything related to approved distributors together in

12   that.

13        It's also intrinsic to this case because the first

14   offense -- the first crime that's charged in this case is

15   when Dr. Norbergs received an unapproved drug from a

16   different distributor --

17        THE COURT:  Why do you need evidence that there was

18   a subpoena served in an unrelated case?

19        MR. SALTZMAN:  Because the subpoena actually

20   provides her with notice that these are -- she is being

21   looked at.  I think it's incorrect to describe her as a

22   witness in that case.  I think she was, at minimum, a subject

23   of that case and maybe even more, but it also provided her

24   with notice because it talked about that they were interested

25   in getting information about a number of topics, including

1    the importation of prescription drugs.  So when someone from

2    the FDA, a law enforcement agent comes to the door and says,

3    "Here's a subpoena regarding..." and in the subpoena it

4    refers to unapproved -- I'm sorry, the importation of

5    prescription drugs, that's highly relevant.  But what makes

6    the subpoena even more relevant is that the agent in this

7    case actually served it on her personally.  He was

8    face-to-face with her, and he told her at that time that he

9    served the subpoena to stop buying foreign unapproved drugs.

10          So the subpoena also provides context for which, he

11   was actually going to her home when he actually made that

12   statement, but it also gives her -- that statement gives her

13   context for what the subpoena was actually about, and it

14   talks about a number of drugs, including one of the drugs

15   that's charged in that case.  In that subpoena it refers to a

16   drug named Zometa, which is charged as being an unapproved

17   drug in this case.  It talks about a number of different

18   types of evidence that the -- that the Government wanted to

19   get from her, which provided her with notice of the types of

20   things that she should be on notice about which would provide

21   evidence of her crime.

22          So, if nothing else, your Honor, it is intrinsic.

23   It is -- it is part of the charged length of time.  We chose

24   to only charge specific Counts in this case, events that took

25   place after this, but we have other evidence that indicates

```
1    she had knowledge that she shouldn't have been doing this
2    before December 2011, but we just chose, as we always do, to
3    limit the nature of the number of Counts to charge to not
4    pile on, but this is intrinsic.  At worst it's inextricably
5    intertwined because it does show the context, motive, setup
6    and everything as it relates to this charge.
7              THE COURT:  The objection is overruled.  Any other
8    issues?
9              MR. TRAGOS:  Your Honor, would the Court allow me
10   to say something?  Because the argument about redacting
11   copies is kind of a new argument rather than un-redacted.
12             THE COURT:  All right.
13             MR. TRAGOS:  Your Honor, the redactions, and I'm
14   sure -- I think I know what the Court is going to say, that I
15   would have the option of "un-redacted," if I wanted to do
16   that.  The redactions, if the Court will look, talks about,
17   "contacted 19 medical practices."  She was not one of the 19
18   contacted, and it's misleading because, if you look at this,
19   it talks about counterfeit drugs, and they've taken all of
20   that out.  And so, the Jury would be mislead into thinking
21   they are talking about what we are talking about here today
22   as opposed to counterfeit drugs or Avastin, which is not a
23   drug we are talking about today.
24             So if the Court is going to let this in, at the
25   time it happens, would the Court allow me -- allow so that
```

1   the Government puts in the un-redacted, once we look at the

2   un-redacted versus the redacted?

3            THE COURT:  Yes.

4            MR. TRAGOS:  Okay.  Has the Court seen the

5   subpoena?

6            THE COURT:  No.

7            MR. TRAGOS:  Would the Court like to see it?

8            THE COURT:  No.  It doesn't really matter what the

9   subpoena says.  I think the evidence really is the

10  conversation between the person that served the subpoena and

11  Dr. Norbergs, and it's just providing context of how he or

12  she happened to be talking to Dr. Norbergs.

13           MR. TRAGOS:  Okay.  Next issue -- the next issue is

14  jury instructions, your Honor.  The Defense provided, and we

15  didn't really cover it on Thursday, but it was there, a jury

16  instruction with regards to experts, when the Government puts

17  on their experts to talk about violations of the FDA

18  statutes, or violations of Florida statutes, those kind of

19  things.  We submitted a jury instruction.  That's a jury

20  instruction that was, in fact, stipulated to by the

21  Government that was given in another case, which is cited in

22  the instruction.

23           THE COURT:  I remember the Government was going to

24  think about it.

25           MR. TRAGOS:  Right.  And they object to it at this

1    point.

2            THE COURT:  Okay.

3            MR. TRAGOS:  So, your Honor, we would submit that

4    before those people testify, that are going to testify about

5    FDA, Medicare, and the State regs, that the jury instruction

6    be given to the Jury.  I believe it's a balance instruction

7    because it tells them they can use it to consider intent, and

8    knowledge, but just the fact that they violated those

9    statutes doesn't make it a crime.

10           THE COURT:  What's the objection?

11           MR. TREZEVANT:  Your Honor, the objection is that

12   this was an instruction that was apparently given during

13   trial in a case concerning home healthcare provider services,

14   which is a very different setting and scenario, and it

15   concerned ethical standards.  The preliminary jury

16   instruction terms ethical standards, standards of care, civil

17   infractions, all sorts of issues that, frankly, just aren't

18   relevant in this case.  The Government's concern is that as

19   to the Jury, basically, to draw distinctions without having a

20   proper framework or a full set of jury instructions that the

21   Court will give the Jury at the conclusion of the trial.  The

22   proposed instruction simply talks in terms of a violation of

23   ethical standards, civil infractions, and then, later at some

24   point it simply says "criminal intent."

25           To the extent the Court is going to instruct the

1    Jury, the Government believes it's appropriate that the jury

2    instructions be considered all together as one, such as

3    knowingly, willfully, and intent to defraud.  Simply telling

4    a Jury in the middle of a trial that this -- that a simple

5    violation of ethical, or standard, or civil infraction is not

6    necessarily a crime, doesn't address criminal intent.  That

7    doesn't really get to the core issue here, which we've

8    actually charged fraud.  We're talking about healthcare fraud

9    is what -- this is an instruction that was given before

10   Mr. Quindoza, who testified in Miami.

11        Fraud involves -- is a somewhat subtle definition,

12   not just criminal intent, and I think it's asking the Jury

13   way in advance, and giving all the instructions at once in a

14   way they can properly consider the evidence.  You start

15   making decisions way too early in the trial when they should

16   wait until the end and consider the evidence against the

17   instructions in full as given by the Court.

18        THE COURT:  Do you agree that a violation of a

19   civil statute is not a crime in this case?

20        MR. TRAGOS:  I do.

21        MR. TREZEVANT:  I do, your Honor.  I just don't

22   think there are any civil infractions that are going to be

23   raised by the Government in this case.

24        THE COURT:  Do you have a witness that's going to

25   testify about civil infractions?

1        MR. TREZEVANT:  Not that I'm aware of, Judge.

2        THE COURT:  All right.  Well, let's raise this

3   issue if a witness talks about civil infractions.

4        MR. TRAGOS:  Your Honor, also going back, and I'm

5   sorry because I said the "redacted versions," if the

6   un-redacted versions come in, will -- will the Government

7   stipulate at that point that the Defendant -- that this case

8   does not involve counterfeit drugs or Avastin?  Because

9   that's what those documents are about.

10        THE COURT:  Well, if it comes in, in that fashion,

11   it's coming in through some witness, and you can ask the

12   witness on cross all about that.

13        MR. TRAGOS:  I don't know if the witness will know

14   that because they are just document witnesses.  That's the

15   problem I have here.  If those come in, the Jury may think we

16   are dealing with counterfeit drugs and we are not, and the

17   Jury may think we are dealing with Avastin and we're not.

18        THE COURT:  Do you want to un-redact the portion

19   that talks about Avastin?

20        MR. TRAGOS:  I think so, otherwise, the Jury is

21   going to think this article is about this case, and you can't

22   read that article and not think it's not about this case the

23   way they are redacting it.  I mean, that -- that -- it just

24   -- why would it come in, in the Jury's mind, unless it had to

25   do with this case?  It had nothing to do with this case.  I

1   understand the Government's position and I understand the

2   Court's position, but the Jury should at least know that

3   those publications, that article, did not deal with

4   counterfeit -- did not deal with these drugs or the issues in

5   this case.

6        THE COURT:  My understanding of the proffer from

7   the Government was that this put Dr. Norbergs on notice,

8   allegedly, that she shouldn't buy from Oberlin and the other

9   one about QSP.  She shouldn't buy anything.

10       MR. TRAGOS:  The point was of the article, if you

11  read the article, it is about counterfeit drugs from those

12  companies, and it is about Avastin, and in this case, there

13  is no allegation that these drugs are counterfeit from QSP,

14  or that these drugs are Avastin.  They are limited -- that's

15  why the redactions are a problem because the redactions make

16  it look like this is a broad spectrum statement, generally

17  speaking, but it was very specific to counterfeit drugs and

18  Avastin.

19       THE COURT:  Well, the Defense is asking the

20  Government if they will stipulate at the time this goes in

21  that this case has nothing to do with counterfeit drugs.

22       MR. SALTZMAN:  Your Honor, if the document comes in

23  in full, I think that it provides Dr. Norbergs with notice

24  that this distributor -- everything from this distributor was

25  unapproved.  In fact, one drug that was unapproved was

```
1    counterfeit, and therefore, if she's buying anything from an
2    unlicensed distributor that is a foreign distributor, you
3    have no ability to determine whether or not it is safe, and
4    efficacious such that any other drug could be counterfeit.
5              THE COURT:  Do you remember the question?
6              MR. SALTZMAN:  Sorry.  I apologize, your Honor.  We
7    will stipulate that the case that Dr. Norbergs did not buy
8    counterfeit Avastin, I think that would be the more narrow
9    and proper stipulation.  Not that the case has anything to do
10   with counterfeit drugs, because the whole concern about
11   buying from the foreign unapproved sources is that you have
12   the possibility that counterfeit drugs could get into the
13   distribution stream.
14             MR. TRAGOS:  Your Honor, this is a criminal case.
15   You can't talk about possibilities.  If either the evidence
16   is or it isn't counterfeit, and there is no evidence that
17   these are counterfeit drugs.
18             THE COURT:  The Government is willing to stipulate
19   that this case involving Dr. Norbergs does not involve the
20   issue of counterfeit drugs.
21             MR. TRAGOS:  If that's the case, then we are
22   satisfied with that, or Avastin.
23             THE COURT:  What's next?
24             MR. TREZEVANT:  Your Honor, in preparing for trial,
25   the Government has discovered a couple of errors in the
```

1    second superseding indictment.  We believe they are

2    scriveners errors, but I wanted to bring them to the

3    attention of the Court.  I brought them to the attention of

4    Defense counsel this morning, and we have a couple of

5    suggestions of how to handle it, but we wanted to bring it to

6    the attention of the Court prior to the Jury coming in.

7             THE COURT:  All right.

8             MR. TREZEVANT:  There are two errors.  One is --

9    the first is found on Page 19, the second superseding -- does

10    the Court have a copy of that document?

11             THE COURT:  I do not have a copy of the indictment.

12             MADAM CLERK:  I'll get it.

13             THE COURT:  Now, I do.

14             MR. TREZEVANT:  Yes, sir.  Looking at Page 19, both

15    of the categories of scriveners errors are found on this

16    page, Judge.  The first is Counts 37 and 38, in the table,

17    going across to the right, under "drug and service provided,"

18    it's column four, the J Code listed there in Counts 37 and 38

19    is J2005, and it should read, I believe, Mr. Saltzman will

20    correct me if I'm wrong, I believe it should read J2505.

21             THE COURT:  What says the Defense?

22             MR. TRAGOS:  No objection.

23             THE COURT:  All right.  I'll allow that amendment.

24             MR. TREZEVANT:  And the second, your Honor, is at

25    the top of the table, going across in the descriptions, it

1   says, "count, claim date, patient, drug and service

2   provided," the "claim date," the word "claim" should be

3   treatment to read consistent with the count -- with the

4   allegations in the paragraph leading to the table where it

5   says, and I'll --

6               THE COURT:  You're talking about the top of Page

7   19?

8               MR. TREZEVANT:  Yes, sir.  The top of column two.

9   The word "claim" should be "treatment" in order to be

10  consistent with the evidence and the charging --

11              THE COURT:  What says the Defense?

12              MR. TRAGOS:  We do object to that, your Honor.

13  That's a material change, not a scriveners error.  When you

14  talk about the dates being dates the claims were made, as

15  opposed to dates that treatment was received.

16              THE COURT:  How are you prejudiced?

17              MR. TRAGOS:  Well, when we were doing our research

18  looking these up, your Honor, point-by-point, we were looking

19  for a claim on those dates, not a treatment on those dates.

20  There's a pretty big difference.

21              THE COURT:  Were you aware that these dates

22  coincided with the treatment date?

23              MR. TRAGOS:  No.  There is no way we could be.

24              THE COURT:  Response?

25              MR. TREZEVANT:  Your Honor, the Government would

1   suggest that if the Court look at page 18, the actual

2   charging language itself says that -- in the last five lines

3   up from the bottom, "property --" six lines -- "Under the

4   custody, control and Medicare program in connection with the

5   delivery of the payment for healthcare (inaudible) and

6   services, by submitting claims to the Medicare program for

7   treatment of the patients listed below..." and it says,

8   "Treatment of the patients listed below the table..." and it

9   is supposed to be listed, and it was inadvertently listed as

10  "claim."  And while the "on or about" language, all the

11  claims are within two days or so, one or two days of the

12  treatment for services, the evidence is going to be that the

13  treatments occurred on all of those -- on all of the dates in

14  column two, and the claims were one or two days later.  So

15  "on or about" would, in fact, capture the claim date.  We

16  would submit that the -- there is no prejudice, and that

17  there is no way to look at the claim date and not notice that

18  the treatment date is always within one or two days of the

19  claim -- the treatment date and claim date are always very

20  close together.  There is no prejudice.  It's just the

21  evidence is going to be that the actual treatment date is the

22  date listed there, and that's what's charged in the language

23  in the Count.

24          THE COURT:  I grant the amendment.  Any others?

25          MR. TREZEVANT:  No, sir.

1          THE COURT:  All right.

2          MR. TRAGOS:  Your Honor, one other thing, there

3    are -- we received today the Government's exhibits on a disc.

4    We received some books as well.  But my understanding is that

5    there are some summaries or -- some documents, things that

6    aren't -- we don't have yet that aren't ready yet, correct?

7          MR. SALTZMAN:  That's correct.

8          MR. TRAGOS:  Right.  All we would like to make sure

9    is that the Government doesn't get into those before next

10   Monday, and that we were provided those before so we would

11   have the weekend.  Because the Court knows, summaries --

12   there have to be documents to backup the summaries.  We don't

13   have those summaries yet.  I want to make sure the Court

14   understands that, that we may request, at least the weekend,

15   to take a look at that if we have them before the weekend.

16         THE COURT:  I'm hoping the Government will finish

17   their case before the weekend.

18         MR. TRAGOS:  I don't have these documents yet.

19         THE COURT:  I will require them to furnish the

20   documents before they put on the witness.

21         MR. TRAGOS:  At some time before, or just the day

22   of?  Because we're talking about summaries.  We're not

23   talking about individual documents.

24         THE COURT:  Let's see how the trial goes and we'll

25   see if that becomes a problem.

```
 1              MR. TREZEVANT:  Your Honor, one final issue, I only
 2     raised it because it's a little bit unusual, that is, the
 3     Government's proposed instruction No. 14.  I don't know if
 4     the Government's voir dire No. 14 dealing with the fact that
 5     tomorrow is an election day, which should have no bearing on
 6     this case, we included that instruction simply because I once
 7     had a trial in front of Judge Bucklew during a -- Supreme
 8     Court Justice Alito had been put up (displayed), and when the
 9     Jurors retired, it was not raised and never discussed, that
10     that should not be considered by the Jury, and it turned into
11     a true, sort of, knock down drag out battle with the Jury.
12     Somebody started discussing conservative and liberal, and it
13     was somewhat -- somewhat horrible.  So I would just ask that
14     we include that, Judge, just so that you can explain to them
15     that -- the voir dire, that the two events are very separate.
16     This trial is this trial, and the election should bear no
17     part in that.
18              THE COURT:  All right.  Bring in the jurors.
19              (Venire enters courtroom 9:31 a.m.)
20              THE COURT:  Good morning.
21              PROSPECTIVE JUROR:  Good morning.
22              THE COURT:  I apologize for keeping you waiting in
23     the hallway.  We were discussing legal matters in here that I
24     thought we had already resolved, but it just took some time.
25     So I apologize.
```

1        I'm Jim Moody, and I'm the Judge that will be

2   trying this case for those of you serving on the Jury.

3        Let me introduce you to the other people that will

4   be working during the trial.  This is the case of the United

5   States of America vs. D. Anda Norbergs.  The Government is

6   represented by Mr. Saltzman.  Would you introduce yourself

7   those with you at counsel table, please.

8        MR. SALTZMAN:  Good morning, your Honor.  Good

9   morning.  My name is Adam Saltzman with the United States

10  Attorneys Office, and along with me is United States Attorney

11  Jay Trezevant.

12       MR. TREZEVANT:  Good morning.

13       MR. SALTZMAN:  And also at counsel table is our

14  Legal Specialist Gina Wetherald, FDA Special Agent Eric

15  Larson, and Health and Human Services Special Agent Rafael

16  Chaka.  Thank you.

17       THE COURT:  All right.  Dr. Norbergs is represented

18  by Mr. Tragos.  Would you introduce yourself and those with

19  you at counsel table, please.

20       MR. TRAGOS:  Good morning.  My name is George

21  Tragos, and I, along with Peter Sartis are representing

22  Dr. D. Anda Norbergs.  We are from Clearwater, Florida.

23       THE COURT:  The purpose of that -- one of the

24  purposes is so now I can ask you, do any of you know any of

25  us that have been introduced so far?  I don't see any hands.

```
1        When you checked in this morning, I think you were
2   given a questionnaire paper with questions on it.  I want you
3   to stand, one at a time, give us your name, and answer the
4   questions, please.
5        PROSPECTIVE JUROR:  Good morning.  I live in
6   St. Petersburg.
7        THE COURT:  Give us your name.
8        PROSPECTIVE JUROR:  My name is Gary May.  I live in
9   St. Petersburg.  I've lived in Florida for about 11 years.  I
10  have a college degree.  I'm a bartender.  Single.  I have a
11  son.  No jury service.  And no, I've never been in this part
12  of the process.
13       THE COURT:  What's your degree in?
14       PROSPECTIVE JUROR:  Business Administration.
15       THE COURT:  All right.  Thank you.
16       PROSPECTIVE JUROR:  My name is Olga Leon.  I'm
17  living in Valrico, **** Pine Top Drive.  I've lived there for
18  five years.  I've lived in Florida for 25 years.  My
19  education is Business Administration in my country.  Um, I'm
20  working janitorial.  I'm divorced.  I have two children.  One
21  is 35.  She is with a kid in the home, and my son is 30.  He
22  is international business.  I don't have military service,
23  and I never do jury service.
24       THE COURT:  All right.  In reference to your
25  education, you said you have a degree in Business
```

1    Administration.  Is that a college degree?

2              PROSPECTIVE JUROR:  Yes.

3              THE COURT:  You said, "in your country," which

4    country is that?

5              PROSPECTIVE JUROR:  Honduras.

6              THE COURT:  I'm sorry?

7              PROSPECTIVE JUROR:  Honduras.

8              THE COURT:  And you said your son was in

9    international business.  Specifically what does he do?

10             PROSPECTIVE JUROR:  Managing.

11             THE COURT:  Well, is he in the pharmaceutical

12   business, or is he in the sportswear business, or -- you

13   don't know what he does?

14             PROSPECTIVE JUROR:  I know it's nothing in the

15   sports business.

16             THE COURT:  Does it have anything to do with the

17   medical business?

18             PROSPECTIVE JUROR:  No, it's not.

19             THE COURT:  All right.  Thank you.

20             PROSPECTIVE JUROR:  Good morning.  I'm Cynthia

21   Egawa.  I live in Tampa.  I have lived there for two years,

22   nine months, same in Florida, for two years, nine months.  I

23   have a Bachelor's Degree in East Asian Studies, with a minor

24   in Business Administration.  I'm currently a Human Resources

25   Generalist.

1           THE COURT:  Currently what?

2           PROSPECTIVE JUROR:  A human Resources Generalist.

3           THE COURT:  To what kind of business?

4           PROSPECTIVE JUROR:  A bank.  I'm married.  My

5      spouse is a Forwarding Specialist, but currently a postal

6      employee.  I have no children.  I have no previous military

7      service.  I have served on a jury before, in Delaware, about

8      ten years ago.  It was a criminal trial, and we did reach a

9      verdict.

10          THE COURT:  And did you reach a verdict?

11          PROSPECTIVE JUROR:  Yes.

12          THE COURT:  Thank you.

13          PROSPECTIVE JUROR:  Hi.  I'm John Brand.  I live in

14     Dunedin, Florida.  I've been there for 34 years.  I have an

15     Associates in Science and Graphic Design and currently a

16     graphic designer.  I'm single, with no children, no military,

17     and although I've been picked for jury duty, I've never

18     served on a jury.

19          PROSPECTIVE JUROR:  My name is Lisa Croy.  I live

20     in Palm Harbor where I've resided for 15 years.  I've been in

21     Florida about 32 years.  I have no -- I have a high school

22     education.  I'm a project manager at Nielsen Media.  My

23     husband's a software developer.  I have no children.  I have

24     not served in the military, and I have not served on a jury.

25          THE COURT:  You said you're from Palm Harbor.  How

1    long have you lived in Palm Harbor?

2           PROSPECTIVE JUROR:  15 years.

3           THE COURT:  Dr. Norbergs is an oncologist, and her

4    office, I think, is in Palm Harbor.  Have you ever had any

5    contact with her office?

6           PROSPECTIVE JUROR:  No.

7           THE COURT:  Do you even recognize the name?

8           PROSPECTIVE JUROR:  No.

9           THE COURT:  All right.  Thank you.

10          PROSPECTIVE JUROR:  My name is Maria Brown.  I've

11   lived in -- I live in Clearwater, Florida, and I've lived in

12   the State of Florida my entire life, which is 32 years.  I'm

13   currently a server/bartender and manager.  My highest level

14   of education, I have a Certificate in Early Childhood

15   Development.  I've been married.  I am married.  I have four

16   children 16, 12 and twins that are 10.  I've never been in

17   the military, and this is my first jury experience.

18          PROSPECTIVE JUROR:  Good morning.  My name is

19   Sabrina Williams.  I live in Pinellas Park.  I've been there

20   for six years.  I've been in the State of Florida for

21   22 years.  My highest level of education is college junior.

22   I'm currently an office manager.

23          THE COURT:  For what kind of business?

24          PROSPECTIVE JUROR:  For a manage care company.

25          THE COURT:  What's the name of the company?

```
 1                    PROSPECTIVE JUROR:  Anthem.

 2                    THE COURT:  Tell us what you do with Anthem?

 3       Anthem is also licensed through Blue Cross/Blue Shield,

 4       right?

 5                    PROSPECTIVE JUROR:  Yes, sir.  I'm just the office

 6       manager.  I deal with taking care of supplies and making sure

 7       -- nothing to do with the medical end of it at all.

 8                    THE COURT:  You have nothing to do with ordering

 9       drugs or approving claims for drugs?

10                    PROSPECTIVE JUROR:  No, sir.  We -- I don't do that

11       there at all.

12                    THE COURT:  Thank you.

13                    PROSPECTIVE JUROR:  I have a daughter who's 26.

14       She is a business analyst for Wellcare.  I have not served in

15       the military, and I have served on a jury, about nine years

16       ago.

17                    THE COURT:  When you said your daughter is a

18       business analyst --

19                    PROSPECTIVE JUROR:  Yes, sir.

20                    THE COURT:  Tell me more specifically what she

21       does.

22                    PROSPECTIVE JUROR:  I'm not exactly sure.  It has

23       nothing to do with medications or anything like that.  I

24       think she does the "reg" of the ROI's and things like that.

25                    THE COURT:  She deals with numbers?
```

```
1              PROSPECTIVE JUROR:  Yes.

2              THE COURT:  All right.  Thank you.

3              PROSPECTIVE JUROR:  Thank you.

4              PROSPECTIVE JUROR:  Good morning.  My name is

5    Robert McHugh, and I live in Nokomis, Florida.  I've lived

6    there for six months.  I've lived in the State of Florida for

7    four years.  I have a Bachelor of Arts Degree in Journalism

8    Broadcasting.  I currently am the Senior Vice President for

9    Feld Entertainment on the international business.  I am

10   married.  My wife does not work.  I have six children 16, 18,

11   20, 22 and 24.  The oldest works for Feld Entertainment as

12   well, out of our West Coast office, in the Marketing

13   Services.  My second daughter, she works as a Marketing

14   Director at an ice rink in Washington DC, and I have three

15   children in college, and one in high school.  I have not

16   served in the military, and I have served on a previous jury.

17   It was a criminal case, and we did come to a verdict, and it

18   was in the state of Virginia.

19             THE COURT:  All right.  Thank you.

20             PROSPECTIVE JUROR:  Good morning.  My name is

21   Leanne Pacent.  I live in Land O'Lakes.  I've lived in

22   Florida for 19 years.  I have a high school diploma.  I'm an

23   office manager and bookkeeper for a collision center.  I am

24   married.  My husband drives a truck for a living.  My

25   daughter is 18, and in high school, and I have a 13-year-old
```

1   son in middle school.  I have not served in the military, nor

2   have I served on a jury.

3              PROSPECTIVE JUROR:  Hello.  My name is Samantha

4   Solie, and I've lived in Manatee County for 19 years.  That's

5   my -- I've lived in Florida for 19 years.  I have a

6   Bachelor's of Science in Marketing.  I work as a traffic

7   specialist in marketing for a large hospital in Sarasota,

8   Florida.  I am single.  I have no children, no previous

9   military service, and no previous jury service.

10             THE COURT:  You work as a traffic specialist in a

11  hospital?

12             PROSPECTIVE JUROR:  Yes, sir.  I basically am the

13  person that manages all marketing requests for the hospital.

14  So I help create brochures, content for the web, so kind of,

15  everything.

16             THE COURT:  Do you have anything to do with

17  pharmaceuticals?

18             PROSPECTIVE JUROR:  No, sir.

19             THE COURT:  Do you have anything to do with filing

20  claims for drugs?

21             PROSPECTIVE JUROR:  No, sir.

22             THE COURT:  All right.  Thank you.

23             PROSPECTIVE JUROR:  Good morning.  My name is

24  Carlos Papoula.  I live in Auburndale.  I've lived in Florida

25  for three years.  I have a high school diploma.  I'm -- I

```
 1    work for the United States Postal Service as a Supervisor.  I

 2    am married, and my wife is a decorator at Publix.  I have two

 3    children.  My daughter is 30, and my son is 28.  My daughter

 4    is a finance officer.  My son is a project coordinator.  And

 5    I have no military experience, and I have not served on a

 6    jury yet.

 7              THE COURT:  What kind of businesses do your

 8    children work for?

 9              PROSPECTIVE JUROR:  My daughter is a finance

10    officer for a finance company, and my son's a project

11    coordinator for a -- developmental disabled adults.

12              PROSPECTIVE JUROR:  Good morning.  My name is Jen

13    Abbott.  I live in Clearwater, Florida.  I've lived there for

14    11 years.  I have a Master's Degree in Mental Health

15    Counseling, and I currently am employed as a Mental Health

16    Counselor at Operation Car in Women's Residential for

17    Co-Occurring Disorders.  I'm divorced.  I have three adult

18    children.  My youngest is 36, and she's a BSN and works at

19    St. Joe's Hospital.  The next one is 38.  She's a Director of

20    Marketing for an organic baby food company in California.

21    And my son is 42, and he's a math teacher in Pennsylvania.  I

22    have no military service, and no previous jury service.

23              THE COURT:  Your daughter that works in the

24    hospital, can you tell me more specifically what she does?

25              PROSPECTIVE JUROR:  She works on the neurology
```

```
 1    floor as a pediatric nurse.
 2              THE COURT:  Does she have anything to do with
 3    administering drugs?
 4              PROSPECTIVE JUROR:  Yes, she does.
 5              THE COURT:  Does she have anything to do with
 6    filing claims for the hospital about drugs that were
 7    administered?
 8              PROSPECTIVE JUROR:  No, she does not.  Purely
 9    patient care.
10              THE COURT:  All right.  Thank you.
11              PROSPECTIVE JUROR:  Thank you.
12              PROSPECTIVE JUROR:  Good morning everyone.  My name
13    is Lori Hamilton.  I live in Pinellas County.  I've been
14    there for 33 years.  I do have a college degree.  I'm a
15    registered nurse, ICU critical care, ER as well.  I'm
16    divorced.  I have an 18-year-old son who's in high school.
17    He works at a local restaurant.  No military service, and
18    I've never been on a jury.
19              THE COURT:  Where do you work?
20              PROSPECTIVE JUROR:  A hospital.
21              THE COURT:  Which hospital?
22              PROSPECTIVE JUROR:  Palms of Pasadena, previously
23    Morton Plant.  I've also worked at St. Anne's.
24              THE COURT:  Do you administer drugs?
25              PROSPECTIVE JUROR:  Yes.
```

 1            THE COURT:  Do you have anything to do with filing

 2     claims for drugs?

 3            PROSPECTIVE JUROR:  No.

 4            THE COURT:  The drugs you administered are those

 5     the ones that are prescribed by a doctor?

 6            PROSPECTIVE JUROR:  Correct.

 7            THE COURT:  Do you know where the drugs come from

 8     or is someone else in charge of ordering the drugs for the

 9     hospital?

10            PROSPECTIVE JUROR:  The pharmacy does that.

11            THE COURT:  I'm sorry?

12            PROSPECTIVE JUROR:  The pharmacy does that.

13            THE COURT:  You have nothing to do with that?

14            PROSPECTIVE JUROR:  No.

15            THE COURT:  All right.  Thank you.

16            PROSPECTIVE JUROR:  Hello.  My name is Joe Seitz.

17     I live in Tarpon Springs.  I've been there just shy of

18     20 years.  Highest level of education is high school.

19     Occupation is industrial sales, fans and blowers.  I am

20     married.  My wife is a clinical pharmacist at Countryside.

21     Four kids, oldest is 31, bartender in Chicago; next son is in

22     Orlando, software; and my other son sells software parts; and

23     my daughter is a full-time student.  No military and never

24     served on the Jury.

25            THE COURT:  Your wife is a pharmacist at a

1    hospital?

2         PROSPECTIVE JUROR:  Yes.

3         THE COURT:  Does she have anything to do with

4    ordering the drugs that come to the hospital?

5         PROSPECTIVE JUROR:  She does not order drugs, no.

6    She fills prescriptions for doctors' orders for patients.

7         THE COURT:  All right.  Thank you.

8         PROSPECTIVE JUROR:  Hi.  My name is Rebecca

9    Hensley.  I've lived in the State of Ohio for, like,

10   56 years.  I've lived in Florida for about a year now.  I

11   have a high school diploma.  My employment is Electrical

12   Mechanical.  I'm a secretary.  My previous job was a camera

13   operator for a television station.  I am married.  My husband

14   is the owner of Electrical Mechanical Company.  I have three

15   children.  My youngest is 35.  She is a manager of a bank.

16   My son is 36, and worked at a jail.  He is on disability

17   right now.  My other son is a manager of a storage company.

18   I have no military experience, and I've never served on a

19   jury.

20        THE COURT:  Your son that works at a jail, what

21   does he do?

22        PROSPECTIVE JUROR:  Um, he's just an officer.  I

23   mean, lieutenant.

24        THE COURT:  So is he with law enforcement or is he

25   a civilian employee?

1           PROSPECTIVE JUROR:  He takes care of the prisoners.

2   I'm not sure what they call those.

3           THE COURT:  So is he with law enforcement?

4           PROSPECTIVE JUROR:  Actually, he has no law degree

5   or anything like that, but he does -- they don't wear guns or

6   any of that.  I'm not really sure.

7           THE COURT:  Why do they -- they call him a

8   lieutenant?

9           PROSPECTIVE JUROR:  Yes.

10          THE COURT:  So he's a deputy or something?

11          PROSPECTIVE JUROR:  Yes, but he's on disability

12  right now, and I'm not sure he'll go back anyway.

13          THE COURT:  How long has he been in law

14  enforcement?

15          PROSPECTIVE JUROR:  I'm going to say probably, I'm

16  guessing, seven years.

17          THE COURT:  And has all of that time been spent at

18  the jail?

19          PROSPECTIVE JUROR:  Um, yes.

20          THE COURT:  All right.  Thank you.

21          PROSPECTIVE JUROR:  Good morning.  My name is James

22  Wilson.  I currently live in Winter Haven.  I've been there

23  41 years.  Some college.  I'm an outside sales representative

24  in the golf industry.  I am married.  My wife also works with

25  me.  We have two children, a son who's 13, a daughter who's

1    11.  No previous military service.  I have served on a jury

2    where we did come to a verdict.

3         PROSPECTIVE JUROR:  Good morning.  My name is

4    Martin Evans.  I live in St. Petersburg.  I have lived there

5    approximately 20 years.  I have lived in the State of Florida

6    for approximately 35 years.  I have two years of college, no

7    degree.  My occupation is retired right now, but when I was

8    working, I was in the hospitality industry.  I am single.

9    Never married.  No children.  No military service, and I have

10   never served on a jury.

11        PROSPECTIVE JUROR:  My name is Edmund Michalski.

12   I've lived in Valrico, Florida, for 14 years.  I've been in

13   the State of Florida for 36 years.  I have two children, one

14   is 43, one is 41.  My oldest is a general manager of an

15   electrical firm.  My youngest, my daughter, works for a

16   doctor's office in Port Charlotte, Florida.  I am retired

17   right now.  I work part-time as a security guard.  Before

18   that I was a plant manager at a medical device manufacturing

19   company.  I was a plant manager at a spa company when living

20   in Florida.  I'm married.  My wife was the director of United

21   Cerebral Palsy.  She is now retired.  I have no previous

22   military experience and no jury experience.

23        THE COURT:  What kind of medical devices did you

24   make?

25        PROSPECTIVE JUROR:  Internal endotracheal tubes,

1   things of that nature.

2          THE COURT:  And your daughter, who works in the

3   medical field, what does she do specifically?

4          PROSPECTIVE JUROR:  She's an office nurse.  She

5   works with a group of neurologists.

6          THE COURT:  So she has a nursing degree?

7          PROSPECTIVE JUROR:  No.  She has no nursing degree.

8   She is a Nursing Assistant and mainly does office work.

9          THE COURT:  Do you ever talk to her about what she

10  does in the office?

11         PROSPECTIVE JUROR:  Yeah.

12         THE COURT:  Does she have anything to do with

13  ordering drugs for the doctor?

14         PROSPECTIVE JUROR:  No, that she doesn't do.  No.

15         THE COURT:  All right.  Thank you.

16         PROSPECTIVE JUROR:  Good morning.  My name is Lucy

17  Schmidt.  I've lived in Tampa for 10 years, Florida 33 years.

18  I have a Bachelor's Degree in Criminology and a Certification

19  in Computer Related Crimes.  My current occupation is report

20  analysis/executive assistant.  I'm single.  Well, divorced.

21  I have no children.  No military service, and I have served

22  on a jury before.  I don't recall exactly when it was,

23  somewhere between 2001 and 2005, and it was a civil case, and

24  we did come to a verdict.

25         THE COURT:  Who do you work for?

1          PROSPECTIVE JUROR:  Ashley Furniture.

2          THE COURT:  And you do report analysis.  What does

3    that mean?

4          PROSPECTIVE JUROR:  We actually run a lot of

5    different reports, sales reports and stuff like that.  It's

6    called "reporting analyst," but right now, I've only been

7    there since April, and we basically run reports entering into

8    a month, numbers as well.

9          THE COURT:  Your degree is in criminology?

10         PROSPECTIVE JUROR:  Yes.

11         THE COURT:  Have you ever worked for law

12   enforcement?

13         PROSPECTIVE JUROR:  No, sir.

14         THE COURT:  Thank you.

15         PROSPECTIVE JUROR:  Good morning.  My name is

16   Danielle Anderson.  I've been living in Wesley Chapel since

17   September 2014.  I've lived in the State of Florida since

18   September 2011.  I have a Bachelor's Degree in Family

19   Consumer Science with a specialization in family studies.  I

20   am working at Humana as a Humana Care Coordinator.  I am

21   married, and my husband is an insurance liaison for Hertz Car

22   Rental.  I have no children.  I have no military service

23   experience, and this is my first time serving on jury duty.

24         THE COURT:  What kind of care coordinator with

25   Humana?

1          PROSPECTIVE JUROR:  A Humana Care Coordinator

2    basically works with adults that have Medicare/Medicaid.

3    It's kind of like a social-service-type field where we

4    basically do preventative healthcare to prevent them from

5    going to the hospital.  Also, we do referrals to social

6    workers, nurses, things like that, basically help meet their

7    needs to prevent them from going into the hospital.

8          THE COURT:  Have you ever had anything to do with

9    approving drugs or approving claims for drugs?

10          PROSPECTIVE JUROR:  No.

11          THE COURT:  All right.  Thank you.

12          PROSPECTIVE JUROR:  Good morning.  My name is James

13    Riley.  I live in Frostproof.  I've been there 14 years.

14    I've been in the State of Florida for 14 years.  My

15    education, I have one semester, with a diploma, at college.

16    My occupation right now, retired.  Previously I worked for

17    Walmart for 12 years.  Before that I was in law enforcement

18    for 23 years.  I retired from there.  I'm married.  My wife

19    is an Asset Protection Manager for Walmart.  I've had two

20    children.  My daughter, 36, sells insurance.  My son is 34,

21    is a Highlands County Deputy.  I have no military and no

22    prior jury.

23          THE COURT:  When you worked for Walmart, did you

24    work in security?

25          PROSPECTIVE JUROR:  Did I?  I was the Asset

```
1    Protection Manager.

2              THE COURT:  All right.  And when you were with law

3    enforcement before that, what did you do?

4              PROSPECTIVE JUROR:  I held all ranks.  I started

5    out with patrolman.  I retired as Chief of Police,

6    approximately 18 years of that I was a detective.

7              THE COURT:  Out in Texas?  Did you say out in

8    Texas?

9              PROSPECTIVE JUROR:  No, detective.

10             THE COURT:  Oh, detective.

11             PROSPECTIVE JUROR:  State of Illinois.

12             THE COURT:  Where were you Chief of Police.

13             PROSPECTIVE JUROR:  Hartford, Illinois.

14             THE COURT:  Don't pass it yet.  This is a criminal

15   case, and I assume, as in most criminal cases, we will have

16   law enforcement witnesses.  I don't know exactly about what,

17   but law enforcement witnesses are to be treated by the Jury

18   like any other witness.  They have occasion to know what it

19   is they are talking about.  If it's a traffic light, were

20   they 50 feet from the traffic light, or 200 feet from the

21   traffic light, or 1,000 feet from the traffic light, just

22   like you would judge the ability of a lay witness to testify

23   about the traffic light.  Just because they carry a badge

24   they don't get extra credit, or if you have a grudge against

25   law enforcement, they don't get less credit.  In other words,
```

```
 1    just because they are a law enforcement officer, you have to
 2    judge their credibility like you would judge any other
 3    witness.  Do you think you can do that?
 4              PROSPECTIVE JUROR:  Yes, sir.  I can be impartial.
 5              THE COURT:  You don't think that would cause you
 6    difficulty in this case?
 7              PROSPECTIVE JUROR:  No, sir.
 8              THE COURT:  All right.  Thank you.
 9              PROSPECTIVE JUROR:  My name is Robert Ruhlman.  I'm
10    a resident of St. Petersburg Beach.  I've had residency there
11    since 1980.  I've been down in Florida -- we have a home in
12    Dayton, Ohio.  I'm up there part-time and down here
13    part-time.  I have a college education.  My occupation is I'm
14    a licensed real estate agent in Florida and Ohio.  I also own
15    two resorts.  One out on St. Pete Beach, and another one in
16    Macon County, North Carolina.  I am married.  My wife is in
17    Dayton, Ohio.  She's a banker up there.  We have one daughter
18    who's 32.  She was a field representative for Congressman
19    Jeff Davis of Kentucky.  I was in the Army National Guard.  I
20    was on jury duty once before.  It settled before the case was
21    finished.
22              PROSPECTIVE JUROR:  Good morning.  My name is Leigh
23    Souther.  I've lived in Wauchula, Florida, for 43 years.
24    I've been a resident of Florida for 43 years.  I have a
25    Bachelor's Degree in Elementary Education.  I am a fourth
```

```
1   grade school teacher at Wauchula Elementary School.  I am
2   married.  My husband is a Sergeant for the Hardy County
3   Sheriff's Department.  He's been employed there for 13 years.
4   We have two children, 12 and 8.  I do not have any military
5   service, and I have never sat on a jury.
6           THE COURT:  I'm going to ask you the same questions
7   I just asked Mr. Riley.  You'll have to judge the credibility
8   of law enforcement officers just like any other witness.
9   Would you have a difficult time doing that since your husband
10  is a law enforcement officer?
11          PROSPECTIVE JUROR:  I probably am a little biased
12  in that area.  I can't honestly say that I wouldn't.
13          THE COURT:  All right.  I'll excuse you, and you
14  can return to the jury assembly room.  Thank you.
15          PROSPECTIVE JUROR:  Thank you.
16          PROSPECTIVE JUROR:  Good morning.  My name is
17  Richard Meredith.  I've lived in New Port Richey for
18  14 years.  I spent two years in college under the General
19  Motors Trade Program because I was a millwright for General
20  Motors.  I am married.  My wife is a housewife.  I have one
21  child 45.  He is a truck driver for automative parts in
22  Michigan; and I spent four years in the Navy, and I was a
23  Sonar Technician; and I served on a jury before, but it was
24  plea bargained out before it went to trial.
25          PROSPECTIVE JUROR:  Good morning.  My name is Andy
```

1    Petterson.  I live in Tampa, Florida.  I've lived in our

2    current -- out in Tampa for 17 years.  I've lived in the

3    State of Florida for about 30 years.  Highest level of

4    education is Master's in Business Administration.  Current

5    occupation, I'm a business owner/manufacturer of distilled

6    spirits.  I am married.  My wife is in software sales.  We

7    have got two children.  One is in high school, and one is in

8    college out-of-state.  No previous military, and no jury

9    service.

10         PROSPECTIVE JUROR:  Hello.  My name is Gerry Kelly.

11   I'm a resident of Pinellas Park, Florida.  I've lived in

12   Florida for approximately 40 years.  I have one year of

13   college.  I'm retired.  I did 20 years in the insurance

14   business, and I retired from Brinks working on armored cars.

15   I'm divorced.  I have three children.  My oldest son is a

16   middle school teacher.  My other son is a professional truck

17   driver, and my third son, who's 35, is a salesperson.  I

18   served in the Navy for six years.  I was in ship supply.  I

19   was picked for a jury one time, but they settled the next

20   day.  So I never actually really served on a jury.

21         PROSPECTIVE JUROR:  My name is Mariela Conde.  I

22   live in Florida for 14-year.  My education in Colombia.  High

23   school.  My occupation, in-house, my home.  I married for

24   20 years.  My spouse's occupation retired in Army.  I have

25   one children, 29 year.  She's married.  Um, no service in

```
 1   military service.  I'm sorry, I don't speak English well.
 2            THE COURT:  You say your daughter is married.  Is
 3   she employed outside the home?
 4            PROSPECTIVE JUROR:  She employed in Chase.
 5            THE COURT:  What does your husband do?
 6            PROSPECTIVE JUROR:  My husband not -- he is now
 7   retired.  Retired from Army.
 8            THE COURT:  All right.  Thank you.
 9            PROSPECTIVE JUROR:  Good morning.  I'm Mike
10   DeVelle.  I live in Clearwater, and we've lived there about
11   two years, with my wife.  We've lived in Florida for eight
12   years.  I have two years' education in Business Management --
13   I'm sorry, Business Administration.  Currently I'm a Bank
14   Relationship Manager, or a "banker."  Married for 44 years.
15   My wife is employed.  She is a licensed optician with the
16   State of Florida, and the state of North Carolina.  We have
17   two children.  My first son is 40 years old.  He is in
18   aerospace, and the other is 36, and he is working with, I
19   believe, it's Wellcare.  He's a supervisor of a team that
20   manages patients.  I have been in the Army National Guard
21   before.  I have never worked or been selected for jury duty.
22            THE COURT:  Does your son have anything to do with
23   filing claims with Medicare or anything for drugs?
24            PROSPECTIVE JUROR:  I don't believe he personally
25   does, sir.  I believe he just manages the team.
```

```
1              THE COURT:  All right.  Thank you.
2              PROSPECTIVE JUROR:  My name is David Blount.  I've
3   lived in Lake Wales for two years.  I've been in Florida for
4   22 years.  I've got a high school diploma.  I'm self-employed
5   doing water and waste water operations.  Not married.  Don't
6   have any kids.  I have not served in the military, and never
7   served on a jury.
8              PROSPECTIVE JUROR:  My name is Eric Price, born and
9   raised in Bradenton, Florida, 41 years.  Some college.  No
10  degree.  I'm a web producer at an internet agency.  My
11  wife -- I'm married.  She's a nurse.  15-year-old daughter.
12  No military, and I've never served on a jury.
13             THE COURT:  Where does your wife work?
14             PROSPECTIVE JUROR:  At a primary care doctor's
15  office.
16             THE COURT:  Does she have anything to do ordering
17  drugs?
18             PROSPECTIVE JUROR:  I believe she does, under the
19  direction of the doctor, but I believe she does.
20             THE COURT:  Does she talk to you about that part of
21  her job?
22             PROSPECTIVE JUROR:  Not really.  To some extent
23  that she, like, keeps inventory of drugs that are in the
24  cabinet and things like that.  I don't know what she orders
25  or the types of drugs.
```

```
 1              THE COURT:  All right.  Thank you.

 2              PROSPECTIVE JUROR:  Good morning.  My name is Kori

 3    Freeman.  I live in Tampa.  I've been here for 32 years.

 4    I've lived in Florida for 42 years.  Um, I have a Bachelor's

 5    Degree in Spanish.  Um, not used.  I worked in property

 6    management for a short time after college, and then, um,

 7    married and stayed home, um, with our three children until

 8    eight years ago, and I went back, and I have been teaching

 9    kindergarten and first grade for the last eight years, and

10    then left my full time teaching job just this year.  I now

11    work for Hillsborough County Schools, also as a daytime

12    tutor, and I have some private tutoring students.  I am

13    married, and my husband's a real estate developer.  We have

14    three grown children.  I have a 23-year-old son who's a

15    financial planner in Atlanta.  I have a 26-year-old daughter

16    who's a BSN with Baycare Medical Group, also connected to

17    St. Joseph's Children's Hospital.  She is a pediatric

18    oncology nurse.  And I have a 29-year-old daughter who, um,

19    is a recruiter for Ideal Image, a corporate recruiter.  I

20    have no military background, and I have not served on a jury.

21              THE COURT:  Your daughter that works in pediatric

22    oncology, do you talk to her about her job and what she does?

23              PROSPECTIVE JUROR:  Sometimes.

24              THE COURT:  Is she the one that orders the drugs

25    for that practice?
```

1            PROSPECTIVE JUROR:  No, she does not.

2            THE COURT:  Does she have anything to do with the

3    drug inventory?

4            PROSPECTIVE JUROR:  Not other than probably just --

5    not managing the inventory.  She does patient care with the

6    children.  She works on the floor of the -- pediatric

7    oncology floor, and then, this is the outpatient clinic for

8    those children who are still on therapy.

9            THE COURT:  All right.  Thank you.

10           PROSPECTIVE JUROR:  Good morning.  My name is

11   Rachel Jolly.  I've lived in the State of Florida for

12   36 years.  I've lived in Ruskin for two years or -- almost

13   two years.  My highest level of education AA in Elementary

14   Education.  Um, I am in customer service for Coca-Cola for

15   over ten years.  I am married.  My husband's in insulation

16   manufacturing, like, for warehouse product insulation.  I

17   have one child, she is six.  No military background, and I

18   have been on a jury, there was a -- it did come to a verdict.

19           PROSPECTIVE JUROR:  Good morning.  My name is

20   Rachel Frappier.  I live in Seminole, and I've lived there my

21   whole life, 19 years.  Same as I've lived in Florida.  I

22   graduated high school and currently am a full time college

23   student at St. Petersburg.  I'm single.  I have no children.

24   I've never had military service, and I've never served on a

25   jury.

```
 1              PROSPECTIVE JUROR:  Good morning.  I'm Beth
 2     Ballentine.  I've lived in Treasure Island for 17 years.
 3     I've lived in Florida my whole life, except two years.  I
 4     have a degree in interior design.  I'm a Medical Staff
 5     Specialist for St. Anthony's Hospital.  I am divorced.  I
 6     have four children.  The oldest is 45.  He's an electrical
 7     contractor.  He does commercial work in Orlando.  My daughter
 8     is 43, and she runs the business for him.  I have a
 9     42-year-old son who does estimating for an electrical firm
10     over in Orlando.  I have a 35-year-old son who does cyber
11     security, and he is now out in Santa Fe.  I have no military
12     service, and I have been on a jury, but it was settled.
13              THE COURT:  You're a Medical Staff Specialist at a
14     hospital?
15              PROSPECTIVE JUROR:  Yes.  I do credentialing of the
16     physicians in Allied Health Professionals before they come on
17     staff.
18              THE COURT:  So you are in credentialing, but do you
19     have anything to do with ordering drugs or --
20              PROSPECTIVE JUROR:  No, sir.
21              THE COURT:  Filing claims for drugs or anything
22     like that?
23              PROSPECTIVE JUROR:  No clinical.
24              THE COURT:  All right.  Thank you.
25              PROSPECTIVE JUROR:  Good morning.  My name is
```

1     Barbara Cummings.  I currently live in Venice, Florida.  I

2     have lived there the entire time I've been in Florida, which

3     is nine-and-a-half years.  My level of education is two years

4     of college and a Degree in Veterinary Medicine as a

5     Technician.  I am married.  My spouse works in human medicine

6     as an MA, and also Radiology Technologies.  I have no

7     children, never served in the military, and I've never served

8     on a jury.

9           THE COURT:  Tell me again what your husband does?

10          PROSPECTIVE JUROR:  A medical assistant, and a

11     radiology technologist in a primary care doctor's office.

12          THE COURT:  Does he have anything to do with

13     ordering drugs or filing claims for the practice?

14          PROSPECTIVE JUROR:  Ordering drugs, yes, but it has

15     to go through corporate, like, the doctor requests certain

16     drugs in the clinic, but then it goes through the hospital.

17          THE COURT:  So he informs someone in Corporate

18     which drugs the doctor is requesting?

19          PROSPECTIVE JUROR:  Correct.

20          THE COURT:  He doesn't place the order himself?

21          PROSPECTIVE JUROR:  No.

22          THE COURT:  He doesn't decide where to order them

23     from?

24          PROSPECTIVE JUROR:  No.

25          THE COURT:  And he doesn't file a claim form to get

1    reimbursed for the cost of the drugs?

2                PROSPECTIVE JUROR:  No.

3                THE COURT:  All right.  Thank you.

4           I want to ask you some general questions now, and

5    the purpose of these general questions is to get you to ask

6    yourself if this is the type of case that you should serve on

7    as a juror.  That may sound strange, but let me see if I can

8    give you an example.

9           This case doesn't have anything to do with selling

10   drugs on the street.  So let me use that as an example.  If I

11   my daughter had been arrested six months ago for selling

12   cocaine on the street corner, and I thought that she was

13   actually involved in that, I might have very strong feelings

14   about people who got others to sell drugs, and people who

15   were charged with that type of offense.  I might be a

16   wonderful juror in any other kind of case, like a traffic

17   accident case, or bank fraud, or any other kind of case other

18   than someone involved in selling drugs on the street or

19   getting others to do that.  If I thought she was innocent and

20   wrongfully arrested, I might have very strong feelings about

21   law enforcement, and perhaps I should not sit as a juror in

22   any criminal case because of my feelings about law

23   enforcement.  I would be a great juror in civil cases.  But

24   the only person that would know how I feel about those kinds

25   of things would be me.  And so, the purpose of these next

```
 1      questions is to get you to ask yourself, "is this the kind of
 2      case that you think you should sit on as a juror, and give
 3      both parties an equal place at the starting line?"
 4              I'll tell you a little bit about the case.
 5      Dr. Norbergs is charged with violating the Federal Food, Drug
 6      and Cosmetic Act, which among other things regulates the
 7      manufacture, labelling and distribution of drugs in the
 8      United States.
 9              Other than what you have told me, have any of you
10      been involved in the manufacture, labelling or distribution
11      of drugs, including prescription drugs and over-the-counter
12      drugs?  All right.  I don't see any hands.
13              Do any of you believe that the Federal Government
14      should not regulate the manufacture or sale of drugs,
15      including prescription drugs?  All right.  Let's start with
16      Mr. Brand here.  Start with Mr. Brand.
17              PROSPECTIVE JUROR:  Yes, sir.
18              THE COURT:  Tell me about that.
19              PROSPECTIVE JUROR:  I just don't think the
20      Government should say what you can and cannot put in your
21      body.
22              THE COURT:  You think they should or should not?
23              PROSPECTIVE JUROR:  Shouldn't.
24              THE COURT:  So you believe that people who
25      manufacture drugs should not have to get them approved by the
```

```
 1   FDA.  They ought to be able to just put them on the market.
 2            PROSPECTIVE JUROR:  Yeah, if they are labeled
 3   correctly and they say what they are putting in it.
 4            THE COURT:  All right.  And if someone were charged
 5   with either manufacturing and selling it without FDA
 6   approval, or buying it without FDA approval and dispensing it
 7   to patients, would it be difficult for you to find someone
 8   guilty of doing that because you don't think it should be
 9   regulated in the first place?
10            PROSPECTIVE JUROR:  Probably.
11            THE COURT:  All right.  I was right when I said
12   Mr. Brand, wasn't I?
13            PROSPECTIVE JUROR:  Yes.
14            THE COURT:  All right.  I'm going to excuse you.
15   You can go to the third floor jury room and hopefully they
16   will have other cases that you can sit on.  Mr. May.
17            PROSPECTIVE JUROR:  Yes, sir.
18            THE COURT:  Tell me what you believe about that.
19            PROSPECTIVE JUROR:  I don't have any -- I can tell
20   you I have no intentions of being fair on any of this.  I
21   feel like I'm forced to be here against my will, first of
22   all.  I didn't want to get into that.  I was waiting to be
23   asked this question.  I don't even feel comfortable.  I feel
24   extremely, extremely uncomfortable being in this building.
25   I'm not voting for anybody, or judging anybody to go to jail,
```

1    or being guilty about anything.  I don't even want to be

2    here.  I'm privileged to vote, and I respect everybody's

3    ability to do that, but I'm not forced to vote.  So that's my

4    choice to do that, but with this particular scenario, I have

5    no choice to come or not or else I get penalized if I don't

6    come.  I'm voting innocent.  With all due respect, I'm voting

7    innocent.  I don't care what the evidence says about anybody.

8    If there is any police information, I don't trust police

9    officers.  And when it comes to the point of your question

10   that you just asked, I believe that if people want to put --

11   sell vitamins and different drugs, whatever they are, and

12   label them properly, they want to do that, they can do that.

13   I don't have any problem with anybody else or anything like

14   that.  Um, I can tell you right now if you want a fair

15   impartial juror, I'm not the person to be part of any jury.

16   Period.  I don't want anything on my conscience, on my life,

17   for me civilly, whatever, the terms, or with judging and

18   things that you do in the courtrooms.  I've never been in a

19   courtroom before.  I don't even like being here.  Um, so if

20   I'm rattling on, please forgive me.

21            THE COURT:  Well, you've made it clear that you

22   don't want to be here, and that you would be biased against

23   everyone that ever came before you.  So I will excuse you,

24   and ask you to return to the third floor jury room, please.

25   Anyone else?

```
1              Have any of you or any member of your family ever
2       had a problem with a mislabeled drug, or a drug purchased
3       from a foreign country that didn't -- that may have caused
4       harm or somehow caused you distress, raise your hand?
5              PROSPECTIVE JUROR:  My husband.
6              THE COURT:  Give us your name.
7              PROSPECTIVE JUROR:  Lisa Croy.
8              THE COURT:  Just a minute.
9              MR. TRAGOS:  May we approach sidebar?
10             THE COURT:  All right.
11      (Sidebar conference held.)
12             MR. TRAGOS:  I'm a little concerned that her
13      publicly saying the answer to that would be testimony,
14      testifying about maybe a bad result from a cancer drug that
15      was mislabeled, and I don't know what she's going to say, and
16      I'm a little worried that it might taint the jury and
17      actually be testimony in the case.
18             THE COURT:  All right.  Response?
19             MR. SALTZMAN:  Your Honor, if we could maybe bring
20      her up, if that's the concern, to discuss it out of earshot
21      of the other jurors?
22             THE COURT:  I don't want to get in the position of
23      starting to bring them up here.  That could never end.  I'll
24      hold that question until the end, and I'll get the indication
25      of those who want to answer the question and we'll do it
```

```
 1    individually.
 2              MR. SALTZMAN:  Okay.
 3    (Back before the venire.)
 4              THE COURT:  All right.  We don't know what your
 5    personal experience is, but what I'm going to do is hold that
 6    question until the end, and let you answer it individually,
 7    when the rest of the jurors are outside the courtroom.
 8              Indicate for me who raised their hands, just two of
 9    you?
10              PROSPECTIVE JUROR:  I wanted clarification on the
11    question.
12              THE COURT:  All right.  It was Ms. Croy and
13    Ms. Solie.  Who else?  Mr. Seitz.
14              PROSPECTIVE JUROR:  Evans.
15              THE COURT:  I'm sorry?
16              PROSPECTIVE JUROR:  Evans.
17              THE COURT:  Evans.  Who else raised their hand?
18    Anyone?  Okay.  I'll move on and we'll come back and have you
19    answer that individually.
20              Now, you've heard the questions that I asked of
21    Mr. Riley about law enforcement.  Is there anyone that would
22    have a problem -- let me back up.  One of your jobs as a
23    juror would be to judge the credibility of witnesses, and you
24    can use a lot of factors in judging that credibility.  Do
25    they have the occasion to know what it is they are talking
```

1    about?  How close were they to the scene that they are

2    testifying about?  What is their experience?  What is their

3    expertise, if any?  One of the things you cannot use as a

4    factor is whether or not they carry a badge.  If you have a

5    grudge against law enforcement, you can't detract from a law

6    enforcement officer's testimony just because you may mistrust

7    all law enforcement, like Mr. May apparently does.

8          The opposite is also true.  You can't give them

9    extra credit just because they carry a badge.  Would anyone

10   have a problem treating and trying to judge the credibility

11   of a law enforcement officer like any other witness?

12   Mr. Evans, tell me about that.

13          PROSPECTIVE JUROR:  I am from Indiana originally,

14   and I have several uncles who are in the police department,

15   and, um, I've had several bad experiences with them with

16   abuse and so on.  So I don't have a very high regard for that

17   area.

18          THE COURT:  So you would have a hard time crediting

19   their testimony?

20          PROSPECTIVE JUROR:  Absolutely.

21          THE COURT:  All right.  Mr. Evans, I will excuse

22   you, and you can return to the third floor jury room, and

23   hopefully there will be a civil case that you can sit on.

24          PROSPECTIVE JUROR:  Thank you, sir.

25          THE COURT:  Thank you for bringing that up.

1          PROSPECTIVE JUROR:  Robert Ruhlman.  Your Honor, I

2     had a resort in North Carolina where I had two encounters

3     with sheriff's deputies there, one involved the theft of two

4     automobiles from the property.  The Sheriff's Department was

5     aware who stole the cars, and the cars ended up in a junk

6     yard, and taken apart and sold, but they were untruthful

7     about knowing who did it, and prosecuting and going forward.

8          We had a second occasion where we had a checkbook

9     stolen, and the same thing happened.  The police came and

10    investigated.  They knew it was one of our maids that took

11    it, and there was no follow-up and no prosecution.  So I have

12    an issue, at times, with the honesty and integrity with some

13    of our law enforcement.

14         THE COURT:  Okay.  I was getting ready to excuse

15    you, but you used the phrase, "some of our law enforcement."

16    That may mean that you think law enforcement officers are

17    like any other witness.  Some tell the truth all the time,

18    some don't tell the truth.  And if you are going to treat a

19    law enforcement officer like any other witness, I want to

20    keep you on this panel.  If you have a problem with law

21    enforcement's testimony across the board, I'm going to excuse

22    you.

23         PROSPECTIVE JUROR:  Your Honor, I had two occasions

24    and both occasions were bad, and I would have to say, in all

25    honesty, my feelings would be jaded.

1          THE COURT:  Okay.  I appreciate that, and I will

2     excuse you, Mr. Ruhlman.  Please return to the third floor

3     jury room.  Anyone else?

4          More specifically, do any of you have any members

5     of your family that are law enforcement officers, raise your

6     hand?  Give us your -- stand and give us your name and tell

7     me about it.

8          PROSPECTIVE JUROR:  Cynthia Egawa.  My husband's

9     father was a police chief in his hometown in Japan, and my

10    cousin was a sheriff in Ohio.

11         THE COURT:  Okay.  Do you talk to them about what

12    they do on the job?

13         PROSPECTIVE JUROR:  No.

14         THE COURT:  Is there anything about that

15    relationship that would make it difficult for you to judge

16    the credibility of a law enforcement officer like any other

17    witness?

18         PROSPECTIVE JUROR:  I don't think so.

19         THE COURT:  All right.  Thank you.

20         PROSPECTIVE JUROR:  Lori Hamilton.  I have a cousin

21    that's a sheriff in South Florida.  We speak a lot of --

22         THE COURT:  And would you have difficulty judging

23    the credibility of a law enforcement officer like any other

24    witness?

25         PROSPECTIVE JUROR:  No, not the credibility.  No.

```
1              THE COURT:  All right.  Thank you.  Mr. Riley, I
2    know you already answered these questions.  Are you saying
3    you want to answer them again?
4              PROSPECTIVE JUROR:  Just as to my son.
5              THE COURT:  I'll get to you in a minute.
6              PROSPECTIVE JUROR:  My name is Rebecca Hensley.  I
7    have a son-in-law who's a detective, and he has, you know,
8    said a lot of things -- stuff, bad, and you hear about them,
9    and the things that they do.  And then, I have an uncle that
10   is chief of police in Fairborn, Ohio, but he is retired.
11             THE COURT:  Would it be difficult for you to serve
12   as a juror in this case, and judge the credibility of law
13   enforcement officers like any other witness?
14             PROSPECTIVE JUROR:  No.
15             THE COURT:  All right.  Thank you.  Let's see what
16   Mr. Riley wants to tell us.
17             PROSPECTIVE JUROR:  As I stated before, my son is a
18   Highlands County Deputy.
19             THE COURT:  Okay.  So does that change your
20   previous answers that you would not have a problem judging
21   the credibility of a law enforcement officer like any other
22   witness?
23             PROSPECTIVE JUROR:  No, sir.  I have no problem
24   judging them to be independent about our cases.
25             THE COURT:  All right.  Thank you.  Anybody else?
```

1          PROSPECTIVE JUROR:  My name is David Blount.  I

2     have a brother who works for the Polk County Sheriff's

3     Department.

4          THE COURT:  How long has he worked for the Polk

5     County Sheriff?

6          PROSPECTIVE JUROR:  I would say about a year now.

7          THE COURT:  What does he do?

8          PROSPECTIVE JUROR:  He was a patrolman.  He just

9     got promoted.

10          THE COURT:  All right.  Do you talk to him about

11     what he does?

12          PROSPECTIVE JUROR:  Yeah.  Sometimes we joke about

13     some of the things that happen.

14          THE COURT:  Would it be difficult for you to judge

15     the credibility of a law enforcement officer like any other

16     lay witness?

17          PROSPECTIVE JUROR:  No, I don't believe so.

18          THE COURT:  All right.  Thank you.

19          PROSPECTIVE JUROR:  I'm Beth Ballentine.  My

20     son-in-law is a Sergeant with the Osceola County Sheriff's

21     Department.

22          THE COURT:  Would you have difficulty judging the

23     credibility of a law enforcement officer just like any other

24     witness?

25          PROSPECTIVE JUROR:  No, I would not.

```
 1            THE COURT:  All right.  Thank you.  All right.  Let

 2    me ask you the other side of that same question.  Like

 3    Mr. Ruhlman, some people have had bad experiences with law

 4    enforcement, and because of that, they just don't think they

 5    could trust any law enforcement officer.  So have any of you,

 6    or any member of your family, had an experience with a law

 7    enforcement officer that was a bad experience?

 8            PROSPECTIVE JUROR:  Your Honor, I'm actually -- it

 9    doesn't have anything to do with your question.

10            THE COURT:  Give us your name.  You're Mr. Kelly?

11            PROSPECTIVE JUROR:  Jerry Kelly.

12            THE COURT:  What did you want to tell me?

13            PROSPECTIVE JUROR:  I have a hearing problem.  I'm

14    having a hard time hearing what you are saying.

15            THE COURT:  Okay.  Well, this courtroom is a little

16    more difficult than other courtrooms because of the height,

17    and that's why we have all these microphones.  If you were

18    sitting as a juror in the jury box here, do you think you

19    would have a hard time understanding a witness on the other

20    side of the courtroom?

21            PROSPECTIVE JUROR:  I'm not really sure.  I would

22    have to experience it.

23            THE COURT:  Okay.

24            PROSPECTIVE JUROR:  I have hearing aids, but I

25    didn't bring my hearing aids today.  I forgot to put it in.
```

```
1              THE COURT:  All right.  Well, if you have a hard
2     time hearing something from this point forward, please stop
3     me and we'll repeat it, okay?
4              PROSPECTIVE JUROR:  Thank you.
5              THE COURT:  All right.  Thank you.  We do have some
6     earphones that help.  I'm not going to say that they are
7     perfect, but they will help, and Ariana will bring you a set.
8              All right.  Does anyone have any bad experiences,
9     like you have been arrested, or family members been arrested,
10    and like I said about my daughter, I thought she was falsely
11    arrested, I might have bad feelings about law enforcement.
12    Anybody like that?
13             PROSPECTIVE JUROR:  Cynthia Egawa.  I do have a
14    family member who has been arrested, but I don't have bad
15    feelings about the officers.
16             THE COURT:  How long ago was the arrest?
17             PROSPECTIVE JUROR:  About a month-and-a-half ago.
18             THE COURT:  What was the arrest for?
19             PROSPECTIVE JUROR:  DUI.
20             THE COURT:  And did you think that that was --
21    incident was handled fairly?
22             PROSPECTIVE JUROR:  I believe so.
23             THE COURT:  All right.  Thank you.  Anyone else?
24             PROSPECTIVE JUROR:  Maria Brown.  I have a couple
25    of family members that have been arrested, but I trust the
```

```
 1    process, and I don't -- it doesn't make me lean one way or

 2    the other.

 3               THE COURT:  How long ago were those arrests?

 4               PROSPECTIVE JUROR:  My mom's were several years

 5    ago, and my brother is currently incarcerated.  He did the

 6    crime, you got to do the time.

 7               THE COURT:  Okay.  On both of those incidents did

 8    you think the system treated them fairly and that the arrest

 9    was justified?

10               PROSPECTIVE JUROR:  Absolutely.

11               THE COURT:  All right.

12               PROSPECTIVE JUROR:  My name is Samantha Solely.  I

13    was arrested five months ago for a DUI, but I don't have any

14    feelings towards law enforcement.

15               THE COURT:  You thought that was handled fairly?

16               PROSPECTIVE JUROR:  Yes, sir.

17               THE COURT:  All right.  Thank you.

18               PROSPECTIVE JUROR:  Hi.  My name is Leanne Pacent.

19    My husband was arrested around 18 years ago in Daytona.

20               THE COURT:  18 years ago?

21               PROSPECTIVE JUROR:  Yeah.

22               THE COURT:  Have you gotten over it?

23               PROSPECTIVE JUROR:  I would have had they not taken

24    him down a back alley and beaten him, and broke his ankles

25    with billy clubs.
```

1        THE COURT:  That doesn't sound very nice.  Does

2   that make it difficult to sit as a juror in this case and

3   judge the credibility of law enforcement like any other

4   witness?

5        PROSPECTIVE JUROR:  It may.

6        THE COURT:  All right.  Give me your name again?

7        PROSPECTIVE JUROR:  Leanne Pacent.

8        THE COURT:  Okay.  I'll excuse you, Ms. Pacent.

9   You can return to the third floor jury room.  Thank you.

10       I think I saw some hands back here, Eddie.

11       PROSPECTIVE JUROR:  Full disclosure, in college I

12   was arrested, back in the 80's, for drugs.  I was treated

13   fairly.  I have no animosity towards law enforcement, though.

14       THE COURT:  All right.  Thank you.  Anyone else?

15       Back of the courtroom, second row back.  Take the

16   microphone back there.  Ms. Frappier, you say that you are a

17   college student?

18       PROSPECTIVE JUROR:  Yes, your Honor.

19       THE COURT:  Are you currently enrolled?

20       PROSPECTIVE JUROR:  Yes, your Honor.

21       THE COURT:  Are you going to miss classes by

22   attending this trial?

23       PROSPECTIVE JUROR:  If it runs past 11:00 a.m.,

24   yes.

25       THE COURT:  Past 11:00 a.m.

1              PROSPECTIVE JUROR:  Yes.

2              THE COURT:  All right.  I'm going to excuse you,

3    and you can return to the third floor jury room, and please

4    tell them why you were excused and I think they will let you

5    go.

6              PROSPECTIVE JUROR:  Okay.  Thank you, your Honor.

7              THE COURT:  Thank you.  We talked about arrests.

8    Have any of you been -- you or any member of your family been

9    the victim of a crime?  Mr. Ruhlman told us that he was a

10   victim of two crimes in North Carolina.  So I'm asking you,

11   let's say, in the last ten years have any of you, or any

12   member of your family been the victim of a crime?  Raise your

13   hand.  You're getting to answer every question.

14             PROSPECTIVE JUROR:  Cynthia Egawa, and it was

15   credit card theft.

16             THE COURT:  How long ago was that?

17             PROSPECTIVE JUROR:  Um, about ten years ago.

18             THE COURT:  Did law enforcement investigate?

19             PROSPECTIVE JUROR:  Yes.

20             THE COURT:  And do you think they did what they

21   could do?

22             PROSPECTIVE JUROR:  Yes.

23             THE COURT:  Is there anything about that experience

24   that would make it difficult for you to sit as a juror in

25   this case?

1          PROSPECTIVE JUROR:  I don't think so.

2          THE COURT:  Thank you.

3          PROSPECTIVE JUROR:  Joe Seitz.  Maybe six years ago

4    my son was the victim of a crime in his home in Orlando where

5    someone broke in.  They held him at gunpoint, stole a TV and

6    stuff.  The police did take care of it.  They arrested them.

7    No hard feelings.  They did a great job.  They did what they

8    are supposed to do.

9          THE COURT:  All right.  Thank you.  Did I see any

10   hands in the back?

11         PROSPECTIVE JUROR:  Hi.  Lucy Schmidt.  The other

12   lady made me think.  I had a fraud last year where somebody

13   was printing checks off in my name, and spending them all

14   over town, but the case didn't go anywhere, but it could have

15   the way things were going.  So I'm fine with everything.

16         THE COURT:  All right.  Thank you.  Right behind

17   you, I believe.

18         PROSPECTIVE JUROR:  We have had three credit card

19   frauds in the last three years.  An outboard motor stolen,

20   and all the copper stripped out of our bar in Hernando

21   County.  So, that's our victim experience.

22         THE COURT:  Do you think that law enforcement

23   handled the situations --

24         PROSPECTIVE JUROR:  (Mr. Petterson.)  They did.  I

25   was.

1          THE COURT:  -- appropriately?  And you are

2     satisfied with that?

3          PROSPECTIVE JUROR:  I was.

4          THE COURT:  Anything about those experiences that

5     make it difficult for you to judge the credibility of a law

6     enforcement officer like any other witness?

7          PROSPECTIVE JUROR:  No.

8          THE COURT:  All right.  Thank you.  That juror was

9     Petterson.

10          PROSPECTIVE JUROR:  Beth Ballentine.  Last year,

11     right after Christmas, I was a victim of identity theft.  I

12     don't know if that counts?

13          THE COURT:  How do you think it was handled by law

14     enforcement?

15          PROSPECTIVE JUROR:  There wasn't anything they

16     could do.  We had to go in and clear up everything, but it

17     was awful.

18          THE COURT:  Was it handled appropriately?

19          PROSPECTIVE JUROR:  I think so.

20          THE COURT:  All right.  Thank you.

21          You've heard me say this case has something to do

22     with the Food and Drug Administration, the "FDA."  Let's see,

23     so it involves an agency of the United States Government.

24     Have any of you, or any member of your family had an issue

25     with an agency of the United States?  It could be the IRS.

1    It could be Immigration.  It could be whatever, Postal

2    Service.  Anybody have a problem with an agency of the United

3    States?  I don't see any hands.

4            One of the things Mr. May said before I excused him

5    was he didn't feel like he could judge anybody about

6    anything, and as far as he was concerned, everybody was

7    innocent.  He could have said the same thing, but then the

8    exact opposite and said, "I don't think I can judge anybody,

9    but as far as I'm concerned, everybody is guilty of

10   everything."  Either one would have gotten him excused.  Do

11   any of you have a problem with sitting in judgment and trying

12   to reach a verdict one way or the other, guilty or not

13   guilty, after you've heard the evidence?  Some people,

14   because of religious persuasion, or for other reasons, just

15   don't think they can sit in judgment of another person.

16   Anybody have a problem like that?  Raise your hand.

17           PROSPECTIVE JUROR:  My is Olga Leon, and I think I

18   can't do it because my English.  I don't understand very

19   well, or all time information.  I can't do it.

20           THE COURT:  You think you would have a difficult

21   time following all of the testimony in English?

22           PROSPECTIVE JUROR:  Yes.

23           THE COURT:  Okay.  Ms. Leon, I'll excuse you, and

24   you can return to the third floor jury room.  Anyone else?

25           PROSPECTIVE JUROR:  My name is Mariela Conde.  I

1    can't speak English very well.

2              THE COURT:  You say you feel the same way that

3    Ms. Leon did, is that what you said?

4              PROSPECTIVE JUROR:  I can't speak English very

5    well.  For me it's very difficult to speak.  I understand

6    little bit.

7              THE COURT:  You have a difficult time understanding

8    English?

9              PROSPECTIVE JUROR:  Yes.  People speak very fast, I

10   don't understand.

11             THE COURT:  All right.  I will excuse you,

12   Ms. Conde, and you can return to the third floor jury room.

13   Anyone else?

14             All right.  Tomorrow is election day, and it's just

15   a coincidence that this trial starts the day before election

16   day, but it has nothing to do with the election.  Does

17   anybody have a problem with thinking that this trial has

18   something to do with the election?  No one raised their hand.

19             I told you that the Defendant in this case,

20   Dr. Norbergs, is a doctor, and that her office is in

21   Palm Harbor, I believe, which means that there may have been

22   some publicity back at the time she was charged.  I don't

23   know.  But have any of you read anything in the paper, or

24   heard anything in the news about this case?  I see no hands.

25             Those of you that serve on the jury when you go

back to consider your verdict, one of the documents you will

have is what we call an "indictment."  An indictment is a

written description of the charges.  It lays out the charges

and it's a notice document.  It places any Defendant in a

federal criminal case on notice of what they are being

charged with.  It's not evidence that they are guilty of

anything.  It's just part of the process.  They are given

notice of what it is.  The reason it's given to the jury at

the end of the case is so that they can keep track of what

the charges were, and it explains what the Defendant is

charged with, but it's not evidence.  Does anyone have a

problem with understanding that and not using it as evidence?

All right.

          I'm going to give the lawyers about ten minutes

each to ask follow-up questions.  Mr. Saltzman.

          MR. TRAGOS:  Your Honor, could we have a sidebar?

          THE COURT:  All right.

(Sidebar conference held.)

          MR. TRAGOS:  Is the Court going to go with a

two-week possible length of trial with the jurors before we

do our questions?

          THE COURT:  Yeah, I'll do that.

          MR. TRAGOS:  Deal with that.  The other is, I know

I objected because someone had a problem with distribution of

drugs.  I think the general question about whether anybody

```
1    treated with cancer, or a family member treated with cancer

2    is -- I think those general questions do not elicit negative

3    questions.  I would reconsider that --

4            THE COURT:  You can do that, if you want to.

5            MR. TREZEVANT:  I'm sorry, I missed what you were

6    talking about.

7            MR. TRAGOS:  I asked if the Court would cover the

8    possibility of a two-week trial with the jurors.  The Court

9    said he would do that.  And I asked the Court if we could

10   cover the cancer questions, and he said we can do that.

11           MR. TREZEVANT:  Your Honor, I was also going to

12   read a list of potential witnesses to make sure there weren't

13   any questions with those.

14           THE COURT:  You can do that.  I'm not going to do

15   that.

16           MR. SALTZMAN:  Mr. Tragos is going to be addressing

17   that.

18           (Back before the venire.)

19           THE COURT:  Okay.  One of the things the lawyers

20   wanted me to advise you of is the length of the trial.  You

21   were summoned to jury duty for a month, but our practice is,

22   as far as we can do it, once you serve on one case, we don't

23   call you back to serve on other cases.  But we expect this

24   case to last, the lawyers have estimated, ten days, which

25   normally would be two weeks.  This Friday is a holiday.  It's
```

1    Veteran's Day.  So we will not work on Friday.  So that gives

2    us nine days, and we're going to try our best to finish by

3    the end of next week.  Does anybody have a specific problem

4    during these next two weeks?  Ms. Brown.

5             PROSPECTIVE JUROR:  My son is epileptic, and he has

6    an important appointment tomorrow morning, and I've been

7    waiting a while for him to get that appointment, and I would

8    really like to keep it, if I can.

9             THE COURT:  Is there anyone else that can take him

10   to the appointment?

11            PROSPECTIVE JUROR:  I have a husband, but his mom

12   is also dying of cancer.  So I want him to be able to spend

13   time with her.

14            THE COURT:  Okay.  When your son goes for his

15   appointment, how long does it take?

16            PROSPECTIVE JUROR:  I'm guessing about an hour,

17   hour-and-a-half.

18            THE COURT:  Well, your husband could take time away

19   from his mom for an hour-and-a-half or two hours, couldn't

20   he?

21            PROSPECTIVE JUROR:  Hmm-hmm.

22            THE COURT:  All right.  Thank you.  We'll keep that

23   in mind.

24            PROSPECTIVE JUROR:  Lori Hamilton.  I'm going to

25   have an issue with that many days in a row.  I work in a

1    hospital, and that's just -- we're shorthanded as it is this

2    time of year, and I just -- I don't think that that's going

3    to be acceptable for my boss or my people that I work with.

4              THE COURT:  Who fills in for you when you're on

5    vacation?

6              PROSPECTIVE JUROR:  Usually agency nurses.  And

7    like I said, we're very short staffed right now.  Plus I work

8    nights and daytime things for me are difficult.  Being here

9    right now is difficult.

10             THE COURT:  All right.  We'll keep that in mind.

11   Thank you.  Anyone else?

12             PROSPECTIVE JUROR:  Joe Seitz.  I'm a one-man

13   office in Oldsmar, 8:00 to 5:00.  No one is there but me.  So

14   that's where I'll be, just to let you know.

15             THE COURT:  When you get sick, who runs the office?

16             PROSPECTIVE JUROR:  I do when I get back, or my

17   boss does.  He's on the other coast right now.  He's a world

18   traveler, so it's me.

19             THE COURT:  Okay.  Anyone else?

20             PROSPECTIVE JUROR:  I'm self-employed.  I don't

21   work, I just don't get paid.

22             THE COURT:  If you don't work, you don't get paid?

23             PROSPECTIVE JUROR:  Pretty much.  I had a $1300 job

24   lined up for today and I'm missing it.

25             THE COURT:  All right.  Your name was Davis?

1          PROSPECTIVE JUROR:  David Blount, B-L-O-U-N-T.

2          THE COURT:  Okay.  Anyone else?

3          PROSPECTIVE JUROR:  Your Honor, Mike DeVelle.  I

4    just want a little clarification here.  My wife and I have

5    not had too much vacation time, and we have some big plans

6    for Thanksgiving, and put out some dollars already.  I'm just

7    curious, are we going to go that far, do you think?

8          THE COURT:  I do not think we will go past

9    Thanksgiving.

10         PROSPECTIVE JUROR:  As far as my job and commission

11   that's part of being in this country.

12         THE COURT:  Specifically what dates are you already

13   committed to?

14         PROSPECTIVE JUROR:  We are committed for the

15   Wednesday before Thanksgiving.

16         THE COURT:  The Wednesday before Thanksgiving?  All

17   right.  Thank you.

18         PROSPECTIVE JUROR:  Hi.  Lucy Schmidt.  We have a

19   work trip.  Our whole team is required to go to Arcadia

20   Wisconsin -- yes, in the middle of winter -- for next week,

21   for three days.

22         THE COURT:  What days are those?

23         PROSPECTIVE JUROR:  Right now it's scheduled for

24   Tuesday, Wednesday and Thursday, flying back on Thursday.  I

25   think it's Tuesday evening we leave.

```
1              THE COURT:  What happens if you miss the trip?

2              PROSPECTIVE JUROR:  Arcadia is not somewhere I want

3    to be this time of year.

4              THE COURT:  I'm sorry?

5              PROSPECTIVE JUROR:  I said, Arcadia is not

6    somewhere I want to be this time of year.

7              THE COURT:  So it might be good if you don't go to

8    Arcadia?

9              PROSPECTIVE JUROR:  Good for you, bad for work.

10             THE COURT:  What happens if you don't go to Arcadia

11   and you sit on this?

12             PROSPECTIVE JUROR:  I do not know.  I've only been

13   in the company since April.  So --

14             THE COURT:  All right.  Thank you.

15             PROSPECTIVE JUROR:  The week of Thanksgiving I'm

16   cooking for 25 people over in Osceola County, and I have to

17   start prepping on Tuesday or Wednesday.  I'll be fine as long

18   as it finishes in the next two weeks.

19             THE COURT:  All right.  Thank you.

20             PROSPECTIVE JUROR:  Barbara Cummings.  We have a

21   trip planned on Friday, the 18th of this month.

22             THE COURT:  Trip to where?

23             PROSPECTIVE JUROR:  New York State, Albany.

24             THE COURT:  And what's the purpose of the trip?

25             PROSPECTIVE JUROR:  My sister-in-law is having
```

1    surgery, and we are taking care of her children.

2            THE COURT:  When is her surgery?

3            PROSPECTIVE JUROR:  The 21st.  Monday the 21st.

4            THE COURT:  Are you driving?

5            PROSPECTIVE JUROR:  Yes.

6            THE COURT:  You could drive on Saturday?

7            PROSPECTIVE JUROR:  Hopefully.

8            THE COURT:  Okay.  All right.  Thank you.  Anyone

9    else?

10           PROSPECTIVE JUROR:  Cynthia Egawa.  I just started

11   a job six months ago, and I'm responsible for year-end

12   processes that are in the middle of doing that now, so I'm in

13   the middle of training.  I'm a little bit concerned about a

14   two-week trial and missing that opportunity to learn the

15   processes that I am going to be accountable for.

16           THE COURT:  Well, one thing in your favor is the

17   federal statutes prohibit an employer for holding against you

18   that you are in jury service.

19           PROSPECTIVE JUROR:  I understand that.  It's more a

20   personal thing.  It will be another year before I have the

21   opportunity to be able to fulfill that expectation.

22           THE COURT:  Okay.  Thank you.  All right.  Does the

23   Government --

24           MADAM CLERK:  There is one more.

25           PROSPECTIVE JUROR:  Hi, your Honor.  I have

1    reservations for the 20th of November to go up north and

2    visit my children and grandchildren, from the 20th through

3    the 30th of November.

4           THE COURT:  All right.  You are Mr. Kelly?

5           PROSPECTIVE JUROR:  Yes, your Honor.

6           THE COURT:  And how -- have you been able to hear

7    okay since you got the hearing device?

8           PROSPECTIVE JUROR:  Yeah.  It's working pretty

9    good.  It's a little sporadic.  You give it a couple taps and

10   it comes back on.

11          THE COURT:  All right.  Thank you.  All right.  My

12   understanding is that Mr. Trezevant is going to ask the

13   questions for the Government.

14          MR. TREZEVANT:  Yes, sir.

15          THE COURT:  You may proceed.

16          MR. TREZEVANT:  Good morning.  I'm going to read a

17   list of individuals who may be called as witnesses in this

18   case, and to the extent anyone knows any of these

19   individuals, I would ask just how, and whether that would

20   impact your ability to be fair and impartial in this case.

21          Joel Burman, Kimberly Carbonelli, Susan Copersito,

22   Kelly Fidler, Brian Frank, Justin Green, Teresa Hoyt, Captain

23   Valerie Jensen, Crystal King, Kelly Krouse, Lee Eric Larson,

24   Mary Mayleben, Sally Marlowe, Dawn McKenna, Ann Mevers,

25   Mukesh Mehta, Amy Pellicano Wolf, Kathleen Pruyn,

```
 1    Stephen Quindoza, Rennae Revell, Karen Rothschild,

 2    Arthur Simone, Makoto Tanaka, Terry Zoubek.

 3             Now, that list of names, is there anyone at all --

 4    I'll first ask those up here in the jury box, the panel,

 5    anyone in the front that knows or may know any of the

 6    individuals I just read?  How about in the back?

 7             PROSPECTIVE JUROR:  Would you clarify the name

 8    Kathleen, last name --

 9             THE COURT:  Wait just a minute.  She needs to

10    repeat that answer into the microphone.

11             PROSPECTIVE JUROR:  I'm sorry.  This is --

12             THE COURT:  Give us your name.  You are

13    Ms. Schmidt?

14             PROSPECTIVE JUROR:  Yes.

15             MR. TREZEVANT:  It's Kathleen Pruyn, but it's

16    P-R-U-Y-N.

17             PROSPECTIVE JUROR:  That's all I needed.  I didn't

18    quite understand.  I know someone with a similar name.

19             MR. TREZEVANT:  All right.  So that's a no.

20             Now, as I explained earlier, this case does concern

21    various government agencies, in particular, the Food and Drug

22    Administration, and Medicare, Health and Human Services and

23    those types of agencies.  Does anyone have, as a result of

24    their work or their personal lives, have any direct

25    interaction with either the FDA or Medicare?  Yes, ma'am.
```

1           THE COURT:  Would you give her the microphone
2    please, Eddie?
3           PROSPECTIVE JUROR:  Like I said before --
4           THE COURT:  Wait a minute.  Give us your name,
5    Ms. Brown.
6           PROSPECTIVE JUROR:  Maria Brown.  Like I said
7    before, my mother-in-law is currently in the process of dying
8    from cancer.  So I am taking care of her Medicare --
9    Medicare, social services.  I am in contact with all those
10   people every day.
11          MR. TREZEVANT:  All right.  Is there anything, as a
12   result of those interactions, that might lead you to do
13   anything other than be fair and impartial to both sides, the
14   Government and Defense in this case?
15          PROSPECTIVE JUROR:  Not that I can think of other
16   than it's just frustrating.
17          MR. TREZEVANT:  You say, "frustrating," in what
18   sense?
19          PROSPECTIVE JUROR:  The whole thing is frustrating.
20          MR. TREZEVANT:  With the Government or life
21   experience?
22          PROSPECTIVE JUROR:  Experience.
23          MR. TREZEVANT:  Could you keep the microphone for
24   one second because I might as well deal with this, in the
25   front and in the back.  Inevitably this case will concern a

```
 1   doctor.  Is there anything about the fact that a doctor is
 2   charged that might impact a person in a way that would make
 3   them be anything other than fair and impartial in this case?
 4   In particular, an oncologist.  So to the extent now we're
 5   going with an oncologist dealing with cancer patients, and
 6   the care of cancer patients, is there anyone who has dealt
 7   with that issue up here in the front panel?
 8            PROSPECTIVE JUROR:  My name is Samantha Solely.  In
 9   reference to your question prior, my sister was diagnosed
10   with Crohn's Disease, very young, and I feel because she had
11   a very severe case, and she was on experimental drugs, and
12   she was, you know -- she had a really hard time with it.  I
13   feel like the Food and Drug Administration does serve a
14   purpose, but we trusted everything with her doctor, and I do
15   trust doctors inherently to be a kind of stewardship for
16   patient's care.
17            MR. TREZEVANT:  So --
18            PROSPECTIVE JUROR:  I feel like I would be a bit
19   more partial to a physician, if I'll be honest so --
20            MR. TREZEVANT:  That's what we're asking you to do.
21   We're not judging you.  So you feel you have a bias in that
22   regard towards a physician?
23            PROSPECTIVE JUROR:  Yes.
24            MR. TREZEVANT:  Such that it might impact your
25   ability to sit as a fair and impartial juror in this case?
```

1          PROSPECTIVE JUROR:  If I'm being honest, yes.

2          MR. TREZEVANT:  Anyone else?  Yes, ma'am.

3          PROSPECTIVE JUROR:  Cynthia Egawa.  My mother did

4    die of breast and bone cancer, but we had a good relationship

5    with the physician.  They did good care.  I don't think it

6    would bias me in any way.

7          MR. TREZEVANT:  Is there anything about the

8    interactions with the physician or the drugs that were used

9    for the care that might affect your ability to sit as a fair

10   and impartial juror in this case?

11         PROSPECTIVE JUROR:  No, I don't think so.

12         MR. TREZEVANT:  What if this case concerned

13   bringing drugs in from foreign markets, such as Canada,

14   England, Germany or Turkey?

15         PROSPECTIVE JUROR:  I tend to think that the FDA

16   does need to regulate the drugs.  So I might be a little bit

17   biased from that standpoint.

18         MR. TREZEVANT:  But do you think you could set that

19   aside and be fair and impartial, and listen to the evidence

20   in this case, and apply the facts as the Judge gives it to

21   you, and be fair and impartial to both sides as to how you

22   view the facts in this case?

23         PROSPECTIVE JUROR:  Yes, I think so.

24         MR. TREZEVANT:  So that you wouldn't be prejudiced

25   by the prior experience or life experience, but you can be

1   fair and impartial in this case?

2          PROSPECTIVE JUROR:  I believe so.

3          MR. TREZEVANT:  Is there anyone else?

4          PROSPECTIVE JUROR:  My name is Lisa Croy.  I have a

5   problem with the pharmaceutical industry.  I think it's very

6   biased and a political organization.  I don't know how much

7   the FDA is involved with that.  I am not very researched, but

8   I do believe that the pharmaceutical industry is a very

9   poorly regulated organization overall and in their way of

10  doing things.  I think the way they are handled in this

11  country is very poorly handled, and I would have a problem

12  with anything regarding pharmaceuticals, and the FDA, and how

13  they deal with the pharmaceutical industry.

14         MR. TREZEVANT:  Concerning how they regulate the

15  pharmaceutical industry?

16         PROSPECTIVE JUROR:  Yes.

17         MR. TREZEVANT:  Is it an inherent bias that might

18  prevent you from being fair and impartial in this case?

19         PROSPECTIVE JUROR:  I think it might.

20         MR. TREZEVANT:  Is it something you can set aside

21  and just listen to the facts, or do you think you would be

22  biased?

23         PROSPECTIVE JUROR:  It's a hard thing to answer.  I

24  have seen so many incidents where the pharmaceutical industry

25  bulldozed their way through lobbying and getting their other

```
1    products passed, their drug prices are out the roof, and
2    people can't get medicines that they need.  I think that's a
3    really huge problem.  So I can't say, honestly, if it would
4    bias me or not.  I think that's something I really have an
5    issue with.
6              MR. TREZEVANT:  So are you unsure whether you could
7    be fair and impartial?
8              PROSPECTIVE JUROR:  I guess that would be a fair
9    answer.
10             MR. TREZEVANT:  Is it Ms. Abbott?
11             PROSPECTIVE JUROR:  Yes.  Mental health counselor.
12             MR. TREZEVANT:  Yes, ma'am.  In your work, do you
13   --
14             PROSPECTIVE JUROR:  I work at Cooperation Park in
15   the women's residential co-occurrence disorders, substance
16   abuse and mental health issues.  Full disclosure, I'm a
17   breast cancer survivor.  No bias, no issues.
18             MR. TREZEVANT:  I was going to ask you in your work
19   do you interact directly with patients?
20             PROSPECTIVE JUROR:  Yes, I do.
21             MR. TREZEVANT:  Do you prescribe medications?
22             PROSPECTIVE JUROR:  No, I do not.
23             MR. TREZEVANT:  So you're a counselor?
24             PROSPECTIVE JUROR:  Yes, I'm a psychotherapist.
25             MR. TREZEVANT:  So if they need prescription
```

1     drugs --

2              PROSPECTIVE JUROR:  Yes, we have an ARNP on staff

3     or we send them to an outside agency that does the

4     prescribing.

5              MR. TREZEVANT:  What about the ordering of those

6     drugs?

7              PROSPECTIVE JUROR:  I have no idea who does that.

8              MR. TREZEVANT:  As far as bias, is there any

9     reason, as you sit there right now, you think this is not the

10    kind of case for you, or you could be fair and impartial?

11             PROSPECTIVE JUROR:  I think I could be fair and

12    impartial.

13             MR. TREZEVANT:  Anyone in the back row?  Thank you,

14    ma'am.

15             PROSPECTIVE JUROR:  Ms. Danielle Anderson.  Um,

16    like I said before, I work for Humana.  So I work with

17    Medicare and Medicaid funded patients.  I don't think I would

18    have a bias towards any of this on this case.

19             MR. TREZEVANT:  Is there anything about the

20    physician being charged, or the fact that we're talking about

21    cancer treatment, or cancer care, or bringing drugs in from

22    outside of the country that might affect you from being fair

23    and impartial in this case?

24             PROSPECTIVE JUROR:  No.  I don't think I would have

25    a problem.

1          MR. TREZEVANT:  So you could wait and listen to the

2     facts presented in this case, and the law instructed by the

3     Court?

4          PROSPECTIVE JUROR:  Correct.

5          MR. TREZEVANT:  Anybody else?

6          Now, the Court asked generally -- I want to touch

7     -- has anyone had any negative interactions with any Federal

8     Government agency, division, any aspect of the Federal

9     Government or the State Government, State of Florida?  All

10    right.

11         Now, there is -- the charges in this case deal with

12    the receipt and delivery of different types of cancer drugs.

13    As you sit there, can you think of anyone in your life,

14    whether yourself, family members, extended family members, or

15    good friends that actually have been involved in an offense

16    or been charged with an offense involving illegal sales of

17    prescription drugs?

18         THE COURT:  All right.  Wrap it up, Mr. Trezevant.

19         MR. TREZEVANT:  Yes, sir.

20         PROSPECTIVE JUROR:  Just about half of my clients

21    have been involved in the sales of prescription drugs.

22         MR. TREZEVANT:  Pardon me, ma'am?

23         PROSPECTIVE JUROR:  Probably half of my clients

24    have been involved in the sale of prescription drugs.

25         MR. TREZEVANT:  Anything about that that would

1   affect you?

2           PROSPECTIVE JUROR:  No.

3           MR. TREZEVANT:  My last question.  Does anyone

4   here, as you sit here, where a question has yet to be asked

5   of you, or placed before you, but as you sit there, is there

6   something that concerns you that you may have some problem,

7   that has yet to be discussed, that might impact your ability

8   to be a fair and impartial juror in this case?

9           Thank you, your Honor.

10          THE COURT:  Mr. Tragos?

11          MR. SARTIS:  If I may, your Honor?

12          THE COURT:  All right.

13          MR. SARTIS:  Good morning everyone.  Is there

14  anyone here who has ever received a medical treatment outside

15  the United States?  In the box, Ms. Egawa?

16          PROSPECTIVE JUROR:  Yes.

17          MR. SARTIS:  Tell me about it.

18          PROSPECTIVE JUROR:  Just because we lived in Japan

19  for two years, so I did have medical appointments in Japan.

20          MR. SARTIS:  Since you have got the microphone,

21  Mr. Trezevant asked you a couple of questions a moment ago

22  regarding your -- I guess, your bias on some issues.  I'm

23  concerned about one thing.  You've got training that is every

24  year, basically.  And I'm not questioning whether you are

25  capable of sitting here and can sit in this case, because I

```
 1    know the Judge already told you that.  Your employer can't do
 2    anything bad to you.  This is going to take a week, maybe
 3    more, and there is a lot of information here, as
 4    Mr. Tragos and I represent Dr. Norbergs, I need to be certain
 5    of people that we put in this box, their attention is here,
 6    and they are focusing on what's going on here.  Because I
 7    really need to make sure she has the opportunity to have a
 8    jury to make a decision.  The facts that the Government is
 9    alleging is criminal, and based on that, it is -- I'm
10    concerned that your mind may be with what's going on at work,
11    or gosh, I hope that's coming together, or I hope they are
12    not thinking poorly of me.  Is that a concern for you?
13              PROSPECTIVE JUROR:  To be honest, yes.
14              MR. SARTIS:  Do you believe that would affect your
15    ability to pay attention and ultimately be fair and impartial
16    to us?
17              PROSPECTIVE JUROR:  To be honest, I have a concern.
18              MR. SARTIS:  Thank you, ma'am.  I appreciate that.
19    Anybody else in the front row or in the back.  Mr. McHugh?
20              PROSPECTIVE JUROR:  I lived in the Netherlands for
21    eight years.  So two of my kids were born in the Netherlands.
22    Whenever the kids were sick, or my wife was sick, we had
23    local care.
24              MR. SARTIS:  How was that experience?
25              PROSPECTIVE JUROR:  It was great.
```

1      MR. SARTIS:  Anything about your experience causing

2  you concern to sit in judgment in this case?

3      PROSPECTIVE JUROR:  No, sir.

4      MR. SARTIS:  Thank you, sir.  We appreciate your

5  candor.

6      PROSPECTIVE JUROR:  I was in the UK for eight years

7  and my oldest child was born there.

8      MR. SARTIS:  Same question, any issues regarding

9  that experience that you had?

10      PROSPECTIVE JUROR:  No, sir.  No.

11      MR. SARTIS:  Is there anyone else in the box on

12  that question?  If we may move to the back, front row.

13  Anyone ever received medical treatment outside the United

14  States?  I'm not seeing anyone.  All right.  Fine.

15      Has anyone here ever used a Canadian pharmacy?

16  Let's start with Ms. Croy.  Have you used a Canadian

17  pharmacy?

18      PROSPECTIVE JUROR:  Yes.

19      MR. SARTIS:  How was that experience?

20      PROSPECTIVE JUROR:  Perfect.

21      MR. SARTIS:  Any issues in the medications you

22  received?

23      PROSPECTIVE JUROR:  No.

24      MR. SARTIS:  Since you have the microphone, let me

25  ask you a question about what Mr. Trezevant asked you

1    earlier.  You have issue, I guess with, the pharmaceutical

2    industry as a whole?

3                PROSPECTIVE JUROR:  Correct.

4                MR. SARTIS:  You don't have a concern against the

5    FDA.  The question that I think is of concern to you is why

6    does it cost a gillion dollars to get treatment and care, or

7    get pharmaceuticals?

8                PROSPECTIVE JUROR:  Yes, but I also thought the FDA

9    regulated the pharmaceutical industry.  That would cause me a

10   bit of concern.

11               MR. SARTIS:  Then to clarify, are you concerned

12   that you could not be fair or impartial to the Government, or

13   Dr. Norbergs in this case simply because she is an oncologist

14   and the Government has charged or -- made allegations that

15   some of the pharmaceuticals that she may have used or -- are

16   from outside the United States?

17               PROSPECTIVE JUROR:  I suppose it's fair to say I

18   may be partial.  I may not be able to be impartial.

19               MR. SARTIS:  You may not be able to be impartial.

20   Okay.  Thank you, ma'am.

21               Back to the Canadian pharmacy question.  Anybody

22   else in the box?  No?  How about in the back?  No "Canadian

23   pharmacy" in the back?  Okay.

24               And I know some of you have expressed that you have

25   family members -- Ms. Brown I'm going to you first -- that

```
1   are currently undergoing chemotherapy or cancer treatments?
2              PROSPECTIVE JUROR:  She completed her cancer
3   treatments.  She's now in Hospice.  Basically we're just
4   waiting for her to pass.
5              MR. SARTIS:  I'm sorry.  Let me ask about that
6   experience.  I'm going to ask the same question I asked
7   Ms. Egawa.  Is this just not the right time for you to be
8   here?
9              PROSPECTIVE JUROR:  Probably not.  I have a lot
10  going on.
11             MR. SARTIS:  I see you are emotional.
12             PROSPECTIVE JUROR:  I just do not want to be here
13  when she does die.
14             MR. SARTIS:  And being here, and then -- it would
15  be difficult for you to pay the attention that we're going to
16  need from you?
17             PROSPECTIVE JUROR:  If I'm being honest, yes.
18             MR. SARTIS:  I appreciate your candor.  Let me ask
19  the question again to the box.  Anyone here whose family has
20  had a family member or personally undergone chemotherapy?
21  Okay.  Actually Ms. Croy, I think you already told us about
22  that.
23             PROSPECTIVE JUROR:  No.  My father-in-law went
24  through chemotherapy.
25             MR. SARTIS:  Were you intimately involved in that
```

1    process?  Personally involved?

2         PROSPECTIVE JUROR:  I was not personally involved,

3    no.  No.

4         MR. SARTIS:  Anything about that experience that

5    colors your feelings to be fair and impartial, other than

6    what you told us?

7         PROSPECTIVE JUROR:  Well, it kind of just ties in

8    to the pharmaceuticals and his ability to get medicines that

9    would have helped or not helped.

10         MR. SARTIS:  I understand.  Thank you, ma'am.

11    Let's go to the second row.  Let's start with Ms. Solie.

12         PROSPECTIVE JUROR:  Solie.  Both of my

13    grandparents, the only two I knew growing up, passed of

14    cancer.  My grandmother survived breast cancer and ended up

15    with brain tumors, and my grandfather was a professional

16    wrestling announcer who got through cancer and had to have

17    his voice box removed.  I was 14.  My father was one of the

18    executors.  So we were very involved in the end-of-life care

19    and treatment up to that point.  We trusted their physicians,

20    just to be, again, kind of the person that would make

21    everything better.  So --

22         MR. SARTIS:  Based on that, and what you gave us

23    earlier, is there any concern in your mind that you would be

24    fair and impartial to both sides sitting in this case?

25         PROSPECTIVE JUROR:  To both sides?  Yes.

1           MR. SARTIS:  You're not concerned about your

2     ability to be fair and impartial?

3           PROSPECTIVE JUROR:  No, I am -- again, I think it's

4     the physician's job to kind of dictate what treatments would

5     be best for their patient.

6           MR. SARTIS:  Follow-up.  So are you telling me you

7     more favor Dr. Norbergs?

8           PROSPECTIVE JUROR:  Yes.

9           MR. SARTIS:  You couldn't give the Government their

10    fair shake?

11          PROSPECTIVE JUROR:  I think they serve a purpose,

12    but I do sway to this woman's opinion that unfortunately

13    there is a lot of lobbyists with a lot of big dollars that

14    may interfere with our access to all available options.

15          MR. SARTIS:  Thank you, ma'am.  If you want to pass

16    the microphone to Mr. McHugh.

17          PROSPECTIVE JUROR:  My father died of cancer in

18    1993.

19          MR. SARTIS:  Did he have chemotherapy?

20          PROSPECTIVE JUROR:  Yes, he did.

21          MR. SARTIS:  Were you involved in that process?

22          PROSPECTIVE JUROR:  Unfortunately not.  I was

23    overseas.

24          MR. SARTIS:  Anything about that process that would

25    make it difficult for you to sit in judgment in this case,

1    one way or the other?

2           PROSPECTIVE JUROR:  No, sir.

3           MR. SARTIS:  Back row.

4           PROSPECTIVE JUROR:  My mother had chemotherapy

5    prior to passing in 1993.  They did the best they could at

6    the time.

7           MR. SARTIS:  Were you involved in that process?

8           PROSPECTIVE JUROR:  Yes.

9           MR. SARTIS:  Does your experience at all color your

10   ability to be fair and impartial here as we sit in this case?

11          PROSPECTIVE JUROR:  I don't think so.

12          MR. SARTIS:  You might as well pass the microphone

13   to Ms. Hamilton.

14          PROSPECTIVE JUROR:  Lori Hamilton.  My grandmother

15   passed from cancer, and she went through chemotherapy.  I

16   deal with cancer on a daily basis in my profession.

17          MR. SARTIS:  Let me ask you a question since you

18   have the microphone.  You work the night shift?

19          PROSPECTIVE JUROR:  I do.

20          MR. SARTIS:  If we choose you to be a juror in this

21   case, I'm concerned that -- you would normally be sleeping

22   right now?

23          PROSPECTIVE JUROR:  Normally, yes.

24          MR. SARTIS:  How are you feeling as we are going so

25   far?

1              PROSPECTIVE JUROR:  A little tired.

2              MR. SARTIS:  Do you think that we should be

3    concerned about your ability to be focused upon --

4              PROSPECTIVE JUROR:  I do.  I do.  Because sometimes

5    I wake up in the middle of the night.  I can't go back to

6    sleep.  I worry about getting here on time.  Things like

7    that.  I'm a night person.

8              MR. SARTIS:  How long have you been working night

9    shift?

10             PROSPECTIVE JUROR:  Eight years.

11             THE COURT:  Wrap it, Mr. Sartis.

12             MR. SARTIS:  If I can finish this line of

13   questioning, I have hands up?  Thank you, your Honor.

14             Microphone down to Ms. Hensley.

15             PROSPECTIVE JUROR:  Yes.  I have a daughter who has

16   leukemia and she had to go through chemotherapy.

17             MR. SARTIS:  Has it resolved itself?

18             PROSPECTIVE JUROR:  It's a rare form, so it can

19   come back.

20             MR. SARTIS:  Is there something about that

21   experience that is concerning to you and your ability to be

22   fair and impartial in this case?

23             PROSPECTIVE JUROR:  No.

24             MR. SARTIS:  Thank you, ma'am.  Anyone else in the

25   box?  Mr. Wilson?

```
1              PROSPECTIVE JUROR:  Unfortunately cancer runs
2     rampant in my family.  I lost my father at a very young age,
3     and about five years ago my mother was diagnosed with breast
4     cancer.
5              MR. SARTIS:  Has anybody had chemotherapy that you
6     are aware of?
7              PROSPECTIVE JUROR:  Yes.
8              MR. SARTIS:  Were you involved in the chemotherapy
9     during that process?
10             PROSPECTIVE JUROR:  Just helping my mom get to and
11    from treatments.
12             MR. SARTIS:  Again, anything about that experience
13    that we should be concerned about, your ability to be fair
14    and impartial here?
15             PROSPECTIVE JUROR:  No, sir.
16             MR. SARTIS: THNG.  Anybody else in the box?  What
17    -- do we have few hands in the back?  Ms. Ballentine.  I'm
18    sorry, Ms. Cummings.
19             PROSPECTIVE JUROR:  Yes.  My mother-in-law passed
20    from cancer and I was involved with her
21    chemotherapy/radiation treatment.
22             MR. SARTIS:  Anything about that experience, ma'am,
23    that we should know that concerns your ability to be fair and
24    impartial in this case?
25             PROSPECTIVE JUROR:  No.
```

1           MR. SARTIS:  Thank you, ma'am.  Pass that

2     microphone down to Ms. Ballentine.

3           PROSPECTIVE JUROR:  Jolly.

4           MR. SARTIS:  Ms. Jolly.  Some people are missing.

5           PROSPECTIVE JUROR:  Several people, my aunt, uncle,

6     grandmother, and cousins.  My uncle and my grandmother didn't

7     catch it in time, but my cousins did catch it in time.  One

8     was caught, one has it, and one is on the chemo right now,

9     but I'm not --

10          MR. SARTIS:  You're not intimately involved in that

11    process?

12          PROSPECTIVE JUROR:  No.

13          MR. SARTIS:  Nothing about that that we should be

14    concerned about?

15          PROSPECTIVE JUROR:  No.

16          MR. SARTIS:  I think it's Ballentine.

17          PROSPECTIVE JUROR:  My cousin had cancer.  He was

18    involved.  I was involved.  My aunt, I had another aunt.  My

19    brother had cancer.  He got through it.  A lot of it in the

20    family.  Not too much --

21          MR. SARTIS:  Have you been intimately involved in

22    the chemotherapy process?

23          PROSPECTIVE JUROR:  Yes.

24          MR. SARTIS:  Anything about your experience we

25    should know about based on what we heard in this case?

1               PROSPECTIVE JUROR:  No.

2               MR. SARTIS:  Thank you, ma'am.  I believe Mr. Kelly

3      had a hand up?

4               PROSPECTIVE JUROR:  I lost my daughter three years

5      ago to esophageal cancer, and I was involved with her.  I

6      took her to her doctor appointments.  I took her to the

7      chemotherapy, and eventually she wound up in Hospice and died

8      in Hospice.

9               MR. SARTIS:  I'm sorry for your loss, sir.  And

10     without prying, I apologize, anything about that experience

11     that leads you to believe you may not be a good juror for us

12     in this case?

13              PROSPECTIVE JUROR:  I don't think so.  It's a

14     terrible thing to go through, cancer.  There is a lot of

15     suffering involved.  A lot of drugs, and patients don't

16     always react positively to drugs that they are given.  So

17     it's touch and go.  It wasn't a great experience, as you can

18     imagine.  I don't think I would be biased.

19              MR. SARTIS:  One way or the other?

20              PROSPECTIVE JUROR:  No.

21              MR. SARTIS:  Thank you, sir.  Thank you, your

22     Honor.

23              THE COURT:  Thank you.  Let's take a 15-minute

24     break, please.

25              CSO OFFICER:  All rise.

```
1              (Venire exits courtroom at 11:24 a.m.)

2              CSO OFFICER:  Please be seated.

3              THE COURT:  Any challenges for cause?

4              MR. TREZEVANT:  Yes, your Honor.  Lisa Croy, in the

5     front row.

6              THE COURT:  Response?

7              MR. SARTIS:  No objection.

8              THE COURT:  All right.  I'll grant that.  She is

9     stricken for cause.  That leaves us 25 jurors.

10             MR. TREZEVANT:  Your Honor, I'm sorry, I have one

11    other.

12             THE COURT:  I know.  My guess is both sides have

13    plenty more.  I'm just laying out the facts.  We have 24

14    jurors not yet stricken.  If we get a jury of 12, plus two,

15    is 14, that leaves 11.  And we've got 16 strikes available.

16    So keep that in mind, if we're going to get a jury.

17             Do you have another challenge for cause?

18             MR. TREZEVANT:  I do, your Honor.  The Government

19    would move to strike Samantha Solie.

20             THE COURT:  Response?

21             MR. SARTIS:  No objection.

22             THE COURT:  I'll strike Ms. Solie.  Any others?

23             MR. TREZEVANT:  No, sir.

24             THE COURT:  Any challenges for cause from the

25    Defense?
```

1          MR. SARTIS:  Yes, your Honor.  Cynthia Egawa.

2          THE COURT:  I don't recall her saying she couldn't

3     be fair and impartial.

4          MR. SARTIS:  I'm more concerned, your Honor, about

5     the fact that, in her mind, she is going to be somewhere very

6     far away from where we are.

7          THE COURT:  She might miss her training?

8          MR. SARTIS:  I don't care if she misses her

9     training, but I'm more concerned -- yeah, she's concerned

10    about missing her training, and she's not going to be focused

11    on what we're talking about here.

12         THE COURT:  I deny that.

13         MR. SARTIS:  Then, your Honor, I would strike

14    Ms. Brown, on the corner.  Her mother, apparently, is in

15    Hospice and is going to die.

16         THE COURT:  It's her mother-in-law, right?

17         MR. SARTIS:  Correct.  She got emotional just

18    telling me about it.

19         THE COURT:  I'm going to deny that on the cause

20    basis.  You can strike her, if you wish.  Any others?

21         MR. SARTIS:  No, your Honor.  That covers us.

22         THE COURT:  I expected one of you to move to strike

23    Lori Hamilton, the nurse, who says no one can fill in for her

24    for two weeks.

25         MR. SARTIS:  She is the night shift nurse?

```
 1              THE COURT:  But if you are both satisfied that she
 2    can pay attention.  She was, I thought, pretty strident in
 3    her answers, but anyway, I will leave that to a strike, if
 4    you wish.  Okay.
 5              MR. SARTIS:  Your Honor, I'll move to strike, if it
 6    makes it easier, for cause.
 7              MR. TREZEVANT:  We're not going to object to that,
 8    Judge.
 9              THE COURT:  I'm sorry?
10              MR. TREZEVANT:  We're not going to object to that.
11              THE COURT:  All right.  I'll strike Ms. Hamilton.
12              All right.  According to my notes that then strikes
13    the ones that we might have called back in individually.  How
14    about David Blount, who's the young potential juror in the
15    back who says he's self-employed and if he doesn't work, he
16    doesn't get paid?
17              MR. SARTIS:  I agree with that, your Honor.  I'll
18    move for cause.
19              MR. TREZEVANT:  Agreed.
20              THE COURT:  All right.  I'll strike him.
21              That leaves us 22 potential jurors.  What says the
22    Defense about the two remaining jurors?
23              MR. SARTIS:  Your Honor, the Defendant would strike
24    Ms. Brown.
25              THE COURT:  What says the Government about the 21
```

```
1    remaining jurors?

2            MR. TREZEVANT:  The Government would strike

3    Robert McHugh.

4            THE COURT:  What says the Defense about the 20

5    remaining jurors?

6            MR. SARTIS:  Your Honor, the Defendant would strike

7    Cynthia Egawa.

8            THE COURT:  What says the Government about the

9    remaining 19 jurors?

10           MR. TREZEVANT:  The Government would move to strike

11   Jennifer Abbott.

12           THE COURT:  What says the Defense about the

13   remaining 18 jurors?

14           MR. SARTIS:  Your Honor, the Defendant would strike

15   Joseph Seitz.

16           THE COURT:  That's Juror 14?  You are striking

17   Juror 14?

18           MR. SARTIS:  I'm sorry, your Honor.  Yes, sir, it

19   is.

20           THE COURT:  All right.  What says the Government

21   about the 17 remaining jurors?

22           MR. TREZEVANT:  The Government would strike Rebecca

23   Hensley.

24           THE COURT:  What says the Defense about the 16

25   remaining jurors?
```

```
 1              MR. SARTIS:  Your Honor, Defendant would strike
 2    Mr. James Riley, who's in the back.
 3              THE COURT:  He said he could be fair.
 4              MR. SARTIS:  I'm sure he did.
 5              THE COURT:  What says the Government about the 15
 6    remaining jurors?
 7              MR. TREZEVANT:  We will accept that panel.
 8              THE COURT:  What says the Defense about the 15
 9    remaining jurors?
10              MR. TRAGOS:  Give us a moment, your Honor.
11              MR. SARTIS:  Your Honor, the Defendant would strike
12    Ms. Schmidt.
13              THE COURT:  What says the Government about the 14
14    remaining jurors?
15              MR. TREZEVANT:  We're okay, Judge.
16              THE COURT:  What says the Defense about the 14
17    remaining jurors?
18              MR. SARTIS:  Your Honor, the Defendant accepts.
19              THE COURT:  Thank you very much.  That gives us a
20    jury of 12, plus two alternates.  So the Jury will be Jurors
21    7, 11, 16, 18, 20, 24, 25, 26, 28, 30, 31, 32, and the
22    alternates are Jurors 34 and 35.
23              Now, that leaves on the Jury Mr. Kelly, who says he
24    has a hard time hearing.  I'll ask him to let us know if he
25    has any difficulty during the trial and we'll stop and
```

1     explore that further.

2              All right.  Let's go ahead and take a ten-minute

3     break ourselves.  My thought is I'll give the opening

4     instructions before lunch and excuse them for lunch.

5              (Brief morning recess at 11:36 a.m.)

6              (Court resumes at 11:45 a.m.)

7              THE COURT:  If I call your name, I need for you to

8     remain here in the courtroom in your present seat.  If I do

9     not call your name, please return to the third floor jury

10    room.

11             Ms. Williams, Mr. Papoula, Mr. Wilson,

12    Mr. Michalski, Ms. Anderson, Mr. Meredith, Mr. Petterson,

13    Mr. Kelly, Mr. DeVelle, Mr. Price, Ms. Freeman, Ms. Jolly,

14    Ms. Ballentine, Ms. Cummings.  If I did not call your name,

15    please return to the third floor jury room.

16             Ms. Williams, would you come down and take the

17    first seat in the first row.  Mr. Papoula, would you sit next

18    to her.

19             PROSPECTIVE JUROR:  This one or that one?

20             THE COURT:  Front row, far seat.  Mr. Wilson, would

21    you come down, and Mr. Michalski, follow him, please.

22    Ms. Anderson, would you come up and have a seat next to

23    Mr. Michalski.  Mr. Meredith, would you come up and have a

24    seat in the first seat in the second row.  Mr. Petterson,

25    would you come up and sit next to him, please.  Mr. Kelly,

 1    would you come sit next to Mr. Petterson.  What happened to

 2    Mr. Kelly?  Mr. DeVelle, Mr. Price, Mr. Kelly, move on down,

 3    please.  Ms. Freeman, take the first chair in the back row,

 4    please.  Ms. Jolly, Ms. Ballentine, and Ms. Cummings.

 5            Swear the Jury, please.

 6            MADAM CLERK:  Please rise and raise your right

 7    hands.

 8            JURY PANEL:  We do.

 9            (Jury panel sworn.)

10            MADAM CLERK:  Please be seated.

11            THE COURT:  Members of the Jury, now that you have

12    been sworn, I need to explain some basic principles about a

13    criminal trial and your duty as jurors.  These are

14    preliminary instructions.  At the end of the trial, I will

15    give you more detailed instructions.

16            It will be your duty to decide what happened so you

17    can determine whether the Defendant is guilty or not guilty

18    of the crime or crimes charged in the indictment.

19            At the end of the trial, I will explain the law

20    that you must follow to reach your verdict.  You must follow

21    the law as I explain it to you, even if you do not agree with

22    the law.

23            You must decide the case solely on the evidence

24    presented here in the courtroom.  Evidence can come in many

25    forms.  It can be testimony about what someone saw, or heard

1   or smelled.  It can be an exhibit admitted into evidence.  It

2   can be someone's opinion.  Some evidence proves a fact

3   indirectly, such as a witness who saw wet grass outside and

4   people walking into the courthouse carrying wet umbrellas.

5        Indirect evidence, sometimes called circumstantial

6   evidence, is simply a chain of circumstances that proves a

7   fact.  As far as the law is concerned, it makes no difference

8   whether evidence is direct or indirect.  You may choose to

9   believe or disbelieve either kind, and should give every

10  piece of evidence whatever weight you think it deserves.

11       Certain things are not evidence.  I will list them

12  for you now:  Statements and arguments of the lawyers.  In

13  their opening statements and closing arguments the lawyers

14  will discuss the case, but their remarks are not evidence.

15       Questions and objections of the lawyers.  The

16  lawyers' questions are not evidence.  Only a witness's answer

17  is evidence.  You should not think that something is true

18  just because a lawyer's question suggests that it is.

19       For instance, if a lawyer asks a witness, "You saw

20  the Defendant hit his sister, didn't you?"  That question is

21  not evidence whatsoever of what the witness saw, or what the

22  Defendant did unless the witness agrees with it.

23       There are Rules of Evidence that control what can

24  be received into evidence.  When a lawyer asks a question or

25  offers an exhibit, and the lawyer on the other side thinks it

is not permitted by the Rules of Evidence, that lawyer may

object.  Now, the lawyers know that when they object, they

are to stand and say, "Objection," and then they state the

legal basis only of the objection.  That's generally one or

two words, like, "Objection, hearsay," or, "Objection,

relevance."  I usually can rule based on just the one or

two words.  But if there's to be a discussion or argument

about it, it's supposed to take place outside of your

hearing.  And if I think that discussion will be brief, I'll

call the lawyers to the sidebar over here and we'll have the

legal discussion outside of your hearing.  If I think it will

be a lengthy discussion, I'll call a recess and let you go

outside and relax while we have the legal arguments here in

the courtroom.

        If I call the lawyers to the sidebar, you may

stand, stretch, relax, talk among yourselves, just don't try

to overhear what we're talking about because that defeats the

whole purpose of me calling them to the side of the bench.

        If I overrule an objection, the question may be

answered or the exhibit received.  If I sustain the

objection, then the question cannot be answered and the

exhibit cannot be received.

        Whenever I sustain an objection to a question, you

must ignore the question and not try to guess what the answer

would have been.  Of course sometimes a lawyer can ask the

```
1    question again in a different way and it can be answered, or
2    can provide support for an exhibit in a different way and it
3    can be admitted.  But if the objection is sustained, please
4    disregard the question or the exhibit.
5            Sometimes I may order that evidence be stricken and
6    that you disregard or ignore the evidence.  That means that
7    when you are deciding the case, you must not consider that
8    evidence.
9            Some evidence is admitted only for a limited
10   purpose.  When I instruct you that an item of evidence has
11   been admitted for a limited purpose, you must consider it
12   only for that limited purpose and no other.
13           In reaching your verdict, you may have to decide
14   what testimony to believe and what testimony not to believe.
15   You may believe everything a witness says, or part of it, or
16   none of it.  In considering the testimony of any witness, you
17   may take into account the opportunity and ability of the
18   witness to see, or hear, or know the things testified to.
19   The witness's memory.  The witness's manner while testifying.
20   The witness's interest in the outcome of the case and any
21   bias or prejudice, whether other evidence contradicted the
22   witness's testimony.  The reasonableness of the witness's
23   testimony in light of all the evidence, and any other factors
24   that bear on believability.  I will give you additional
25   guidelines for determining credibility of the witnesses at
```

1    the end of the case.

2         As you know, this is a criminal case.  There are

3    three basic rules about a criminal case that you must keep in

4    mind.  First, a Defendant is presumed innocent until proven

5    guilty.  The indictment against the Defendant brought by the

6    Government is only an accusation, nothing more.  It is not

7    proof of guilt or anything else.  The Defendant, therefore,

8    starts out with a clean slate.

9         Second, the burden of proof is on the Government

10   until the very end of the case.  The Defendant has no burden

11   to prove his or her innocence, or to present any evidence or

12   to testify.  Since the Defendant has the right to remain

13   silent and may choose whether to testify, you cannot legally

14   put any weight on a Defendant's choice not to testify.  It is

15   not evidence.

16        Third, the Government must prove the Defendant's

17   guilt beyond a reasonable doubt.  I will give you further

18   instructions on this point later, but bear in mind that the

19   level of proof required is high.

20        Our law requires jurors to follow certain

21   instructions regarding their personal conduct in order to

22   help assure a just and fair trial.  I will now give you those

23   instructions.

24        Do not talk, either among yourselves or with anyone

25   else about anything related to the case.  You may tell the

1    people with whom you live and your employer that you're a

2    juror, and give them information about when you will be

3    required to be in court, but you may not discuss with them or

4    anyone else anything related to the case.

5             Two, do not, at any time during the trial, request,

6    accept, agree to accept or discuss with any person any type

7    of payment or benefit in return for supplying any information

8    about the trial.

9             Three, you must promptly tell me about any incident

10   you know of involving an attempt by any person to improperly

11   influence you or any member of the Jury.

12            Four, do not visit or view the premises or place

13   where the charged crime was allegedly committed, or any other

14   premises or place involved in the case.  And you must not use

15   internet maps, or Google Earth, or any other program or

16   device to search for a view of the location discussed in the

17   testimony.

18            Five, do not read, watch or listen to any accounts

19   or discussions related to the case which may be reported by

20   newspapers, television, radio, the internet or any other news

21   media.

22            We never know when the media is going to be

23   reporting something from a trial.  A lot of times it depends

24   on whether or not it's a slow news day and they need

25   something to fill time.  But we have Rules of Evidence that

1    the lawyers are to follow, and the rules are to control what

2    evidence you are to hear, and see and rely on in reaching

3    your verdict.  I can control what comes into evidence here in

4    this courtroom, but I can't control what somebody says

5    outside the courtroom, including a reporter or a TV person.

6    So if any of that comes before you, please do not watch it or

7    read it.  Otherwise, you won't know if you base your opinion

8    partially on what someone else has said or only what you

9    heard in this courtroom.

10           Six, do not attempt to research any fact, issue or

11   law related to this case, whether by discussions with others,

12   by library, or any other research, or by any other means or

13   source.

14           In this age of instant electronic communication and

15   research, I want to emphasize that in addition to not talking

16   face-to-face with anyone about the case, you must not

17   communicate with anyone about the case by any other means,

18   including telephone, text messages, email, internet chat,

19   chat rooms, blogs or social networking websites such as

20   *Facebook*, *Myspace* or *Twitter*.  You must not provide any

21   information about the case to anyone by any means whatsoever,

22   and that includes posting information about the case, or what

23   you are doing in the case, on any device or internet site,

24   including blogs, chat rooms, social websites or any other

25   means.

```
 1              You also must not use Google or otherwise search

 2     for any information about the case, or the law that applies

 3     to the case, or the people involved in the case, including

 4     the Defendant, the witnesses, the lawyers or the Judge.  It

 5     is important that you understand why these rules exist and

 6     why they are so important.  Our law does not permit jurors to

 7     talk with anyone else about the case, or to permit anyone to

 8     talk to them about the case because only jurors are

 9     authorized to render a verdict.  Only you have been found to

10     be fair, and only you have promised to be fair.  No one else

11     is so qualified.  Of course you can talk about the case once

12     it is over with, just not during the case.

13              Our law does not permit jurors to talk among

14     themselves about the case until the Court tells them to begin

15     deliberations, because premature discussions can lead to a

16     premature final decision.  You know, we're all human, and if

17     we start discussing a subject, we start forming a conclusion,

18     which wouldn't be fair if you were to form conclusions before

19     you had heard all the evidence.  That's why you can't even

20     talk among yourselves about the case until after all the

21     evidence is in, and I instruct you to return to the jury room

22     and begin your discussions.

23              Our law requires that you not read or listen to any

24     news accounts of the case, and that you not attempt to

25     research any fact, issue or law related to the case.
```

1    Your decision must be based solely on the testimony and other

2    evidence presented in this courtroom.

3           Also, the law often uses words and phrases in

4    special ways.  So it's important that any definitions you

5    hear come only from me and not from any other source.  It

6    wouldn't be fair to the parties for you to base your decision

7    on some reporter's view or opinion, or upon other information

8    you acquire outside the courtroom.

9           These rules are designed to help guarantee a fair

10   trial, and our law accordingly sets forth serious

11   consequences if the rules are not followed.  I trust that you

12   understand and appreciate the importance of following these

13   rules and in accord with your oath and promise I know you

14   will do so.

15          Different people listen better in different ways.

16   Some people listen better if they are just concentrating on

17   what a person says and not taking notes.  Other people

18   actually listen better if they are taking notes, or doodling,

19   or doing whatever they do with a pen or pad.  I'm one of

20   those former people that I listen better if I'm just

21   concentrating on what someone says.  If you would like to

22   take notes, you are free to do so.  If you let Eddie know, he

23   will provide with you a pen and pad so that you can take

24   notes.

25          If you do take notes, don't let your note taking

1    distract you so that you do not hear other answers by the

2    witnesses, or that you don't observe the demeanor of the

3    witness.  Because a lot of times your credibility decision

4    may depend on the demeanor of the witness while testifying.

5              When you leave the courtroom, your notes should be

6    left in the jury room.  Whether or not you take notes, you

7    should rely on your own memory of what was said.  Notes are

8    to assist your memory only.  They are not entitled to any

9    greater weight than your memory or impression about the

10   testimony.

11             I've mentioned before that sometimes it's hard to

12   hear in this courtroom because it's so large and spacious.

13   That's for everyone, not just Mr. Kelly, but if any of you

14   have a hard time hearing, either a lawyer, or a witness, or

15   me, please stop me right away so I can have whatever happened

16   be repeated so that you can hear it.  It's important that you

17   hear everything or see everything that goes on during the

18   trial.

19             We normally will take one break in the morning and

20   one break in the afternoon, but we can take as many breaks as

21   anyone needs.  I know we took a long time this morning

22   without a break.  I was testing your bladders to see how well

23   you can hold up.  I can see we have a very good group in our

24   jury box.  If you do need to take a break, get my attention

25   and we'll take however many breaks anyone needs.

```
1          We would generally start about 8:45 in the morning,
2   depending on what hearings I have each morning, and we'll
3   generally stop about 4:30 or so in the afternoon to give you
4   a jump on the rush hour traffic.  That may depend on who's
5   testifying, or nearing the end of testimony, or in the middle
6   of testimony.  Sometimes we may go a little later to try to
7   finish with a witness.  The exception will be tomorrow.
8   Because we're taking Friday off, and the lawyers estimated a
9   ten-day trial, we'll probably go to 5:30 or 6:00 tomorrow to
10  try to get in as much evidence as we can on that one day.  I
11  don't expect to have to do that on any other day, but we'll
12  have to see how things go and how I think the trial is moving
13  along.  But if any of you have a problem picking up a child
14  at 5:30 or anything like that, let me know, and we will try
15  to accommodate your schedule.
16          As you noticed, we have one area for elevators, and
17  when you leave or you return from lunch, for example, you may
18  be riding up the elevator with one or more of the lawyers, or
19  you may pass a lawyer in the hallway.  Now, it's human nature
20  that when we pass someone that we recognize, particularly
21  after three or four days of seeing someone here in court, you
22  may say, "good morning" or "hello" or whatever, and the
23  lawyer may not say anything at all.  Please understand that
24  they are trying to follow the same rules you are and not
25  being seen by anyone as potentially talking about the case.
```

1    So they may just ignore you all together, and I would request

2    that you ignore them all together.  Sometimes it's a problem

3    if someone says something at one end of the hall and someone

4    at the other end sees that exchange take place, and they

5    often assume that something about the case was exchanged.

6    The best way to avoid that is just don't say anything at all

7    to anyone that you know is connected with this case.

8              It is now 12:15 p.m.  We're going to break for

9    lunch until 1:30.  When we return for lunch, we will begin

10   with the parties beginning their opening statements.  First

11   the Government makes an opening statement, which is simply an

12   outline to help you understand the evidence as it is coming

13   in.  Then the Defendant's attorney may, but does not have to,

14   make an opening statement.  Opening statements are neither

15   evidence nor argument.

16             Then we begin the trial, with the Government

17   presenting its witnesses, and counsel for the Defense may

18   cross-examine them.  After the Government's case the

19   Defendant may, if he or she wishes, present witnesses who the

20   Government may cross-examine.  After all the evidence is in,

21   the attorneys will present their closing arguments to

22   summarize and interpret the evidence for you, and I will

23   instruct you on the law.  After that, you will go to the jury

24   room to decide your verdict.

25             All right.  We will be in recess until 1:30.

1          CSO OFFICER:  All rise.

2          (Jury exits at 12:16 p.m. for lunch.)

3          CSO OFFICER:  Please be seated.

4          THE COURT:  Leslie tells me that a news reporter, I

5    don't know from where, did call this morning and asked when

6    opening statements would be.  So I assume that the reporter

7    wants to sit in on opening statements.  I will also assume

8    that there may be a story in the paper, or something on the

9    news tonight or tomorrow.  So if counsel will remind me at

10   the end of the day, I will remind the jurors again not to

11   listen to anything having to do with the case.

12          Anything else before we retire for lunch?

13          MR. SALTZMAN:  Your Honor, just a quick question,

14   will you be reading or summarizing the indictment to the

15   Jury?

16          THE COURT:  No.  Anything else?

17          MR. TREZEVANT:  Not from the Government.

18          THE COURT:  All right.  See you at 1:30.

19          (Noon recess taken at 12:17 p.m.)

20          (Court back in session at 2:00 p.m.)

21          THE COURT:  How much time do you want for openings?

22          MR. SALTZMAN:  Your Honor, I would estimate about

23   20 minutes.

24          THE COURT:  20 minutes.  How about the Defense?

25          MR. TRAGOS:  If I give one, your Honor, it won't be

1    any longer.

2            (Jury enters courtroom at 2:03 p.m.)

3            THE COURT:  Were you thinking that perhaps we don't

4    know how to tell time?  It turns out this time it was not the

5    lawyers arguing about anything.  It was our sound system went

6    out completely, and none of the microphones worked.  So we

7    had to have our tech people up here trying to figure out what

8    was going wrong and fix it.  We finally got it back on.  All

9    right.

10           All right.  As I told you, the next step is from

11   the opening statements of the lawyers.  The Government may

12   proceed.

13           MR. SALTZMAN:  May it please the Court.

14   Dr. Norbergs treated patients with cancer.  Patients came to

15   her when they were sick and often needed chemotherapy.

16   Chemotherapy drugs so potent the patients would sometimes

17   lose their hair.

18           Rather than using FDA approved chemotherapy drugs,

19   the Defendant, Dr. Norbergs, imported foreign unapproved

20   drugs to have injected into her patients without even telling

21   them, and she did it for one reason and that reason was

22   greed.  Because if she bought the unapproved drugs cheaper

23   than the approved drugs, she made more money when she

24   submitted claims to Medicare for reimbursement.

25           When she did that, she certified that the drugs

1    that she gave her patients were FDA approved, because absent

2    circumstances not present in this case, FDA-approved drugs

3    are the only types of drugs that Medicare will pay for.  But

4    the evidence will show in this case that Dr. Norbergs

5    routinely received unapproved drugs, and had those drugs

6    given to patients and submitted claims to Medicare.  Based on

7    that conduct, the Defendant is charged with 45 counts of four

8    categories of crimes, and we will present evidence in this

9    case to prove to you beyond a reasonable doubt that she

10   committed those four categories of offenses.

11        First, you will see here on the screen the receipt

12   and delivery of misbranded drugs with the intent to defraud

13   and mislead, and I will explain what "misbranded" means in a

14   moment.

15        Next, smuggling goods into the United States.  The

16   "goods" being the misbranded drugs.

17        Third, healthcare fraud, and fourth, mail fraud.

18        Once again, ladies and gentlemen, my name is Adam

19   Saltzman and I represent the United States, along with Jay

20   Trezevant.  Also sitting at counsel table is our legal

21   specialist Gina Wetherald, FDA Special Agent Eric Larson, and

22   Health and Human Services Special Agent Rafael Chaka, and we

23   would like to sincerely thank you in advance for your service

24   in this case.

25        Now, I would like to take a step back and give you

1   a quick overview of the case that I'm going to talk about in

2   this opening statement.

3          First, I would like to talk about some, but not all

4   the knowledge -- not all the evidence that will show

5   Dr. Norbergs knew what she could do and what she could not

6   do.

7          Next, we will talk about the FDA approval process.

8          After that, we will talk about misbranding and what

9   that means.

10          You will hear evidence about how Dr. Norbergs

11   obtained these cheaper and foreign unapproved drugs.

12          And finally, you will hear about how these drugs

13   were being administered to unknowing cancer patients and then

14   claims were being submitted to Medicare so Dr. Norbergs could

15   make more money.

16          So let's start with No. 1, about some, but not all

17   of the evidence that will show Dr. Norbergs knew what she

18   could do legally, but also knew what she could not do.  And

19   I'm going to highlight five examples for you, but during

20   trial you will hear about more than just these five.

21          First, you'll hear about how Dr. Norbergs

22   registered for a medical practice that was called Eastlake

23   Oncology as a healthcare clinic establishment, and she did

24   that in October of 2009.  That is something that Eastlake

25   Oncology was required to do under Florida law because it was

1    a medical practice that was purchasing prescription drugs.

2    When she did that, when she completed that application, she

3    had to swear that she understood that she had to follow a

4    specific Florida law.

5         Now, this is a federal criminal case, and the Judge

6    will explain the law to you that is involved in this case.

7    But the law in Florida, along with other things, at least

8    criminalized the receiving of misbranded drugs and then

9    giving them to patients.

10        Next, in September of 2011, FDA Special Agent Eric

11   Larson, who is sitting at counsel table, was assisting a

12   colleague of his in an investigation regarding foreign and

13   unapproved drugs.  As part of that investigation, he went to

14   Dr. Norbergs office to serve her with a subpoena for

15   documents.  When Special Agent Larson handed her the

16   subpoena, he very clearly told her --

17        MR. TRAGOS:  Renew our objection, your Honor.

18        THE COURT:  Overruled.

19        MR. SALTZMAN:  Special Agent Larson handed her a

20   subpoena.  He was face-to-face with her, and he very clearly

21   told her to stop buying foreign unapproved drugs.

22        So we have October 2009, September 2011.  All the

23   conduct for the crimes that she is accused of committing in

24   this case all took place after those two events.  It took

25   place after she swore that she understood that she had to

1   follow a law that prohibited, that criminalized the receiving

2   of misbranded drugs and giving them to patients.  All the

3   conduct, all of this took place after she received a subpoena

4   from a federal law enforcement officer that had to do with

5   the importation of prescription drugs.  All of the conduct

6   took place after she was told by Special Agent Larson to stop

7   buying foreign unapproved drugs.

8           Third, you'll hear about a search warrant that was

9   conducted in this case.  That was conducted in February of

10   2013, of Dr. Norbergs' office at Eastlake Oncology.  Law

11   enforcement went to her office to collect a number of

12   records, which we will show in this case, and one of the

13   items found in the doctor's office was a printed article.

14   And you'll hear evidence that Dr. Norbergs saw this article.

15   That article provided warnings within it by FDA officials

16   telling clinics that they needed to buy their medicines from

17   legitimate sources, and from licensed suppliers in the United

18   States.

19           It then identified a specific supplier that was not

20   approved by the name of Quality Specialty Products, and it

21   identified that supplier, Quality Specialty Products, as an

22   overseas supplier.  You'll hear evidence in this case that

23   Dr. Norbergs bought drugs from that overseas supplier.

24           Next, you will see evidence that the FDA sent a

25   letter to Dr. Norbergs in April 2012, and in that letter it

1   told her that the FDA, at that point, had evidence that she

2   had purchased drugs from foreign sources.  That letter told

3   her that doing so was illegal, and it told her that these

4   products, which were foreign and unapproved, could cause

5   serious harm to patients because they could be unsafe and

6   ineffective.

7           Next you'll hear that a reporter inquired of

8   Dr. Norbergs about the letter she received, and wanted to

9   know how she responded to getting a letter about purchasing

10  drugs that were not FDA approved, and you'll hear how

11  Dr. Norbergs responded.  She responded in two ways.

12          First, she said she didn't want to give a comment.

13  And next, after those five things that I just mentioned, all

14  five of those things happened, Dr. Norbergs then continued to

15  buy more foreign unapproved drugs, but this time from a

16  different supplier to then have them injected into her

17  unknowing cancer patients.  And based on some of the

18  information that was in those materials, it told her that

19  injecting her cancer patients with these foreign unapproved

20  and cheaper drugs could cause serious harm to patients

21  because they could be unsafe and ineffective.

22          As I said, because you will hear evidence about the

23  drugs being approved by the -- some drugs being approved by

24  the FDA, you'll hear about what that means and that brings us

25  to our next topic.

1          Now, Dr. Arthur Simone, an official with the

2     Food and Drug Administration will be testifying in this case.

3     And he'll testify about what the FDA looks at when it makes a

4     decision to approve a drug so that way when -- when people go

5     out and buy drugs, or have drugs administered to them in a

6     hospital setting or doctor's office, they can feel confident

7     to know that the drugs that they are getting are safe and

8     effective for use.

9          Now, Dr. Simone will testify, in this case, about

10    some of the drugs that were ordered by Dr. Norbergs, which

11    were not FDA approved.  I expect Dr. Simone will testify that

12    if a drug is not FDA approved, he cannot say whether that

13    drug is safe and effective to use.

14         Now, on the screen I'm going to put up an

15    non-exhaustive list of some of the things that the FDA looks

16    at when it looks to approve a drug.  Starting with the animal

17    and clinical trials.  Manufacturers are required to provide

18    information about the testing that they did in animal and

19    clinical trials to show that the drug that they are looking

20    to bring to market is safe and effective for use.

21         The FDA will also review the manufacturing of the

22    drug, and that includes the active ingredient for the drug.

23    Something you may have heard as the ingredient I like to

24    think of as what does the "leg work" for the drug to treat

25    whatever condition it is that the drug is designed to treat.

1          But Dr. Simone, I expect, will explain to you that

2     the approval of a drug is far more than just of the active

3     ingredient.  The approval process includes the source of the

4     drug.  It includes how the drug is manufactured.  It includes

5     the facility that the drug is manufactured in.  It includes

6     the storage of the drug.  And I would like to spend a few

7     moments talking about the storage of the drug, because in

8     this case you'll hear about how some of the drugs are

9     required to be stored cold.  And by cold, I mean, they are

10    required to be stored in a fairly narrow range of between two

11    degrees and eight degrees celsius, and this requirement for

12    the storage in this narrow range, this requirement exists

13    from the time the drug comes off of the assembly line until

14    it is actually injected into a cancer patient.

15          And you'll hear how the FDA-approved drugs are

16    required to be shipped in some way so that the recipient of a

17    drug can confirm when they receive it, that it hadn't

18    actually gone outside of that narrow range.  In some cases it

19    might be a chip inside of the actual box that the drug is

20    coming in that takes temperature readings every couple of

21    minutes so that way when a person receives it, they can plug

22    it into the computer or somehow find out has it gone outside

23    of the range.  Because if a drug does go outside of that

24    narrow range, the drug may no longer be safe and effective

25    for use.  And there will be evidence in this case that some

1  of the drugs that were sent to Dr. Norbergs did not have any

2  such device.

3          MR. TRAGOS:  I'm sorry, I did not hear what you

4  said.

5          MR. SALTZMAN:  Did not have such a device.

6          Then you have the labelling of the drug, which

7  includes the container of the box that drug comes in, but it

8  also includes the insert that comes in the box that you

9  unfold and it is usually very large.  That is required also

10 to be approved by the FDA.  And that is so, so a doctor or

11 nurse can know how to safely administer the drugs that they

12 are going to be administering to patients.

13         In this case you'll hear from nurses who work for

14 Dr. Norbergs.  And at times, the nurses will testify that

15 they could not even read the instructions on how to prepare

16 the drugs for injecting into their patients that Dr. Norbergs

17 bought because the instructions were in foreign languages,

18 like Turkish, and there was no English to be found.

19         Then you'll also hear about the transportation of

20 the drugs, how the FDA approved that.  I covered that a

21 little bit with the storage, such approved drugs.

22         Then you have unapproved drugs and misbranded

23 drugs.  And the Judge will explain the law on misbranded

24 drugs to you at the end of the case, and you should take all

25 explanations of the law from the Court, but it, essentially,

means in some way that the drug does not meet the rules of

the FDA about how a drug should appear.  And I would like to

talk to you about some of the evidence that you'll hear in

this case on the topic of misbranding.

Dr. Simone, the FDA official that I mentioned, he

will testify that he considered certain drugs that were

bought by Dr. Norbergs, and how these drugs were prescription

drugs and that they are not approved by the FDA.

You'll also hear evidence about how certain drugs,

in this case, had labelling, and the box and the instructions

were in foreign languages without any English.

And third, you'll also hear evidence about how some

of the drugs did not have what's called an "RX only" symbol,

which is an indication that the drug is a prescription drug.

You'll also hear about the actual ordering of drugs

at Dr. Norbergs' practice "East Lake Oncology," which were

foreign and unapproved drugs.

And one of the witnesses in this case who you will

hear from is Kelly Krouse.  Ms. Krause was an office manager

for Dr. Norbergs at East Lake Oncology for a number of years.

She will explain how Dr. Norbergs had tasked her to find

distributors who sold a particular drug at the cheapest

price.  And she'll tell about two distributors in particular

that come up in this case, which are Quality Specialty

Products, also known as "QSP," you will hear, and Cancer

1    Drugs Online, and she'll explain that Dr. Norbergs instructed

2    her to research these distributors and report back.

3         When Ms. Krause reported back to Dr. Norbergs, she

4    had some concerns.  Her concerns were how are these drugs,

5    coming from foreign countries, going to go through customs?

6    So Ms. Krause looked into it.  And then, she told

7    Dr. Norbergs that the drugs would get through customs because

8    they would be improperly declared as gifts.

9         Once the drugs came in -- (if you can go back one

10   slide) -- the drugs came in, the nurses would unpack the

11   shipping boxes that the drugs came in, and when they would

12   open up the box, they would find inside of the box the actual

13   drugs that were ordered, but then a piece of paper, a packing

14   slip, that would describe the drugs that were in that box.

15   That packing slip that was accompanying the drugs was

16   provided to Dr. Norbergs.

17        As we will see on the next slide, this is how the

18   drugs were described on the packing slips that were provided

19   to Dr. Norbergs.  You'll see one drug described was MabThera,

20   known as are Rituxan in the US-European Union; or another

21   example, Ribomustin, known as Treanda in the

22   United States-Germany.  Those papers were describing the

23   drugs in that way, they were all provided to Dr. Norbergs.

24        MabThera, you will hear evidence of, is not an

25   FDA-approved drug.  You will hear evidence that putting,

1    "Known as another drug name in the United States," does not

2    make that drug the same.

3         And you'll hear about certain drugs in this case,

4    these two examples on the screen already, and evidence on

5    what the FDA-approved name for that drug is.  You'll hear

6    that FDA-approved drugs are the only drugs that can be billed

7    to Medicare for reimbursement.

8         The active ingredient that's on the screen, that's

9    the ingredient that I mentioned that does the legwork for the

10   drug, and then, you have a foreign name for a drug that

11   purports to have the same active ingredient as the

12   FDA-approved drug.

13        And Dr. Simone, our FDA official, who will testify

14   in this case, will say that drugs that have a foreign trade

15   name, like MabThera or Rituxan, there is no FDA-approved drug

16   by that name in the United States.  The FDA-approved drug is

17   Rituxan.  It is not MabThera.  And you will hear evidence

18   that MabThera, because it is not FDA approved, is not a drug

19   that Medicare will pay for if given to a patient.

20        As a note, I should say that during the search

21   warrant at Dr. Norbergs' office, none of these drugs going by

22   these foreign trade names were found.  As I mentioned, the

23   search warrant was conducted in February of 2013.  The

24   conduct that's at issue in this case occurred earlier,

25   September 2011, until June of 2012.  So by the time the

1    search warrant came, those drugs had likely been administered

2    to patients.

3           So on the next topic of administration of drugs to

4    patients, you'll hear evidence about how agents looked at

5    these cheaper and foreign unapproved drugs that came into

6    Dr. Norbergs' office, and engaged in a tracing exercise to

7    find out which ones were administered to particular cancer

8    patients at East Lake Oncology, and you'll hear from some of

9    those cancer patients in this case.  In some cases you'll

10   hear from the family members who went with the sick father or

11   sick husband to appointments at East Lake Oncology.  And the

12   evidence will show that those cancer patients or their family

13   were not told that the practice -- the source of the drugs

14   that the practice was buying, and they were not told that the

15   drugs the practice were buying and giving to patients were

16   not FDA approved.  They were not told that these drugs were

17   being bought because they were cheaper, and they were not

18   told or given any money or any discounts because East Lake

19   Oncology was buying drugs at cheaper prices.

20          Then you'll hear from a Medicare witness who will

21   explain the Medicare program and rules, and how they only pay

22   -- Medicare only pays for FDA-approved drugs, and that the

23   cost of the drugs and the reimbursement for those drugs are

24   pretty narrow.  It's about a six percent difference between

25   the cost and what Medicare will reimburse.  But you will also

```
1    hear that doctors and their staff make money in other ways.

2    As an example, there's a separate billing for the actual

3    injection of the drug.  So the drug costs alone are not how

4    doctors make their money.

5            Ladies and gentlemen, that completes the overview

6    of this opening statement and the type of evidence I expect

7    you will hear in this case, and after you hear that evidence,

8    I will have a chance to address you again, and I'll ask you

9    to consider that evidence, and ask that you find Dr. Norbergs

10   guilty of the four categories of crimes.

11           First, that she received and delivered misbranded

12   drugs with the intent to defraud and mislead.

13           Second, that she smuggled goods, in this case, the

14   misbranded drugs, into the United States.

15           Third, that she committed healthcare fraud.

16           And fourth, that she committed mail fraud.  Thank

17   you.

18           THE COURT:  The defense?

19           MR. TRAGOS:  We reserve.

20           THE COURT:  All right.  The Government may call

21   their first witness.

22           MR. TREZEVANT:  Yes, your Honor.  The Government

23   would call Mary Mayleben.  If we can re-arrange our computer?

24   Thank you, your Honor.

25           MADAM CLERK:  Good afternoon.  Please raise your
```

1    right hand.

2             THE WITNESS:  I do.

3             MADAM CLERK:  Please state your name and spell your

4    first and last name for the record.

5             THE WITNESS:  Dr. Mary Mayleben, M-A-R-Y,

6    M-A-Y-L-E-B-E-N.

7             MADAM CLERK:  Thank you.  You may have a seat.

8    (Witness sworn.)

9             THE COURT:  Proceed.

10                        **DR. MARY MAYLEBEN**

11   Called as a witness herein, having been first duly sworn

12   was examined and testified as follows:

13                       **DIRECT EXAMINATION**

14   **BY MR. TREZEVANT:**

15   **Q.**   Good afternoon, Dr. Mayleben.

16   **A.**   Good afternoon.

17   **Q.**   Dr. Mayleben, could you tell this Jury what you do for a

18   living?

19   **A.**   I am employed by the State of Florida as a

20   Pharmaceutical Program Manager for the Department of Business

21   and Professional Regulations.

22            MADAM CLERK:  Ma'am, can you please speak into the

23   mic, please.

24            THE WITNESS:  I just noticed that.  Don't get too

25   close.  Sorry.  Is that better?

1              I work for the State of Florida, Department of

2      Business and Professional Regulations, Division of Drugs,

3      Devices and Cosmetics as a Pharmaceutical Program Manager.

4      **Q.**   For how long have you worked in the position of

5      Pharmaceutical Program Manager?

6      **A.**   I've worked in that position since 2010 to the present.

7      **Q.**   And could you explain the scope and responsibility of

8      the Division of Drugs, Devices and Cosmetics, in which you

9      work.  Going forward, is it all right with you if I refer to

10     that as the DDC?

11     **A.**   That would be great.

12     **Q.**   Okay.  Is that how you refer to it?

13     **A.**   We do.  It's much easier than Drugs, Devices and

14     Cosmetics.

15     **Q.**   All right.  If you could explain the scope and

16     responsibility of the DDC, ma'am?

17     **A.**   Yes.  The DDC is tasked with protecting the health and

18     welfare of the citizens of Florida, as well as the visitors

19     in regards to prescription drugs, OTC drugs that are

20     manufactured in the State of Florida, as well as cosmetics

21     manufactured in the State of Florida.

22              In addition, we also monitor and are tasked with

23     insuring the safety of prescription drugs that are

24     distributed, either by it being sold or shipped into or

25     within the State of Florida.

1          To that end, we have multiple permits that we have

2     available for businesses to obtain to get properly licensed

3     to conduct business under those regulations.

4     **Q.**    All right.  Where does your position, Pharmaceutical

5     Program Manager, fit within the DDC organizational chart?

6     **A.**    There is the Director of DDC, which is the top person in

7     the Division.  Right under the Director is the Chief of

8     Compliance and Enforcement, and I would report directly to

9     her.  So I'm third in command after the Director, Chief and

10    then myself.

11    **Q.**    And what are your personal duties and responsibilities?

12    **A.**    My responsibilities include hiring and training our

13    inspectors, which include drug inspectors and medical gas

14    inspectors.  I also work closely with the Director and the

15    Chief of Compliance in drafting legislative statute and rules

16    and reviewing those.  Also establishing policies within the

17    Department, or within the Division, and also as a liaison

18    with other regulatory and law enforcement agencies.

19    **Q.**    And you mentioned drug inspectors under your

20    supervision.  What is their role?

21    **A.**    The drug inspectors, um, first, must be a registered

22    pharmacist as a requirement.  And they are tasked primarily

23    with, um, when an entity or a business wants to get into

24    business, and let's use an example a prescription drug

25    manufacturer or drug wholesaler, they would -- it's for all

1    of our permits, but they would submit an application, and

2    then once that application is reviewed and considered

3    complete, then the entity, depending upon what type of

4    permit, could get an inspection.  So that Drug Inspector

5    would conduct opening inspections, if that entity was in the

6    State of Florida.  Also, the Drug Inspector would conduct

7    routine inspections; and also desk audit.  So the routine

8    inspections or desk audits are done on both in the state and

9    out-of-state entities that have licenses with us.  They also

10   would conduct investigations for noncompliance, and also go

11   into facilities that should have permits or licenses with us

12   and we suspect unlicensed activity.  So they would also do

13   unlicensed activity cases.

14         THE COURT:  Let me stop you a minute.  Mr. Kelly,

15   can you hear okay?  All right.  Proceed.

16   BY MR. TREZEVANT:

17   **Q.**   Yes.  Ms. Mayleben -- Dr. Mayleben, you also mentioned

18   medical gas inspectors.  Could you just very generally

19   explain what medical gas inspectors are, what they do?

20   **A.**   Yes.  We have medical gas inspectors that primarily

21   their focus is on the medical grade gases.  That would be

22   oxygen, USP, nitrogen, nitrous oxide, and they would go into

23   those businesses that deal with either the gas manufacturing,

24   gas distribution or gas retail establishments that provide

25   oxygen to patients.

1    Q.   In your oversight role, do you have -- what, if any,

2    oversight role do you have for drug manufacturers, drug

3    distributors, drug wholesalers, and pharmacist?

4    A.   We require that anyone that is manufacturing a drug in

5    the State of Florida, whether it be an over-the-counter drug

6    or a prescription drug, has a permit with us prior to them

7    operating.  Um, and they would be required to comply with all

8    state and federal regulations regarding that drug

9    manufacturing.

10             As far as a drug wholesaler or a distributor, we

11   also would require anyone that is either going to sell or

12   ship a drug, prescription drug, into the State of Florida or

13   within the State of Florida to also have a permit with us.

14   Q.   And do you hold any professional licenses, ma'am?

15   A.   Yes.  I, myself, hold a Registered Pharmacy in four

16   states, and I'm also a Doctor of Pharmacy.

17   Q.   Is one of those states Florida?

18   A.   Yes, it is.

19   Q.   Now, touching on your education, backing up just

20   briefly, do you have a college degree?

21   A.   Yes.  I got a Bachelor of Science Degree in pharmacy --

22   in the School of Pharmacy.

23   Q.   From where?

24   A.   That is from Northeastern University in Boston.

25   Q.   And following that degree did you ever study and take

1  your Boards?

2  **A.**   I did.  After a five-year degree then I sat and took my

3  Boards and passed the National Association of Boards of

4  Pharmacy exam that's required before you can actually

5  practice pharmacy.

6  **Q.**   And then, did you attend any post-graduate programs?

7  **A.**   I attended a two-year, what is called, a Doctor of

8  Pharmacy program.  That's a post-BS degree, that's two-year

9  Pharm D, and then, post the Pharm D, I also took a two-year

10 clinical residency.

11 **Q.**   What was that clinical residency?  What exactly was

12 that?

13 **A.**   The clinical residency involved working very closely

14 with a team of physicians where we would be assigned a team

15 and then we would basically rotate with that team of

16 physicians and be assigned to various different types of

17 patients, whether it be like a diabetic floor, or maybe it

18 could be a renal floor for kidney, whatever the area was, you

19 would be assigned to that team, and as a pharmacist on the

20 team, we were responsible for providing input to the

21 physicians, also recommending dosing of drugs, and also

22 ordering studies for the drug monitoring to make sure the

23 drugs were dosed appropriately based upon a person's

24 conditions -- disease conditions.

25 **Q.**   Prior to your present position as a Pharmaceutical

1  Program Manager, did you work in any other capacity within

2  the DDC?

3  **A.**   Yes.  Prior to being the Program Manager I served as a

4  drug inspector from 2000 to 2005, so about five years.

5  **Q.**   And then, prior to that, at any time, did you ever work

6  in the private sector as a retail pharmacist?

7  **A.**   Yes.  I worked in the retail sector right after I

8  graduated, and also in, um, the late 80's I worked for a

9  major chain.

10  **Q.**   Did you work in a hospital setting?

11  **A.**   Yes.  I worked in several different hospital settings,

12  both teaching hospitals, as well as community hospitals.

13  **Q.**   What about in any other setting?

14  **A.**   I also worked for the State of Florida in their central

15  pharmacy, which provided prescription drug services as a mail

16  order facility for the 67 counties for the State of Florida.

17  **Q.**   During your work tenure, did you ever have any

18  experience working in a medical office setting in which that

19  office ordered and administered prescription drugs for use in

20  the office?

21  **A.**   Yes.  I actually was an office manager for approximately

22  two years in a physician's office where I was responsible for

23  ordering and receiving those prescription drugs.

24  **Q.**   In what state?

25  **A.**   That was in Florida.

1    **Q.**   And so, in your capacity as a pharmacist working in a

2    medical office, did you have to follow and comply with many

3    of the state laws and rules that you now enforce?

4          MR. TRAGOS:  Objection, your Honor, as to

5    applicable time period.

6          MR. TREZEVANT:  I'll clear it up, your Honor.

7    BY MR. TREZEVANT:

8    **Q.**   And when was that, ma'am?

9    **A.**   That was in --

10   **Q.**   Approximately?

11   **A.**   That was approximately 1987 to '89.

12   **Q.**   1987 to 1989.  I'm sorry, when did you say, ma'am?

13   **A.**   Yes.  I believe it was around the late 80's.  Late

14   1980's.

15   **Q.**   All right.  In your capacity as a pharmacist working in

16   the medical office, did you have to file and comply with many

17   of the laws and rules?

18   **A.**   Yes.

19   **Q.**   That you now enforce as a Pharmaceutical Program

20   Manager?

21         MR. TRAGOS:  Objection to relevance and predicate.

22         THE COURT:  Overruled.

23         THE WITNESS:  Yes, I did.

24   BY MR. TREZEVANT:

25   **Q.**   And did you, in fact, follow the laws and rules?

1   **A.**   Yes.

2   **Q.**   Did you ever order prescription drugs that had not been

3   approved by the FDA?

4   **A.**   No, absolutely not.

5   **Q.**   What, if any, methods did you use to insure that the

6   drugs that were received in that medical office were, in

7   fact, approved by the FDA?

8            MR. TRAGOS:  Objection, your Honor, there is no

9   notice of expert witness -- I'm sorry.

10           THE COURT:  Approach the bench.

11           MR. TRAGOS:  Excuse me?

12           THE COURT:  I said, approach the bench.

13   (Sidebar conference held.)

14           THE COURT:  What's the objection?

15           MR. TRAGOS:  Your Honor, they are asking her about

16   her practices in 1989, and No. 1, I think it's irrelevant

17   what her practice was in 1989.

18           Secondly, what relevance does it have with what she

19   did, whether she did practice correctly, whether she ordered

20   any drugs, what relevance does that have to the case?

21           THE COURT:  Response.

22           MR. TREZEVANT:  Yes, your Honor.  I anticipate that

23   she's going to explain that when prescription drugs arrived,

24   she would look at the packaging, and the labelling, and all

25   of those things that are available and that those are part of

what she enforces.  Now, it's all the same the rules.  The

rules, I don't believe, have changed.  I think she would say

they haven't changed such that when the drugs arrive, whether

you ordered them or not, if they, in fact, show up, and you

undo them, and you look at the drugs themselves, you can tell

by the packaging and the labelling whether or not it's an

FDA-approved misbranded drug, and she's just talking about

her personal experience in the field and the way drugs arrive

in the State of Florida at doctors' offices.

            MR. TRAGOS:  I think that they can ask her under

today's rules what should be done, but asking her what she

did in 1989 in making that evidencing as to our client, I

don't think it's relevant to know what she did in '89.

            THE COURT:  The objection is overruled, but tie it

to today's rules.

            MR. TREZEVANT:  Yes, your Honor.

            (Back before the Jury.)

            THE COURT:  I'm not sure you can move that that

much.

            MADAM CLERK:  Just be careful, the connection

can --

            MR. TREZEVANT:  I'm okay now.  Thank you, your

Honor.

            THE COURT:  All right.

BY MR. TREZEVANT:

1    **Q.**   Dr. Mayleben, when you were working in the medical

2    office setting, were the rules -- how, if they were, the

3    rules similar as far as the use of the FDA-approved drugs?

4              MR. TRAGOS:  Objection to the word "similar."

5              MR. TREZEVANT:  To now.

6              THE COURT:  Are the rules the same now as they were

7    then?

8              THE WITNESS:  Yes, sir.  As far as -- the rules are

9    the same in the sense of a drug needs to be properly labeled.

10   The package -- when you receive the package, it needs to be

11   -- come in, and we look at the packaging to make sure the

12   packaging was intact and hadn't been tampered with.  That the

13   labelling is legible, and that it's easily read, that would

14   include being in English, and that it would have appropriate

15   directions on it based upon the drug.

16   BY MR. TREZEVANT:

17   **Q.**   So when you were working, ma'am, what would you look for

18   when -- and what steps, if any, would you take to insure that

19   they were FDA-approved drugs?

20   **A.**   To make sure they are FDA-approved drugs would be that

21   they were different sources than now, but they are similar,

22   not in the sense that now there is many more sources online

23   than recent times then -- but both now and then there were

24   resources where you would look up drugs before ordering them

25   to determine if they were approved drugs, just by the nature

1    of them being on the market, being labeled as such where they

2    have -- as far as the process when we see -- receive the

3    drug, once we are assured we ordered an approved drug, we

4    insure when we got the drug that the labelling was in

5    English, which is a requirement.  That it was labeled -- if

6    it was a prescription drug, it says clearly on there that it

7    is an "RX-only" drug or prescription drug, and based on the

8    drug, what kind of labelling -- additional labelling we would

9    need to be required on there.

10             MR. TREZEVANT:  Your Honor, if Ms. Wetherald could

11   approach the witness?

12             THE COURT:  All right.

13   BY MR. TREZEVANT:

14   **Q.**   Ms. Wetherald is going to approach with Government's

15   Exhibits 1A through 1C, and we have provided defense a copy

16   and let them know what we are using.  1A, 1B and 1C, you have

17   those exhibits in front of you, Dr. Mayleben?

18   **A.**   Yes, I do.

19   **Q.**   If you can briefly look through them so you --

20   **A.**   (Witness perusing documents.)  Okay.

21   **Q.**   Are those three exhibits, Government Exhibits 1A, 1B and

22   1C, are they made up of true and correct copies of records

23   maintained on file with the Florida Department of business

24   regulations?

25   **A.**   Yes, they are.

1    **Q.**   And are they required to be kept by the Department?

2    **A.**   Yes, they are required to be kept.  There's a retention

3    period, and in this case, um --

4           THE COURT:  Speak into the microphone.

5           THE WITNESS:  I'm sorry, sir.

6    BY MR. TREZEVANT:

7    **Q.**   Do the exhibits relate to any particular healthcare

8    office or clinic, ma'am?

9    **A.**   Yes, I'm looking at Exhibit 1A.

10   **Q.**   Yes, ma'am.  Just before.

11   **A.**   Yes.

12   **Q.**   Do they relate to any particular healthcare office or

13   clinic?

14   **A.**   Yes, they do.

15   **Q.**   What clinic or office do they relate to?

16   **A.**   East Lake Oncology.

17   **Q.**   Where was that located, ma'am?

18   **A.**   4114 Woodlands Parkway, Suite 301, Palm Harbor, Florida.

19   **Q.**   Now, as far as Government Exhibit 1B, did you personally

20   secure or produce to the Government one of two pages that

21   make up that exhibit?

22   **A.**   Yes, I did.

23   **Q.**   Which page did you produce?

24   **A.**   I produced the second page of that exhibit.

25   **Q.**   All right.  Is that page also a true and correct copy of

1    the records --

2    **A.**    Yes, it is.

3    **Q.**    -- on file with your Department, ma'am?

4    **A.**    Yes, it is.

5    **Q.**    All right.

6            MR. TREZEVANT:  Your Honor, at this time, the

7    Government would offer Government's Exhibits 1A, B and C into

8    evidence pursuant to Federal Rule of Evidence 902(1).

9            MR. TRAGOS:  May I take a look at the exhibits?

10           THE COURT:  Yes.

11           MR. TRAGOS:  No objection.

12           THE COURT:  It will be admitted.

13   (Government Exhibit Nos. 1A, 1B, 1C

14   admitted into evidence.)

15   BY MR. TREZEVANT:

16   **Q.**    All right.  If we could first look at Government

17   Exhibit 1A, the first page.

18           MR. TREZEVANT:  Excuse me.  If we can switch to the

19   computer?

20           MADAM CLERK:  We are having a slight issue.

21           THE COURT:  Can you use the Elmo?

22           MR. TREZEVANT:  We can, your Honor.

23           THE COURT:  Well, we can't switch to the Elmo

24   either.  Apparently our panel is frozen.

25           Let's take our afternoon break early.  So we'll be

1    in recess for 15 minutes, and then we'll go from 3:00 o'clock

2    to 4:30, hopefully.

3              CSO OFFICER:  All rise.

4    (Jury exits at 2:45 p.m.)

5              CSO OFFICER:  Please be seated.

6              THE COURT:  We're in recess.

7              (Recess taken at 2:47 p.m.)

8              (Jury enters courtroom at 3:05 p.m.)

9              THE COURT:  You may proceed.

10             MR. TREZEVANT:  Thank you, your Honor.

11   BY MR. TREZEVANT:

12   **Q.**   Dr. Mayleben, what I have in front of you is

13   Government's Exhibit 1A, and start focusing on the top third

14   of the document.  You can look at the document itself, or you

15   can look on your screen, whichever is more convenient for you

16   to do.  First, what type of document is this?  Do you

17   recognize the document?

18   **A.**   Yes.  This is for a healthcare clinic establishment

19   application.  So this would be the document person who would

20   fill out to apply for a healthcare clinic establishment

21   permit or license, which is also known as an HCCE permit or

22   license.

23   **Q.**   All right.  And let's break that down just a little bit.

24   What do you mean by healthcare clinic establishment?

25   **A.**   A healthcare clinic establishment was a type of permit

1    that was established so that a healthcare practitioner could,

2    if they were part of a business, if they had formed, like, a

3    corporation or limited liability company and they chose to

4    buy their drugs under the business entity, under that tax ID

5    in the business as opposed to taking the funds out of their

6    personal funds, then this was a way that a business would be

7    able to purchase prescription drugs under the authority of

8    having this healthcare clinic establishment permit.

9    **Q.**    And is this a required license for a healthcare clinic

10   establishment?

11   **A.**    Yes.  If you are going to -- if a -- if a healthcare

12   practitioner is going to choose to purchase the drugs under

13   the business entity as opposed to out of their personal

14   funds, they are to get this permit.

15   **Q.**    And so, within your Department or the DDC, which you

16   referred to, the healthcare clinic establishment, do you also

17   sometimes refer to that as an HCCE?

18   **A.**    Yes, we do.

19   **Q.**    Do you consider that the purchaser of the drugs?

20   **A.**    Yes.  The HCCE permits the holder to be the purchaser of

21   the business or actually buyer of the prescription drugs.

22   **Q.**    In the top right-hand corner of this document are you

23   able to see a date there?

24   **A.**    Yes.  It's bates stamped 10-1-2009.

25   **Q.**    Why would that be there, ma'am?

1    **A.**    That is a stamped -- when it's received in, we give it a

2    date stamp as part of the processing when they receive the

3    application and when they process it.

4    **Q.**    And received where?

5    **A.**    Into the Drug, Devising, Cosmetics.

6    **Q.**    Now, you told us earlier that you work for the DDC and

7    this is part of the --

8    **A.**    That is correct at this time.

9    **Q.**    This says the Foreign Department of Health.  Can you

10   explain that?

11   **A.**    Yes.  In 2011 the Division for the Drug, Devices and

12   Cosmetics as a complete entity moved from the Department of

13   Health, where it was housed previously, and then in the fall

14   of 2011 it moved from the Department of Health to the

15   Department of Business and Professional Regulation as its own

16   entity.

17   **Q.**    And if this application is for the healthcare clinic

18   establishments to purchase prescription drugs, are there

19   other similar applications that are utilized by the DDC?

20   **A.**    Yes.  We have many different permit types.  Some of them

21   would be for drug manufacturers, drug wholesalers, freight

22   forwarders.  We have multiple, as we said, medical gas.

23   **Q.**    And when you say wholesale distributor, what do you mean

24   by wholesale distributor?

25   **A.**    A wholesale distributor is a business that is selling or

1   shipping a prescription drug that they themselves did not

2   manufacture.  So if they wanted to distribute it, whether

3   it's by selling or by shipping, they could obtain a wholesale

4   distributor permit that would allow them to basically pass

5   title or physical possession of the drug.

6   **Q.**   And under Florida law, your Department, is it -- is

7   that -- is that a necessary license to wholesale distribute

8   into the state?

9   **A.**   Yes.  Anyone that is -- that chooses to -- anyone to be

10  in compliance with Florida law would need to obtain a permit

11  with the DDC prior to wholesale distributing into the State

12  of Florida.

13          MR. TRAGOS:  Your Honor, we renew our request, at

14  this time, for the instruction.

15          THE COURT:  Overruled.

16  BY MR. TREZEVANT:

17  **Q.**   And you also mentioned the term "freight forwarder."

18  What is a freight forwarder?

19  **A.**   A freight forwarder is a type of business that is not

20  selling a prescription drug, but they are responsible for

21  shipping the prescription drug.  So if a manufacturer or drug

22  wholesaler chose to sell a prescription drug, but they didn't

23  want to maybe bother with having the actual facility to store

24  and house prescription drugs, they might choose to use a

25  freight forwarder as a business that would hold, store the

1    prescription drugs, and then they would be shipped on behalf
2    of the seller, whether it was the wholesale distributor or
3    the manufacturer.
4    **Q.**    Is there a separate license that would be applicable for
5    freight forwarders?
6    **A.**    Yes, there is.
7    **Q.**    What about a manufacturer that is actually operating in
8    the State of Florida, do they need a permit?
9    **A.**    Yes.   If they are operating in the State of Florida and
10   they are manufacturing prescription drugs or over-the-counter
11   drugs, they need a permit.   And if they are manufacturing
12   prescription drugs out-of-state, of Florida, they would also
13   need a permit if they want to sell those prescription drugs
14   directly into Florida.
15   **Q.**    So does Florida require every wholesale distributor or
16   freight forwarder that ships into the state to have a
17   license?
18   **A.**    Yes, either a wholesale distributor or freight
19   forwarder, whether selling or shipping directly in Florida,
20   is required to obtain a license prior to operations with us.
21   **Q.**    And this clinic healthcare establishment that's in front
22   of us here, looking at the lower middle section, does that --
23   does it identify the entity that actually submitted the
24   application?
25   **A.**    Yes.   This business entity is for the business of East

1  Lake Oncology, PA, is what it states.

2  **Q.**   And what is the listed mailing address?

3  **A.**   4114 Woodlands Parkway, Suite 301, Palm Harbor, Florida.

4  **Q.**   And now looking at the bottom half of the form, is the

5  applicant listed there?

6  **A.**   Yes.  It's a little bit harder to see, but the applicant

7  contact is listed in the grayed area above the white line,

8  and you can see that it states --

9  **Q.**   By what number, ma'am?

10  **A.**   I'm sorry.  By No. 6, where it has the name, last,

11  first, middle initial.  It states "Norbergs D. Anda."

12  **Q.**   Okay.  And then, looking down a little lower, is there a

13  physical location listed?

14  **A.**   Yes.  The address listed, which would be right below

15  No. 6, it says, "As above," which would -- that would mean to

16  us that the physical address location is the same as the

17  mailing address, which was the 4114 Woodlands Parkway.

18  **Q.**   Do you see down -- the next one down where it says at

19  Box 7, "designated qualifying practitioner."  Are you

20  familiar with that term?

21  **A.**   Yes.  Any entity that's going to apply and receive a

22  healthcare clinic establishment permit must designate a

23  qualified practitioner.  That practitioner is the person who

24  is associated with the permit to take the responsibility for

25  all compliance for the permit.

1        MR. TRAGOS:  Your Honor, we request that

2   instruction at this time.

3        THE COURT:  Overruled.

4   BY MR. TREZEVANT:

5   **Q.**    And is there a signature of the designated qualifying

6   practitioner at the bottom right of the form?

7   **A.**    Yes.  There is on the first page, there's a signature.

8   **Q.**    Is that the designated qualifying practitioner?  Is that

9   an important designation to your office?

10  **A.**    Yes.  That's an extremely important designation.  That

11  is who we would hold responsible.

12  **Q.**    Turning now to page 2, and looking in the middle of the

13  form, does it identify the -- who's the president?

14  **A.**    Yes, under the corporate officers, etc., it lists Diana

15  Anda Norberg as the president.

16  **Q.**    And looking lower down, is Ms. Diana Anda Norberg also

17  listed as a registered agent?

18  **A.**    Yes, she is.

19  **Q.**    Turning to page 3, in the middle of page 3, where it

20  says, "affidavit," ma'am.

21  **A.**    Yes.

22  **Q.**    Is this an important part of the form?

23  **A.**    Yes.  This is basically where the qualified practitioner

24  is basically making a statement, and basically this says that

25  "Diana Anda Norberg, on behalf of the applicant business,

1    which is Eastlake Oncology, do solemnly swear or affirm that

2    I understand that the HCCE and the designated qualifying

3    practitioner are required to comply with the provisions of

4    chapter 499 Florida Statute and Rule 64(f)12 Florida

5    Administrative Code.  I further affirm the information

6    submitted to the Department on this applications and any

7    attachments thereto are true and correct."

8            So basically, this statement is a required

9    statement if the application had come in and this had not

10   been filled out or signed, it would have been considered a

11   deficient application.  Because it did have all the parts and

12   it was signed, this basically is -- this person is taking

13   responsibility to comply with the Florida regulations.

14   **Q.**   And do you have -- what was the date listed?

15   **A.**   This is dated September 28th, 2009.

16   **Q.**   And is it signed?

17   **A.**   Yes, it is.

18   **Q.**   Now, if we could go to Government Exhibit 1B, and look

19   at the very top corner or -- top third of this exhibit.  What

20   are we looking at here, ma'am?  What is this document?

21   **A.**   This is actually a copy of the license that was issued.

22   You see the license No. 60 is the prefix for HCCE permit with

23   the license No. 2239.

24   **Q.**   When was it issued relative to the signature date on 1A?

25   **A.**   This was issued on 10-15-2009, and the signature on 1A

1    was September 28th, 2009.  So very shortly thereafter she

2    obtained the permit for East Lake Oncology, PA, and

3    4114 Woodlands Parkway.

4    **Q.**    The permit was good for how long?

5    **A.**    The permits are renewable every two years.

6    **Q.**    What was the expiration date of the permit, ma'am?

7    **A.**    The expiration date was October 31, 2011.

8    **Q.**    Looking at the second page of this exhibit, and the

9    bottom third of this page, what is this document?

10   **A.**    This document is a renewal issuance of her license.

11   **Q.**    Of which license?

12   **A.**    Of the HCCE permit, and you see the license number, the

13   602293, is the same number as the original license.  So this

14   issue -- this permit was issued as a renewal of the original

15   license that was obtained of the HCCE permit of East Lake

16   Oncology.

17   **Q.**    As of what date?

18   **A.**    This was issued 11-14-2011.

19   **Q.**    And what is the expiration on this license?

20   **A.**    October 31, 2013.

21   **Q.**    Turning now to Government Exhibit 1C, and looking at the

22   top third of this exhibit.  What are we looking at?

23   **A.**    This is a renewal application.  It says, "The

24   application for permit renewal."  The permit that's being

25   renewed is East Lake Oncology, and so, this is what is

1    submitted to renew the original HCCE permit.

2    **Q.**    So is this the document that was submitted, the alleged

3    renewal that we just looked at Exhibit 1B?

4    **A.**    Yes, it is.

5    **Q.**    What is the date on the top right of the document when

6    it was submitted or received?

7    **A.**    9-16-2011.

8    **Q.**    And it was by what entity?

9    **A.**    This was received by the Department of Business and --

10   no, this was Department of Health.  We were prior -- before

11   we moved, the Department of Health, but the Division of

12   Drugs, Devices and Cosmetics.

13   **Q.**    So had it changed from the Department of Health to --

14   **A.**    No.  It did not change until I think it was October or

15   November of 2011.

16   **Q.**    All right.  Ma'am, so at the very top does it list the

17   healthcare clinic establishment permit number we are talking

18   about?

19   **A.**    Yes.  At the very top right underneath the bolted area

20   it lists the permit No. 602239.

21   **Q.**    Is that the same one for East Lake Oncology we have been

22   discussing?

23   **A.**    Yes, it is.  That's the original permit number that was

24   issued.

25   **Q.**    Looking at box No. 3, does it, again, list the

1    designated qualifying practitioner?

2    **A.**    Yes, in box No. 3, the designated qualifying

3    practitioner is D. Anda Norbergs, who was the original

4    designated qualifying practitioner in the original

5    application.

6    **Q.**    So has that changed?

7    **A.**    That has not changed.

8    **Q.**    And if we look at No. 4 what, if anything, is it

9    addressing?

10   **A.**    No. 4 is basically asking if there had been any changes

11   in ownership or any other directors, partners, corporate

12   officers.  So in this No. 4, it's indicating there have been

13   no changes to the owners, partners or corporate offices.

14   **Q.**    Now, looking down in the bottom half of the document,

15   East Lake Oncology, all right.  So looking here at the bottom

16   half of the Document No. 5, have conditions or practices

17   changed that would make it ineligible?  What is this section

18   about, in the renewal form?

19   **A.**    This is basically a statement of -- asking particular

20   questions regarding the designated qualifying practitioners,

21   specifically whether the designated qualifying practitioner

22   has been fined or disciplined, entered a plea for guilty or

23   conviction, if they have had their license suspended or

24   revoked, and had they been denied a permit or license in any

25   state.

1    **Q.**    Does this indicate that there were no conditions or

2    practices changed?

3    **A.**    That is correct.

4    **Q.**    So as far as East Lake Oncology and its status as an

5    HCCE, from its initial application in 2009, was it

6    consistently licensed by the DDC with an expiration in

7    October -- from 2009 to 2013?

8    **A.**    Yes.  From the beginning -- from the beginning of the

9    issuance of the permit back in 2009, East Lake Oncology held

10   a permit active through the time period you stated with the

11   same designated qualifying practitioner as of this time.

12   **Q.**    Who was the designated qualifying registrant throughout

13   the entire period?

14   **A.**    Diana Anda Norbergs.

15   **Q.**    Looking down at No. 6 at the very bottom.  What is that?

16   Could you please read what it says on there, "other

17   information?"

18   **A.**    "By submitting the appropriate renewal fees to the

19   Department, I certify compliance with all requirements for

20   renewal.  I am responsible for knowing these requirements as

21   set forth in the laws and the rules that govern my

22   profession."

23             MR. TRAGOS:  Your Honor, I would request the

24   instruction.

25             THE COURT:  Approach the bench.

1    (Sidebar conference held.)

2            THE COURT:  You're still objecting to giving an

3    instruction?

4            MR. TREZEVANT:  We do, the one that he has

5    proposed, your Honor.  We would have no problem with this

6    Court instructing the Jury that she is not -- that the

7    charges raised in this case are not for violating any state

8    law -- for a state law.  That would make this very clear

9    because that's all we are talking about is 499, which is a

10   state law, but we're not talking about ethical standards.

11   We're not talking about civil rules or civil penalties.  He

12   asked me earlier if I was going to raise the fact she has a

13   civil penalty.  I made it clear we are not raising it, even

14   though she did.  I haven't discussed it and don't intend to

15   discuss it with this witness.

16           THE COURT:  The purpose of this question is what?

17   That she is on notice of some sort?

18           MR. TREZEVANT:  She absolutely is on notice and has

19   knowledge under 499.  When we look at 499, your Honor, you're

20   going to see that 499 is actually specifically, by its very

21   language, says that its mirrored and based upon the federal

22   act, and that it's drafted, in other words, as a mirror, and

23   that it puts her on notice as to misbranding and what you can

24   and can't do.  It's very clear, straight forward.  We're not

25   going to read the whole thing.  That would be crazy.  We're

1    just going to hit those sections that specifically address

2    this case.

3              MR. TRAGOS:  Your Honor, that may be their intent,

4    but they have put before the Jury that she has to obey all

5    the rules and regulations, and if the Jury is not told that

6    those rules and regulations are civil in nature, and that a

7    violation of them doesn't mean that she has committed a

8    crime, but they have repeatedly -- I can cite even on there

9    where it says that she signs that she agrees to the

10   administrative Rule No. 94 point something, and it's all the

11   way through -- and all the way through her testimony.  If

12   they want to get in the criminal violation, that's fine.  I

13   think the Jury needs to know there's a difference between

14   violating the rules of this Department.  Because they got

15   into this thing about this licensure of, what was it --

16             THE COURT:  I heard enough.  I'm going to instruct

17   the Jury that she's not charged with violating state laws or

18   state regulations.  She's charged with federal violations.

19   The testimony they've heard so far goes to her knowledge and

20   her notice of misbranded and non-branded drugs.

21             MR. TRAGOS:  Is the Court saying in such a way to

22   make a conclusion?  That's the only problem, telling the Jury

23   that she is on notice.  That's the problem I have with it.

24             THE COURT:  I think what I said was the Government

25   is offering it to show her knowledge.

1          MR. TRAGOS:  And nothing more.  Okay.

2          (Back before the Jury.)

3          THE COURT:  You've been hearing some testimony

4    about state law and state regulations.  The Defendant in this

5    case is not charged with a crime under state law or state

6    regulations.  She's charged with federal charges.  The

7    Government is offering this information as to the Defendant's

8    knowledge, not that these are -- she's committed state law

9    crimes.  This just goes to her knowledge.  All right.

10   Proceed.

11         MR. TREZEVANT:  Thank you, your Honor.

12   BY MR. TREZEVANT:

13   **Q.**   Dr. Mayleben, looking back at Government Exhibit 1A,

14   page 3, the affidavit signed there, as the Court just

15   instructed, do you see where it says Chapter 499?

16   **A.**   Yes, I do.

17   **Q.**   Is that, in fact, a Florida statute, ma'am?

18   **A.**   Yes.  Chapter 499 is a Florida statute.

19   **Q.**   Um, if we could --

20         MR. TREZEVANT:  If Ms. Wetherald may approach, your

21   Honor.  Could Ms. Wetherald have permission to approach

22   whenever an exhibit or -- do you want me to ask each time?

23         THE COURT:  She has permission to approach.

24         MR. TREZEVANT:  She is approaching with Government

25   Exhibit 1D, and your Honor, we would offer this pursuant to

1    the stipulation.

2              THE COURT:  It will be admitted then.

3    (Government's Exhibit No. 1D

4    admitted into evidence.)

5    BY MR. TREZEVANT:

6    **Q.**    Looking at the top half of this document, ma'am, what

7    exactly is in front of you as Government Exhibit 1D?

8    **A.**    This is a 2009 Florida Statute, Chapter 499, which is

9    the regulation for Drugs, Devices and Cosmetics.

10   **Q.**    Is that provision referred to in the affirmation we just

11   looked at?

12   **A.**    Yes, it is.

13   **Q.**    Are you familiar with this act?

14   **A.**    Yes, I am.

15   **Q.**    Do you refer to it as part of your daily work?

16   **A.**    On an every minute-almost daily basis.

17   **Q.**    And for what year, ma'am?

18   **A.**    This is the 2009 Florida Statutes.

19   **Q.**    All right.  What I would like to do is start, and I

20   certainly don't intend to publish this entire document, but I

21   do want to look at certain sections of the document.  If we

22   could first look down at the table of contents, here on the

23   first page, the very first 1499.01.  Could you read that,

24   ma'am?

25   **A.**    499.001 says, "A Florida Drug and Cosmetic Act."

1  **Q.**   And the item directly below it?

2  **A.**   And right under it, "499.002 is the purpose,

3  administration and enforcement of an exemption from this

4  part."

5  **Q.**   All right.  If we could look now, turn to page 3 of the

6  exhibit, and looking at 499.002, "Purpose administration and

7  enforcement of an exemption," from this part under 499.002,

8  looking from 1A, B and C, first, could you read what is

9  under, "This part is intended to..." in Section A?

10  **A.**   Yes.  Section A is, "This part is intended to safeguard

11  the public health and promote the public welfare by

12  protecting the public from injury by product use and by

13  merchandising deceit involving drugs, devices and cosmetics."

14  **Q.**   And Section B, ma'am?

15  **A.**   "Provide uniform legislation to be administered so far

16  as practicable in conformity with the provisions of, and

17  regulations issued under the authority of the Federal Food,

18  Drug and Cosmetics Act, and that portion of the Federal Trade

19  Commission Act which expressly prohibits the false advisement

20  of drugs, devices and cosmetics."

21  **Q.**   Finally, Section C.

22  **A.**   "Provide thereby uniformity of state and federal laws

23  and their administration and enforcement throughout the

24  United States."

25  **Q.**   So the structure of the statute in front of us does it

1   relate in any way to the Federal Food, Drug and Cosmetics

2   Act?

3   **A.**   Yes, in areas that are applicable it mirrors it very

4   closely.

5   **Q.**   Is it fair to say it's not exact, though?

6   **A.**   It is not exact.

7   **Q.**   Looking at Section 2, just below, that one little

8   paragraph, if you could publish that, ma'am.

9   **A.**   "The Department shall administer and enforce this part

10  to prevent fraud, adulteration, misbranding or false

11  advertising in the preparation, manufacturing, repackaging or

12  distribution of drugs, devices and cosmetics."

13  **Q.**   All right.  Now, if you could turn to Page 26, the

14  bottom of the page, 499.01, dealing with permits.  What does

15  this section deal with, ma'am?

16  **A.**   This is a section that establishes all the different

17  types of permits and what those permits are for.  Section (1)

18  lists the permit types, and Section (2) goes into the detail

19  on the permit types.

20  **Q.**   So in Section (1), does it actually -- the first

21  paragraph say, "Prior to operating, a permit is required for

22  each person and establishment that intends to operate as?"

23  **A.**   Yes, it does.

24  **Q.**   All right.  And so, looking at the next page, page 27 of

25  Exhibit 1D, what could you tell us, what is that

1    Subsection D?

2    **A.** 1(d) is a prescription.

3    **Q.** No, ma'am.

4    **A.** 1(d) is a prescription drug wholesale distributor, and

5    1(e) is an out-of-state wholesale prescription drug

6    distributor. Do you want me to read the other ones

7    highlighted there?

8    **Q.** Well, first, we have a -- what is an out-of-state

9    prescription drug wholesale distributor?

10   **A.** An out-of-state prescription drug wholesale distributor

11   would be a business located outside the State of Florida that

12   wants to sell or ship directly into Florida. If they were

13   going to do that, they need a permit with us. If they

14   weren't going to sell or ship into Florida, then they would

15   not need a permit with us.

16   **Q.** Would that be the same as required for an HCCE, or would

17   it be its own permit?

18   **A.** It would be its own permit. All permits have a prefix.

19   This is a prefix of a 60, and this would have a different

20   prefix number.

21   **Q.** Looking down at Subsection I there, what is listed

22   there, ma'am?

23   **A.** An "I" lists the freight forwarder, which would also

24   need a permit prior to operating.

25   **Q.** Is that what we were discussing earlier in your

1    testimony concerning freight forwarder?

2    **A.**    Yes, it is.  Yes, it is.

3    **Q.**    All the way down is "healthcare clinic establishment"

4    listed here?

5    **A.**    Yes.  Under "T", is Healthcare Clinic Establishment,

6    which is also listed as a permit that is required prior to

7    operating.

8    **Q.**    Now, under Subsection 2, what does Subsection 2 deal

9    with?

10   **A.**    Subsection 2 gets into the details of each permit type,

11   and gives a little bit more detail on the permit type.

12              MR. TRAGOS:  I'm sorry, can we have, for the

13   record, which Subsection 2 --

14              MR. TREZEVANT:  Under 499.01.  I apologize.

15   BY MR. TREZEVANT:

16   **Q.**    So under 499.012, what is addressed there?

17   **A.**    That goes into the details of different permit types.

18   **Q.**    So turning to page 29, Subsection E, where it says,

19   "out-of-state prescription drug wholesale distributor

20   permit," is that the type of permit we were just discussing

21   concerning out-of-state drug wholesalers?

22   **A.**    Yes.  This would be a permit that out-of-state

23   prescription drug wholesalers would need, and it goes into

24   detail of what is required to get that permit.

25   **Q.**    And I -- I -- it says what it says, but just for

1    understanding purposes, could you simply read just the first

2    sentence of that paragraph?

3    **A.**   Sure.  "An out-of-state prescription drug wholesale

4    distributor is a wholesale distributor located outside this

5    state which engages in the wholesale distribution of

6    prescription drugs into this state, and which must be

7    permitted by the Department and comply with all provisions

8    required by the wholesale distributor under this part."

9    **Q.**   And now, turning to page 30, and all the way down near

10   the bottom, Subsection I talks in terms of a freight

11   forwarder permit.  Could you simply read the first sentence.

12   **A.**   "A freight forwarder permit is required for any person

13   that engages in the distribution of a prescription drug as a

14   freight forwarder unless the person is a common carrier."

15   **Q.**   And could you generally explain the difference, to the

16   Jury, of a freight forwarder and what you might mean by

17   "common carrier?"

18   **A.**   Common carrier would be -- typically mean the Postal

19   Service, UPS, FedEx, someone responsible for the actual

20   movement as opposed to a freight forwarder, which would

21   typically store the drugs onsite for a period of time and is

22   responsible for storage -- proper storage, temperature, etc.,

23   of the drug as opposed to a common carrier is recognized and

24   would be -- a common carrier is licensed as a common carrier

25   that has a designation that's different than a freight

1    forwarder.  In simple terms, it gets there quickly.  A

2    freight forwarder typically is storing it for a while and has

3    higher responsibilities because it may be stored for some

4    time.

5    **Q.**    Turning a couple of pages to page 34, Subsection T.

6    Does that identify what is required for a healthcare clinic

7    establishment permit?

8    **A.**    Yes, it does.

9    **Q.**    And is that the type of permit we're talking about that

10   was held by East Lake Oncology?

11   **A.**    Yes, it is.

12   **Q.**    And this was effective as of what date?

13   **A.**    Effective January 1, 2009.

14   **Q.**    And could you read the first sentence there?

15   **A.**    "Effective January 1, 2009, a healthcare clinic

16   establishment permit is required for the purchase of a

17   prescription drug by a place of business at one general

18   physical location that provides healthcare for veterinary

19   services, which is owned and operated by a business entity

20   that has been issued a federal tax identification number."

21   **Q.**    And then, the second sentence, ma'am.

22   **A.**    "For the purpose of this paragraph the term 'qualifying

23   practitioner' means a licensed healthcare practitioner

24   defined in the statute 456.001, or a veterinarian licensed

25   under Chapter 474 who's authorized under the appropriate

1    Practice Act to prescribe and administer a prescription

2    drug."

3    **Q.**   Looking at T(1), just the first -- the next paragraph

4    down, just -- if you could just read the first sentence?

5    **A.**   "An establishment --" we're talking here about a

6    healthcare clinic establishment.  "An establishment must

7    provide, as part of the application required under 499.012,

8    designated -- designation of a qualified practitioner who

9    would be responsible for complying with all legal and

10   regulatory requirements related to the purchase, record

11   keeping, storage and handling of the prescription drugs."

12   **Q.**   And then, looking at Subsection 4 on the next page,

13   page 35 -- the top of page 35, what does that say, ma'am?

14   **A.**   "The purchase of prescription drugs by the healthcare

15   clinic establishment is prohibited during any period of time

16   when the establishment does not comply with this paragraph."

17   **Q.**   All right.  Now, going backwards to page 23, do you see

18   on page 23, Section 499.007?

19   **A.**   Yes.

20   **Q.**   And what does it say following that, ma'am?

21   **A.**   This statute 499.007 relates to -- what it says here, is

22   a misbranded drug or a device, and lays out when a drug or

23   device is considered misbranded.

24   **Q.**   Moving down to item four or -- paragraph four under that

25   section.  Are you familiar with that, ma'am?

**A.**   Yes, I am.

**Q.**   And what does it say there?

**A.**   "If any word, statement or other information required by or under this part to appear on the label or labelling is not prominently displayed or placed thereon with such conspicuousness as compared with other words, statements, designs or devices in the labelling, and in such terms as to render the word, statement or other information likely to be read or understood -- I'm sorry -- to be read and understood under customary conditions of purchase and use."

**Q.**   And the language, "Read and understood under customary conditions of purchase and use," does that relate in any way to what you were talking about earlier when you were talking about when you would open up a package when you were in private practice?

**A.**   Yes.  "Likely to be read and understood under customary conditions of purchase and use," one of the things that's referring to is being able to be --

        MR. TRAGOS:  Objection, your Honor.  Speculation, and basic knowledge.

        THE COURT:  Overruled.

        THE WITNESS:  It's referring to being able -- to be able to be read and understood would be, um, in the United States of America the acknowledged language is English.  So part of that would be that it should be in English so that

1    the average person would be able to read it and understand

2    it.

3    BY MR. TREZEVANT:

4    **Q.**   But this is a -- but this is a Florida statute, though,

5    correct, ma'am?

6    **A.**   Yes, it is a Florida Statute.

7    **Q.**   All right.  Looking down at item No. 6, where it says,

8    "If its labelling does not bear," what are we talking about?

9    **A.**   Here it's saying, "If its labelling does not bear

10   adequate directions for use."

11   **Q.**   All right.  Now, if we could go to page 25, item No. 14

12   in conjunction with B.  If you could read that, ma'am.

13   **A.**   Okay.  "If it is a drug subject to paragraph 13(a) --"

14   when you go back to 13(a), that's talking about a

15   prescription drug -- "and if at any time before it is

16   dispensed its label does not bear the statement, 'caution

17   federal law prohibits dispensing without prescription and RX

18   only,' handle RX only," it an "RX only" there.

19   **Q.**   So when you were talking about unpackaging the drugs and

20   looking at the labelling, "RX only," was that one of the

21   items you were looking for?

22   **A.**   Yes.  When we are ordering a prescription drug, we would

23   expect it to have the labelling indicating that it was an RX

24   drug, RX office manager.

25   **Q.**   In the State of Florida?

**A.**   Yes.

**Q.**   Turning your attention now to paragraph 12 -- I mean page 12, 499.005.  At the bottom of the page, could you please read starting, "after prohibited acts."

**A.**   "It is unlawful for a person to perform or cause the performance of any of the following acts in this state. No. 1, is the manufacturing, repackaging, sale, delivery, or holding, or offering for sale any drug, device or cosmetic that is adulterated, or misbranded, or has otherwise been rendered unfit for human or animal use."

**Q.**   So what -- again, what does "misbranded" mean?

**A.**   So in this case if the product did not have language on it that was easily read, if it was not clearly identified as a prescription drug, then those drugs would be considered misbranded, and therefore, unlawful under 499.005.

**Q.**   Looking at page 13, items 12 and 14, at the bottom of the page, and reading that in conjunction with the introductory language of, "unlawful for a person to perform or cause the performance of any of the acts," what does 12 say, ma'am?

**A.**   12 says, "The possession of any drug in violation of this part."

**Q.**   What about 14?

**A.**   And 14 is, "The purchase or receipt of a prescription drug from a person that is not authorized under this chapter

1    to distribute prescription drugs to that purchaser or

2    recipient."

3    **Q.**    Turning to Page 15 at the top, 499.0051, where it says,

4    "criminal acts?"

5    **A.**    Yes, sir.

6    **Q.**    Below where it says item No. 14 -- 4, at the bottom of

7    the page.

8    **A.**    No. 4, under criminal acts states, "Knowing purchase or

9    receipt of a prescription drug from an unauthorized person, a

10    person who knowingly purchases or receives from a person not

11    authorized to distribute prescription drugs under this

12    chapter a prescription drug and a wholesale distribution

13    transaction commits a felony of the second degree."

14    **Q.**    What does that mean, "unauthorized to distribute under?"

15    **A.**    What that means is that they -- a wholesale distributor,

16    the person -- the purchaser of that prescription drug needs

17    to be purchasing it from an entity or a business that has a

18    permit to distribute the drug.  In other words, that entity

19    would need to have a permit with Drugs, Devices and Cosmetics

20    to sell or to ship that drug to the entity that's purchasing

21    the drug or buying the drug.

22    **Q.**    Turning to page 17, at item 12, in the same section,

23    could you read 12, "Along with A --"

24    **A.**    "Along with A?"  I'm not sure what you mean by --

25    **Q.**    12, and then, (a) below.

**A.**   I'm sorry.  Okay.  Under Criminal Acts (12),

"Adulterated and misbranded drugs, false advertisement,

failure to maintain records relating to drugs.  Any person

who violates any of the following provisions commits a

misdemeanor of the second degree punishable as provided in

775.082 or Section 775.083, but if the violation is committed

after a conviction of such person under this subsection has

become final, such person commits a misdemeanor of the first

degree punishable as provided in --"

          MR. TRAGOS:  I'm sorry a misdemeanor in the second

degree or first degree?

          THE WITNESS:  The first section is -- would you

like me to reread it?

          MR. TRAGOS:  I'm sorry, your Honor, I thought she

said first degree.

          THE WITNESS:  The second part of the section is,

"Such person commits a misdemeanor in the first degree."  The

beginning of it is, "A misdemeanor of the second degree."  In

the middle of that statement it says, "If the violation is

committed after a conviction of such person under this

subsection has become final, such person commits a

misdemeanor of the first degree punishable as provided under

Section 775.082 or Section 775.083, or as otherwise provided

by in this part."

          Subsection A then says, "The manufacture,

1    repackaging, sale, delivery, or holding or offering for sale

2    any drug that is adulterated, or misbranded or has otherwise

3    been rendered unfit for human or animal use."

4    BY MR. TREZEVANT:

5    **Q.**    And then, moving down to Section C in the same under

6    Item 12.

7    **A.**    Section C states, "The receipt of any drug that is

8    adulterated or misbranded and the delivery or preferred

9    delivery of such drug for pay or otherwise."

10   **Q.**    And then, just turning to page 18 -- the bottom of 18

11   and the very top of 19, 14 carrying over to the next page

12   (A), if you can start with 14.

13   **A.**    "Other violations under this part are any person who

14   violates any of the following provisions commits a felony of

15   the second degree punishable as provided under Section

16   775.082, 775.083, or 775.084, or as otherwise provided in

17   this part."

18   **Q.**    And is Section 499 -- oh, let me go up to (A) first.

19   I'm sorry.  If you could read that, ma'am.

20   **A.**    Section A, under this part, "Is knowingly manufacturing,

21   repackaging, selling, delivering, or holding or offering for

22   sale any drug that is adulterated, or misbranded or is

23   otherwise been rendered unfit for human or animal use."

24   **Q.**    And under Section 499, are there also rules -- certain

25   provisions concerning record keeping?

**A.**    Yes.  We have -- along with the Florida Statute we have
the Florida Administrative Code, which are Rules that
accompany the Statute, and also are enforceable.

**Q.**    But looking just at the Statute, ma'am, under --

**A.**    Oh, under the Statute we also have "recordkeeping"
addressed in 499.0121(4) and (6).

**Q.**    So if we were to look at page 48 of Florida Statute 499,
which is Government 1D, did you say 4(C)?

**A.**    Yes.  4(C).  The recordkeeping requirements in
Subsection 6 under 499.012, Subsection 6 is what they are
talking about, must be followed for all incoming and outgoing
prescription drugs.

**Q.**    And (6), that is down below on the page?

**A.**    Yes.  It's at the bottom of the page.  It starts at the
bottom of the page.

**Q.**    If you could just do (6) and then (A) on the next page,
I think that is all for this.

**A.**    Okay.  "The Department shall adopt rules that require
keeping such records of prescription drugs as are necessary
for the protection of the public health."

        And under (A), "The wholesale distributor must
establish and maintain inventories and records of all
transactions regarding the receipt and distribution or other
distribution of prescription drugs.  These records must
provide a complete audit trail from receipt to sale or other

1    disposition, be readily retrievable for inspection and

2    include at a minimum the following information."

3    **Q.**    And then there are various items, is that correct,

4    ma'am?

5    **A.**    Yes, there is various information there.

6    **Q.**    Turning to page 50, item No. 10, what does that state

7    there?

8    **A.**    Item No. 10 states, "That compliance with federal law,

9    state and local law is required.  A wholesale distributor

10   must operate in compliance with applicable federal, state and

11   local laws and regulations."

12              MR. TRAGOS:  I'm sorry, where is 10?

13              MR. TREZEVANT:  The next page, page 52.

14              MR. TRAGOS:  What tab or --

15              THE WITNESS:  It's under 499.0121.

16              MR. TRAGOS:  0121, compliance.  Okay.  Thank you.

17   BY MR. TREZEVANT:

18   **Q.**    And then, finally, looking at Page 57, 499.023, what is

19   this provision dealing with?

20   **A.**    This is dealing with addressing, "That a person may not

21   sell or distribute --" would you like me to read it for you?

22   **Q.**    Yes, ma'am.

23   **A.**    "-- new drugs, sale, manufacture, repackaging,

24   distribution.  A person may not sell, offer for sale, hold

25   for sale, manufacture, repackage, distribute or give away any

1   new drug unless an approved application has become effective

2   under Section 505 of the Federal Act, or unless otherwise

3   permitted by the Secretary of the United States, Department

4   of Health and Human Services for shipment in interstate

5   commerce."

6   **Q.**   All right.  Now, if you could set that aside for now,

7   and so focusing now on the 2011/2012 time period, if you

8   would consider that time period.  What, if any, tools were in

9   place to assist a healthcare clinic, entity or really any

10  person in the State of Florida to determine whether a drug

11  manufacturer, a wholesale distributor, a freight forwarder

12  was licensed, as necessary, under Chapter 499?

13  **A.**   The Division of Drugs, Devices and Cosmetics has a

14  public website available that's very easy to access.

15  **Q.**   What do you mean by that, ma'am?

16  **A.**   I would say that it's similar to, like, if you did

17  online shopping, if you just Google, you can look it up.  You

18  find it quickly, and then, you can go in and, um, if you were

19  wondering -- like, if I was a doctor, or if I was a pharmacy

20  and I wanted to buy a drug, I could go in and search by name.

21  I could search by a part of a name.  I could search by -- if

22  I had the whole name.  If I had just heard part of the name

23  and I thought I wanted to find that one, do they have a

24  permit?  So it's very user friendly.  You can search by name.

25  If you have a permit number, and you want to find out if a

1   permit number is still valid and hadn't expired, you can

2   search by the permit number. So it's very readily available

3   to search.

4   Q.   And was it available in 2011 and 2012?

5   A.   Yes, it was.

6   Q.   And as far as, um, when you're talking about the permit,

7   are you talking about the permits required under 499?

8   A.   Yes. I'm talking about permits required under 499.

9   Q.   If you were a purchaser in the State of Florida during

10  2011 or 2012, and you upheld a permit, and you were

11  purchasing from a wholesaler or freight forwarder that was

12  out-of-state, would he -- would both the freight forwarder

13  and the wholesale distributor out-of-state selling directly

14  to a purchaser, would all three of those have to have a

15  permit?

16  A.   Yes, they would, and often times that purchaser, in the

17  State of Florida, accesses that database on a routine basis

18  to check that out.

19  Q.   Now, if a person didn't want to access a website, would

20  it be possible to contact the Department by telephone?

21  A.   Yes. We have a -- we have office hours. Someone is

22  available 8:00 to 5:00, Monday through Friday, by phone. We

23  also have email that we respond to. We have very -- we try

24  to get back to those entities quickly with responses.

25  Q.   Prior to coming in to testify today, were you asked by

1    the Government to search the Department of Business and

2    Professional Regulations to determine whether certain

3    entities or businesses were licensed as required under

4    Chapter 499 to sell, or distribute or freight forward

5    prescription drugs into the State of Florida?

6    **A.**    Yes, I was.

7    **Q.**    Ms. Wetherald is going to approach and show you

8    Government Exhibit 1E first, and then we may need to switch

9    to the Elmo.  Do you recognize that exhibit, ma'am?

10   **A.**    Yes, I do.

11   **Q.**    Is that a table that you reviewed that relates to the

12   entities that you searched for?

13   **A.**    Yes, it is.

14            MR. TREZEVANT:  Your Honor, we're going to ask to

15   simply use Government Exhibit 1E as a demonstrative exhibit.

16   We don't want to offer it into evidence.  We don't feel the

17   need to offer it into evidence, just simply as a

18   demonstrative.

19            MR. TRAGOS:  We would object, your Honor, because

20   of the -- there has been no dates placed on this exhibit as

21   to when -- what date she checked for that's relative to the

22   indictment or some other dates.

23            MR. TREZEVANT:  I can clear that up,

24   your Honor.

25            THE COURT:  Overruled.

BY MR. TREZEVANT:

**Q.**   Now, before we go any further, Dr. Mayleben, when you

look for the different entities --

             MR. TRAGOS:  Excuse me.  Your Honor, may we have a

sidebar?

             THE COURT:  Approach the bench.

             (Sidebar conference held.)

             MR. TRAGOS:  Your Honor, in looking at this list,

the Court remembers -- the Court allowed a subpoena from the

California Oberlin investigation.  The Court is going to

allow that to come into evidence based on the fact that the

Government was saying this puts her on notice that she was

violating the law, but how is the fact that Oberlin is not a

licensee relevant in this case since Oberlin is not one of

the crimes charged, and has nothing to do with the crimes

charged in this case?  That most of -- at least half, not

most -- most of the corporations or entities listed that

she's going to say that she checked on are not entities that

are involved in the sale of drugs to her pursuant to this

indictment.  So they are going back to Oberlin again.  So

they are going beyond and now they are saying that she

violated the law by buying from Oberlin when that's not

charged in the indictment.

             THE COURT:  Response?

             MR. TREZEVANT:  As Mr. Saltzman said earlier today,

1    the manner and means actually charges from '09 to 2013.  It

2    says, "Quality --" I don't have it in front of me.  It says,

3    "Quality Specialty Products and other entities that were

4    out-of-state and unlicensed."  That was actually charged in

5    the manner and means.  That's the actual scheme charged in

6    this case in the second superseding indictment.  So that

7    these are a list that I believe the records will reflect, as

8    we go along during the trial, and it's going to show that

9    all -- none of these ever were licensed, and so, it's not

10   just an error or accident.  This is actually what's charged

11   and what she did.

12         MR. TRAGOS:  There is not a single transaction in

13   that indictment, and they are all listed by count, that has

14   anything to do with Oberlin, that has anything to do with

15   Richards Pharma, which is on here.  Not a single count.  They

16   can do a broad language and say others, but when they nail

17   down the count as schemes, none of the counts deal with not a

18   single charge with any of these people.

19         THE COURT:  Overruled.  How much longer do you have

20   with this witness?

21         MR. TREZEVANT:  About 15 to 20 minutes, Judge.

22         THE COURT:  Proceed.

23   BY MR. TREZEVANT:

24   Q.   All right.  Dr. Mayleben, in -- where it says "entity,"

25   could you explain, looking at Oberlin Medical Supply and QS

1    Med Supplies as related addresses on the right, what type of

2    searches you ran to determine whether they had been licensed

3    or were licensed by your Department ever, is that correct?

4    **A.**    Yes.  I was able to determine if they had ever been

5    licensed at all.  I ran the searches by the full names listed

6    as well as partial.  So, like, for example, Oberlin Medical

7    Supply, I would have put in just Oberlin to see if I pull up

8    anything.  The QS Med Supplies, I would have put in QS Med

9    Supplies, as well as QS Med, as well as Just QS.

10             THE COURT:  When did you do this?

11             THE WITNESS:  I did this last Friday.

12             THE COURT:  All right.  Proceed.

13             THE WITNESS:  Um, and so -- and I also looked for

14   the specific addresses listed, as well as any other possible

15   addresses.  So the database will pull up, whether you have a

16   permit -- because we do have companies that have multiple

17   permits and have many different addresses.  So I did not

18   search specifically by address, but I searched by the company

19   and by partial names of the companies to make sure I covered

20   the whole company possibilities.  And then I also, you know,

21   tried to verify if that company was listed under any

22   addresses.

23   BY MR. TREZEVANT:

24   **Q.**    And in this list, if you could read just down to the

25   bottom of the screen that is in front of you.

1    **A.**   Okay.

2    **Q.**   Starting at "Oberlin Medical," and without reading the

3    addresses, but did you search for the addresses, ma'am?

4    **A.**   Yes.  I searched for the name, and then I also

5    searched -- I did not search specifically, just by address.

6    I searched by the name, with or without the full name and

7    with or without the address.

8    **Q.**   All right.  If you would just read down the entities to

9    the bottom of the screen that is visible on this.

10    **A.**   Oberlin Medical Supply, QS Med Supplies, QS Supplies

11    CASHOO, QSP, Quality Specialty Products, Meiko America, Inc,

12    Cancer Drugs Online, Richards Pharma.

13    **Q.**   Okay.  If we can turn to page 2.  How many are listed on

14    this page, ma'am?

15    **A.**   Three.  Montana Health Solutions, Quantum Solutions,

16    SRL, and RX Stores R US.

17    **Q.**   And for the entities that you just read, did any of

18    those entities -- have any of those entities ever held a

19    permit or license under the DDC that would permit them to

20    bring drugs or ship drugs into the State of Florida?

21    **A.**   No.  None of these entities, by any search, partial

22    search, full search, any type of search, with address,

23    without address, yielded that it showed that none of these

24    entities had a permit with Drug, Devices and Cosmetics at any

25    time.

1    **Q.**   If we could now go away from the Elmo, and if I could

2    show you Government Exhibit -- showing you Government

3    Exhibit 31A and 35A -- 31A and 35A, and we would offer these

4    pursuant to the stipulation -- be admitted pursuant to the

5    stipulation.

6          THE COURT:  They will be admitted.

7    (Government Exhibit Nos. 31A and 35A

8    admitted into evidence.)

9    BY MR. TREZEVANT:

10   **Q.**   Okay.  Looking first at 31A, this document, ma'am,

11   looking at the top half --

12         MR. TRAGOS:  I'm sorry, the stipulation was to

13   authenticity.  We would object as to relevance.

14         THE COURT:  Since I don't have the document, can

15   you bring me a copy of the document?

16         MR. TREZEVANT:  Should we approach, Judge?

17         THE COURT:  No, just bring me a copy of the

18   document, please.

19         (Court peruses document.)

20         THE COURT:  Approach the bench.

21         (Sidebar conference held.)

22         THE COURT:  What's the relevance?

23         MR. TREZEVANT:  Your Honor, on its face -- on its

24   face this is a record that shows Cardinal Health shipping to

25   East Lake Oncology, PA, owned by, shipped to -- directly to

```
1    the Defendant at that address.  It is from Cardinal Health.
2    The witness will testify, if permitted, that this is an
3    example of a document that actually is within the permitting
4    rules, and that she recognizes Cardinal Health from her
5    position as a licensed wholesale manufacturer or drug
6    wholesaler, and refers to the license number, which she
7    referred to earlier, they would have a 23 prefix.  It's lower
8    down on the Document 23.00331, as an example of a document
9    when it comes with the packaging and you pull it out, if the
10   Court will recall, Mr. Saltzman explained in his opening that
11   these items would typically -- would all be given to the
12   Defendant so that the Defendant would have both examples
13   receiving, like, Cardinal Health she received this one.  This
14   is an example of one following the law, complying with the
15   law, that actually has the license number on it, and our
16   witness will say this is what it looks like.  This is
17   required in the recordkeeping provisions of 499 that she just
18   referred, and this is an example of one done properly.
19       So as we proceed through the trial, I anticipate there is
20   going to be other packing slips that are not going to look
21   anything like this, and they are not going to have license
22   numbers, or licensed importers, or wholesalers or freight
23   forwarders.
24            THE COURT:  Response.
25            MR. TRAGOS:  These are not the same type of drugs.
```

1    They are not even the same drugs that are in the indictment.

2    If they have something with the same type of drug, I

3    understand that, but randomly to pick invoices and say,

4    "Uh-huh, she doesn't -- she should know better."  Plus there

5    has been no evidence that she even saw this invoice.

6                THE COURT:  Overruled.

7                (Back before the Jury.)

8                THE COURT:  It will be admitted.

9    BY MR. TREZEVANT:

10   **Q.**   Dr. Mayleben, looking first at Government Exhibit 31A,

11   the top half of this document, first, top right, what type of

12   document is this, ma'am?

13   **A.**   This is an invoice.

14   **Q.**   And are you familiar with these types of documents?

15   **A.**   Yes.  I review these on a regular basis.

16   **Q.**   Looking at the top left "Cardinal Health Specialty

17   Pharmaceutical Distributor.  Do you recognize Cardinal

18   Health?

19   **A.**   Yes, I do recognize this business.

20   **Q.**   And is that a licensed company?

21   **A.**   Yes, it is.  It is.

22   **Q.**   Properly permitted under 499?

23   **A.**   Yes.  It is a company that is permitted with Drugs,

24   Devices and Cosmetics.

25   **Q.**   Is the information on this document similar -- there is

1    information on this document that we just -- consistent with

2    what we just looked at in Section 499, Florida Statutes?

3    **A.**   Yes.  When we looked under recordkeeping in the Florida

4    Statutes, um, it talked about the record needed to have

5    certain elements.  This invoice has the name of Cardinal

6    Health, who the drugs are being sold to.  It's being billed

7    or sold to East Lake Oncology, at 4114 Woodlands Parkway, and

8    being shipped to the same East Lake Oncology, Diana Anda

9    Norbergs.  If you want to drop lower then --

10   **Q.**   Look at the bottom half of this document.

11   **A.**   It also lists the prescription drug names.  So this is a

12   document that's required for any prescription drugs that when

13   you are selling or shipping prescription drugs into or within

14   the State of Florida, there are certain minimal recordkeeping

15   requirements regardless of what prescription drug it is, you

16   would need to have these kind of records.  You could include

17   over-the-counter drugs on them also, but it's required for

18   prescription drugs.

19        So it also lists the name of the drug, quantity of

20   the drug that was ordered and shipped, the pricing, and then

21   at the bottom of the form, um, it does also list here the

22   statement of the Florida license number, which is in -- this

23   particular one is Cardinal Health.  This particular one is

24   licensed as Permit No. 2300331.  So this document is a really

25   quick look at when we, as drug inspectors, are looking at

1    documents; or when a buyer is buying their drugs, they can

2    quickly look at this and can find a lot of good information

3    regarding their purchase.

4    **Q.**   Now, when you were talking earlier about unpacking drugs

5    yourself, is this the type of information you would look for?

6    **A.**   Yes.

7    **Q.**   And as far as quantity, and type of drug, and all of

8    that, directly above the "wholesale distributor number with

9    DDC," is that for any prescription drug?

10   **A.**   All prescription drugs are required to have --

11   **Q.**   Looking at Government Exhibit 35A, again, looking at the

12   top half of this form, are you familiar with Oncology Supply?

13   **A.**   Yes.  This is Oncology Supply, and as you see next to

14   it, distributed by ASD Specialty Healthcare, Inc.

15              MR. TRAGOS:  Which number is that?

16              MR. TREZEVANT:  35A.

17              MR. TRAGOS:  You said Oncology Supply?

18              MR. TREZEVANT:  Yes.

19   BY MR. TREZEVANT:

20   **Q.**   Do you recognize that as a licensed --

21   **A.**   Yes.  I'm familiar with this firm.

22   **Q.**   Do they hold a license with the DDC?

23   **A.**   Yes, they do.

24   **Q.**   And again, looking in the middle of this form --

25   **A.**   Yes.  If you look in the middle of this form, at the

1    top, we see it's an invoice.  In the middle we have the

2    names --

3              THE COURT:  Wait just a minute.

4              MR. TRAGOS:  Can I approach to take a look at that

5    exhibit?

6              THE COURT:  All right.

7              MR. TRAGOS:  Okay.  Your Honor, thank you.

8    BY MR. TREZEVANT:

9    Q.   Dr. Mayleben, okay, so as to the middle of the form is

10   that followed generally with what we were talking about in

11   499 as far as what's required?

12   A.   Yes.  In this document it has the names of the

13   prescription drugs, information regarding quantity, pricing,

14   and it also -- in the middle of this page also lists the

15   Florida out-of-state prescription drug wholesale permit

16   number listed there as 2300660.  So that would be the permit

17   that authorized this entity to sell the prescription drug

18   into Florida.

19   Q.   And how difficult would it be to verify that with the

20   DDC, the 2300660?

21   A.   If you had this on a document and you saw it, this end,

22   you could easily go to the same public website and rather

23   than look it up by name, verify that the permit matched the

24   actual name of the company.

25   Q.   If we could go away from this document.  Now,

1  Dr. Mayleben, at any point in time did you ever participate

2  in a federal search and seizure at East Lake Oncology?

3  **A.**   Yes, I did.

4  **Q.**   And what year was that, ma'am?

5  **A.**   2013.

6  **Q.**   What was your role during the search and seizure?

7  **A.**   I was a subject-matter expert.

8  **Q.**   And so generally what does that mean?

9  **A.**   I was basically there to assist the agents in

10  identifying drugs, reviewing records, and just providing any

11  assistance as far as answering any questions they may have.

12  **Q.**   And did you write or author any reports or statements

13  about your participation in that search?

14  **A.**   No, I did not.

15        MR. TREZEVANT:  One moment, your Honor.  Your

16  Honor, we would pass this witness.

17        THE COURT:  Cross?

18                    **CROSS-EXAMINATION**

19  **BY MR. TRAGOS:**

20  **Q.**   Ms. Mayleben --

21  **A.**   Yes.  Dr. Mayleben.

22  **Q.**   You are a PhD?

23  **A.**   Doctor of Pharmacy, Pharm D.

24  **Q.**   Pharm D?

25  **A.**   Yes.

1   **Q.**   Let's start where the prosecutor ended, your

2   participation in the execution of a search warrant.  How did

3   you find out that the search warrant was going to be

4   executed?

5   **A.**   I believe I was notified by the agent -- one of the

6   agents, and was asked if I would be able to be available for

7   any questions or assistance they might have.

8   **Q.**   Have the agents contacted you before about Dr. Norbergs?

9   **A.**   Can you clarify the question as far as "before?"  I

10  mean --

11  **Q.**   Before the search warrant -- was the search warrant the

12  first time that an agent had contacted you?

13  **A.**   Honestly, I cannot remember that for sure.

14  **Q.**   Okay.  You are, um -- I guess your agency is the, I

15  think the prosecutor said, it's kind of like the FDA of

16  Florida, kind of?

17  **A.**   Similar, yes.

18  **Q.**   All right.  And you are a person that keeps up with

19  what's going on with the FDA, correct?

20  **A.**   Yes.

21  **Q.**   And when the FDA sends out notices, letters, alerts,

22  those kinds of things, you review those, correct?

23  **A.**   Um, if you're talking about, like, warning letters and

24  public notices, that is what you're talking about?

25  **Q.**   Yes.

**A.**    Yes, I do review those.  I wouldn't say I review every
single one of them, but I do review them.

**Q.**    Why don't you review every single one of them?

**A.**    Because it's such a broad FDA cert's sends out notices
on things that don't pertain -- like, food, that don't
pertain to Drugs, Devices and Cosmetics.

**Q.**    If they send out reviews about drugs, do you review
those?

**A.**    Yes, I do.

**Q.**    When did you find out about a company called QSP?

**A.**    QSP?  Personally, I have -- I couldn't give you the year
of when I found out about it, but I know that personally I
had heard of QSP as being a company that had been known to,
um, being -- shipping drugs that they shouldn't have been
shipping.  I believe I might have heard that through both,
um, news articles, as well as, um, just talking to people in,
um, within the scope of my business.

**Q.**    How about Oberlin?

**A.**    Oberlin?  The question is when did I hear about it?

**Q.**    Yes.

**A.**    I couldn't give you an exact date on that.

**Q.**    Can you give me a year?

**A.**    Um, well, I would say that at the time of the, um, visit
to Dr. Norbergs office in 2013, I did review certain records
while I was there.  So I may have seen some records, but I

1    could not recall because I don't have any of those records in

2    my possession.  So it would be hard for me to give you an

3    exact date on that.

4    **Q.**    So before you saw Oberlin records at Dr. Norbergs

5    office, you didn't know about Oberlin?

6    **A.**    No, I did not say that.  I said I could not tell you

7    definitively when I have heard of Oberlin.

8    **Q.**    Well, you are aware that in California Oberlin was

9    raided and prosecuted?

10   **A.**    Sir, I have heard many things, but I don't know -- have

11   all those facts in my head.  I couldn't definitively give you

12   answers to that kind of a question.

13   **Q.**    Well, when you hear a company is, like, let's say, QSP,

14   I'm trying -- I want to make this clear.  Before you

15   participated in the raid at Dr. Norbergs' office, you had

16   heard of QSP?

17   **A.**    I believe so.

18   **Q.**    Okay.  And you believe that you heard of QSP through the

19   FDA?

20   **A.**    No.  I did not say that.  I said I think I believe -- I

21   believe, but that is pure speculation.  I don't have facts on

22   it.  In my position --

23              MR. TREZEVANT:  Objection, your Honor, she is

24   speculating.

25              THE COURT:  Overruled.  She's already answered the

1  question.

2  BY MR. TRAGOS:

3  **Q.**  And how often does the FDA issue warning letters,

4  bulletins, those kind of things?

5  **A.**  I couldn't tell you.  I don't report to the FDA.

6  **Q.**  I know that, but you read them?

7  **A.**  Yes, I do read them, but you couldn't answer that

8  question.

9  **Q.**  A lot?

10  **A.**  Sir, I really couldn't answer that question.

11  **Q.**  Do you get them once a week?

12  **A.**  I would say no.  Not warning letters once a week, no.

13  **Q.**  Excuse me?  I'm sorry.

14  **A.**  I would say not necessarily warning letters once a week.

15  I'm on a couple different -- it's very easy to be signed up

16  for various communications with the FDA.  So if you want to

17  know about recalls, if you want to know about warning

18  letters, many things you can publicly sign up and be a

19  recipient of the emails.  So it's very easy to be staying

20  abreast of things.  So I do actually get quite a few.  So

21  it's hard for me to tell you when, and where, and how, but

22  they are very readily available.

23  **Q.**  Well, if you find that somebody is violating Chapter

24  499, it is your duty and it is the duty of the State

25  Prosecutor to prosecute those people, isn't it?

**A.**   If we find a violation of Chapter 499, it is our duty to
proceed within the manner of our, um, policies and
procedures, how we would proceed regarding each violation.
It's not -- it depends upon the violation.

**Q.**   Well, isn't it true that -- do you still have Chapter
499 there in front of you, Exhibit 1D?

**A.**   Yes.

**Q.**   If you would look at page three, paragraph four.  That
would be (4).  Do you see that, ma'am?

**A.**   Yes, I do.

**Q.**   Could you read (4) for us, please?

**A.**   "Each State attorney, County attorney --" is it under
002?  Is that where we are at?

**Q.**   Yes.

**A.**   Okay.  Under (4), "Each State attorney, County attorney
or Municipal attorney to whom the Department or designated
agent reports any violation of this part shall cause
appropriate proceedings to be instituted in the proper Courts
without delay and to be prosecuted in the manner required by
law."

**Q.**   So the State prosecutors are required, if you report
this, to take action against the people you report, right?

**A.**   I really couldn't answer to what a State prosecutor is
required to do.  I would say that we, as DDC, if you're
talking about this specific case, we have this case on

1    criminal hold.

2    **Q.**   Ma'am, I'm asking you what the statute says.  Does the

3    statute not say, "Shall cause appropriate proceedings..."

4    you just read paragraph four?

5    **A.**   If you read paragraph five, this part, "Does not require

6    the Department to report for the institution of proceedings

7    under this part minor violations of this part or --" that's

8    one example, but also if it's under "criminal hold."  So we

9    have policies within the Division of when we report.  Not

10   every violation is reported because it's -- all of them are

11   depending upon how they are being handled.  It is not a

12   requirement to report.

13   **Q.**   When you found out about QSP, did you report it to the

14   state attorney to shut them down so they would stop doing

15   this?

16   **A.**   No.  Since we were working with federal law enforcement,

17   and we knew that this was a criminal case, we deferred to

18   our -- our law enforcement partners.  If they are state law

19   enforcement, we defer to them.  If they are federal, we defer

20   to them.  So basically our law is we can take it criminally,

21   and we have definitely done that on occasion where we go to

22   the State prosecutor's offices and they do prosecute them at

23   the State level.  Since this one was being prosecuted at a

24   Federal level we didn't interfere with that prosecution.

25   **Q.**   So you did not do anything to stop QSP?

**A.**    I thought we were talking about East Lake Oncology.

**Q.**    No.  I said QSP.

**A.**    QSP?  No, we had -- I had no evidence of QSP selling or shipping into Florida.  If I would have had invoices, packing slips or drugs, if we were to go into a facility in the State of Florida and we found those drugs onsite, absolutely we would request either a voluntary quarantine or seizure.  We would open a case on the out-of-state entity, and then we would prosecute that case.

**Q.**    Have you opened a case against QSP?

**A.**    As I said, as far as I know, we do not have the records for that case to be opened.

**Q.**    And no one has given them to you, right?

**A.**    I could not tell you definitively -- I was not prepared to answer the question.  If you like me to, and if I need to I can certainly let you know if we ever had a case or not.

**Q.**    Are you only prepared to answer the prosecutor's questions?

**A.**    No, sir.  I didn't expect the question.  I would be glad to answer the question, if I knew it.  What I can tell you is it is our routine practice and procedure that if we come -- become aware, and it happens if we become aware of a business entity, whether they are in the state or out-of-state, that's selling or shipping prescription drugs and they do not have a permit, we definitely take action on that.  We take that as a

1    very serious charge.

2              MR. TRAGOS:  Could I have the Elmo, please?

3    BY MR. TRAGOS:

4    **Q.**   Okay.  If you'll take a look at 1E that's been

5    introduced into evidence.  These are the companies that you

6    checked on.

7              THE COURT:  That's not in evidence.  It was for

8    demonstrative --

9              MR. TRAGOS:  Offered for demonstrative.

10   BY MR. TRAGOS:

11   **Q.**   These are the companies you say you checked on, correct?

12   **A.**   Yes, sir.

13   **Q.**   Oberlin Medical Supply, right?

14   **A.**   Yes.

15   **Q.**   And you checked on them because the Government asked you

16   too, right?

17   **A.**   Yes, last Friday.

18   **Q.**   And before that they never asked you to check on

19   Oberlin, did they?

20   **A.**   I never checked on them by myself, no.

21   **Q.**   QS Med Supplies, before Friday, had the Government ever

22   asked you to check on them?

23   **A.**   No, I did not check on them.

24   **Q.**   QS Supplies CASHOO, did the Government ever ask you to

25   check on them before Friday?

**A.**   No, I did not check on them.

**Q.**   QSP and Quality Specialty Products, before Friday, the Government ever ask you to check on them?

**A.**   Not that I am aware of.  I might have checked on them myself.  Just like I said, I've heard of them before, but as far as I know --

THE COURT:  The question was did the Government before --

THE WITNESS:  No.  I'm sorry, sir.  No.

BY MR. TRAGOS:

**Q.**   Meiko America, Inc., did the Government ever ask you to check on them?

**A.**   No.

**Q.**   Have you ever heard of them before?

**A.**   Yes.

**Q.**   When did you hear of them?

**A.**   As stated previously, I probably heard of and saw some of these records during the time I was at Dr. Norbergs office.  I cannot tell you definitively, but I am aware of some of these names from the time of that search -- search.

**Q.**   Have you taken any action against Meiko America, Inc.?

**A.**   I'm not prepared to answer questions on if we have taken any action because we have a large database of cases.  So unless I was asked specifically to look these up I could not definitively tell you we have a case open, or have we ever

1    taken action.

2    **Q.**    Ma'am, let me -- what is your job, if you don't know if

3    you're taking some action?

4    **A.**    Sir, we have hundreds -- we have more than a thousand

5    departments.  We have in-state and out-of-state permits, and

6    we have many people doing cases.  So -- and this is over

7    years of time.  So if you're asking me if I'm able to

8    remember all those cases, I am not able to remember them.  I

9    certainly would be able to look them up, if needed, but I

10   could not tell you that on the stand right now today.

11   **Q.**    So when the Government asked you to look up Meiko, you

12   didn't do anything else other than look it up to see if they

13   had a license, right?

14   **A.**    Yes.  Last Friday I looked these companies up to find

15   out if they had any licenses or permits with the Division.

16   **Q.**    And when the Government asked you to do that, you didn't

17   look up anything in your database about Meiko, right?

18   **A.**    No.  I was asked to find out if they had any permits

19   with the Division.

20   **Q.**    Ma'am, please listen to my question.  Did you do

21   anything else other than look up and see if they had a

22   license?

23   **A.**    No, I did not.

24   **Q.**    Cancer Drugs Online, are you familiar with that?

25   **A.**    I see it's on the list, yes.

1    **Q.**   Do you know anything about that company?  Have you done

2    any checking in your database about that company?

3    **A.**   To verify that they do not have any licenses with the

4    Division.

5    **Q.**   Ever heard of them before?

6    **A.**   Again, as with all of these, I may have seen them, I may

7    not.  I cannot testify accurately to that.

8    **Q.**   Same answer for Richard Pharma?

9    **A.**   Yes, sir.

10         THE COURT:  How much longer do you have with this

11   witness?

12         MR. TRAGOS:  Quite a bit, your Honor.

13         THE COURT:  All right.  We'll recess until tomorrow

14   morning.  Do any of you plan to vote tomorrow and have not

15   yet voted?  All right.  The polls are open at 7:00 o'clock

16   a.m., I believe.  We'll be in recess until 9:30 tomorrow

17   morning.

18         MR. TRAGOS:  Your Honor, I only have two questions

19   left with this exhibit and I can put it away.  Can I ask

20   those two questions?

21         THE COURT:  All right.

22   BY MR. TRAGOS:

23   **Q.**   Montana Health Solutions, same answers?

24   **A.**   Yes, sir.

25   **Q.**   Quantum Solutions, same answers?

1   **A.**   Yes, sir.

2   **Q.**   RX Store R US same answer?

3   **A.**   Yes, sir.

4           MR. TRAGOS:  That's it, your Honor.

5           THE COURT:  All right.  We are in recess until

6   tomorrow morning at 9:30.

7           MR. TREZEVANT:  Excuse me, your Honor.

8           THE COURT:  Remember not to see any news reports or

9   listen to any news reports about this case if they should

10  happen to come before you.  All right.  See you tomorrow

11  morning.

12          CSO OFFICER:  All rise.

13          (Jury exits courtroom at 4:38 p.m.)

14          CSO OFFICER:  Please be seated.

15          THE COURT:  How are we doing time wise?

16          MR. TREZEVANT:  Fine, your Honor.

17          THE COURT:  Are you going to finish your case by

18  Wednesday?

19          MR. TREZEVANT:  Of this Wednesday?

20          THE COURT:  Yes.

21          MR. TREZEVANT:  Unfortunately no, sir.

22          THE COURT:  When will you finish your case?

23          MR. TREZEVANT:  We believe next Tuesday or

24  Wednesday, Judge.

25          THE COURT:  All right.  And how long does the

1    Defense expect their case to take?

2              MR. TRAGOS:  No more than one or two days.  If they

3    finish by Wednesday, we will be done by Friday.

4              THE COURT:  All right.  I would like for the

5    Government to see if they can be finished with their case by

6    Tuesday afternoon, if possible.

7              MR. TREZEVANT:  We will do everything we can,

8    Judge.

9              THE COURT:  All right.

10             MR. TRAGOS:  If the Court would instruct the

11   witness about not talking to the Government or anybody.

12             MR. TREZEVANT:  We are not going to speak with her

13   now that she has taken the stand, Judge.

14             THE COURT:  All right.  Don't talk to the

15   Government --

16             THE WITNESS:  Yes, sir.

17             THE COURT:  -- until after your testimony is

18   completed.  See you tomorrow morning.

19             (Court adjourned at 4:40 p.m.)

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3    COUNTY OF HILLSBOROUGH     )

4                              )  SS.

5    STATE OF FLORIDA          )

6

7    I, MELISSA A. PIERSON, OFFICIAL COURT REPORTER, REGISTERED

8    PROFESSIONAL REPORTER, IN AND FOR THE UNITED STATES DISTRICT

9    COURT FOR THE MIDDLE DISTRICT OF FLORIDA, DO HEREBY CERTIFY

10   THAT I REPORTED, STENOGRAPHICALLY, THE FOREGOING PROCEEDINGS

11   AT THE TIME AND PLACE HEREINBEFORE SET FORTH; THAT THE SAME

12   WAS THEREAFTER REDUCED TO TYPEWRITTEN FORM BY MEANS OF

13   COMPUTER-AIDED TRANSCRIPTION; AND I DO FURTHER CERTIFY THAT

14   THIS IS A TRUE AND CORRECT TRANSCRIPTION OF MY STENOGRAPHIC

15   NOTES.

16

17

18   DATE:  October 10, 2017

19

20   **S:/MELISSA A. PIERSON**

21   MELISSA A. PIERSON, CA/CSR 12499

22   IL/CR 084.003138, RPR

23   FEDERAL OFFICIAL COURT REPORTER

24

25