1 UNITED STATES OF AMERICA
 UNITED STATES DISTRICT COURT
2 MIDDLE DISTRICT OF FLORIDA

3
   – – –
4 HONORABLE JAMES S. MOODY, JR.
 UNITED STATES DISTRICT JUDGE PRESIDING
5   – – –

6 UNITED STATES OF AMERICA, )
     )
7   PLAINTIFF, )
     )
8 VS. ) NO. 8:15-cr-183-T-30AEP
     )
9 D. ANDA NORBERGS, )
     )
10   DEFENDANT. )
 _____)

11

12   **<u>TRIAL – DAY 6</u>**

13

14  **REPORTER'S TRANSCRIPT OF PROCEEDINGS**
   **NOVEMBER 15, 2016**
15   TAMPA, FLORIDA

16

17
  MELISSA A. PIERSON, CA CSR 12499,
18  IL CSR 084.003138, RPR
  FEDERAL OFFICIAL COURT REPORTER
19  801 N. FLORIDA AVENUE, 2ND FLOOR
  TAMPA, FLORIDA 33602
20  PH: (813)301-5336
  USDCtranscripts@gmail.com

21

22

23

24

25

```
1    APPEARANCES OF COUNSEL:

2    ON BEHALF OF PLAINTIFF:
              A. LEE BENTLEY, III
3             UNITED STATES ATTORNEY
              BY:  MR. ADAM SALTZMAN, ESQ.
4             BY:  MR. JAY TREZEVANT, ESQ.
              ASSISTANT UNITED STATES ATTORNEYS
5             400 N. TAMPA STREET
              ST. 3200
6             TAMPA, FL 33602
              (813) 274-6000
7             ADAM.SALTZMAN@USDOJ.GOV
              JAY.TREZEVANT@USDOJ.GOV
8

9

10   ON BEHALF OF DEFENDANT:
              TRAGOS, SARTES & TRAGOS, PLLC
11            BY:  MR. GEORGE E. TRAGOS, ESQ.
              BY:  MR. PETER SARTES, ESQ.
12            601 CLEVELAND STREET
              ST. 800
13            CLEARWATER, FL 33755
              (727) 441-9030
14            george@greeklaw.com
              peter@greeklaw.com
15

16

17

18

19

20

21

22

23

24

25
```

1                              I-N-D-E-X

2     **WITNESS:**

3     Sally Marlowe

4         Direct Examination by Mr. Trezevant:          5
          Cross-Examination by Mr. Tragos:             16
5         Redirect Examination by Mr. Trezevant:       18

6     Rennae Revell

7         Direct Examination by Mr. Saltzman:          19
          Cross-Examination by Mr. Tragos:             27
8

9     Kelli Fidler

10        Direct Examination by Mr. Trezevant:         33
          Cross-Examination by Mr. Tragos:             47
11        Redirect Examination by Mr. Trezevant:       52

12

13    Special Agent Eric Larson

14        Direct Examination by Mr. Saltzman:          67

15

16

17

18

19

20

21

22

23

24

25

1              **E-X-H-I-B-I-T-S**                    **ADM**

2        **Government's**

3           No. 4                                      66
            No. 171                                    73
4           No. 172                                    73
            No. 173                                    73
5           No. 174                                    73
            No. 171A                                   73
6           No. 171B                                   73
            No. 173A                                   73
7           No. 173B                                   73
            No. 180                                    84
8           No. 180A                                   84
            No. 180B                                   84
9           No. 182A                                   94
            No. 182B                                   94
10          No. 182C                                   94
            No. 182D                                   94
11          No. 182E                                   94
            Nos. 401A - 406A                          102
12          Nos. 401B - 406B                          102

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              TAMPA, FLORIDA; NOVEMBER 15, 2016

 2                           - - -

 3            (COURT IN SESSION AT 9:04 A.M.)

 4                        *  *  *  *

 5          THE COURT:  Good morning.  Call your next witness,

 6     please.

 7          MR. TREZEVANT:  Thank you, your Honor.  The

 8     Government would call Sally Marlowe.

 9          MADAM CLERK:  Good morning.  Please raise your

10     right hand.

11          THE WITNESS:  I do.

12     (Witness sworn.)

13          MADAM CLERK:  Please state your name, and spell

14     your first and last name for the record.

15          THE WITNESS:  Sally Marlowe, S-A-L-L-Y,

16     M-A-R-L-O-W-E.

17          MADAM CLERK:  Thank you.  You may have a seat.

18          THE COURT:  Proceed.

19          MR. TREZEVANT:  Thank you, your Honor.

20                       SALLY MARLOWE

21     Called as a witness herein, having been first duly sworn

22     was examined and testified as follows:

23                     DIRECT EXAMINATION

24     BY MR. TREZEVANT:

25     Q.   Good morning, Ms. Marlowe.  Can you see all right?
```

1    **A.**    Yes, I can.

2    **Q.**    What do you presently do for a living?

3    **A.**    I'm in the field of rheumatology.

4    **Q.**    Can you tell us a little bit about your education,

5    following high school?

6    **A.**    Yes.  I started my journey as a three-year nursing

7    graduate.  I went on to get a degree, um, that related to

8    that, and then later on, about 25 years after I was a

9    graduate nurse, I became a nurse practitioner.

10    **Q.**    Okay.  Now, ma'am, you said you started first by earning

11    your RN?

12    **A.**    That's correct.

13    **Q.**    Is that a registered nurse?

14    **A.**    Yes.

15    **Q.**    That was following three years of school?

16    **A.**    Yes, the old fashioned kind.

17    **Q.**    Where did you go to school for that degree?

18    **A.**    Hartford Hospital in Hartford, Connecticut.

19    **Q.**    After that, did you pursue more education?

20    **A.**    Yes, I did.

21    **Q.**    What was the next degree you pursued?

22    **A.**    I got a degree, BS in Visual Arts, which was a degree

23    related to methodology.

24    **Q.**    Was that a four-year college degree?

25    **A.**    Actually, um, it was one of the -- I was on a college

1    campus, but it was also a situation where I could do much at

2    home.  At that time, I had four children.

3    **Q.**    And when you earned that degree, how, if at all, did

4    that degree relate to your registered nursing degree?

5    **A.**    Well, actually, I never used that degree because as soon

6    as I finished it, I entered the -- one of the first programs

7    in the country to become a nurse practitioner.

8    **Q.**    And where did you enter that program, ma'am?

9    **A.**    At the University of Hartford, Hartford Hospital.

10   **Q.**    In approximately what year?

11   **A.**    Oh, gracious, I think it was 1978.

12   **Q.**    And did you complete that program?

13   **A.**    Yes.

14   **Q.**    And as a result of completing that program, did you earn

15   either a certificate or a diploma?

16   **A.**    Yes.

17   **Q.**    After that did you sit for any sort of test?

18   **A.**    Yes, a national test.

19   **Q.**    Was that like a national Boards?

20   **A.**    Yes.

21   **Q.**    Now, once you passed your Boards as a Nurse

22   Practitioner, what, if anything, did you do?

23   **A.**    Well, I took a position with the Division of Rheumatic

24   Diseases at the University of Connecticut, School of

25   Medicine, in Farmington, Connecticut, and thought I was being

1    trained or allowing -- I was the first nurse practitioner

2    that the University School of Medicine had ever seen, and

3    pursued my work there.  I thought had just applied for a job,

4    but later on I found that I was a subject, and the subject

5    was, you might call it, an experience -- an experiment

6    because I learned later that the National Institutes of

7    Health had given the University of Connecticut, School of

8    Medicine a $46,000 grant, way back then in 19 -- I mean,

9    yeah -- '80, to train me to see if they could take a nurse

10   practitioner and train her as a rheumatologist.

11   **Q.**   And did you complete that program?

12   **A.**   Well, um, they said I went through it very quickly

13   because within a year I was appointed to the faculty as a

14   full voting faculty member.

15   **Q.**   At what school, ma'am?

16   **A.**   The University of Connecticut, School of Medicine.

17   **Q.**   And how long did you work at the University of

18   Connecticut, School of Medicine?

19   **A.**   Five years.

20   **Q.**   And during that period of time were you focused on

21   rheumatology and the practice of rheumatology?

22   **A.**   Absolutely.  That's all.

23   **Q.**   And then what, if anything, did you do following that?

24   **A.**   I came to Florida, and I became part of the Mease

25   Dunedin and Countryside Group as an expert in rheumatology.

1    Q.   As to rheumatology, just so everyone knows what we are

2    talking about, could you explain to the Jury what you do as a

3    nurse practitioner who specialized in rheumatology?

4    A.   Well, rheumatology is a -- relates primarily to the

5    field of arthritis, and the many forms of arthritis that are

6    connective-tissue based, and you can say that the

7    rheumatologist is most known for dealing with the pain of

8    joints and that sort of thing.  But it's a very extensive

9    field, and there are probably about 100 different types of

10   connective tissue diseases that are associated with it.

11   Q.   And at Mease -- how long did you remain at Mease, ma'am?

12   A.   22 months.

13   Q.   Following that, what did you do?

14   A.   I created my own practice.

15   Q.   So as a nurse practitioner with the specialized

16   training, such as yourself, do you have to create that sort

17   of a practice under an MD, or are you perfectly capable of

18   running your own practice, ma'am?

19   A.   Well, I had some different variables in my situation.  I

20   created it, essentially, under my own -- everything was my

21   own.  I had -- for purposes of the law of the State of

22   Florida, I had a physician who was considered "by associate"

23   for that purpose.

24   Q.   And what was the name of your own practice?

25   A.   At that time it was called The Arthritis Pain Treatment

1    Center.

2    **Q.**    And when you opened The Arthritis Pain Treatment Center,

3    at that point what licenses did you hold in the State of

4    Florida?

5    **A.**    It was the licenses -- it's dual, the RN and the ARNP.

6    Those are the graduate nurse, plus the nurse practitioner.

7    **Q.**    And did you enroll with any government health programs

8    to become providers when you opened The Arthritis Pain

9    Treatment Center?

10   **A.**    Yes, I did.

11   **Q.**    With what programs?

12   **A.**    I, um, became -- I obtained my numbers or -- my

13   appropriate numbers with, um, Medicaid/Medicare, Tri-Care,

14   The Railroad Fund, and a few others that I don't recall right

15   now.

16   **Q.**    And what year did you actually open The Pain Treatment

17   Center, if you recall?

18   **A.**    That was in 1987.

19   **Q.**    And is your practice still named The Arthritis Pain

20   Treatment Center?

21   **A.**    No.    When -- I changed it to the Southeast Regional

22   Arthritis Center when I realized "pain" wasn't a good name to

23   have in anybody's, you know -- I didn't want "pain" in there

24   because people started to come that did not have arthritis.

25   **Q.**    All right, ma'am.    Now, at any point in time during your

1   practice, while you have been here in Florida, have you

2   become -- did you become familiar with a physician named

3   Dr. Norbergs?

4   **A.**   Yes.

5   **Q.**   Approximately when did you first meet Dr. Norbergs?

6   **A.**   I'm sorry.  (Witness crying.)  Um, 20 -- excuse me.

7   25 years ago.

8   **Q.**   And ma'am, if you need any water or anything, there is

9   some water up there.  Now, how is it that you first came to

10  know Dr. Norbergs?

11  **A.**   Um, well, you know, at that time, the drug companies had

12  more dinners, and events, and that sort of thing, and it

13  was -- I had that opportunity to meet her, um, at the -- at

14  that time, at those events, and you know, integrating with

15  people that I had been integrating with at Mease Hospitals,

16  of course, that led me to get to know her.

17  **Q.**   And by meeting her, interacting with her, did you get to

18  know what her practice focused upon?

19  **A.**   Yes.

20  **Q.**   What was that, ma'am?

21  **A.**   Hematology and oncology.

22  **Q.**   And at any point in time did you refer your patients to

23  Dr. Norbergs?

24  **A.**   I referred my hematology and oncology to nobody else but

25  her.

```
 1   Q.   At any point in time did you, yourself, become a patient
 2   of Dr. Norbergs?
 3   A.   Yes.
 4   Q.   When did you first become a patient of Dr. Norbergs?
 5   A.   I believe it was about in the -- in 2000.
 6   Q.   And when you first went to Dr. Norbergs, what, if any,
 7   condition were you going to her for?
 8   A.   Well, at that time I had a hematological situation that
 9   I knew then.  Also, I had Lupus, and I had some other
10   concerns about the blood work, and she very graciously
11   allowed me to understand that I, um, had some other
12   conditions other than the Lupus.
13   Q.   As far as hematological, do you mean blood conditions?
14   A.   Yes, that show up in the blood, anemia and some other
15   things.
16   Q.   So as a result of that, did she -- did she give
17   treatment to you, or follow you, or any sort of interaction
18   in 2000?
19   A.   She was very -- she was diagnostic with me.  She, of
20   course, did not treat the Lupus because that is not in her
21   venue.  She -- I had Cryal's Lavio Anemia and glomerular
22   glutens that she discovered, and I was anemic, and she
23   directed me what I should do about these things.  There was
24   no actual treatment, but she was very kind to allow me to --
25   I went to see her a couple times to hear her and to get the
```

1    blood work done.

2    **Q.**    Sort of like a follow-up exam?

3    **A.**    Yes.

4    **Q.**    At some point in time, did you ever receive treatment at

5    East Lake Oncology?

6    **A.**    For?

7    **Q.**    Not for that, ma'am.  At some time did you receive

8    treatment at East Lake Oncology?

9    **A.**    Yes, I did.

10   **Q.**    And when did it arise that you went to East Lake

11   Oncology for treatment?

12   **A.**    I think it might have been the beginning of 2011.  It

13   was 2011.  My mother had just passed away at Christmastime in

14   2010, so I recall that January.

15   **Q.**    And what led you to go to Dr. Norbergs in January of or

16   -- the early part of 2011?

17   **A.**    Because I felt she was the best.

18   **Q.**    And what, if any, issue did you have at that time?

19   **A.**    Um, I had a very disturbing drop in my hematology, and

20   my hematocrit, and my hemoglobin, and some other values that

21   had been obtained by a primary care.

22   **Q.**    And when you say, "a drop," is that more generally

23   speaking, so everyone understands, a blood condition?

24   **A.**    Well, I didn't know.  Yes, it involves the blood, yes,

25   but I knew there was something else going on.

1  **Q.**   Did you ultimately -- while at East Lake, did

2  Dr. Norbergs find a diagnoses?

3  **A.**   Yes, she did.  She did a bone marrow biopsy and did

4  very, very extensive work on me and determined that I had a

5  form of cancer.

6  **Q.**   And did you start chemotherapy?

7  **A.**   Yes.

8  **Q.**   And when, approximately, did you start chemotherapy?

9  **A.**   Well, that's a little hard to absolutely recall because

10 I had college graduation in Pennsylvania, and two weddings to

11 go to in Virginia and Washington, so I didn't want my family

12 to know.  So I put it off until maybe the end of the spring.

13 I might have started -- I think maybe I started it in, like,

14 May or June.

15 **Q.**   Of 2011?

16 **A.**   Yes.

17 **Q.**   And generally, do you recall your treatment regiment?

18 **A.**   Um, yes.

19 **Q.**   And generally, could you explain what the regiment was?

20 **A.**   Well, um, it was a Benadryl IV steroids, um, Rituxan.

21 **Q.**   And how often did you go?

22 **A.**   And there was another medication I don't recall because

23 it was fairly new.  It was -- all I can recall it started, I

24 believe, with an, "N," and I had it interspersed

25 periodically.

1   **Q.**   And how often did you go for the treatments?

2   **A.**   Due to the nature of the disease, with frequency.  I

3   went about every week.

4   **Q.**   For approximately how long, ma'am?

5   **A.**   Upwards of a year.

6   **Q.**   Now, at any point in time during your chemotherapy

7   treatments at East Lake Oncology, what, if anything, were you

8   told about whether the drugs utilized in your chemotherapy

9   treatments were or were not FDA-approved?

10   **A.**   Nothing.

11   **Q.**   Is that something you would have wanted to know, ma'am?

12   **A.**   Yes, sir.

13   **Q.**   How, if at all, would that have affected your treatment

14   decisions?

15   **A.**   I'm sorry?

16   **Q.**   How, if at all, would that have affected your treatment

17   decision, ma'am?

18   **A.**   Well, first of all, I would have wanted to know why --

19   why that change.

20   **Q.**   What change, ma'am?

21   **A.**   If it was not the drug I was anticipating.  I would ask

22   that question.

23   **Q.**   So --

24   **A.**   And, um, yes, sir.

25   **Q.**   So were you expecting to receive FDA-approved drugs?

1    **A.**    Yes, yes.

2    **Q.**    In your practice have you ever administered drugs to a

3    patient that was not FDA-approved?

4            MR. TRAGOS:  Objection, relevance.

5            THE COURT:  Overruled.

6    BY MR. TREZEVANT:

7    **Q.**    You can answer, ma'am?

8    **A.**    No.  No, I would not.

9            MR. TREZEVANT:  Your Honor, we have no further

10   questions of this witness.

11           THE COURT:  All right.  Any cross?

12                    **CROSS—EXAMINATION**

13   **BY MR. TRAGOS:**

14   **Q.**    Ma'am, how much time did Dr. Norbergs spend with you?

15   **A.**    I would say a great deal.

16   **Q.**    And when you received what you believed was Rituxan, was

17   that a chemo nurse that did that?

18   **A.**    I trust so, yes.

19   **Q.**    So the chemo nurse gave you the Rituxan, correct?

20   **A.**    Yes.

21   **Q.**    And who told you that you were getting Rituxan?

22   **A.**    Well, I was told I would be receiving Rituxan.

23   **Q.**    And who told you that?

24   **A.**    Well, Dr. Norbergs told me I would be receiving Rituxan.

25   **Q.**    And do you know the active ingredient in Rituxan?

1    **A.**    I'm sorry, I do not.

2    **Q.**    And you said that you -- in your opinion, Dr. Norbergs

3    was the best?

4    **A.**    Yes, sir.

5    **Q.**    Did you refer patients to her?

6    **A.**    Yes.

7    **Q.**    Did you refer patients to her in 2012?

8    **A.**    I believe so.

9    **Q.**    Okay.  How many patients did you refer to her?

10   **A.**    I wouldn't know that, sir.

11   **Q.**    Okay.  And after receiving the treatment from

12   Dr. Norbergs, did you go into remission?

13          MR. TREZEVANT:  Objection, your Honor.  May we

14   approach sidebar?

15          THE COURT:  Approach the bench.

16          MR. TRAGOS:  Your Honor, I'll withdraw the

17   question.

18   BY MR. TRAGOS:

19   **Q.**    The -- when did you stop receiving the Rituxan?

20   **A.**    After about -- when it got close to a year that I was

21   receiving it, I decided to stop it.

22   **Q.**    And why is that?

23   **A.**    I -- I -- I can't be -- I can't be certain.  I just felt

24   I had to stop it.

25   **Q.**    Okay.

1    **A.**    I stopped it.

2    **Q.**    It was your decision?

3    **A.**    It was my decision.

4    **Q.**    Okay.  Now, you were interviewed by the Inspector

5    General, Office of Investigations, Health and Human Services

6    about this case, correct?

7    **A.**    Yes.

8    **Q.**    In August 2015?

9    **A.**    Yes.

10   **Q.**    Before they interviewed you, did you have any idea that

11   the drugs you received were not FDA-approved?

12   **A.**    No.

13   **Q.**    Did they tell you they were not FDA-approved?

14   **A.**    Yes.

15              MR. TRAGOS:  That's all the questions I have.

16              THE COURT:  Any redirect?

17              MR. TREZEVANT:  Yes, sir.

18                    **REDIRECT EXAMINATION**

19   **BY MR. TREZEVANT:**

20   **Q.**    When you referred patients to Dr. Norbergs, did you do

21   so because you trusted her?

22   **A.**    Yes, absolutely.

23   **Q.**    If you had had any idea that she was using

24   non-FDA-approved drugs, would you have referred patients to

25   her?

1   **A.**    Probably not.

2            MR. TREZEVANT:  No further questions, your Honor.

3            THE COURT:  Thank you.  You may step down.

4    (Witness excused.)

5            THE COURT:  Call your next witness, please.

6            MR. SALTZMAN:  The United States calls Rennae

7    Revell.

8            MADAM CLERK:  Good morning.  Please raise your

9    right hand.

10           THE WITNESS:  Yes.

11   (Witness sworn.)

12           MADAM CLERK:  Please state your name, and spell

13   your first and last name for the record.

14           THE WITNESS:  Rennae Revell, R-E-N-N-A-E,

15   R-E-V-E-L-L.

16           MADAM CLERK:  Thank you.  You may have a seat in

17   the witness box.

18           THE COURT:  Proceed.

19           MR. SALTZMAN:  Thank you, your Honor.

20                      **RENNAE REVELL**

21   Called as a witness herein, having been first duly sworn

22   was examined and testified as follows:

23                   **DIRECT EXAMINATION**

24   **BY MR. SALTZMAN:**

25   **Q.**   Good morning, ma'am.

1    **A.**   Good morning.

2    **Q.**   Let's talk about your background.  How far did you go in

3    school?

4    **A.**   I have an Associate's Degree in Science and Nursing.

5    **Q.**   For the nursing, have you received any specialized

6    training?

7    **A.**   I have had some training in critical care and oncology.

8    **Q.**   When did you receive that training?

9    **A.**   Critical care was back in 2001, and oncology was about

10   11 years ago.

11   **Q.**   And I'm having a hard time hearing you.  If you don't

12   mind pulling that microphone closer to you.  Thank you.  What

13   do you currently do for work?

14   **A.**   I'm a Clinical Research Coordinator.

15   **Q.**   What does that mean?

16   **A.**   I enroll patients into clinical research studies.

17   **Q.**   Where do you do that?

18   **A.**   Florida Cancer Specialists.

19   **Q.**   How long have you been doing that at Florida Cancer

20   Specialists?

21   **A.**   For 11 months.

22   **Q.**   Did you have any other positions at Florida Cancer

23   Specialists before research -- Clinical Research Coordinator?

24   **A.**   Yes.  Prior to that I was a Chemo Infusion Nurse.

25   **Q.**   How long did you do that for?

1  **A.**    About four years.

2  **Q.**    Before working at Florida Cancer Specialists where did

3  you work?

4  **A.**    Pasco-Pinellas Cancer Center.

5  **Q.**    How long were you there for?

6  **A.**    I was there for about six years, um, with a short stint

7  of a couple weeks off.

8  **Q.**    What did you do during that short stint that you were

9  off?

10  **A.**    That was when I went to work for East Lake Oncology.

11  **Q.**    Who hired you to work at East Lake Oncology?

12  **A.**    Dr. Norbergs.

13  **Q.**    And do you see Dr. Norbergs in the courtroom today?

14  **A.**    I do.

15  **Q.**    Can you please point her out and identify her by an

16  article of clothing that she is wearing?

17  **A.**    She is sitting right there (indicating), wearing a white

18  shirt and black blazer.

19          MR. SALTZMAN:  Your Honor, may the record reflect

20  the witness has identified the witness?

21          THE COURT:  Let the record so reflect.

22  BY MR. SALTZMAN:

23  **Q.**    When you worked at East Lake Oncology for Dr. Norbergs,

24  what did you do?

25  **A.**    I was hired to be in charge of her chemo infusion room.

**Q.**   And why did you only work there for a couple of weeks?

**A.**   Because I opened a box that was labeled, "from the United Kingdom," that had drugs in it and I was very uncomfortable.

**Q.**   I'll get to that in a moment.  As part of your responsibilities as being in charge of the clinic at East Lake Oncology, what, if any, involvement did you have in ordering drugs for the practice?

**A.**   I had one-time experience of ordering drugs.

**Q.**   And for the one time you ordered drugs, how did you know what to order?

**A.**   I was instructed by Dr. Norbergs to make a list of inventory of what was on stock and what drugs were needed for the following week and then --

**Q.**   Did you do that?

**A.**   Yes, I did.

**Q.**   And after you did that, what did you do with that information?

**A.**   I gave that list to Dr. Norbergs.

**Q.**   And after you gave the list -- and what was on that list, just generally speaking?

**A.**   Just chemo drugs and, um, just any infusions that we would need.

**Q.**   And after you gave that list of drugs that were needed, did you -- I'm sorry, did you provide that to Dr. Norbergs?

1    **A.**    Yes.

2    **Q.**    After you gave it to Dr. Norbergs what, if anything,

3    happened next?

4    **A.**    She then gave me the list back and indicated on there

5    which drugs for me to order, from where, and which drugs she

6    would take care of.

7    **Q.**    And who made the decisions about what drugs to order?

8    **A.**    Dr. Norbergs.

9    **Q.**    And for the drugs that she asked you to order, do you

10   recall where you ordered those from?

11   **A.**    I believe it was Oncology Supply and McKesson.

12   **Q.**    And for the drugs that she said she would order, um, did

13   she tell you why she was going to order those?

14   **A.**    No.

15   **Q.**    And the drugs you ordered, how did you place those

16   orders with McKesson and Oncology Supply?

17   **A.**    I believe I called them, gave them an account number,

18   and then ordered the drugs.

19   **Q.**    And for the drugs that Dr. Norbergs said she would

20   order, do you know if that order was placed?

21   **A.**    Yes.

22   **Q.**    And how do you know that?

23   **A.**    Because those were the drugs that came in the box that

24   were labeled, "from the United Kingdom."

25   **Q.**    And what, if anything, did you do when you saw that box?

**A.**   Um, I was very uncomfortable about it, and I discussed
it with another nurse that worked there.

**Q.**   Which nurse was that?

**A.**   Peggy.

**Q.**   And for any -- did you unpack drugs at the practice?

**A.**   I'm sorry?

**Q.**   Did you unpack drugs that were delivered into the
practice?

**A.**   Yes.

**Q.**   And can you just explain what you did when you unpacked
the drugs, from beginning to end?

**A.**   Um, we would receive the drugs.  We would unpack them.
There would be an invoice in there, and then we would check
off on the invoice that everything that was on the invoice
was inside the box, and then we would stock the drugs.

**Q.**   And what, if anything, did you do with that invoice?

**A.**   The invoices I had were given to Kelly.

**Q.**   If we could publish Exhibit 103B.  Do you recognize this
exhibit?

          MR. TRAGOS:  Objection, your Honor, foundation.

          THE COURT:  Overruled.

BY MR. SALTZMAN:

**Q.**   The question was whether or not she recognizes the
exhibit, right?

**A.**   It looks very similar.

```
1            MR. TRAGOS:  Objection, your Honor.
2            THE COURT:  It calls for a yes or no.  Do you
3    recognize it or you don't?
4            THE WITNESS:  Yes.
5    BY MR. SALTZMAN:
6    Q.   How do you recognize it?
7    A.   It looks similar to the box that I had seen at East Lake
8    Oncology.
9    Q.   And do you recognize the name that's on this box?
10   A.   Yes.
11   Q.   And if we could zoom in on -- zoom out and just zoom in
12   on the -- where it says, "Zometa," on the bottom.  Below
13   where it says, "Zometa," do you know what language that is?
14   A.   No.
15   Q.   And is it in English?
16   A.   No.
17   Q.   When you worked at East Lake Oncology, did you see any
18   other drugs that had languages other than English?
19   A.   Yes.
20   Q.   How much time elapsed between when you saw that box from
21   the United Kingdom and when you stopped working?
22            MR. TRAGOS:  Objection, your Honor.  She said this
23   looked similar to the box.
24            THE COURT:  Overruled.
25                               *
```

BY MR. SALTZMAN:

**Q.**   How much time between seeing the box from the United Kingdom and when you quit?

**A.**   Within a week.

**Q.**   And was there a connection between those two?

          MR. TRAGOS:  Objection, relevance.

          THE COURT:  Overruled.

          THE WITNESS:  Could you repeat that, please?

BY MR. SALTZMAN:

**Q.**   Was there a connection between seeing the box and when you stopped working at East Lake Oncology?

**A.**   Yes.  I was very uncomfortable knowing where the drugs came from.

**Q.**   Did you talk to Dr. Norbergs about that?

**A.**   No, I did not.

**Q.**   When was the last time you talked to Dr. Norbergs?

**A.**   It was within a couple days of me exiting.  She had asked me to stay after work to have a conversation with her. I had a conversation with her, went into her office, she asked me for the invoices for the week, and I had told her that I had given them to Kelly, and then, she was having conversation about needing to be able to trust, um, people in her office.  She was kind of cold.  A different type of conversation than we had ever had before.  It was very uncomfortable, and I left there feeling --

1          MR. TRAGOS:  Objection, relevancy.

2          THE COURT:  Sustained.

3          MR. SALTZMAN:  No further questions, your Honor.

4          THE COURT:  Cross?

5                    **CROSS-EXAMINATION**

6    **BY MR. TRAGOS:**

7    **Q.**   Let me ask you to take a look at Exhibit 20A.  If we can

8    have the Elmo, please?  Thank you.  Do you recognize the

9    handwriting?

10   **A.**   No.

11   **Q.**   It's not your handwriting?

12   **A.**   No.

13   **Q.**   When you did the inventory, um, did you also do an

14   inventory of the refrigeration section?

15   **A.**   Yes.

16   **Q.**   And when you did the inventory of the refrigeration

17   section, did you, um, write down, for instance, how many

18   boxes of Rituxan there were?

19   **A.**   Yes.

20   **Q.**   And did you write down how many boxes of Neulasta there

21   were?

22   **A.**   Yes.

23   **Q.**   Okay.  And when you wrote this down, you would write

24   "Rituxan," what, "times five," or, "times two," or whatever

25   was there?

1    **A.**   I think I wrote the total number of milligrams that we

2    had remaining.

3    **Q.**   Of Rituxan, right?

4    **A.**   Of any drug.

5    **Q.**   Okay.  But Rituxan was one of them, right?

6    **A.**   Right.

7    **Q.**   Neulasta was one of them, right?

8    **A.**   Right.

9    **Q.**   And you would then give that list to who?

10   **A.**   I gave that list to Dr. Norbergs.

11   **Q.**   Okay.  And then, about when was this?  When did you work

12   there, from when to when?

13   **A.**   July of 2011.

14   **Q.**   To when?

15   **A.**   It was just a couple of weeks.

16   **Q.**   So July to August?

17   **A.**   At most, yeah.

18   **Q.**   Okay.  And you said one time you ordered drugs, correct?

19   **A.**   Yes.

20   **Q.**   Okay.  And now, you are -- where are you working now?

21   **A.**   Florida Cancer Specialists.

22   **Q.**   How many doctors are there?

23   **A.**   Depends on what clinic.

24   **Q.**   Total, Florida Cancer Specialists, they have 100

25   doctors?

1   **A.**   I don't know exactly how many doctors they have.

2   **Q.**   Do they have a full-time pharmacy?

3   **A.**   Yes.

4   **Q.**   With pharmacists?

5   **A.**   Pharm techs and pharmacists.

6   **Q.**   Okay.  And do they have a compliance section?

7           MR. SALTZMAN:  Objection, relevance, your Honor.

8           THE COURT:  Sustained.

9   BY MR. TRAGOS:

10  **Q.**   Ma'am, do you believe that all the drugs used in America

11  come from American manufacturers?

12          MR. SALTZMAN:  Objection, relevance.

13          THE COURT:  Sustained.

14  BY MR. TRAGOS:

15  **Q.**   Ma'am, you said that you were concerned because the

16  drugs that they were using at East Lake Oncology came from a

17  foreign country, correct?

18  **A.**   Yes.

19  **Q.**   Is that the first time you had ever seen drugs, in any

20  work you have ever done, that came from a foreign

21  manufacturer?

22  **A.**   Yes.

23  **Q.**   And since then you've never seen a drug come from a

24  foreign manufacturer?

25  **A.**   No.

1    **Q.**   So all drugs that you have seen and you have used, all

2    were manufactured in the United States?

3              MR. SALTZMAN:  Objection, asked and answered.

4              THE COURT:  Overruled.

5              THE WITNESS:  Could you repeat the question?

6    BY MR. TRAGOS:

7    **Q.**   All drugs that you have used and seen, in your career,

8    were manufactured in the United States?

9    **A.**   Yes.

10   **Q.**   The refrigerated drugs, how were they kept?

11   **A.**   In the refrigerator.

12   **Q.**   Okay.  Does the refrigerator have a lock on it?

13   **A.**   I do not recall.

14   **Q.**   And you say you unpacked drugs, correct?

15   **A.**   Correct.

16   **Q.**   Okay.  Did you unpack drugs that were required to be

17   refrigerated?

18   **A.**   Yes.

19   **Q.**   How did they come to you?

20   **A.**   In a cooler.

21   **Q.**   Okay.  Packed in ice?

22   **A.**   With ice packs.

23   **Q.**   And would you take them and put them in the

24   refrigerator?

25   **A.**   Correct.

1  **Q.**   Okay.  Would you check to see what was delivered is what

2  was ordered?

3  **A.**   By the invoice within the box, yes.

4  **Q.**   And you would check the little boxes to make sure, like,

5  it said, "two of this, three of that," that kind of stuff,

6  right?

7  **A.**   Yes.

8  **Q.**   Okay.  And when -- you, then, treated a patient with

9  chemotherapy, correct?

10  **A.**   Yes.

11  **Q.**   Did you treat the patient according to Dr. Norbergs'

12  orders?

13  **A.**   Yes.

14  **Q.**   Okay.  Now, again, using the example of Rituxan,

15  Dr. Norbergs would then tell you this patient gets Rituxan,

16  correct?

17  **A.**   Yes.

18  **Q.**   And then, you would go to the refrigerated cabinet and

19  take out Rituxan?

20  **A.**   Yes.

21  **Q.**   And then, you would take that Rituxan and you would

22  administer it to a patient?

23  **A.**   Yes.

24  **Q.**   Okay.  Did you ever -- if Dr. Norbergs told you Rituxan,

25  did you ever administer a drug to a patient that was not

1    Rituxan?

2    **A.**    No.

3    **Q.**    So you always followed her orders when she told you

4    Rituxan?

5    **A.**    Yes.

6    **Q.**    Or Neulasta?

7    **A.**    Yes.

8    **Q.**    Or Procrit?

9    **A.**    Yes.

10   **Q.**    Or Treanda?  You are not familiar with Treanda or --

11   Treanda (pronunciation), sorry?

12   **A.**    Yes.

13   **Q.**    Sorry.  Or Zometa?

14   **A.**    Yes.

15   **Q.**    In your current work do you use Zometa?

16   **A.**    No.

17   **Q.**    Have you used it before Dr. Norbergs?

18   **A.**    Yes.

19   **Q.**    And is it spelled the same way as the Zometa was on the

20   box that the Government showed you?

21   **A.**    Yes.

22              MR. TRAGOS:  No other questions.

23              THE COURT:  Redirect?

24              MR. SALTZMAN:  No, your Honor.

25              THE COURT:  Thank you, ma'am.  You may step down.

```
 1   (Witness excused.)
 2            THE COURT:  Call your next witness, please.
 3            MR. TREZEVANT:  The Government calls Ms. Fidler.
 4   F-I-D-L-E-R, Fidler.
 5            MADAM CLERK:  Good morning.  Please raise your
 6   right hand.
 7            THE WITNESS:  I do.
 8   (Witness sworn.)
 9            MADAM CLERK:  Please state your name, and spell
10   your first and last name for the record.
11            THE WITNESS:  Kelli Fidler, K-E-L-L-I, F-I-D-L-E-R.
12            MADAM CLERK:  Thank you.  You may have a seat.
13            THE COURT:  Proceed.
14                    DIRECTION EXAMINATION
15   BY MR. TREZEVANT:
16   Q.   Good morning, Ms. Fidler.
17   A.   Hi.
18   Q.   Ms. Fidler, if you could move to your right a little
19   bit, then I could see.  Do you see me all right?
20   A.   Hmm-hmm.
21   Q.   Do you have a job?
22   A.   Yes, I do.
23   Q.   What do you do for a living?
24   A.   I'm a chemotherapy nurse with Suncoast Infusion Center
25   with BayCare.
```

1    **Q.**   How long have you worked there?

2    **A.**   Year-and-a-half.

3    **Q.**   So as to your education, what's your highest degree that

4    you've earned?

5    **A.**   I have a Bachelor's Degree in Nursing.

6    **Q.**   And you work in Florida -- do you have a licensed

7    nursing degree in Florida, ma'am?

8    **A.**   Yes.

9    **Q.**   All right.  Now, during your -- how long have you been

10   an RN in Florida?

11   **A.**   17-and-a-half years.

12   **Q.**   And during that period of time did you ever have an

13   opportunity to work in East Lake Oncology?

14   **A.**   I did.

15   **Q.**   And how did that actually come about, ma'am,

16   approximately when?

17   **A.**   That was about 2011, I believe.  Around there.

18   2011/2012, I worked there for a year, and I answered an ad.

19   **Q.**   Did you interview there?

20   **A.**   I did.

21   **Q.**   And with whom did you interview?

22   **A.**   Dr. Norbergs.

23   **Q.**   And what, if anything, were your duties and

24   responsibilities at East Lake Oncology?

25   **A.**   To infuse the patients, and to, um, mix chemotherapy,

1    and eventually, after I was there for a while, to count the

2    medications, and to let Dr. Norbergs or Kelly know what we

3    needed for the following week when it came to how many

4    milligrams for different medications.

5    **Q.**    Was that the inventory process, ma'am?

6    **A.**    Yes.

7    **Q.**    And who, generally, trained you as to the different

8    tasks you performed there?

9    **A.**    Um, I learned to mix certain chemo medications on my own

10   by looking at the insert, because the main nurse, Peggy, was

11   on vacation when I had arrived.

12   **Q.**    All right.

13   **A.**    Started working.

14   **Q.**    And are you familiar with something called *The*

15   *Prescription Bible* or something like that, ma'am?

16   **A.**    Yes.  There was a book that we had in the back, in the

17   mixing area, that if you didn't know how to mix a medication,

18   then you would look at that and it would tell you how to do

19   it.

20   **Q.**    And what -- how was the book arranged?

21   **A.**    Just, um, I believe it was alphabetical.  I'm not

22   positive.  But it just had inserts or pamphlets in there that

23   told you, you know, about each medication.

24   **Q.**    And so, if you wanted to mix, say, a drug such as

25   Rituxan, what would you do, and how would you use that book?

**A.**   Well, Rituxan is already made, but it was mainly for drugs that you would need to mix.

**Q.**   Could you give me an example?

**A.**   Um, I'm trying to think.  I'm not -- I know that the Dacogen was in there -- was one drug.  Treanda was in there. Um, it was a wide list of drugs that were in there.

**Q.**   So when you went to the book, was the book made up of the labels or were the labels taped down --

**A.**   It was inserts.  Inserts out of the boxes of medication. It was the actual insert.

**Q.**   Alphabetically within the book?

**A.**   Hmm-hmm.

**Q.**   And then you would use those to mix the drugs?

**A.**   Hmm-hmm.

**Q.**   All right.  Now, at any point in time -- back up.  I apologize.  You said a little while ago, just a few moments ago, that at some point you began taking inventory, is that correct?

**A.**   Hmm-hmm.

          THE COURT:  Wait just a minute.  You need to answer "yes or no," ma'am.

          THE WITNESS:  Yes.

          THE COURT:  When you answer the question, you need to answer "yes or no," rather than "hmm-hmm" or "uh-huh."

          THE WITNESS:  Yes, sir.

BY MR. TREZEVANT:

**Q.**   And when you began taking inventory, who actually assigned that task to you?

**A.**   Kelly Krouse and Dr. Norbergs.

**Q.**   And could you explain to us step-by-step what and how you went through that process?

**A.**   I would go to the wall, the cabinet where we kept medications, and we had a locked refrigerator, and I would see what we already had and count that, and then I would -- they would let me know what patients were coming, or what drugs were needed for the next week, and sometimes we would order twice a week, and sometimes we would order weekly according to how many more of the milligrams we needed for each medication.

**Q.**   And so, would you compose a list of what was needed?

**A.**   Yes.

**Q.**   And, um, did you say you had a refrigerator that had a lock on it?

**A.**   Yes.

**Q.**   And who had access to that refrigerator?

**A.**   Kelly, the nurses and Dr. Norbergs.

**Q.**   And when you prepared the list, who was -- in East Lake would you give the inventory list to, to order the drugs?

**A.**   I would bring -- I would write it down on this list, and then I would make a copy of it, and then I would bring it

1     to -- Kelly had an area that had, like, bins for mail, and I

2     would set it there, because her office was right near

3     Dr. Norbergs.  There was, like, two offices in one, and if

4     she wasn't there, then I would put the list in bins that

5     Dr. Norbergs had.

6               MR. TREZEVANT:  One moment, your Honor.  If we

7     could go --

8     BY MR. TREZEVANT:

9     Q.   Do you see this exhibit, ma'am?

10    A.   Yes.  Hmm-hmm.  Yes, sir.

11              MR. TREZEVANT:  Your Honor, I apologize.  I thought

12    that was in evidence.  Could I use this as a demonstrative,

13    your Honor?

14              THE COURT:  Yes.

15              MR. TRAGOS:  Your Honor, I think it's in evidence.

16              THE COURT:  What number is it?

17              MR. TREZEVANT:  500.

18              THE COURT:  590?

19              MR. TREZEVANT:  500.

20              THE COURT:  It is not in evidence.

21    BY MR. TREZEVANT:

22    Q.   All right.  Using this as a demonstrative, ma'am --

23    A.   Hmm-hmm.  I'm sorry, yes.

24    Q.   -- have you seen this before?

25    A.   Yes.

1  **Q.**  Where have you seen this exhibit?

2  **A.**  Last night.

3  **Q.**  At the US Attorney's Office in Tampa?

4  **A.**  Yes, sir.

5  **Q.**  Okay.  And who showed it to you?

6  **A.**  Rafael.

7  **Q.**  Does he work with the Government?

8  **A.**  Yes.

9  **Q.**  Now, looking at this exhibit, could you tell us -- just

10  sort of orient us, and touch the screen -- if you reach out

11  and touch your screen where the front door is, it should

12  leave a mark on your screen.

13          MR. TRAGOS:  Your Honor, objection, foundation.

14          THE COURT:  Overruled.

15          THE WITNESS:  Okay.  Right here (indicating).

16  BY MR. TREZEVANT:

17  **Q.**  Did it leave a mark?

18  **A.**  No.

19  **Q.**  Are you familiar -- first off, what is this a diagram

20  of?

21  **A.**  The office.  Dr. Norbergs' office.

22  **Q.**  Okay.  And, ma'am, what is this area where we are that

23  is highlighted on the screen?

24  **A.**  When you walk in.

25  **Q.**  Okay.  And then, let me just -- if you could tell us

1    what this area is over here to the right -- to the bottom

2    right of the diagram?

3    **A.**   Kelly and Dr. Norbergs' office.

4    **Q.**   Now, when you finished the inventory, where within ELO

5    would you take it?

6    **A.**   I would take it to Room A.  That was Kelly's area.  Or I

7    would set it in a bin or put it in Room B, and put it in a

8    mail bin.

9    **Q.**   In Room B.  Who's officed in Room B?

10   **A.**   Dr. Norbergs.

11   **Q.**   So as far as actually ordering the drugs on a weekly

12   basis, was that your responsibility?

13   **A.**   No.

14   **Q.**   Once the drugs began to arrive, after being ordered, did

15   you take part in any of the unpacking of the drugs?

16   **A.**   Yes.  I would unpack them and compare what the invoice

17   said to what was in the package.

18   **Q.**   All right.  Let me show you a few exhibits.  Looking at

19   Government 336A, which is in evidence, do you recognize the

20   handwriting there, ma'am?

21   **A.**   Yes.  It's my handwriting.

22   **Q.**   Could you tell us what that says?

23   **A.**   "Patient left without receiving Procrit 40K.  Patient

24   will come in tomorrow to receive Procrit 40K.  Inform

25   Dr. Raj."

1   **Q.**   Who's Dr. Raj?

2   **A.**   She was working with Dr. Norbergs as a partner for --

3   while I was working there.

4   **Q.**   Is your signature on this document?

5   **A.**   Yes, it is.

6   **Q.**   Is that your signature?

7   **A.**   Yes, it is.

8   **Q.**   Where is your signature relevant -- could you tell us

9   which one of those is your signature, ma'am?

10  **A.**   Right beside where it says, "sign."

11  **Q.**   Next to the little "k"?

12  **A.**   Yes.

13  **Q.**   That's your "k"?

14  **A.**   Yes.

15  **Q.**   And then "Fidler"?

16  **A.**   Yes.

17  **Q.**   Now, if we could go to Government Exhibit 101A, and

18  turning within that exhibit, it should come up on your

19  screen, and its Bates 000491.  Do you see that on your

20  screen, ma'am?

21  **A.**   Yes, I do.

22  **Q.**   Do you recognize the signature on that screen?

23  **A.**   It is my signature.

24  **Q.**   Looking at the top half of that page, how was this page

25  used at East Lake Oncology?

1    **A.**    It would come with the medications that were delivered,

2    and I would just see if what was ordered was delivered, if it

3    matched, and then I would sign it.

4    **Q.**    So when the medications arrived -- first off, how did

5    they typically arrive?

6    **A.**    Um, if they were dry medications, non-refrigerated, they

7    would normally come either FedEx or UPS, both of them, and

8    then -- they would be, like, in a brown box, something of

9    that nature; and if they were refrigerated, they would come

10   in a cooler.

11   **Q.**    And how would they be delivered in the cooler?

12   **A.**    Um, similar to the ice packs you use when you go to the

13   beach.

14   **Q.**    So when we look at this and it says, "Shipment date and

15   shipping information," was this actually inside the packaging

16   with the medication?

17   **A.**    It would either be inside it, or it would be on top of

18   it in a plastic sheet that would hold it in that you would

19   have to cut in order to pull the invoice out.

20   **Q.**    And where it says, "contents of shipment," right down

21   below, do you see where it says, "Ribomustin - known as

22   Treanda in the US?"

23   **A.**    Yes.

24   **Q.**    So what would you compare this to?

25   **A.**    To just the sheet that we ordered.  I would just

1    normally go by that sheet and just mark that what we -- what

2    came in the box or in the cooler was -- matched that sheet.

3    **Q.**   To the order sheet?

4    **A.**   Hmm-hmm.

5    **Q.**   If we could go to 492.  And again, just so we know, is

6    that your signature, ma'am?

7    **A.**   It is my signature.

8            MR. TRAGOS:  I'm sorry, what did you just say?

9            MADAM CLERK:  I thought he said 492.

10           MR. TREZEVANT:  101A.

11   BY MR. TREZEVANT:

12   **Q.**   Looking at 103 -- 103A, at the top half of that, ma'am.

13   Do you see that document, ma'am?

14   **A.**   Hmm-hmm.  Yes.

15   **Q.**   Did you see those actual invoices or would those not

16   come to you?

17   **A.**   No, I didn't see any payment or prices.

18   **Q.**   And at the time you worked for East Lake Oncology,

19   during that period of time, what, if any, understanding did

20   you have as to the rules and laws regulating the purchasing

21   of drugs, whether they needed to be licensed or not?

22           MR. TRAGOS:  Objection, foundation, and relevance

23   to her understanding.

24           THE COURT:  Sustained on foundation.

25                                    *

1    BY MR. TREZEVANT:

2    **Q.**    Did you have any understanding of the laws or rules

3    governing the purchase of unlicensed drugs when you worked at

4    East Lake Oncology?

5    **A.**    No, I did not know that you can't purchase --

6              MR. TRAGOS:  Objection, asked and answered.

7              THE COURT:  Overruled.  The answer was, "no."

8              THE WITNESS:  Okay.

9              THE COURT:  You answered the question.  What's the

10   next question?

11             MR. TREZEVANT:  Yes.  If we can turn into Bates

12   ELO-SW-01776.

13             MR. TRAGOS:  In what exhibit?

14             MR. TREZEVANT:  103A.

15             MR. TRAGOS:  103?

16             MR. TREZEVANT:  A, as in alpha.

17   BY MR. TREZEVANT:

18   **Q.**    Looking at the top half of this page, ma'am, do you see

19   that?

20   **A.**    Yes.

21   **Q.**    And is that your signature?

22   **A.**    It is.

23   **Q.**    Going to the next page.  When you would look inside at

24   the packing materials, ma'am, do you see at the top left

25   where it says, "P-A-Y-G-O Medicare Solutions," and little

1   lower down it says, "United Kingdom?"

2   **A.**   I don't recall seeing that.

3   **Q.**   Would you even look for that, ma'am?

4   **A.**   No.

5   **Q.**   Was that even a concern to you?

6   **A.**   No.

7   **Q.**   And down below where it says, "country of manufacture,

8   Turkey," do you recall ever seeing that?

9   **A.**   I -- we had certain -- yes.

10  **Q.**   You did see that?

11  **A.**   Yes.

12  **Q.**   If we can go to Exhibit 109 -- 104, I apologize.

13  Flipping through that exhibit to ELO-SW-1785.  Again, is that

14  your signature, ma'am?

15  **A.**   Yes, it is.

16  **Q.**   And looking at the next page of that, so inside, with

17  the packaging material, would you typically see an invoice?

18  **A.**   No.

19  **Q.**   Would you -- would you see this document, a packing

20  slip, ma'am?

21  **A.**   I don't recall seeing that.  I would just sign the one

22  that I saw.

23  **Q.**   And then, with whatever paperwork was there, what would

24  you do with it?

25  **A.**   I would put it either on Kelly's mail bin or

1    Dr. Norbergs' mail bin.

2    **Q.**    105A.  Looking at Bates ELO-SW-1748, is that your

3    signature?

4    **A.**    Yes.

5    **Q.**    And so, you circled "10" there, and would that mean that

6    there were ten in the box --

7    **A.**    Yes.

8    **Q.**    -- when you unpacked it?

9    **A.**    Yes.

10   **Q.**    And to the left where it says, "Turkey," is that what

11   you were referring to earlier?

12   **A.**    Yes.

13   **Q.**    Finally, looking at 106, Bates ELO-SW-66, is your

14   signature on this page, ma'am?

15   **A.**    Yes.

16   **Q.**    And, um, for -- what product came in?

17   **A.**    Zometa.

18   **Q.**    Ma'am, do you remember when you were working at East

19   Lake Oncology, do you ever recall seeing any products arrive

20   with packaging in a language other than English?

21   **A.**    The only thing I could recall is this package took a

22   while, like, a week to arrive, and it looked like there were

23   some odd symbols, not on the invoice, but on the box itself.

24   **Q.**    It was a language that you didn't understand or -- or

25   couldn't identify?

1  **A.**   Right.  It just looked like symbols to me.  I didn't

2  really think much of it.

3        MR. TREZEVANT:  Your Honor, we have no further

4  questions of this witness.

5        THE COURT:  Cross?

6                    **<u>CROSS—EXAMINATION</u>**

7  **BY MR. TRAGOS:**

8  **Q.**   This, I guess, is *The Prescription Bible*, is that the

9  correct term for it?

10 **A.**   *Infusion Bible*.  Like, that's what we referred -- I

11 mean, nursing wise, that's what you would go to.

12 **Q.**   And these -- this is a -- and this is the document or --

13 book that has all of the packaging inserts for all of the

14 chemotherapy drugs that you use?

15 **A.**   Not all of the inserts.

16 **Q.**   The ones you use or --

17 **A.**   There were some that were in there.  If we didn't have

18 the actual insert out of the box, and sometimes it would be

19 duplicated, and it was, like, a clear plastic sheet in a

20 white notebook and so they would be, like, in the sleeves.

21 **Q.**   Okay.  And these were in English?

22 **A.**   Yes.

23 **Q.**   And, um, the refrigerator, in this case, did it have a

24 lock on it?

25 **A.**   Yes, it did.

1   **Q.**   Was it a combination lock, key lock?

2   **A.**   It was a combination lock.

3   **Q.**   Okay.  Now, you say that you would do inventories?

4   **A.**   Yes.

5   **Q.**   Okay.

6   **A.**   There were a few of us that did the inventory.

7   **Q.**   Okay.  Now, this may or may not be you, but let me just

8   ask you:  Is this your handwriting in Exhibit 20A?  I'm

9   sorry, the Elmo.

10  **A.**   No.

11  **Q.**   Let me ask you to take a look at -- this is also 20A,

12  this document?

13  **A.**   Yes.

14  **Q.**   Excuse me.  This document, do you see it?

15  **A.**   No.

16  **Q.**   You don't see the document?

17  **A.**   Yes, I see it.

18  **Q.**   Okay.  There's a little delay, I guess, and this

19  document with my highlights --

20  **A.**   No.

21  **Q.**   No what?

22  **A.**   Um --

23  **Q.**   You don't see it?

24  **A.**   I see it.

25  **Q.**   I'm just asking you right now if you see the document?

1    **A.**   Yes, I see it.

2    **Q.**   Okay.  Now, I understand it's not your handwriting.

3    **A.**   Okay.

4    **Q.**   What I'm asking you is this similar to what you would do

5    when you would do your inventory?  You would list the drugs?

6    Do it like this, and then give it to, like, either Kelly

7    Krouse or Dr. Norbergs?

8    **A.**   Yes.

9    **Q.**   This is the way you would do it?

10   **A.**   Yes.

11   **Q.**   Okay.  When you did your inventory, you would tell or --

12   would you write down, for instance, how many Rituxan you had?

13   **A.**   Yes.

14   **Q.**   Right.  How many Neulasta you had?

15   **A.**   Yes.

16   **Q.**   How many Procrit you had?

17   **A.**   Yes.

18   **Q.**   How many Treanda?

19   **A.**   Yes.

20   **Q.**   How many Zometa you had?

21   **A.**   Yes.

22   **Q.**   And you would write those words on the inventory?

23   **A.**   Yes.

24   **Q.**   And that is what you would hand to Dr. Norbergs or Kelly

25   Krouse?

1    **A.**    There was a printed out inventory sheet and we wrote

2    down how many we had of each, and we would compare it to the

3    patients that were coming in, and that's what we would

4    handwrite what was needed.

5    **Q.**    Okay.  And it would, say, Rituxan?

6    **A.**    Yes.

7    **Q.**    And it would say, again, Procrit?

8    **A.**    Yes.

9    **Q.**    Neulasta?

10   **A.**    Yes.

11   **Q.**    Treanda?

12   **A.**    Yes.

13   **Q.**    Zometa?

14   **A.**    Yes.

15   **Q.**    Let me ask you to take a look at 336A, which the

16   Prosecutor showed you.  Okay?

17   **A.**    Hmm-hmm.  Yes, sir.

18   **Q.**    All right.  Now, that document is dated December 28,

19   2011, correct?

20   **A.**    Yes.

21   **Q.**    On December 28, 2011, was Dr. Norbergs even in the

22   office?

23   **A.**    I can't recall.

24   **Q.**    Do you recall her getting married?

25   **A.**    I don't remember when she got married.

1    **Q.**   Do you recall her getting married?

2    **A.**   I remember she did get married.

3    **Q.**   You don't remember whether she was out of the office on

4    December 28, 2011?

5    **A.**   No, I don't remember.

6    **Q.**   Okay.  You do know, though, that the person you spoke to

7    was Dr. Raj?

8    **A.**   Yes, that's what I remember.

9    **Q.**   Because you made a note of that?

10   **A.**   Yes.

11   **Q.**   And did you mention to Dr. Raj anything about the fact

12   that the box you received had a different language on it?

13   **A.**   No.

14   **Q.**   Also, I just want to clear something up.  When you got a

15   box in, delivered, and you compared it to the packing slip,

16   right, and you did your little checkmarks, correct?

17   **A.**   Yes.

18   **Q.**   Did you actually take the order that was placed and

19   compare it to what was delivered?

20   **A.**   Not necessarily, no.  I just put the invoice slip in the

21   office and signed it that what was in the box is what the

22   slip said, the invoice.

23   **Q.**   All right.  So you never actually said -- you never

24   actually compared to see whether or not what you ordered is

25   what you got?

**A.**    No.  We normally -- if we didn't get that amount, like,

on one of the exhibits that was shown, instead of having ten,

I wrote "nine," and I would just put that in there to let

them know, and let Kelly or Dr. Norbergs know that we didn't

get the amount that it said on the invoice.

          MR. TRAGOS:  That's all the questions I have.

          THE COURT:  Redirect?

          MR. TREZEVANT:  Yes, sir.

                    **REDIRECT EXAMINATION**

**BY MR. TREZEVANT:**

**Q.**    The preprinted inventory sheet, what was preprinted on

the sheet, ma'am?

**A.**    There was a large list of medication.

**Q.**    Preprinted on the sheet?

**A.**    Yes.

**Q.**    Was that created by you?

**A.**    No.

**Q.**    Was it created prior to you arriving at East Lake?

**A.**    Yes.

**Q.**    And *The Prescription Bible*, was that created by you?

**A.**    No, that was already there.

**Q.**    When you arrived?

**A.**    Yes.

          MR. TREZEVANT:  No further questions, your Honor.

          THE COURT:  Thank you.  You may step down.

1    (Witness excused.)

2          THE COURT:  We'll take our 15-minute recess.

3          CSO OFFICER:  All rise.

4    (morning recess taken at 10:22 a.m.)

5    (Court resumes at 10:41 a.m.)

6          THE COURT:  Do you have an issue to raise?

7          MR. TRAGOS:  Yes, your Honor.

8          THE COURT:  Of course.

9          MR. TRAGOS:  The Court said of course?

10         THE COURT:  Of course you do, yes.

11         MR. TRAGOS:  Your Honor, because this is a complex,

12   and kind of a long argument, we thought it would be best

13   presented -- it relates to the next witness.  The next

14   witness is the agent who they plan on putting in a large

15   volume of charts, and graphs, and things that are not

16   actually evidence, but are exhibits about evidence.  And we

17   would like to present to the Court our arguments with regards

18   to whether or not they are, in fact, admissible as evidence

19   as opposed to demonstrative, and I don't know if the Court's

20   got them or not.

21         MR. SALTZMAN:  I'm happy to hand up --

22   unfortunately, these were finalized last night.  I have the

23   Jury copy, but I'm happy to hand that up.

24         THE COURT:  All right.  Don't the civil rules

25   provide for them to be admitted as summaries?

1          MR. TRAGOS:  Your Honor, actually, they are -- they

2     come under, I believe, 611.  These are not summaries because

3     the evidence that they are based on, I believe, all of it,

4     and correct me if I'm wrong, I believe all of it is admitted.

5          MR. SALTZMAN:  Yes, these are all based on admitted

6     pieces of evidence.

7          MR. TRAGOS:  All the evidence is admitted.  These

8     aren't summaries.  What the Government is doing is taking the

9     admitted evidence and kind of regurgitating it, and having

10    testimony about it in the form of putting together these

11    exhibits.

12         Our first position is -- first of all, under

13    611(a), the Court has the authority, with regards to these

14    exhibits, whether or not they are evidence or not, and

15    whether or not they are going to be admitted into evidence.

16         And the -- starting with -- because there are

17    different categories in these exhibits, what they have given

18    us, and starting with 171 and 173; beginning with 171, the

19    Government, first off, is taking the evidence that's in here,

20    and again, testifying, again, to the Jury about the dates

21    that MabThera was ordered, and the dates that Rituxan was

22    ordered from the other manufacturers, which again, has been

23    testified about and can be testified about, but I don't

24    believe an exhibit is necessary.

25         And if you look at, um -- so, we would object in

1    that we do not believe that there's a necessity for there to

2    be in evidence -- again, I'm not saying they can't argue it.

3    I'm not saying they can't show it to the Jury, but to be

4    evidence to take back to the Jury room, I don't see the

5    necessity for this document.  So we would object to 171.

6           The same type of arguments, grouping them, would

7    relate to 173, and 173 is particularly unique, if the Court

8    will look at it, because it's different from 171 in that in

9    173 they do the chart, again, and then -- if I can have the

10   Elmo, ma'am?  I'm sorry.  It's on or not -- it's on.  They do

11   the chart again, but then they do the chart, then they give

12   you a -- one bar graph.  Then they give you another bar

13   graph.  Then they give you another bar graph, all saying the

14   same thing.  The bar graphs are different, but they all are

15   interpreting 173.  So they give you 173, then they give you

16   three -- more than three bar graphs to show you what is

17   actually on 173.  So aside from it being repetitious, again,

18   the testimony has already covered it, and we don't believe

19   that it should be an exhibit -- an evidentiary exhibit.

20          So those arguments are for 171, 173, 174, 172.  So

21   those are our arguments to that batch, because again, this

22   case is not so voluminous and not so long that the Jury could

23   not be told this by testimony or in argument using the

24   documents as opposed to the Government being able to put them

25   in evidence that merely restates their case.

1           THE COURT:  Response?

2           MR. SALTZMAN:  Your Honor, under 1006 the proponent

3    may use a summary chart or calculations to prove the content

4    of voluminous writings.

5           Exhibits -- speaking about 171, just to -- and

6    then, the same arguments apply for 172, 73 and 74.  171

7    provides, on the left column, the orders of MabThera from QSP

8    for a period of time of about three years.  This information

9    is culled from about a thousand pages of order records from

10   East Lake Oncology's office that was provided in Grand Jury

11   subpoenas.  It basically pulled out the information that --

12   of specific orders.  We did not provide testimony on each of

13   those specific orders, and when they were -- when orders were

14   made because that would have taken a very long time.  Whereas

15   a summary chart such as this provides the information in a

16   clear concise way and is summarizing voluminous information,

17   at least on the left side.

18          On the right side it provides a summary of two

19   specific distributors, domestic distributors, of what is the

20   FDA-approved version of Rituxan.  That is coming from the

21   Agent who prepared this based on looking at five different

22   spreadsheets of hundreds and hundreds of drug purchases, and

23   pulling out from that voluminous amount of information the

24   specific FDA-approved drug purchases.

25          The purpose behind this information, and this also

came in a little bit because Exhibit 171 was used as --

marked for identification for Kelly Krouse when she

testified, the purpose was to show the order history of

where -- when FDA-approved versions of drugs came in.  And

that way when -- when the -- when you look at a patient's

record that shows that they received Rituxan, but you look at

the order history and you see that there was no Rituxan

ordered for the six months before the patient file, shows

that they -- Rituxan was ordered, that -- this chart

demonstrates that there is no way that that patient received

Rituxan.  What they actually received was MabThera.  The

Agent is not going to testify to the last piece I'm about to

say, but obviously during closing we'll argue that based on

the fact that the practice only kept drugs for a week or two

weeks, that is -- further buttresses the argument that the

actual drug that the patients receive was the MabThera.  That

argument -- the records are used for the same purpose for

172, 173, and 174.

171A and B merely are just different

representations, summaries of the same voluminous exhibits,

and it just shows basically 171A is a -- is taking the left

column from 11 and provides it in a bar graph.  It's

summarizing the records that are a thousand pages, nearly a

thousand pages of records, from Exhibit 151, which is the QSP

order records, and 171B is the same type of thing, but this

```
 1    time for the domestic distributors.  It is a corollary

 2    companion for 173A and B.  Those are the same types of graphs

 3    summarizing voluminous information.

 4              THE COURT:  This appears to be the typical use of

 5    summaries as allowed under Rule 1006, so I overrule the

 6    objection.  There is -- I believe there's an instruction to

 7    give to the Jury that they are to rely on the underlying

 8    documents, but I don't see the instruction right now.

 9              MR. SALTZMAN:  Your Honor, I do recall that jury

10    instruction.

11              THE COURT:  Perhaps it's a civil instruction.  All

12    right.  Bring in the Jury.

13              MR. TRAGOS:  Your Honor, that's just a portion of

14    the documents.  We have other objections.

15              THE COURT:  Are they different?

16              MR. TRAGOS:  Yes.

17              THE COURT:  The exhibits are different?

18              MR. TRAGOS:  Yes.

19              THE COURT:  Proceed.

20              MR. TRAGOS:  Your Honor, if the Court would take a

21    look at the indictment in this case, which is the basis for

22    the objections, the indictment, on page 7, lists five

23    non-FDA-approved drugs with their trade names as being the

24    drugs alleged in this indictment.  That's the only five

25    drugs.  No others.  And it talks about Quality Specialty
```

1    Products and Cancer Drugs and Cancer Drugs Online.  If we

2    move to page 11, it talks about, "January 11, 2011, to on or

3    about March 2012, Norbergs caused ELO to purchase from QSP

4    $700,000 in misbranded drugs."

5         Then we start with Count 1 through 6, and it talks

6    about Ribomustin/QSP with a date 2011.  Counts 2, 3, 4, 5 and

7    6 are also either QSP or the only -- Cancer Drugs Online/

8    Zometa, also 2011 or 2012.

9         Counts 7 through 17, these are all QSP drugs

10   2011/2012.

11        Page 15, Counts 18 through 29, QSP or Cancer Drugs

12   Online, specific drugs, same five drugs, 2011/2012.

13        Page 19, Counts 30 through 40 are specific patients

14   and specific drugs, and the dates are specific 2011 dates and

15   2012 dates.

16        And Counts 41 through 45 are specific drugs,

17   specific dates and specific patients.

18        Beginning with Exhibit 180B, that is a -- total

19   purchases from QSP and Cancer Drugs Online, not the drugs

20   alleged in the indictment, not "maybe" approved or unapproved

21   FDA drugs, but total purchases made from two companies by

22   this practice.  Far beyond the scope of the indictment, and

23   far beyond the scope of what should be presented to the Jury

24   because this is not limited to the five drugs we're talking

25   about, nor is it limited to FDA or non-FDA-approved drugs,

1  and that's 180B.

2          180A, same thing.  We have total purchases from QSP

3  and Cancer Drugs Online broken down by month, and again,

4  notice the difference between that and the indictment.

5          Then Exhibit 180, of which those two come from, is

6  a breakdown of purchases from QSP and Cancer Drugs Online,

7  and if the Court will notice, there are tons of drugs on

8  there that are not mentioned in the indictment, not part of

9  the indictment, have nothing to do with the indictment, and

10  have not been testified to as being non-FDA-approved.  Yet

11  they are listed and going to be presented to this Jury with

12  the obvious inference that they ordered 707 something

13  thousand worth of illegal drugs, when, in fact, it should be

14  limited -- at the very least, we believe, limited to the

15  drugs in the indictment or to the counts in the indictment.

16          But even broader, it can't be broader than the

17  drugs in the indictment, but now they are bringing in all

18  sorts of other drugs, and all sorts of other transactions

19  that are not evidence in this case, and should not be taken

20  to the Jury as a crime to go beyond those that are stated in

21  the indictment, and that is 180.

22          Plus, your Honor, we don't know if those drugs were

23  or weren't submitted.  We don't know.  But regardless of

24  that, it's just way too broad an exhibit and an argument.

25          182A, QSP and Cancer Drugs Online costs compared to

1  costs purchased at an average sale.  What difference does it

2  make if they are comparing costs that have nothing to do with

3  the crimes charged in this case?

4        THE COURT:  It has to do with intent, doesn't it?

5        MR. TRAGOS:  But, your Honor, there has been no

6  testimony that there is anything wrong with those drugs.

7  There is no testimony that there is anything wrong with those

8  drugs.  The only testimony are those five drugs we're talking

9  about.  That's the only questions asked of the FDA, and all

10  those people have those drugs.  These drugs have not been

11  testified about, and that -- so to paint this picture of

12  anything that she orders from these companies is an

13  indication of her intent goes well beyond the indictment.

14        You know, an example, drug dealers, you're a drug

15  dealer.  The fact that you made a drug sale, as long as

16  you're not charged in trafficking, but as long as you're --

17  maybe you made a drug sale five years ago of cocaine, does

18  that mean without 404(b) that that can come in as evidence in

19  your case as intent?  There is no 404(b) notice about any of

20  this.  These are just other purchases.  And we believe that

21  these documents, at the very least, if they came in, should

22  be limited to the drugs in the indictment and nothing else.

23  They are just making the number look bigger without actually

24  charging these cases or charging these drugs.  So we think

25  that these should not be allowed into evidence.

1          THE COURT:  Response?

2          MR. SALTZMAN:  Your Honor, the manner and means of

3    the healthcare fraud count charges Dr. Norbergs with having

4    purchased or caused to be purchased from QSP and other

5    distributors the following, among other misbranded drugs, and

6    then lists the five drugs we have been talking about.  It

7    talks about drugs being purchased from, not just QSP, and not

8    just Cancer Drugs Online, but really any other distributors.

9    This is a scheme that spanned -- charged from May 2009

10   through January 2012.  That's part of the reason why when

11   issues like this in the past have come up, the Court has

12   admitted evidence beyond just the distributors at issue and

13   beyond just the drugs at issue.  And that is -- as the Court

14   has said, this is all going to intent.  The documents are

15   summarizing the total amount of purchases that she made from

16   these distributors, that we actually alleged in the

17   indictment so we would like to prove it.  But also, it's

18   showing the intent when you look at how the drug costs

19   compare to the average sale price.

20          We also heard testimony from Dr. Mary Mayleben, our

21   first witness, that the distributors at issue in this case,

22   none of them were licensed to distribute drugs in the State

23   of Florida.  This shows that these were drugs that were not

24   FDA-approved.

25          So that -- and then, right, the specific counts in

1   the healthcare fraud charges are simply just the executions

2   of that fraud, the entire healthcare fraud is the scheme

3   across the whole dates.

4         The same arguments apply for the different forms

5   that this evidence comes in.  It's merely to -- they are all

6   summaries and it's all coming from the same, in this case,

7   two exhibits.  It's the thousand-pages from QSP, which were

8   the records from East Lake Oncology, as well as a shorter

9   stack that's still voluminous, looking together at Cancer

10  Drugs Online.

11        MR. TRAGOS:  May I briefly?

12        THE COURT:  30 seconds.

13        MR. TRAGOS:  Yes, less than that.  I want to make

14  sure we are including in those arguments 180, 182, 483 and

15  611 of the rule numbers as well.

16        THE COURT:  All right.  The objection is overruled.

17        MR. TRAGOS:  Okay.  Your Honor, we have another set

18  that the Government wishes to put in, which is a set of the

19  400 series that the Court has there.  These are individual

20  patients, and these are documents that are in evidence, but

21  there is no reason for them to do this.  This is not a chart.

22  These, if you will -- if the Court will look at these, these

23  are merely arguments.

24        For instance, Ms. Schafer, this is contained within

25  401A.  It shows, all right, on these dates the MabThera came

1    in.  On these dates, this was the last time they ordered

2    MabThera, you know, on and on, and on.  It just shows you a

3    flow, which again, is their argument from the documents.

4            And then, two sets also, 401B, but then they start

5    talking about the costs for MabThera is this.  The allowed

6    reimbursement is this.  And the cost difference is that.  So

7    they are now, again, putting in testimony.  This is not a

8    summary.  This is a particular patient, and they are going to

9    argue to the Jury that there is this cost difference between

10   the reimbursement and the cost of MabThera.  That's argument.

11   It's not a summary.  And it is being placed before the Jury,

12   and if it becomes evidence, then the Court is stamping its

13   approval on this, and the Jury will take it as proven, and as

14   testimony that they have to accept.

15           So, we would object to the 400 series, that's just

16   an example.  They are all basically the same by patient, just

17   showing how much the MabThera costs, how much was reimbursed

18   or could be reimbursed, and what the difference is.

19           THE COURT:  Response?

20           MR. SALTZMAN:  Your Honor, I'll take them in the

21   same order Mr. Tragos did.  So, for example, in Exhibit 401A,

22   this too is summarizing voluminous data.  It looks at

23   specific purchases, but it then incorporates into it also

24   voluminous information regarding when specific FDA-approved

25   versions of drugs were ordered from domestic distributors.

1           If you look at the last page of that document,

2    you'll see it shows up there in the red box on the left, and

3    then on the right box it's, again, summarizing voluminous

4    information, this time coming from Quality Specialty

5    Products, of the orders of MabThera, which is the purported

6    substitute for the FDA-approved product.  And you can see it

7    cites to the specific exhibits in there, and the exhibit on

8    the left side, Exhibit 33, is a voluminous record showing

9    McKesson orders.  Whereas the exhibit on the right side, 151,

10   is a voluminous record that's a thousand pages.  I have been

11   referring to a couple times of Quality Specialty Products'

12   records.

13           As it relates to -- and all -- Mr. Tragos is

14   correct, all the documents from 401A through 406A, all the A

15   series are all of the same ilk.

16           Exhibit 401B through 406B, those are also the same

17   variety, and I mean, they do -- you know, I think that they

18   do -- these are appropriate under 1006 because it is

19   summarizing, taking information out of voluminous claims

20   data.  It is also taking information from voluminous average

21   sales price information that's being extracted and put

22   together.  It provides calculations, which is also permitted

23   under 1006.  Our position is that these are summary exhibits.

24           If the Court -- we are willing to use these as

25   demonstratives, if that's the Court's desire.  But we do

```
 1    think that Exhibits 401A through 406A are voluminous --

 2    summarizing voluminous records.

 3              THE COURT:  Are these patients specifically named

 4    in the indictment?

 5              MR. SALTZMAN:  Every one of them is a specific

 6    patient that's named in the indictment, and it's to show the

 7    exercise that I was talking about earlier, to show that a

 8    drug was stated to be provided to them, that there was the

 9    FDA-approved drug, and this is to demonstrate that there was

10    no drug of that kind ordered any time prior to that.

11              THE COURT:  Objection is overruled.

12              MR. TRAGOS:  It's 403 and 611.  Would the Court

13    allow me -- we would just preserve the objections.  I don't

14    have to re-raise them during testimony.

15              THE COURT:  Yes.  I have a note from the Jury

16    saying, "The Jury requests a list of the witnesses.  Thank

17    you."

18              Is that Grace down there?  Make that a Court's

19    exhibit, please, whatever the next number is for the Court's

20    exhibit.

21              MADAM CLERK:  Yes, your Honor.

22    (Court's Exhibit No. 4

23    admitted into evidence.)

24              THE COURT:  And the Government can retrieve their

25    exhibits.
```

```
1              MR. SALTZMAN:  Thank you, your Honor.

2              THE COURT:  Hand those to Mr. Saltzman, please.

3              CSO OFFICER:  All rise.

4   (Jury enters courtroom at 11:09 a.m.)

5              THE COURT:  I apologize for the delay.  We had some

6   legal discussions here in the courtroom.

7              Call your next witness, please.

8              MR. SALTZMAN:  The United States calls Eric Larson.

9              THE COURT:  You're still under oath.

10             THE WITNESS:  Yes, your Honor.

11             THE COURT:  All right.  Proceed.

12             MR. SALTZMAN:  Thank you, your Honor.
```

**SPECIAL AGENT ERIC LARSON**

```
14  Called as a witness herein, having been previously duly sworn

15  was examined and testified as follows:
```

**DIRECT EXAMINATION**

```
17  BY MR. SALTZMAN:

18  Q.   We're not going through your background again, but can

19  you just remind the Jury where you work, and what position

20  you hold?

21  A.   Yes.  I am a special agent with the Food and Drug

22  Administration, Office of Criminal Investigations.

23  Q.   In this case did you collect a volume of documents from

24  a variety of different sources?

25  A.   I did, sir.
```

1  **Q.**   If we could switch to the computer, and publish

2  Government's Exhibit 12B.  It would be the computer at the

3  Government table.  Looking at the right-hand -- first off,

4  are you familiar with this document?

5  **A.**   I am.  It was seized in the search warrant.

6  **Q.**   What is shown in the right-hand --

7  **A.**   The right-hand side of the document shows domestic

8  distributors for approved drugs.

9  **Q.**   These distributors, were these distributors used by East

10  Lake Oncology?

11  **A.**   Yes, they were.

12  **Q.**   What, if any, records did you obtain from those

13  entities?

14  **A.**   We obtained the purchasing records for East Lake

15  Oncology for each of these.

16  **Q.**   And when you say "purchasing records," what type of

17  purchasing were you obtaining from these distributors?

18  **A.**   Purchasing records regarding the specific drugs, the

19  chemotherapy drugs.

20  **Q.**   And how, if at all, did you learn if the distributors

21  that were listed on the screen are the only distributors for

22  East Lake Oncology?

23  **A.**   These were the distributors that we found records of

24  during the execution of the search warrant, along with

25  information that we gathered throughout the investigation

1    from employees and others.

2    **Q.**    What, if any, other distributors did you obtain records

3    from?

4    **A.**    The foreign unapproved distributors.

5    **Q.**    And I believe in front of you, you should have on the

6    desk Government's Exhibits 31 to 35.  If you could take a

7    look at those exhibits?

8    **A.**    Yes, sir.  I'm familiar with these.

9    **Q.**    Do you recognize those?

10   **A.**    Yes, I do.

11   **Q.**    What are these exhibits?

12   **A.**    These are the purchases of chemotherapy drugs from the

13   domestic distributors.

14   **Q.**    Approximately how many different purchases are shown in

15   those exhibits?

16   **A.**    Oh, there are hundreds and hundreds of purchases in

17   here.

18   **Q.**    And you are holding that exhibit.  Can you just explain

19   what is actually in that file, just because the Jury can't

20   see it?

21   **A.**    Absolutely.  Inside each one of these files is a CD of

22   the data from the distributors McKesson, Cardinal,

23   Curescript, Oncology Supply.

24   **Q.**    What format is that data on that disc?

25   **A.**    It's contained in spread sheets.

1    **Q.**   Do you see Exhibit 151 up on the desk there?

2    **A.**   Yes, sir.

3    **Q.**   Can you explain what Exhibit 151 is?

4    **A.**   Exhibit 151 are the records from East Lake Oncology as

5    they relate to Quality Specialty Products for 2011 and 2012.

6    **Q.**   Do you see Exhibit 153?

7    **A.**   Yes, sir, I do.

8    **Q.**   And what is that?

9    **A.**   These are the invoices and records that pertain to the

10   purchases of foreign drugs from Cancer Drugs Online.

11   **Q.**   Taking 151 and 153 together can you quantify for us

12   approximately how many pages that is?

13   **A.**   It's approximately 900 documents.

14          MR. SALTZMAN:  Your Honor, permission to approach?

15          THE COURT:  All right.

16          MR. SALTZMAN:  Thank you.

17   BY MR. SALTZMAN:

18   **Q.**   I just handed you what's been marked for identification

19   as Government's Exhibit 171 through 174, as well as 171A,

20   171B, 173A, and 173B.  Do you see those exhibits?

21   **A.**   Yes, I do.

22   **Q.**   And who created these?

23   **A.**   I did, along with other agents.

24   **Q.**   And can you just describe, starting with 171 through

25   174, what those are showing?

1    **A.**    Okay.  Exhibit 171 is a chart, and what it shows is

2    purchasing of MabThera from QSP, in green, followed by a

3    black bar; and then Rituxan, the FDA-approved version, from

4    McKesson and Curescript; and then, on the far left-hand side

5    it's the ordering dates for each of the purchases.  So it's

6    both the foreign MabThera and the domestic Rituxan.

7    **Q.**    For the information that was placed in those charts

8    where did you obtain that information from?

9    **A.**    I obtained them from exhibits -- the 31-series exhibits

10   from the domestics -- for the domestic suppliers, as well as

11   the Cancer Drugs Online, as well as Quality Specialty

12   Products documents.

13   **Q.**    You mentioned for this exhibit that it includes

14   Curescript and McKesson.  Why are CardinalHealth, Metro

15   Medical and Oncology Supply not included in that exhibit?

16   **A.**    We didn't find any purchases of Rituxan from those

17   suppliers.

18   **Q.**    Can you explain what Exhibit 172 is?  Actually, I'm

19   going to withdraw that question.

20          If you can just explain the arrangement of exhibits

21   172 through 174, just in a general sense.

22   **A.**    Yes.  That they are -- are charts where we took the data

23   from the domestic distributors as well as the foreign

24   distributors, and did an analysis to see how purchases were

25   made and what the buying trends were.

1  **Q.**   Does it provide information in a similar fashion to

2  Exhibit 171 that you just described?

3  **A.**   Yes, it does.

4  **Q.**   And you said that you prepared this with others, is that

5  correct?

6  **A.**   Yes, other agents and analysts.

7  **Q.**   Did you confirm that the information in those charts is

8  accurate?

9  **A.**   I did.

10  **Q.**   And do they fairly and accurately summarize what you

11  just described?

12  **A.**   Yes, they do.

13  **Q.**   And just so it's clear, for Exhibits 172 to 174, can you

14  just identify the specific drugs that are in each of those

15  exhibits, one at a time?

16  **A.**   Yes, sir.  Exhibit 172 relates to Ribomustin and

17  Treanda.  Exhibit 173 relates to Neulastim and Neulasta.  And

18  Exhibit 174 relates to the domestic Zometa and the foreign

19  Zometa.

20  **Q.**   How, if at all, does Exhibit 171A relate to Exhibit 171,

21  which is -- I believe 171A is in front of you?

22  **A.**   Exhibit 171A is a bar graph that shows the orders of

23  MabThera to QSP.

24  **Q.**   And how does Exhibit 171B relate to Exhibit 171?

25  **A.**   171B shows the domestic orders of Rituxan to McKesson

1    and Curescript.

2    **Q.**   And if you could also explain how Exhibits 173A and B

3    relate to Exhibit 173?

4    **A.**   173A is a bar graph of Neulastim to QSP, and 173B is a

5    bar graph of Neulasta to Metro Medical and McKesson.

6           MR. SALTZMAN:  At this time, the Government moves

7    for the admission of Exhibits 171 through 174, and 171A,

8    171B, 173A and 173B.

9           THE COURT:  They will be admitted.

10   (Government Exhibit Nos. 171-174, 171A, 171B, 173A, 173B

11   admitted into evidence.)

12          MR. SALTZMAN:  If we could publish Government

13   Exhibit 171, and zoom in at the top, the first couple of

14   rows.

15   BY MR. SALTZMAN:

16   **Q.**   Can you explain, slowly, for the Jury, going from the --

17   all the way to the left, in the gray bar, all the way to the

18   right.  What is shown in this chart?

19   **A.**   Yes.  On the left side of the document we've got our

20   order dates from QSP.  That's how they maintain their

21   records.  For the other distributors we have an invoice date,

22   and that's how their records were maintained.

23          In the green area we've got Quality Specialty

24   Products, QSP, in green, for the 100 milligram and 500

25   milligram strength.

1      Next to that is a black bar, followed by the

2    Rituxan product, domestic products from McKesson and

3    Curescript, both in the 100 milligram and 500 milligram

4    variance.

5    **Q.**   Why is there a black bar in the middle every document?

6    **A.**   It separates out the foreign drugs from the domestic

7    drugs.

8    **Q.**   If we can zoom out and zoom in on February 16th, which

9    is toward the bottom of the document.  I want you to describe

10   for us what we are seeing -- which is in the second row here,

11   what we are seeing in the second row.  What's represented in

12   this second row that's displayed?

13   **A.**   Okay.  Okay.  So what we found in the documents was that

14   for Curescript, the domestic, that there were four vials of

15   100 milligram Rituxan purchased, and one vial of the 500

16   milligram Rituxan purchased.

17   **Q.**   And can you explain what we are seeing on March 22nd, of

18   2011, in terms of the order history at East Lake Oncology?

19   **A.**   On March 22nd, we see, essentially, the same thing from

20   Curescript, four purchases of the 100 milligrams, and one

21   purchase of the 500 milligrams, both from Curescript.

22   **Q.**   I apologize if I said February 22nd.  I meant to say

23   March 22nd.

24   **A.**   Okay.  On March 22nd we see a shift in the buying trend

25   to the foreign products where we see that -- an order to QSP

1    for two vials of 100 milligram, and two vials of 500

2    milligram MabThera.

3    **Q.**    And if we can just zoom out, and can you just explain

4    what you see here as the order history of MabThera and

5    Rituxan taken as a whole on this page?

6    **A.**    Yeah.  It appears that in the records we see back from

7    January 12, 2010, that there are domestic purchases from

8    McKesson mostly, which run all the way into early 2011, when

9    there's a couple purchases domestically, for Curescript, for

10   Rituxan, followed by a couple more from McKesson, and then a

11   switch to the foreign unapproved drugs of MabThera, which

12   runs from approximately March 15th, down on page 2, primarily

13   to February 28th, with a couple of exceptions.

14   **Q.**    And what you just described about the purchases from

15   QSP, is that what has been zoomed in on the screen right now?

16   **A.**    Yes, sir.

17   **Q.**    And if we could go to the next page, and if we can zoom

18   in the top left through March of 2012, can you tell us what

19   we're seeing on page 2 of this document?

20   **A.**    We see a continuation of those purchases of MabThera

21   from QSP in both 100 milligram and 500 milligram

22   consistently.

23   **Q.**    And when did that consistent ordering stop?

24   **A.**    I see -- I see February 7, 2012, there was a single vial

25   ordered from Curescript, and on February 10, 2012, there was

1  a two -- two 100 milligram bottles ordered from Curescript.

2  The trend goes back to the foreign distributor from 2/17 to

3  2/28, at which point the buying trend goes back to the

4  domestic distributors.

5  **Q.**   And if we could zoom out.  Zoom in on the bottom half of

6  the document.  The trend that you were just describing, is

7  that what we're seeing here?

8  **A.**   Yes, sir.

9  **Q.**   Is that the last page of the document or is there

10 another page after that?

11 **A.**   Sir, I have one more that continues.

12 **Q.**   Okay.  If we can go to that next page.  And so, what we

13 see is the history from March 2012 through March 2013?

14 **A.**   You say March 2012, sir?

15 **Q.**   Yes.

16 **A.**   It's buying history of -- domestically of Curescript.

17 **Q.**   If we can display 171A.  What is this showing?

18 **A.**   This is a bar graph depiction of MabThera orders to QSP.

19 **Q.**   And can you describe what the bar graph is showing to

20 the Jury, starting from the first --

21 **A.**   Sure.  On March 20th is when we start to see buying

22 activity to the foreign distributor, which, essentially, went

23 to approximately March of 2012.

24 **Q.**   And if we could display Government Exhibit 171B.  What

25 is this showing?

1    **A.**   This shows the Rituxan orders from McKesson to

2    Curescript in a bar graph.

3          MR. TRAGOS:  Your Honor, I'm going to object to the

4    characterization that these were MabThera orders.  He said

5    that these were MabThera orders on the previous exhibit.  So

6    they are Rituxan orders filled with MabThera.

7          THE COURT:  Overruled.  You can clear that up on

8    cross.

9          MR. TRAGOS:  Okay.

10   BY MR. SALTZMAN:

11   **Q.**   So can you describe what is shown in this exhibit,

12   starting from the left side going to the right?

13   **A.**   Yes.  It shows the buying trend of East Lake Oncology

14   where back in January 2010, they were purchasing Rituxan from

15   McKesson and Curescript, in various amounts and quantities,

16   right up until March 2011, where there were no more purchases

17   of domestic Rituxan.  And then, it switches back to the

18   domestic distributor around January-March of 2012, running

19   through the end of March 2013.

20   **Q.**   If I could display one on top of each other, 171A and

21   171B, can you explain what these graphs together show?

22   **A.**   Yeah.  It shows the complete overall picture of the

23   orders of both Rituxan and MabThera for this time period.

24   You can see that the orders pretty much run consistent --

25   when you put the two graphs together, consistent use of

1    MabThera or Rituxan.

2    **Q.**    I would like to publish Exhibit 172.  Is this

3    information organized in a similar way to Exhibit 171 that we

4    just looked at?

5    **A.**    Yes, sir.

6    **Q.**    And could you just explain to the Jury what drugs are

7    being referred to and what distributors?

8    **A.**    Yes.  In this chart we've got Ribomustin from QSP,

9    followed by a black bar, and then the domestic Treanda

10   version from McKesson, Curescript and Metro Medical in both

11   25 and 100 milligram strengths across the board.

12   **Q.**    On the right side, for the domestic distributors, why is

13   Cardinal -- why are Cardinal and Oncology Supplies not

14   listed?

15   **A.**    I didn't see any purchases for Treanda for those

16   domestic distributors.

17   **Q.**    And can you just explain to the Jury the trend or -- the

18   history that we see here for the 100 milligram purchases of

19   Ribomustin and Treanda.

20   **A.**    Yes.  On 9/21/2010 we see a purchase or -- two purchases

21   of 100 milligram Treanda from Metro Medical; and then, for --

22   at that point, the buying trend switches exclusively to the

23   QSP, Quality Specialty Products, for the Ribomustin, which

24   runs from 3/22/2011 to 12/26/2011.

25   **Q.**    If we can publish Exhibit 173?  Is this also organized

1  in a similar fashion to the last two exhibits?

2  **A.**  Yes, it is.

3  **Q.**  If we can zoom in at the top, and can you explain what

4  drugs and what distributors this relates to?

5  **A.**  Okay.  This chart relates to Neulastim for QSP, and

6  followed by a black bar, and then, the domestic Neulasta from

7  McKesson and Metro Medical, all in the same strengths.

8  **Q.**  And what does the chart show in terms of orders from

9  July 2012?  And if we could zoom out to include

10  February 2012 -- July 2010.  I think I may have said that

11  wrong.  July 2010 through February 2012.

12  **A.**  It shows the buying trend where originally East Lake

13  Oncology was purchasing from Metro Medical, and then right

14  around 8/15/2011 that buying trend switched to the foreign

15  distributor, which ran consistently into February 2012.

16  **Q.**  If we can publish Government Exhibit 173A.  What is this

17  showing?

18  **A.**  173A is a bar graph which shows Neulastim orders to QSP.

19  It shows the orders -- ordering history -- it shows an

20  ordering trend from August 2011 to February 2012.

21  **Q.**  Actually, if we could publish Exhibit 173A on one side,

22  and 173 on its own on the other side.  Can you just explain

23  how Exhibit 173 relates to Exhibit 173A, that are both

24  displayed?

25  **A.**  173A is a bar graph of just the QSP orders.

1    **Q.**   And where is that information shown in each of the

2    different exhibits?

3    **A.**   On the document on the left, the dates of purchase run

4    up and down the document, and on the bar graph they run

5    across the bottom of the document.

6    **Q.**   And if we can publish Exhibit 173B on its own, and what

7    is this showing?

8    **A.**   173B shows the Neulasta orders to Metro Medical and

9    McKesson.  Essentially it shows that the buying trend from

10   July of 2010, stopping at about October 2010, and then a gap

11   from 2010, with exception of one purchase in 2012, to around

12   October 2012 when purchases began again to Metro Medical and

13   McKesson through March of 2013.

14   **Q.**   If we could display Exhibits 173A and B, one on top of

15   each other.  Can you explain what we see here?

16   **A.**   Yes.  When you put these two together you see the

17   ordering trends for Neulastim and Neulasta together.  You'll

18   see using -- starting with the bottom chart, you'll see the

19   purchases domestically.  Then a fall off on time where we

20   didn't have any purchases from anybody for Neulastim or

21   Neulasta; and then, the trend picks up with the QSP orders

22   around August 2011, drops off February 2012, with another

23   small gap in time where neither Neulastim or Neulasta are

24   ordered; and then, the product picked up again on the

25   domestic side, buying in the domestic side around

1  October 2012.

2  **Q.**   If we can publish 174.  Is this one organized in the

3  same way as the others?

4  **A.**   It is, sir.

5  **Q.**   If you can just explain, zoom in at the top, which drug

6  and which distributor we're talking about, or distributors?

7  If we can zoom in at the top.

8  **A.**   Yes, sir.  For this chart we're looking at the order

9  date for QSP, and the invoice date for Cancer Drugs Online,

10  McKesson and Curescript, that's how their documents were

11  kept.  It shows, essentially, the two foreign distributors,

12  QSP and Cancer Drugs Online, orders to those two companies

13  followed by a black bar, and then the domestic versions after

14  that.

15  **Q.**   And if we could zoom out, and zoom in on the upper half,

16  showing from there all the way to the McKesson purchase.

17  Perfect.  Can you explain the history of orders of Zometa at

18  East Lake Oncology?

19  **A.**   Yes, sir.  With the exception of that first order on

20  February 1, 2010, it appears that on 5/10/2011 the ordering

21  trend was from QSP exclusively, which ran to about July 1st,

22  2011.  The next purchase on 12/21/2011 went to Cancer Drugs

23  Online, where the buying trend switched from one foreign

24  distributor to another foreign distributor for a period of

25  time; and then, on July 26, 2012, there was a shift in the

1    buying trend back to the domestic product.

2              MR. SALTZMAN:  Permission to approach, your Honor?

3              THE COURT:  You may.

4    BY MR. SALTZMAN:

5    **Q.**   I just handed you Government's Exhibits 180, 180A, 180B,

6    181, and 182A through E.  Do you recognize those exhibits?

7    **A.**   Yes, sir.

8    **Q.**   And what is Exhibit 180?

9    **A.**   Exhibit 180 is, essentially, a spreadsheet of the

10   documents -- of the information that is contained within

11   Exhibit 151 and 153, the foreign purchases.  Those 900 pages

12   boil down to a spreadsheet.

13   **Q.**   And approximately -- who created the chart in

14   Exhibit 180?

15   **A.**   I did, along with other agents.

16   **Q.**   Can you explain what is included in Exhibit 180?

17   **A.**   Yes, sir.  On the left side of the document we've got a

18   category called "Bates Numbers."  Bates Numbers are numbers

19   that we use to mark documents in the legal profession,

20   followed by an order number, which comes directly from 151

21   and 153, an order date from those records, what dosage date,

22   what vial numbers per unit, quantity purchase, purchase price

23   per unit and the cost from foreign suppliers.

24   **Q.**   Is all the information that's in the chart below it, is

25   that from the records 151 -- Exhibits 151 to 153?

**A.**   Yes, sir.

**Q.**   And did you review the information to confirm it was an accurate summary of the information in Exhibits 151 and 153?

**A.**   I did, sir.

**Q.**   And does it fairly and accurately summarize the information?

**A.**   Yes, sir.

**Q.**   And what is Exhibit 180A?

**A.**   Exhibit 180A is a monthly breakdown of total purchases to QSP and Cancer Drugs Online all from Exhibit 180.

**Q.**   And who created Exhibit 180A?

**A.**   I did, along with other agents.

**Q.**   What is Exhibit 180B?

**A.**   180B is a bar graph that further shows the purchases from both Cancer Drugs Online and QSP from both a monthly and a dollar amount.

**Q.**   Did you confirm that Exhibits 180A and 180B were accurate?

**A.**   Yes.

**Q.**   And do they fairly and accurately summarize what you just explained?

**A.**   They do, sir.

MR. SALTZMAN:  The government moves for the admission of Exhibits 180, 180A and 180B.

THE COURT:  They will be admitted.

```
 1                              *

 2    (Government Exhibit Nos. 180, 180A, 180B

 3    admitted into evidence.)

 4          MR. SALTZMAN:  If we can publish Exhibit 180.

 5    BY MR. SALTZMAN:

 6    Q.   Can you just walk the Jury through the document, just

 7    from the left to the right, as to what is shown on this

 8    document?

 9    A.   Yes, sir.  We start off with, you'll see ELOPA, Bates

10    Numbers, an order number, an order date, an item name,

11    dosage, a number of vials per unit, a quantity purchased, a

12    purchase price and a cost from a foreign supplier.

13    Q.   If we can go to Page 6, and using what is in the row

14    towards the bottom of June 23, 2011, for MabThera, can you

15    explain what we see in that row?

16    A.   Yes.  Under order No. 55310 on 6/23, 2011, an order was

17    placed for MabThera to QSP for the 100 milligram by 10 ML

18    version.  The number of units that are -- that come with that

19    are two vials, and I'm having a hard time keeping these lined

20    up.  One unit was purchased, total price was 950 per unit, so

21    at the end it costs $950.

22    Q.   Can you explain the next row?

23    A.   Yes.  On the same date, under the same invoice number, a

24    500 milligram by 50ML version was purchased.  That comes in a

25    one-pack.  Two were purchased.  So the unit price on that was
```

1    $2,375.  Because we bought two, it becomes $4,750.

2    **Q.**    And when you say, "because we bought," who's the "we?"

3    **A.**    I'm sorry, East Lake Oncology bought that, we

4    discovered, and put it in the spreadsheet.

5    **Q.**    Under the item name MabThera, and then parentheses

6    (Rituxan), was it described differently in the actual

7    document?

8    **A.**    Yeah, in the documents itself it says, you know,

9    MabThera - known as Rituxan in the US.  It was just shortened

10   down to fit within the spreadsheet.

11   **Q.**    And if we can go to the last page of the document.  What

12   is shown at the bottom of the document?

13   **A.**    Total foreign drug purchases.

14   **Q.**    And what is the number there?

15   **A.**    $769,171.

16   **Q.**    And where does that information come from?

17   **A.**    Those are the purchases -- those are -- that's the sum

18   of the money that East Lake Oncology spent for drugs

19   purchased from Cancer Drugs Online, as well as those from

20   Quality Specialty Products for 2011 and 2012.

21   **Q.**    And the $769,171, where does that information come from

22   within the chart that is displayed on Exhibit 180?

23   **A.**    It's in the last column, summation of the cost from

24   foreign suppliers.

25   **Q.**    If we can publish Exhibit 180A.  Can you explain what is

1   shown in this document?

2   **A.**   Yes, this is a breakdown of the total purchases from QSP

3   and Cancer Drugs Online per month, how much East Lake

4   Oncology had spent per month on these products for the same

5   grand total amount of $769,171.

6   **Q.**   Can you just take a couple of examples and explain what

7   we see?

8   **A.**   The trends were relatively small, like, $2,085 in

9   January.  By October it was $77,000 in purchases, and then

10  when we moved to February 2012, it was over 131,000 for the

11  month.

12  **Q.**   If we can publish Government Exhibit 180B.  How does

13  this chart relate to the last chart we were just looking at?

14  **A.**   This is a bar graph depiction of the same with the

15  months running at the bottom of the graph showing the January

16  through June -- January 2011 through June 2012 buying trends.

17  You can see for April, May and June that was the switch to

18  Cancer Drugs Online, the purchases of the 10, 10, 10, 10 that

19  we saw on the other exhibits.

20  **Q.**   You should have Exhibit 181 in front of you.  Do you see

21  that exhibit?

22  **A.**   Yes, sir, I do.

23  **Q.**   What is Exhibit 181?

24  **A.**   181 is a comparison of a sampling of purchases made by

25  East Lake Oncology in comparison to the average sale price of

1    drugs at the time.

2    **Q.**    And when you say, "Purchases by East Lake Oncology,"

3    from which distributors?

4    **A.**    These are from the domestic distributors.

5    **Q.**    And what is the time period that you looked at?

6    **A.**    It's January 2011 through March of 2012.

7    **Q.**    And which distributors does it include?

8    **A.**    It includes McKesson, Metro Medical, Curescript,

9    Cardinal.

10   **Q.**    And how did you choose which drugs to include in that

11   chart?

12   **A.**    What I did was I took the drugs that were -- that we had

13   records -- that East Lake Oncology was purchasing from the

14   foreign distributors and I matched them up with drugs that

15   were purchased domestically to see -- try and figure out if

16   using the average sale price was an appropriate measure of

17   comparison.

18   **Q.**    And is the sampling information that's in that chart

19   fair and accurate from the information in Exhibits 31 to 35?

20   **A.**    Yes, it is.

21   **Q.**    And does it also have information from Exhibit 53?

22   **A.**    It does.  It has the J Code assignment, the billing code

23   assignment on the far right-hand side.

24           MR. SALTZMAN:  Your Honor, permission to publish

25   Exhibit 181 as a demonstrative?

```
 1            THE COURT:  You may.
 2   BY MR. SALTZMAN:
 3   Q.   If we can just look at the top left of the document.
 4   The first couple of rows.  Could you just explain what it is
 5   we are seeing, just in the first row?
 6   A.   We see from distributor McKesson an order date placed on
 7   January 11, 2011, for Velcade 3.5 milligrams.  The price that
 8   was paid to McKesson for that drug by East Lake Oncology was
 9   $1,396.60.
10            Skipping the difference section just for a second,
11   that correlated to the average sales price of 1368.85 for
12   that particular J Code.  So the difference between that shows
13   a difference of 27.75 in that East Lake Oncology was paying
14   about $27.75 more than the average sales price for the
15   Velcade they purchased on January 2011.
16   Q.   How did you know what J Code to use for the drug
17   Velcade?
18   A.   I need help with the Exhibit number.
19   Q.   If we can publish Exhibit 201D-1?
20   A.   Okay.  This is, like, three different moving parts here.
21   The domestic drug distributors sell the drug by its -- it's
22   commercial name, okay.  And then, Medicare reimburses based
23   upon an active pharmaceutical ingredient and its billing
24   code, and then, using the document that I found with the
25   search warrant where it relates the billing code to the trade
```

1   name, I can bring those three documents together in order to

2   determine which goes with which.  So that's how I determined

3   that the J code for Velcade or -- for the drugs that were --

4   for Velcade was 9041, which you can see there J9041.

5   **Q.**   If we can go back to Exhibit 181, and on the -- looking

6   at the top right.  Is that the same J0941 you were just

7   talking about?

8   **A.**   Yes, sir.

9   **Q.**   And if we can zoom out.  Can you just explain, now that

10  the exhibit is up on the screen, what the period of time was

11  that you looked at?

12  **A.**   We look at January 2011 through March of 2012.  We used

13  specific drugs, like I said, that were purchased, um, both

14  foreign, down the road, and the domestic purchases, but this

15  is specifically for the domestic.

16  **Q.**   And is this just a sampling of information?

17  **A.**   Yes, sir.

18  **Q.**   When you picked particular drugs, did you pick them to

19  show any sort of price difference or was it just a sampling?

20  **A.**   It was just -- it was a sampling, but there was a

21  purpose behind this project.  What I was trying to determine

22  is whether or not using the average sales price was an

23  appropriate comparator when I compared them to all the

24  foreign purchase prices, and when I looked at it and I saw

25  that Dr. Norbergs was actually paying more on most occasions

1    than the average sales price when she bought drugs

2    domestically, that would be the most conservative number to

3    use as I conducted analysis on the foreign purchases.  It

4    gives the biggest benefit to the Defendant.

5    **Q.**   And if we could -- if we could look at row -- for

6    February 16, 2011, for Rituxan, and then also zoom in to

7    include a little bit below that to February 7, 2012, for

8    Rituxan, and at the 100 milligram strength, is the number --

9    are the dollar figures the same between those two entries on

10   the left side of the document?

11   **A.**   I'm sorry, Counselor, can you ask that one more time.

12   **Q.**   Sure.  Depiction of clarity.  For the Rituxan 100

13   milligram order from Curescript on February 16, 2011, and

14   then on February 7, 2012, also from Curescript, is the dollar

15   amount the same?

16   **A.**   It is not.

17   **Q.**   And looking at the right side of the document for the

18   average sale price, same question, are those numbers the

19   same?

20   **A.**   They are not.

21   **Q.**   And to, um, get the information that's on the right side

22   of the document, did you rely on Exhibit 53?

23   **A.**   I did, sir.

24   **Q.**   And does that -- does Exhibit 53 show the changes -- if

25   we can actually publish Exhibit 53, and if we could look at

1    the bottom where it says "J9310 Rituximab, is that where you

2    got that information from?

3    **A.**   Yes, it was, sir.

4    **Q.**   If you could take a look at Exhibit 182A, that's in

5    front of you.

6    **A.**   Yes, sir.

7    **Q.**   What is Exhibit 182A?

8    **A.**   This is -- was another spreadsheet that I had done which

9    included cost purchases from drugs purchased from Cancer

10   Drugs Online and QSP, very similar to that of 180.

11   **Q.**   So how, if at all, does Exhibit 180 relate to

12   Exhibit 182?

13   **A.**   Well, 180 is the raw data, and 182 is the analysis using

14   the average sales price.

15   **Q.**   Does Exhibit 182A include all the drugs that were listed

16   in Exhibit 180?

17   **A.**   Yes, sir.  Oh, no, sir.  No, we exclude the Erbitux,

18   Gemzar and Taxotere.

19   **Q.**   Why did you not include those?

20   **A.**   I saw they didn't correlate to the US versions in

21   strengths.  Because I used set dollar figures put forth as

22   the average sales price, I didn't have an apples-to-apples

23   comparison because those drug strengths aren't available in

24   the US.  So I omitted them once again to give the best

25   benefit to the Defendant.

1   **Q.**   And how did you get the average sales price numbers to

2   include in this chart?

3   **A.**   I used Exhibit 153.

4   **Q.**   Is that Exhibit 53?

5   **A.**   I'm sorry, Exhibit 53.

6   **Q.**   Did you follow the same process that you described as

7   related to Exhibit Demonstrative 181 that we were just

8   looking at?

9   **A.**   Yes, sir.

10   **Q.**   And did you do that for each entry, for each drug order

11   that's in Exhibit 182?

12   **A.**   I did, sir.

13   **Q.**   And what is Exhibit 182B?

14   **A.**   This is a monthly breakdown chart for the foreign drug

15   costs versus costs at the average sales price.  So it's

16   182 -- the spreadsheet of 182 broke down monthly.

17   **Q.**   When you said 182, did you mean 182A?

18   **A.**   I did.  I'm sorry, sir, 182A broke down monthly.

19   **Q.**   And what is Exhibit 182C?

20   **A.**   182C is a -- is a bar graph of the same information, the

21   foreign drug costs versus the costs at average sale price for

22   Cancer Drugs Online.

23   **Q.**   When you say, "the same information," what's the

24   information the same as?

25   **A.**   It's the information that I used once I made 182A, could

1    I use that information to come up with a total cost

2    difference and a bar graph that depicts it.

3    **Q.**   What is Exhibit 182D?

4    **A.**   These are foreign drug costs versus costs for average

5    sale price for specific drugs, MabThera, Neulastim,

6    Ribomustin and Zometa.

7    **Q.**   What is exhibit -- where did you get that information

8    from?

9    **A.**   That was all pulled from 182A.

10   **Q.**   And what is Exhibit 182E, as in echo.

11   **A.**   It's another bar graph of foreign drug costs versus

12   average sale price for both QSP and Cancer Drugs Online, and

13   then, the average sale price and total cost difference.

14   **Q.**   For Exhibits 182A through E, did you create these charts

15   by yourself?

16   **A.**   No, I did it with other agents.

17   **Q.**   Did you confirm that they were accurate?

18   **A.**   I did, sir.

19   **Q.**   And do they fairly and accurately summarize what you

20   just explained?

21   **A.**   Yes, sir.

22            MR. SALTZMAN:  Government moves for the admission

23   of Government's Exhibits 182A through E.

24            THE COURT:  They will be admitted.

25                                  *

1    (Government Exhibit Nos. 182A - 182E

2    admitted into evidence.

3            MR. SALTZMAN:  If we can publish Government

4    Exhibit 182A.

5    BY MR. SALTZMAN:

6    **Q.**   And maybe if we could take this half at a time, top left

7    half, going through "purchase price."  If you could explain

8    how that information relates to Exhibit 180.

9    **A.**   It's the exact same information in 180 with the

10   exception of Gemzar and Taxotere, with Quality Specialty

11   Products and Cancer Drugs Online.

12   **Q.**   If we can zoom out and then continue to the other side.

13   Actually, I think the cost from the foreign suppliers column,

14   that is also in Exhibit 180?

15   **A.**   Yes, it is, sir.

16   **Q.**   Okay.  So can you explain what is shown in this chart,

17   starting with the "J Code" column?

18   **A.**   We start with the J Code, the billing code that we heard

19   about, followed by the average sales price per dosage unit,

20   quantity of dosage units purchased, what the cost of ASP --

21   the cost of ASP at that given time, and what the cost

22   difference was between the average sales price and the price

23   from the foreign distributors.

24   **Q.**   Could we publish Government Exhibit 182B.  What is shown

25   here?

**A.**   This is a monthly graph depicting, essentially, the same

information, the foreign drug costs versus costs at average

sales price broken down per month, and we've got the costs of

QSP and Cancer Drugs Online, what the costs of the drugs were

at average sales price, and the cost difference in the far

right-hand column.

**Q.**   And the grand total at the bottom of $632,000, why is

that different than the other $700,000 figure we talked about

earlier?

**A.**   I had removed those three drugs from the equation

because they didn't have an apples-to-apples comparison, so

we omitted those.

**Q.**   Can you explain what we see as the difference in the

cost difference column?

**A.**   With those three drugs removed, a cost difference of

$265,693.86.

**Q.**   If we could publish Government Exhibit 182C.  What is

this document showing?

**A.**   This is a bar graph for the foreign drug costs versus

the costs of drugs at the average sales price.  So in the

blue you can -- you can see how much the drugs cost --

representative of how much the drugs cost in 20 -- in 2011

and 2012, and the average sales price for those drugs in the

orange behind.

**Q.**   And on the bottom access, below the dates, what are

1    those numbers that are in there?

2    **A.**    Those are the cost differences per month.

3    **Q.**    And was that the same information that we just looked at

4    in Exhibit 182B?

5    **A.**    Yes, sir, it is.

6    **Q.**    And what is the number in bold writing on the bottom

7    left?

8    **A.**    $265,693.86 is the total cost difference between foreign

9    and average sales price.

10    **Q.**    Is that what we looked at in Exhibit 182B?

11    **A.**    Yes, sir.

12    **Q.**    If we can publish Government Exhibit 182D.  If you can

13    zoom in on just the chart itself.  What is this showing?

14    **A.**    This is a chart that shows the foreign drug costs versus

15    costs of the average sales price.  Drugs are MabThera,

16    Neulastim, Ribomustin and Zometa, the costs from QSP and

17    Cancer Drugs Online for each individual drug, and then what

18    the cost at the average sales price was, and what the cost

19    difference was for those specific drugs.

20    **Q.**    And can you just tell us what you see is the data for

21    the MabThera and Rituxan, in parentheses?

22    **A.**    I'm sorry, sir, say that again.

23    **Q.**    Can you just tell us what the data shows in that row for

24    MabThera/Rituxan?

25    **A.**    Sure.  It shows the drug name MabThera.  The cost from

1   QSP is $165,490.  The average sales price for that amount of

2   Rituxan was $206,621.23.  So there's a cost difference for

3   buying MabThera of $41,131.23 as opposed to buying the

4   Rituxan.

5   **Q.**   And can you explain Zometa in this chart?

6   **A.**   Yes.  The foreign Zometa costs $47,910 from the foreign

7   distributors.  The average sales price for Zometa

8   domestically for that quantity would have been $101,070.32.

9   So the cost difference for buying the foreign Zometa was

10  $53,160.32.

11  **Q.**   And can you just provide us with a -- can you quantify

12  that in some sort of percentage in terms of the difference

13  between cost of QSP and Cancer Drugs Online versus costs at

14  ASP?

15  **A.**   Yes.  Some of them were half price or better off,

16  50 percent.

17  **Q.**   Can we publish Exhibit 182E, and can you explain what we

18  see here?

19  **A.**   Yes.  This is a depiction of the foreign drug costs

20  versus costs at average sales price for MabThera, Neulastim,

21  Ribomustin and Zometa, like we looked at in the previous

22  exhibit.  It shows the cost differentials on the left-hand

23  for MabThera to be the $42,000 difference between the drugs

24  purchased by East Lake Oncology versus what they would have

25  cost if bought at average sales price.

1  Q.   And what is the total cost difference that's shown for

2  these four drugs?

3  A.   It is $129,080.54.

4  Q.   And if we can just go back quickly to Exhibit 182A.  In

5  the right column, if we can just zoom in on that right

6  column, just the top half, that cost difference column, was

7  it always positive?

8  A.   No, sir.  I've got an anomaly in there where it's not

9  positive.

10  Q.   When you say "an anomaly," how many times was it not

11  positive?

12  A.   I only found one that I can recall offhand.

13  Q.   And do you recall the reason why that occurred?

14  A.   Yeah.  When I was looking in the records for MabThera

15  100 milligrams, it comes in a two-pack.  But when I looked at

16  the supporting documents, I saw that they only received a

17  single vial.  I couldn't find anywhere else where the second

18  vial had been purchased.  So in order to keep the integrity

19  of the chart together, that's going to be reflected as a

20  negative number because she would have only received one

21  instead of two.  So again, that works towards the benefit of

22  the Defendant in the overall price, yeah.

23  Q.   But other than that one, all the numbers were positive?

24  A.   Oh, very much so.

25  Q.   If we can publish Exhibit 181 on the left side and

1    Exhibit 182A on the right side.  On the right side, if we can

2    just zoom in on the right column.  Using a demonstrative on

3    the left, what did your sampling show in terms of whether or

4    not East Lake Oncology paid more or less than the average

5    sales price in a general fashion?

6    **A.**   When purchasing from the domestic distributors?

7    **Q.**   Yes, sir.

8    **A.**   For the most part she was paying a little bit more than

9    the average sales price for her drugs.

10   **Q.**   In Exhibit 182A, what does this exhibit show you in

11   terms of whether or not purchases from QSP and Cancer Drugs

12   Online, how the purchases compared to the average sales

13   price?

14   **A.**   Well, they were much, much less.  Sometimes 50 percent

15   less.

16           MR. SALTZMAN:  Your Honor, if I can have permission

17   to approach?

18           THE COURT:  Are you going into the 400 series?

19           MR. SALTZMAN:  I am, sir.

20           THE COURT:  We will break for lunch until 1:20 p.m.

21           CSO OFFICER:  All rise.

22           (Noon recess taken at 12:05 p.m.)

23           (Court back in session at 1:20 p.m.)

24           THE COURT:  How much longer do you have with this

25   witness?

1          MR. SALTZMAN:  Your Honor, I think it's going to
2     take some time to go through these, hour-and-a-half maybe.
3          THE COURT:  How long will you be on cross?
4          MR. TRAGOS:  At least a half hour.
5          THE COURT:  That's two hours.  Is he your last
6     witness?
7          MR. SALTZMAN:  He is, your Honor.
8          THE COURT:  Do you have a witness lined up?
9          MR. TRAGOS:  We do.
10          THE COURT:  Okay.  Where is your client?
11          MR. SARTIS:  Oh, she's in the bathroom.
12          THE COURT:  All right.  Bring in the Jury, please.
13          (Jury enters at 1:21 p.m.)
14          THE COURT:  You may proceed.
15          MR. SALTZMAN:  Thank you, your Honor.
16     BY MR. SALTZMAN:
17     **Q.**   Special Agent Larson, I placed before you Exhibits 401A
18     through 406A, and 401B through 406B.  Do you see those
19     exhibits?
20     **A.**   Yes, sir.
21     **Q.**   To create Exhibits 401A through 406A, what exhibits did
22     you rely on?
23     **A.**   We relied on the -- all of the purchasing records from
24     both domestic and forward -- foreign distributors, as well as
25     medical records and claims data.

Q.   And can you just describe, in general terms, what
Exhibits 401A through 406A are designed for?

A.   This is a tracing exercise where we try to follow-up the
foreign drugs from the point that they were or had until they
were infused into a specific patient.

Q.   And what are Exhibits 401B through 406B -- for those
exhibits, first, what records did you rely on to create those
exhibits?

A.   I relied on the purchasing records for the foreign
distributors, as well as Medicare claims data and the average
sales price information.

Q.   And what does -- do exhibits 401B through 406B generally
relate to?

A.   The cost difference between the foreign drugs and the
domestic drugs in relation to the billing.

Q.   And to create Exhibits 401A through 406A, and 401B
through 406B, did you rely on voluminous records?

A.   Yes, I did, sir.

Q.   And did you create these exhibits on your own?

A.   No, I did not.

Q.   Did you confirm that the information in there is true
and accurate?

A.   Yes, I did.

Q.   And is that the case for all exhibits that were just
mentioned?

**A.**    Yes, sir.

**Q.**    And do they fairly and accurately summarize what you just explained?

**A.**    Yes, sir.

**Q.**    Um, of the series 401A through 406A, are any one of those different than the other five?

**A.**    Yes, sir.  For one of these exhibits we broke down everything with the supporting data instead of just making reference to it.  We actually embedded that data into the presentation.

**Q.**    And within the 401B through 406B series, is any one of those different from the rest?

**A.**    Yes, sir, in the same way.

         MR. SALTZMAN:  At this time, the Government moves for the admission of 401A through 406A, and 401B through 406B.

         THE COURT:  They will be admitted.

(Government Exhibit Nos. 401A-406A, 401B-406B admitted into evidence.)

         MR. SALTZMAN:  If we can publish Government's Exhibit 404A.

BY MR. SALTZMAN:

**Q.**    Is this the exhibit where you described you provided the supporting documentation?

**A.**    Yes, sir.

1    Q.   So we're just going to walk through these step-by-step

2    and just explain what is shown in this.  First, starting with

3    the title, what is shown in this first document?

4    A.   We start off with the patient's name Anita Lechmanski,

5    AL, and this is in reference to the drug Neulasta, and first

6    one for the drug, January 21st, 2012, East Lake Oncology,

7    received Neulastim - known as Neulasta in the US, from QSP.

8    Q.   What exhibit supports that?

9    A.   That would be Exhibit 111.

10   Q.   If we go to the next page, what is shown here?

11   A.   Okay.  This is a picture of Exhibit 411.  This is the

12   invoice dated January 4, 2012, where the product was ordered.

13   Q.   Let's go to the next page.  What is shown now as

14   different from the other screen?

15   A.   Okay.  In this screen we just bolded certain areas.  The

16   shipment date of January 4th.  The fact it was mailed next

17   day regular, and the drug name Neulasta - known as Neulastim

18   in the US.

19   Q.   Go to page 4.  What does this show?

20   A.   On January 5th, 2012, the medical chart shows the

21   patient Anita Lechmanski received the Neulasta supported by

22   Exhibit 337A and 337B.

23   Q.   Go to the next page.  What is this showing?

24   A.   This is a chart, a document from Anita Lechmanski's

25   medical chart.

1   **Q.**   What Exhibit number is that?

2   **A.**   That's 337A.

3   **Q.**   Going to the next page, what is that showing?

4   **A.**   It shows Anita Lechmanski's name as part of that

5   document.

6   **Q.**   Going to the next page.  What is that showing?

7   **A.**   This shows the -- you see on the very bottom it says,

8   "January 5th, 2012, Neulasta, six milligram," that's part of

9   the chemo treatment from the medical chart.

10   **Q.**   Going to the next page, is that just showing the same

11   two pieces of information in another display?

12   **A.**   Yes, sir.

13   **Q.**   Going to the next page, what is shown here?

14   **A.**   We just highlighted the Neulasta that I was trying to

15   point out in the previous slide for January 5th.

16   **Q.**   Go to the next page.  What is shown here?

17   **A.**   A blowup of the name, "Neulasta, six milligram," and the

18   patient's name.

19   **Q.**   And what exhibit is this all coming from?

20   **A.**   Exhibit 337A.

21   **Q.**   Go to next page.  What is this showing?

22   **A.**   This shows that 337B, this was the order form off the

23   super bill that was inside of Anita Lechmanski's medical

24   file.

25   **Q.**   Next page.  What is shown here?

**A.**    This is a blowup of the super bill where it says the patient's name on the left, Anita Lechmanski, and it has her appointment date of 1/4/2012, doctor's name Dr. D. Anda Norbergs, MD.

**Q.**    Go to the next page.  Is this zooming in on the patient name?

**A.**    Yes, it is.

**Q.**    Go to the next page.  Is this show -- zooming in on the provider's name and date that you just described?

**A.**    Yes, sir.

**Q.**    Go to the next page.  What is shown here?

**A.**    This, at the top of it, are the notes, and it says, "Neulasta, six milligram," along with other drugs, including Zometa.

**Q.**    Go to the next page, and is that just highlighting what you just described?

**A.**    It is, plus the doctor's signature, initials on the bottom.

**Q.**    Going to the next page.  What is shown here?

**A.**    Okay.  We looked at when was the last time that Neulasta was purchased by East Lake Oncology, and in looking through the records we saw that the last date was October 28, 2010, from Metro Medical.  That's Exhibit 34 and 173.

**Q.**    Going to the next page.  What was added there, above that red box?

**A.**   Above that is a notation that's approximately one year and two months prior to this delivery to Anita Lechmanski.

**Q.**   Go to the next page.  What is shown here?

**A.**   We were in looking at the purchasing of the foreign records.  We could discern that from 8/15/2011 to 1/4/2012 there were 13 separate orders of Neulastim from QSP before Anita's treatment.

**Q.**   Does that also include the order that was received on January 5th, 2012?

**A.**   It does.

**Q.**   Go to the next page.  What is shown here?

**A.**   It shows that on 1/5/2012 the medical chart shows that patient Anita Lechmanski received Neulasta.

**Q.**   What is shown on the left, zoomed in?

**A.**   Neulastim – known as Neulasta in the US.

**Q.**   Going to the next page.  Is that what's now displayed on the screen on page 22 that is coming from Exhibit 337A?

**A.**   Yes, it is.

**Q.**   Go to the next page.  What does it show next?

**A.**   It shows that on February 17, 2012, a claim was submitted to Medicare for the reimbursement for a Pegfilgrastim injection, exhibit 337D and 337E.

**Q.**   Go to the next page.  What does this show?

**A.**   This is claims data information that we -- summary that we had received.

**Q.**   If we can go to the next page.   What do we see here?

**A.**   It shows the patient's initials "AL" on 1/5/2012, the billing code of J2505 for Pegfilgrastim injection six milligram.   The bill was submitted on 2/17/2012.

**Q.**   And go to the next page.   What does this show?

**A.**   It says, "CMS reimburses for administration of the Pegfilgrastim injection in the amount of $2,203.26," which is 80 percent of the allowed amount of $2,754.07, and that's within Exhibits 200C and 337E.

**Q.**   If we go to the next page, and skip one more page, what does this show?

**A.**   It shows the allowed amount, which is $2,754.07, and the paid amount, which is 80 percent of that, with the 20 percent being co-insurance, of $2,223.06 paid to East Lake Oncology on 2/3/2012.

**Q.**   Go to the next page.   Tell us what the top of the document says?

**A.**   Yes.   It says, "Anita Lechmanski," her initials "AL" and "Neulastim No. 2."

**Q.**   Why does it say, "Neulastim, No. 2?"

**A.**   Second time that we found her with the Neulastim injection that we could trace.

**Q.**   What does that bubble at the top say?

**A.**   "January 27, 2012, East Lake Oncology received Neulastim − known as Neulasta in the US, from QSP, for Lechmanski."

1  Q.   And what exhibit was that from?

2  A.   That's Exhibit 112.

3  Q.   What is this showing?

4  A.   This is an order, Neulasta, six milligrams, QSP, Cancer

5  Drugs Online.

6  Q.   Next page.  What information is zoomed in on here?

7  A.   The drug name Neulasta, six milligrams, and a note that,

8  "We will receive on Friday 1/27/2012," and it's dated

9  1/25/2012.

10  Q.   Next page.  What is this showing?

11  A.   This was a note that we found in Anita Lechmanski's

12  medical file, "1/25/12, six milligrams Neulasta for

13  Lechmanski."

14  Q.   Look at the -- tell the Jury where this particular paper

15  was found?

16  A.   I stand corrected.  This was provided with the East Lake

17  Oncology records that were provided to us in the Grand Jury

18  subpoena.

19  Q.   How does Exhibit 112, this page, relate to the page we

20  just looked at before?

21  A.   It shows that there was an ordering for a specific drug

22  on a specific date for a specific patient.

23  Q.   Go to the next page.  What is this showing?

24  A.   It's a composite of all of that.  It shows the note on

25  1/25.  It shows the order on 1/25 for the drug Neulasta from

1    QSP, overnight.

2    **Q.**    The Post-it Note that's an order for a specific patient,

3    is that correct?

4    **A.**    Yes.

5    **Q.**    Go to the next page.  This just highlights what you just

6    described?

7    **A.**    Yes, it does.

8    **Q.**    Go to the next page.  What is shown here?

9    **A.**    It's a shipment record for Neulastim – known as Neulasta

10   in the US, refrigerated, six milligram.

11   **Q.**    Next page.

12   **A.**    Again, it's the blown up version of that, with

13   January 26, 2012, next day regular, and the drug name

14   Neulastim – known as Neulasta in the US.

15   **Q.**    When does that indicate East Lake Oncology received

16   Neulastim – known as Neulasta in the United States?

17   **A.**    January 27th.

18   **Q.**    Going to the next page.  What does it show next?

19   **A.**    It shows on January 27th, Anita Lechmanski's medical

20   chart shows that the patient received Neulasta.

21   **Q.**    Going to the next page, and we'll skip another page,

22   what is this?

23   **A.**    These are excerpts from Anita Lechmanski's medical chart

24   that shows on January 27, 2012, Neulasta, six milligram, was

25   administered to the name below, Lechmanski, Anita.

1    **Q.**   Going to the next page.  What is shown here?

2    **A.**   In looking back at when the last purchase from domestic

3    suppliers for Neulastim was approximately one year and

4    three months prior to Anita's appointment.

5    **Q.**   Going to the next page.  What has now been added?

6    **A.**   Between 8/15/2011 and 1/25/2012 we counted 16 separate

7    orders from the foreign distributors up until Anita's

8    appointment.

9    **Q.**   Then does that include the order that shows for

10   Lechmanski?

11   **A.**   Yes, sir, it does.

12   **Q.**   Going to the next page.  What is shown -- actually, go

13   to the next page.  What is shown now, on the screen, on page

14   43?

15   **A.**   It's a composite of all the information for this

16   submission.

17   **Q.**   Was it common, during your analysis, to find Post-it

18   Notes showing orders for specific patients?

19   **A.**   No, no.

20   **Q.**   Did not having a Post-it Note affect your analysis in

21   any way?

22   **A.**   No, it did not.

23   **Q.**   Why do you say that?

24   **A.**   I could rely on the last time a purchase was made and

25   last time before that foreign purchase was made, and knowing

1   drugs were only kept in the business for a week or so, I was

2   able to discern which drugs went to which patients.

3   **Q.**   Going to the next page.  What is shown there?

4   **A.**   On January 31st, a claim submission to Medicare for

5   reimbursement for Pegfilgrastim injection, in Exhibit 338A

6   and 338B.

7   **Q.**   And what is on the next page?

8   **A.**   This is the claims data summary.

9   **Q.**   And go to the next page.

10   **A.**   Again, this shows her initials "AL" for Anita

11   Lechmanski, the date of service 1/27/12, the J Code of --

12   J Billing Code for J2505 for Pegfilgrastim, injection, six

13   milligrams, submitted on January 31, 2012.

14   **Q.**   Going to the next page.  What does this show?

15   **A.**   It says that on February 14, 2012, CMS reimbursed East

16   Lake Oncology for the administration of the Pegfilgrastim

17   injection in the amount of $2,203.26, which is 80 percent of

18   the allowed value of $2,754.07, in Exhibit 200C and 338B.

19   **Q.**   Going to the next page, and going to the page after

20   that, what is shown on page 49 here?

21   **A.**   It shows that the amount -- amount allowed by CMS for

22   the drug, of $2,754.07, 80 percent of which is the amount

23   paid, which is $2,203.26, and the payment date of

24   February 14, 2012.

25   **Q.**   And going to the next page.  That's the last page of the

1   document.  Has the information from the exhibits been

2   supported by the text that's in the actual bubbles on

3   Exhibit 404A?

4   **A.**   Yes, sir.

5   **Q.**   And did you provide this type of supporting

6   documentation from all the exhibits in the case, in Exhibits

7   401A through 403A, and 405A and 406A?

8   **A.**   I'm sorry, say that again.  I'm sorry.

9   **Q.**   Did you include screen shots, like the one that's on the

10  screen here from Exhibit 338B, did you include that type of

11  information in all the other exhibits we're going to talk

12  about from 401A through 406A to exclude 404A?

13  **A.**   No.  We didn't -- I didn't do that with these -- with

14  the rest of the examples.  I put in the exhibit numbers that

15  correspond with that information, but didn't put in all the

16  supporting documents into the presentation.

17  **Q.**   If we could go to Government Exhibit 404B, and what do

18  we see here?

19  **A.**   It's "Anita Lechmanski" title, initials "AL," for

20  Neulastim, and we're talking about the order from Quality

21  Specialty Products, and the cost for six milligrams of

22  Neulastim, East Lake Oncology paid $1,935 for it.  It's

23  Exhibit 111.

24  **Q.**   Go to the next page, and go to the next page after that.

25  Is this exhibit showing the price that was paid for

Neulastim?

**A.**   Yes, sir.

**Q.**   If we go to the next page, what are you showing here?

**A.**   Okay.  In Exhibit 337E it is the claims data information, and it shows the allowed reimbursement for Neulastim was $2,754.07 for this specific block of time.

**Q.**   Go to the next page.  What does this show?

**A.**   It shows the amount allowed $2,754.07.

**Q.**   Going to the next page, what does this show?

**A.**   That's the cost difference between what -- what the drug was reimbursed for versus what the drug cost, a difference of $819.07 from QSP drugs.

**Q.**   Going to the next page, is that just showing the math?

**A.**   That is the math.

**Q.**   Going to the next page, what is this showing?

**A.**   Okay.  Using the average sales price for 2012, Quarter 1, the cost for six milligrams of Neulasta is $2,691.59, which is Exhibit 53.

**Q.**   Going to the next page, is that showing where you got that from, Exhibit 53?

**A.**   Yes, sir.

**Q.**   Going to the next page, and what does that show?

**A.**   That's a blowup of the first quarter 2012, January 2012 to March 2012, where it shows the $691.59 as the average sales price.

1    **Q.**    Going to the next page, what does this show?

2    **A.**    The allowed reimbursement it will not change between QSP

3    and ASP.  It will always be the same.  It's $2,754.07, and

4    that's in Exhibit 337E.

5    **Q.**    Going to the next page, what is that showing?

6    **A.**    It shows a cost difference of $62.12, if the drugs were

7    purchased at the average sales price.

8    **Q.**    Going to the next page, is that just the math?

9    **A.**    That is the math.

10    **Q.**    Going to the next page, what is that showing?

11    **A.**    It shows additional dollars received by East Lake

12    Oncology in the amount of $756.95.

13    **Q.**    Going to the next page, is that just the math between

14    $819.07 minus $62.12?

15    **A.**    Yes, it is.

16    **Q.**    Going to the next page.  What is this showing?

17    **A.**    Remember Anita Lechmanski got two injections of

18    Neulastim.  So we multiply that by two, for total additional

19    dollars of $1,513.05.

20    **Q.**    And what is this next page showing?

21    **A.**    I think that's the same page, isn't it?

22    **Q.**    If you look at the bubble where there's a cost

23    difference --

24    **A.**    I'm sorry.  Cost difference for the drugs versus QSP

25    versus cost difference of drugs bought by ASP, it's 13 times

1    more return for the QSP drugs based upon the reimbursement

2    amount.

3    Q.    Going to the next page, if there is one -- okay.

4          If we could now go to Exhibit 401A.  What is

5    Exhibit 401A showing?

6    A.    This shows Margaret Schaefer, initials "MS," Sally

7    Marlowe, initials "SM," and Crystal King, initials "CK," and

8    essentially on 9/9/2011 East Lake Oncology received MabThera

9    - known as Rituxan in the US, from QSP, 1900 milligrams was

10   received.  That's Exhibit 101A

11         And then, on 9/22/2011, they received MabThera -

12   known as Rituxan in the US, another 1700 from QSP.  So we're

13   working with both those numbers combined.  That's

14   Exhibit 101A.

15   Q.    Go to the next page.  Are we now just looking at

16   Margaret Schafer individually?

17   A.    That's correct.

18   Q.    Going to the next page, what is that now added to the

19   exhibit?

20   A.    So total amount received in those two orders was

21   3600 milligrams of MabThera.

22   Q.    Going to the next page, what does this show?

23   A.    Okay.  It shows on 9/26/2011 the medical chart shows

24   that Margaret Schafer received 600 milligrams of Rituxan, and

25   that's Exhibit 330A, 330B and 330C.

1   **Q.**   Go to the next page.  What is this showing?

2   **A.**   This shows -- okay.  When we look back, it's when we

3   went with the last order from the domestic providers -- we're

4   33, 2011 was the last order FDA-approved Rituxan for

5   McKesson, Exhibit 33 and 171.

6   **Q.**   Going to the next page, what does that show?

7   **A.**   That's six months prior to this administration to

8   Margaret Schafer.

9   **Q.**   Going to the next page, what does this show?

10  **A.**   It shows on 3/15/2011 to 9/20/2011, East Lake Oncology

11  placed 16 separate orders for MabThera from QSP, including

12  the two orders that we're already talking about.  That's in

13  the 101A-1, 101A and 151, 171.

14  **Q.**   What's the significance of that?

15  **A.**   Those are the supporting example Exhibit numbers.

16  **Q.**   No.  What's the significance of the two red boxes on the

17  screen?

18  **A.**   Okay.  The red box on the left talks about the domestic

19  purchases, when was the last domestic purchase made, and

20  then, on the one on the right is the difference in time

21  between the last domestic purchase and how many foreign

22  purchases were made prior to one of our patients.

23  **Q.**   And when you say, "prior to one of our patients," what

24  do you mean by that?

25  **A.**   Prior to the -- one of our patients receiving a drug by

1    that name.

2    **Q.**   Going to the next page, what is shown here?

3    **A.**   After we take 600 milligrams out of the bank for

4    Margaret Schafer, that leaves us 3000 milligrams of MabThera

5    left over.

6    **Q.**   Going to the next page.  What do we see here?

7    **A.**   On 9/28/2011 claim submitted to Medicare for

8    reimbursement for Rituximab injection, 330A and 330D.

9    **Q.**   What does this show?

10   **A.**   October 13, 2011, CMS reimbursement for Ribomustin

11   injection, in the amount of $2,932.59, which is 80 percent of

12   the allowed amount of $3,666.19, which is Exhibits 200C and

13   330E.

14   **Q.**   Going to the next page.  What patient is this referring

15   to now?

16   **A.**   This is for Sally Marlowe, "SM."

17   **Q.**   Is that box the same as the box that we were looking at

18   before?

19   **A.**   That's correct.  The first box will remain a constant.

20   **Q.**   And what is below that box?

21   **A.**   We have 3000 milligrams of MabThera left.

22   **Q.**   Going to the next page, what does this show?

23   **A.**   Okay.  On 9/20/2011 Sally Marlowe's medical chart shows

24   she received 600 milligrams of Rituxan, Exhibit 331A.

25   **Q.**   Going to the next page, what does this show?

1    **A.**    Again, it shows the last time that these drugs were

2    ordered from a domestic source was on 3/31 -- 3/3/2011, when

3    Rituxan was ordered from McKesson, Exhibit 33 and 171.

4    **Q.**    Going to the next page, what does this show?

5    **A.**    Again, it shows from 3/15/2011 to 9/20/2011 East Lake

6    Oncology placed 16 separate orders of MabThera from QSP,

7    including the first two in the first bubble there.

8    **Q.**    Going to the next page, what is shown here?

9    **A.**    It shows, after Sally Marlowe, received 600 milligrams,

10   that there were 2400 milligrams of MabThera left.

11   **Q.**    And going to the next page, what does this show?

12   **A.**    It shows that on 9/30/2011, a claim submitted to

13   Medicare for reimbursement for Rituximab injection,

14   Exhibit 331B and 331C.

15            THE COURT:  We have a request for a break.  Let's

16   take a five-minute break.

17            CSO OFFICER:  All rise.

18            (Brief recess taken at 1:51 p.m.)

19            (Court resumes at 2:01 p.m.)

20            THE COURT:  Bring in the jury, please.

21            (Jury enters courtroom at 2:01 p.m.)

22            THE COURT:  Proceed.

23            MR. SALTZMAN:  Thank you, your Honor.

24   BY MR. SALTZMAN:

25   **Q.**    What is shown here on page 16?

**A.**    9/30/2011 a claim was submitted to Medicare for the reimbursement of Rituximab injection, supported in 331A and 331C.

**Q.**    Go to the next page.  What is shown on this page?

**A.**    It shows that on October 17th, that CMS reimbursed East Lake Oncology for the Rituximab injection in the amount of $2,932.95, which is 80 percent of the allowed amount of $3,666.19, Exhibits 200C and 331C.

**Q.**    And if on the left side we could display Government Exhibit 171, and on the right we could display this exhibit at 401A, page 17.  Using Exhibit 171, can you just explain the red bubble on the left side of the page, as it relates to Exhibit 171?

**A.**    Yes.  On 3/3/2011 we have our last order for FDA-approved Rituxan from McKesson.  So if we go to McKesson and we go down to 3/3 --

**Q.**    If we can zoom in on the bottom left of -- a little higher.  A little bit more.  Perfect.

**A.**    Okay.  There we go.  You see the last purchase, in the blue, the blue is going to be your domestic distributors. That was the last purchase, in blue, was on 3/3/2011.

**Q.**    If we can zoom out, and then just zoom in on the bottom left, the green, where there is writing in there.  If we could move that over just to the right side of the screen -- to the left side, I'm sorry.  Okay.  So explain how -- what

1    we're seeing on the left side of the screen relates to the

2    right red bubble in Exhibit 401A?

3    **A.**    Okay.  So for the right red bubble we've got our time

4    frame between 3/3/2011, which is the last domestic purchase.

5    The next purchase is on 3/13/2011, which in the red bubble

6    says 3/15/2011.  If you add down to the purchase on

7    9/20/2011, you've got approximately 16 separate orders until

8    we get to the drugs that were administered, at that time

9    frame, to Sally Marlowe.

10   **Q.**    And if we can just, on its own, display Exhibit 401A,

11   page 18, and continuing on, what is the title of this

12   document?

13   **A.**    This is the patient by the name of Crystal King, "CK."

14   **Q.**    Is the blue box at the top the same blue box we have

15   seen on the other slides?

16   **A.**    Yes, it is, but now we are down to 2400 milligrams of

17   MabThera left.

18   **Q.**    Going to the next page, what is shown here?

19   **A.**    It shows that on 9/30/2011 patient, Crystal King,

20   received 1000 milligrams of Rituxan, Exhibit 332D, 332E, 332E

21   and 332H.

22   **Q.**    And going to the next page, what is shown here?

23   **A.**    Once again, we talk about our last order of -- from a

24   domestic source of Rituxan was from McKesson on 3/3/2011.

25   **Q.**    Going to the next slide, what is shown here?

**A.**   Again, there are 16 separate orders from East Lake Oncology to Quality Specialty Products.

**Q.**   Going to the next slide, what is now shown?

**A.**   That leaves a reserve of MabThera, 1400 milligrams, after Crystal King receives her 1000.

**Q.**   Going to the next slide, what is shown here?

**A.**   It shows that on October 4th, a claim submission to Medicare for reimbursement for Rituximab injection, 332L and 332M.

**Q.**   Go to the next page.  What is shown here?

**A.**   Then what shows is on October 18th, that CMS reimburses East Lake Oncology for administration of the Ribomustin injection, amount $4,888.25, which is 80 percent of the allowed amount of the $6,131.31, which is Exhibit 332C and 332M.

**Q.**   Going to Exhibit 401B, what's the title of this document?

**A.**   Okay.  This is Margaret Schafer, "MS," and Sally Marlowe, "SM."

**Q.**   Did they both receive 600 milligrams of a drug?

**A.**   That's correct.

**Q.**   What's shown in this?

**A.**   It shows the cost for 600 milligrams of MabThera, East Lake Oncology paid $2,865, which is in Exhibit 101A.

**Q.**   And that is for each 600 milligrams, that's what the

1    cost was?

2    **A.**    Correct.

3    **Q.**    Go to the next page.  What is this showing?

4    **A.**    It shows the allowed reimbursement of $3,666.19 for

5    those 600 milligrams of MabThera, in Exhibits 330E and 200C.

6    **Q.**    Going to the next page, what does this show?

7    **A.**    It shows the cost difference of $801.19 for that drug

8    from QSP.

9            THE COURT:  Apparently we need another break.

10   We'll take another break for five minutes.

11           CSO OFFICER:  All rise.

12           (Brief recess taken at 2:09 p.m.)

13           MR. TRAGOS:  Can we inquire if there's an issue?

14           THE COURT:  All right.

15           MR. TRAGOS:  May we inquire of you if there's an

16   issue going on here with one of the jurors?

17           THE COURT:  Ariana thinks that one of them is

18   having some sort of problem.

19           MR. TRAGOS:  Okay.

20           THE COURT:  Ariana is getting them a ginger ale for

21   some sort of stomach issue.

22           Have you looked at the amended jury instructions?

23           MR. SARTIS:  We have the amended jury instructions,

24   your Honor.

25           THE COURT:  I'm sorry?  They are okay?

1          MR. SARTIS:  They are, at this point, what I

2    believe we all agreed to.  The only thing we have to pull out

3    of the instructions and talk about, for example, if the

4    Defendant doesn't testify, those kind of things.  Beyond

5    that --

6          MR. TRAGOS:  And the -- our additional instruction

7    No. 4 that the Defense has requested with regards to rules

8    versus criminal conduct, and the Court had the 106

9    instruction that we haven't had a chance to take a look at

10   yet, remember the Court asked about that instruction.

11         THE COURT:  Are you talking about a summary

12   instruction?

13         MR. TRAGOS:  That one.

14         THE COURT:  That's normally given at the time the

15   evidence comes in, but you are welcome to take a look at it,

16   if you wish.

17         CSO OFFICER:  They are ready.

18         THE COURT:  Bring in the Jury.

19         (Jury enters courtroom at 2:21 p.m.)

20         THE COURT:  Proceed.

21         MR. SALTZMAN:  Thank you, your Honor.

22   BY MR. SALTZMAN:

23   **Q.**   What are we looking at on page 3 of Exhibit 401B?

24   **A.**   This is, essentially, what the drugs from QSP cost, what

25   the reimbursement allowance was, and what the cost difference

1    is.

2    **Q.**    Skip two pages ahead.   What does this show?

3    **A.**    Drugs purchased at the average sale price for 2011,

4    Quarter 3, the cost of 600 milligrams of Rituxan is

5    $3,548.58, in Exhibit 53.

6    **Q.**    What's on the next slide?

7    **A.**    Again, the allowed reimbursement is always the same

8    $3,666.19, Exhibit 330A and 200C.

9    **Q.**    What's on the next line?

10   **A.**    And the cost difference for drugs purchased

11   domestically, average sales prices $117.61.

12   **Q.**    Going to the next page, what is this showing?

13   **A.**    It shows $683.58 in additional dollars for that single

14   drug.

15   **Q.**    Going to the next page, what is this showing?

16   **A.**    Because it was given twice, the additional dollars are

17   $1,367.16, twice being two patients.

18   **Q.**    Going to the next page, what's been added now?

19   **A.**    So the difference is about six times the amount in the

20   cost difference between Quality Specialty Products and the

21   domestic average sales price.

22   **Q.**    Going to the next page, are we looking at a different

23   page, Crystal King?

24   **A.**    This is Crystal King because she got a 1000 milligrams

25   and that put her in a separate category.   East Lake Oncology

1  paid $4,707 for 700 milligrams.

2  **Q.**   Going to the next page, what does this show?

3  **A.**   It shows the allowed reimbursement for 1000 milligrams,

4  $6,110.31, in Exhibit 332M and 332C.

5  **Q.**   Going to the next page, what is this showing?

6  **A.**   That's a cost difference for drugs purchased from QSP,

7  $1,340.31.

8  **Q.**   Skipping two slides ahead, what is shown in these two?

9  **A.**   Sure.  For the average sales price in 2011, Quarter 3,

10  Rituxan -- 1000 milligrams of Rituxan was $5,914.30, with the

11  allowed reimbursement being the same across the board of

12  $6,110.31, in Exhibit 332M and 200C.

13  **Q.**   And is it shown on the next slide?

14  **A.**   The cost difference for the drugs bought domestically

15  $196.01 for that drug.

16  **Q.**   What's on the next slide?

17  **A.**   The additional dollars to East Lake Oncology was

18  $1,144.30.

19  **Q.**   And going to the next slide, what do we see here?

20  **A.**   That's roughly six times as much for the reimbursement

21  between QSP and ASP.

22  **Q.**   If we could go two slides ahead, and can you tell us

23  what we are seeing on these two boxes here?

24  **A.**   Yes, for 1000 milligrams of MabThera, East Lake Oncology

25  paid $4,770 to QSP, reimbursement from Medicare for that is

1    $4,888.25.  So that's Exhibit 200C and 332M, leaving a

2    patient responsibility $1,222.06.

3    **Q.**   And what is shown on the next page?

4    **A.**   The difference of $118.25.

5    **Q.**   And what is that difference between, which two numbers?

6    **A.**   The amount of the reimbursement and the amount of the

7    cost.  It was already more than paid for, the drug from

8    Medicare.

9    **Q.**   And if we could jump to Exhibit 402A.

10   **A.**   Okay.  This is for patient Arthur Berman, "AB," for the

11   drug MabThera.

12   **Q.**   And if we go to the next slide, it references multiple

13   orders.  Is this first chart simply for MabThera?

14   **A.**   Correct.  The first charge for MabThera on December 7,

15   2011, East Lake Oncology received Ribomustin – known as

16   Treanda in the US, and MabThera – known as Rituxan in the US.

17   We're going to talk about MabThera first.

18   **Q.**   Go to the next page.  What do we see here?

19   **A.**   Okay.  On December 13, 2011, the patient files show that

20   Arthur Berman received Rituxan, 700 milligrams, Exhibit 333A,

21   330D and 333D.

22   **Q.**   Going to the next slide, what does this show?

23   **A.**   On 3/3/2011, the last order of FDA-approved Rituxan came

24   from McKesson, Exhibit 33 and 171, which we've seen before.

25   **Q.**   Going to the next slide.

1    **A.**    That's approximately nine months since the last order to

2    patient Arthur Berman's injection.

3    **Q.**    Going to the next slide, what is this showing?

4    **A.**    Shows on 3/15/2011 to December 6, 2011, East Lake

5    Oncology placed 25 separate orders of MabThera solely from

6    QSP, including the order above in Exhibit 102, 151 and 171.

7    **Q.**    And if we could display this chart on the left side,

8    402A, page 6; on the right side display Government

9    Exhibit 171, and if we zoom in on the lower left, what is

10   this showing from Exhibit 171?

11   **A.**    Okay.  It shows the purchases of MabThera and Rituxan,

12   and you can see on 3/3/2011, there's a -- one in the blue

13   section -- remember, that's the domestic distributors of the

14   drug, first one being McKesson.

15   **Q.**    What is shown in the green on the left?

16   **A.**    The green is the foreign distributors, in this case

17   Quality Specialty Products is in the green area, and you can

18   see between the 3/3 or -- 3/15 was the first purchase, in the

19   green area, for the foreign drugs, all the way down to 12/6.

20   **Q.**    If we can go to page 171.  If we can jump to page 2.

21            THE COURT:  Just a minute.  Is everyone okay in the

22   jury box?

23            THE JUROR:  I'm trying.

24            THE COURT:  Okay.  All right.  Proceed.

25            MR. SALTZMAN:  Thank you, your Honor.

1                                    *

2    BY MR. SALTZMAN:

3    **Q.**    And if we zoom in on the top right -- sorry, top left.

4    My apologies.  What do we see, the continuation of

5    December 6th?

6    **A.**    You see a purchase of MabThera, 100 and 500 milligrams,

7    foreign sources.  The foreign source, QSP, all the way

8    through 12/6, where there's two - 500 milligrams.

9    **Q.**    Is what you just described captured in the right red box

10   in Exhibit 402A that's displayed right now?

11   **A.**    Yes, it is.

12   **Q.**    If we can display on its own Government Exhibit 402A,

13   page 7.  What is now shown here?

14   **A.**    It shows on December 15, 2011, claim submitted to

15   Medicare for the reimbursement for Rituximab injection 331E

16   and 332F.

17   **Q.**    Go to the next page.  What is shown here?

18   **A.**    On December 2, 2011, CMS reimburses East Lake Oncology

19   for the administration of Rituximab injection in the amount

20   of $3,511.50, which is 80 percent of the allowed value of

21   $4,389.37 in Exhibit 200C and 333F.

22   **Q.**    If we go to the next page, skip one more page, what are

23   we now looking at?

24   **A.**    We're now looking at the Ribomustin product for Arthur

25   Berman, "AB."

**Q.**    What does it say about Ribomustin, in the box on the top?

**A.**    Sure.  On 12/3/2011 East Lake Oncology received Ribomustin - known as Treanda in the US, 200 milligrams, from Quality Specialty Products.  That's in Exhibit 102 alpha. And then, on December 7, 2011, East Lake Oncology received Ribomustin - known as Treanda in the US, 200 milligrams, from QSP, Exhibit 102.

**Q.**    If we go to the next slide, what is shown here?

**A.**    It shows that on 12/13/2011 the medical chart shows that the patient, Arthur Berman, received Treanda, 150 milligrams, Exhibit 333A, 330B and 333D.

**Q.**    Going to the next slide, what does this show?

**A.**    It shows that the last order of the FDA-approved Treanda from domestic sources, Metro Medical, over 100 milligrams, was on 9/21/2010, in Exhibit 34 and 172.

**Q.**    If we go to the next slide, what is that showing?

**A.**    That's one year/two months before Arthur Berman's appointment.

**Q.**    Going to the next page, why is there an asterisk in the red box and note there?

**A.**    We did see on the domestic purchases that there was a purchase on 9/22/2011 for Treanda, but that was only in the 25-milligram order from Curescript, and we're showing 150 milligrams being administered in our case.

1   **Q.**   If we could just display Government Exhibit 172, can you

2   explain what you just described, as it relates to this chart

3   here?

4   **A.**   Yes.  You can see on 9/21/2010 we have McKesson, a

5   25-milligram purchase, and then we've got another

6   25-milligram purchase on 9/22/2011 from Curescript.

7   **Q.**   If we can go back to Exhibit 402A, Page 15, if we could

8   skip a page, what does this show?

9   **A.**   It shows on December 15, 2011, a claim was submitted for

10  Bendamustine injection, 50 milligrams, an additional 50

11  milligrams that was discarded or waste.  It was not

12  administered to the patient.  That's in Exhibit 333E and 334.

13  And then, on December 2nd, CMS reimburses East Lake Oncology

14  for the administration of the discarded Bendamustine

15  injection, and the administration of the 150, for $3,111.68,

16  which is 80 percent of the allowed amount of $3,764.60, in

17  Exhibits 200C and 334.

18  **Q.**   Going to the next page, what's the title of this chart?

19  **A.**   This is Arthur Berman, "AB," Ribomustin No. 2.

20  **Q.**   Is the top box the same as the one we were looking at

21  before?

22  **A.**   Yes, it is.

23  **Q.**   Skipping two pages, what's shown here?

24  **A.**   It shows that Arthur Berman received Treanda,

25  150 milligrams, again, on December 14, 2011.

1   **Q.**   And what's on the next page?

2   **A.**   Again, one year, two months earlier 9/21/2010, that was

3   the last order of FDA-approved Treanda for East Lake

4   Oncology, with the exception of 25 milligrams, which is

5   ordered on 9/22/2011 from Curescript.

6   **Q.**   Actually, I should have asked before, what's the

7   significance of the order on 9/22/2011 of only 25 milligrams?

8   **A.**   Well, the way the drug is being administered and billed

9   for, we're getting 200 milligrams of the product.  We're only

10  using 150.  So there is 50 milligrams of waste, which is all

11  billed for through CMS.  The 25 milligrams isn't significant

12  in these amounts when we've got sources that are providing

13  the 200 milligrams.

14  **Q.**   What do you mean by, "not significant?"

15  **A.**   I don't think that that 25-milligram Treanda applies.

16  **Q.**   Okay.  Going to the next page -- we can skip that page,

17  and that page as well.  Can you just start with the red

18  bubble on the right and walk us through the rest of this

19  chart?

20  **A.**   Yes.  Between 3/22/2011 and 12/6/2011, East Lake

21  Oncology placed seven separate orders for Ribomustin/QSP, and

22  that's in Exhibits 102, 151 and 172.  On December 14, 2011,

23  the medical chart shows that Arthur Berman received Procrit,

24  150 milligrams.  On 12/16/2011 a claim was submitted to

25  Medicare reimbursement for the injection, and an additional

1   150 milligrams that was discarded.  So we have a 50-milligram

2   injection, 150 was discarded, and all billed for to CMS, and

3   CMS reimburses the administration and discard of Bendamustine

4   injection in the amount of $3,011.68, which is 80 percent of

5   the allowed amount of $3,764.60.

6   **Q.**   And do you know why the medical chart shows that the

7   patient received 150 milligrams, yet the claims submitted was

8   for 50 milligrams and discard of 150 milligrams?

9   **A.**   I do not.

10  **Q.**   Was the reimbursement amount the same between Ribomustin

11  No. 1 and Ribomustin No. 2?

12  **A.**   Yes.

13  **Q.**   If we can go now to Government Exhibit 402B.

14          MR. TRAGOS:  The last one you asked about, which

15  one was that?

16  (Discussion off the record.)

17  BY MR. SALTZMAN:

18  **Q.**   Looking at Exhibit 402B, can you explain what is shown

19  here?

20  **A.**   Yes.  This is for patient Arthur Berman, "AB," for

21  MabThera, and for Quality Specialty Products, the cost of

22  700 milligrams of MabThera, East Lake Oncology paid $3,339,

23  Exhibit 102.

24  **Q.**   And going to the next page, what does this show?

25  **A.**   This page shows the reimbursement rate for

1    700 milligrams of MabThera is $4,389.37.

2    **Q.**   Going to the next page, what does it show?

3    **A.**   It shows a cost difference of $1,050.37 for that drug.

4    **Q.**   And going to the next page.

5    **A.**   The average sales price in 2011, Quarter 4, for domestic

6    approved, 700 milligrams of Rituxan, $4,289.34.

7    **Q.**   What's the next page?

8    **A.**   Lab reimbursement $4,389.37.

9    **Q.**   Going to the next page.

10   **A.**   Which renders a cost difference of $150 for that

11   particular drug.

12   **Q.**   Going to the next page, what does that show?

13   **A.**   That shows additional dollars for that drug of $900.34

14   to East Lake Oncology.

15   **Q.**   Going to the next page, what does that show?

16   **A.**   That shows roughly seven times more additional dollars.

17   **Q.**   And if we could display page 402, this page on the left

18   side, 402B, page 8 --

19           THE COURT:  How much longer do you have on direct?

20           MR. SALTZMAN:  Probably another hour, your Honor.

21           THE COURT:  Let's take another five-minute break.

22           CSO OFFICER:  All rise.

23   (Jury exits at 2:41 p.m.)

24           MR. TRAGOS:  Can we have a sidebar?

25           THE COURT:  I'm sorry?

```
1              MR. TRAGOS:  Can we have a sidebar?

2              THE COURT:  If they are out of the courtroom --

3              MR. TRAGOS:  Non-sidebar.

4              THE COURT:  Yes.

5              MR. TRAGOS:  Your Honor, although the Prosecutor's

6   direct is riveting, I really want the Jurors to be able to

7   pay attention to my cross.  I'm concerned about the one juror

8   and her ability to concentrate, when she is obviously

9   fighting something.  We are a day ahead of schedule.  Maybe

10  if the Prosecutor wants to finish his cross (sic), but I

11  would ask that maybe, if it's something that maybe overnight

12  would help the Juror, that maybe we should recess early and

13  take it up in the morning?

14             THE COURT:  I don't know that we're a day ahead.

15  We seem to be crawling along with these exhibits.

16             MR. TRAGOS:  Believe it or not, we're a day ahead.

17  The government was planning on finishing on Wednesday, and

18  frankly, they could have finished today, if it wasn't for

19  this.

20             THE COURT:  So you're assuming they will finish

21  today?

22             MR. TRAGOS:  They would, if we could go at the

23  normal pace, I think.

24             THE COURT:  But you like the idea of them being

25  distracted during direct, just not --
```

 1          MR. TRAGOS:  Right.  I don't mind if he wants to

 2    finish his direct.  It's my cross that I'm worried about.

 3          THE COURT:  All right.  We'll keep plotting along

 4    and see how it goes.

 5          MR. TRAGOS:  Your Honor, we have a witness.  Can we

 6    excuse her?  She's sitting out there.

 7          THE COURT:  All right.

 8          MR. SARTIS:  What time tomorrow do you anticipate?

 9          THE COURT:  9:15.

10          MR. SARTIS:  Thank you, your Honor.

11          THE COURT:  The juror has told us that she doesn't

12    think she can continue for today.  So we'll recess until 9:15

13    tomorrow morning.

14          MADAM CLERK:  Do you want me to let them know or do

15    you want the Jury back in to let them know.

16          THE COURT:  Tell them to come back at 9:15 tomorrow

17    morning.

18          CSO OFFICER:  All right.

19          (Jury is dismissed for the day at 2:46 p.m.)

20          THE COURT:  Let's see if we can finalize these jury

21    instructions.

22          MR. TRAGOS:  Sometimes -- the Court indicated that

23    it was going to fashion its own instruction about the issues

24    raised in our suggested jury instruction No. 4, or use our --

25    I'm not sure where we are on that.

1          THE COURT:  My thought is that it's better to take

2     the standard jury instruction and change the wording, if

3     necessary.

4          MR. TRAGOS:  There's a standard?

5          THE COURT:  I'm sorry?

6          MR. TRAGOS:  There's a standard on that issue?

7          THE COURT:  There's a standard on the "intent

8     necessary to find someone guilty."  It's got to be "willing

9     and --"

10         MR. TRAGOS:  "Willing, knowing..." all that stuff.

11         THE COURT:  Yes.

12         MR. TRAGOS:  So the Court would like to add a

13    paragraph in there about rules?

14         THE COURT:  It's not that I would like to, it's

15    that I'm willing to listen.

16         MR. TRAGOS:  Okay.  Is the Court willing to listen

17    now?

18         THE COURT:  Yes.  I would like to listen now.

19         MR. TRAGOS:  Okay.  If the Court would give us just

20    a moment to find it, our No. 4.

21         THE COURT:  Do you have a proposal to make?

22         MR. TRAGOS:  I do.

23         MR. SALTZMAN:  Your Honor, while he's looking for

24    that, can I make a request that we can speak to the Agent

25    overnight, even though he's testifying, not about issues

1    related to testimony, but just other housekeeping matters

2    regarding trial prep, that an Agent typically helps out with?

3              THE COURT:  All right.

4              MR. SALTZMAN:  Thank you.

5              THE COURT:  Do you have a copy of your proposed

6    instruction?

7              MR. TRAGOS:  Frantically looking.  We did file it.

8    We weren't expecting this to happen until tomorrow.  We'll

9    find them, though.

10              THE COURT:  Ariana, print them out, please.

11              MR. TREZEVANT:  I've got copy of it, Judge.

12              THE COURT:  Is that your only copy?

13              MR. TREZEVANT:  Yes, sir.

14              MR. TRAGOS:  I'll share it with him.

15              MR. TREZEVANT:  I don't even need to see it.

16              THE COURT:  All right.  Bring it up, then.

17              MR. TRAGOS:  Okay.  Although the Prosecutor has

18    already said that the fact that the Government stipulated to

19    this in the prior trial, um, and it was to one of the exact

20    same witnesses we're talking about here today, the Court's

21    suggestion of putting this into the "intent section" of the

22    jury instructions would mean that really we would have to put

23    this, I think, in each one of the counts.

24              THE COURT:  I'm thinking about putting it at the

25    beginning of the "offense" instructions.  Ariana, print out

1    the thing for me.

2              MADAM CLERK:  Do you want the amended version?

3              THE COURT:  No.  Print out the Defendant's proposed

4    jury instructions.

5              MR. TRAGOS:  Where is the Court thinking of -- I'm

6    looking at the Government's amended proposed -- is that the

7    one we're looking at?

8              THE COURT:  Yes, and I'm looking at B8,

9    Introduction to Offense Instructions.

10             MR. TRAGOS:  The Court said page 8?

11             THE COURT:  B, as in boy, 8.

12             MR. TRAGOS:  Okay.

13             THE COURT:  Page 24 in mine.

14             MR. TRAGOS:  Okay.  So the Court is thinking about

15   or -- willing to hear discussion with reference to adding it

16   under another paragraph in the B8 section?

17             THE COURT:  Yes, maybe making it the first

18   paragraph.

19             MR. TRAGOS:  Okay.  Your Honor, the concern with

20   the Defense, the reason we proposed this, is for one thing,

21   the Prosecutor asked and the witness said, that a doctor is

22   always the responsible party in these regulations.  And that

23   may be true for the doctor's civil liability, for a civil

24   fine, or for a revocation of her license, revocation of her

25   FDA license, whatever, but it's not true, because there's a

difference between that responsibility and the responsibility

necessary for a criminal charge.  And the Jury needs to know

the distinction, which is why we have drafted, and I won't

take total credit for this because it's the one that

Judge Bloom gave in the case of *US vs. Ellerbee*, where it

distinguishes and says how the rules, regulations, ethical

standards, standards of care are applicable to her conduct,

however, Medicare rules and regulations, ethical standards

and standards of care may be relevant to determine only the

state of mind whether the Defendant acted with criminal

intent, but that violations of the civil statutes is not a

crime, and this is a criminal case, and the Defendant is not

on trial for a civil violation.

So these two paragraphs, they are not long, and I

think they clearly state out -- if the Government wants to

make an argument, the Government can make an argument -- the

Government can make an argument using those rules, and

regulations and standards, but the Jury cannot be mislead

into thinking that a violation of those rules constitutes a

crime.

I think this is a balanced instruction, and

although it necessarily shouldn't be a separate one, but it

could easily be added to B8 to accomplish the purpose.

MR. TREZEVANT:  Can the Government be heard on

this?

1          THE COURT:  Not yet.

2          MR. TRAGOS:  I would also add, FDA and Medicare --

3    because we have FDA and Medicare rules and regulations, this

4    was drafted for Medicare.

5          (Judge peruses document.)

6          THE COURT:  All right.  I'll now hear from the

7    Government.

8          MR. TREZEVANT:  Your Honor, in the first paragraph

9    the Government is concerned, particularly, with the last few

10   sentences of the first paragraph that say, "I caution you, a

11   violation of civil statutes, rules, regulations, ethical

12   standards or standards is not a crime."

13         THE COURT:  Let me stop you.

14         MR. TREZEVANT:  Yes, sir.

15         THE COURT:  Let me read to you what I'm proposing

16   that we give as the first paragraph under the "introduction

17   to offense" instructions.

18         MR. TREZEVANT:  Yes, sir.

19         THE COURT:  And then I'll hear from both sides.

20   "Ladies and gentlemen, during this trial you have heard

21   testimony regarding Medicare's civil rules and regulations

22   and opinions regarding ethical standards and standards of

23   care -- and standards of care for physicians.  I caution you

24   that a violation of the civil statutes, rules, regulations,

25   ethical standards, or standards may not be a crime.  If you

find the claims to Medicare were not allowable under the

applicable statutes, rules and regulations, a Defendant

cannot be convicted of a crime merely for breaching those

civil rules, regulations, ethical standards and standards of

care applicable to her conduct.

This is a criminal case.  The Defendant is not on

trial -- the Defendant is not on trial for civil violations.

This is a criminal case.  To be guilty of a crime

one must act with criminal intent, that is, knowingly and

willfully doing something the law forbids.  Medicare's rules

and regulations, ethical standards, and standards of care may

be relevant in determining the Defendant's state of mind and

whether the Defendant acted with criminal intent.  This is

how you may consider this evidence."

All right.  What says the Defense about that?

MR. TRAGOS:  Um, one is, I'd like to -- if the

Court can let me think about it for a second?

Secondly, could we -- I would like to request that

whenever you say "Medicare," put "Medicare and/or FDA,"

because they both testified to their civil rules and

regulations.  So we have this case, we have both Medicare and

FDA regulations.  So the word "FDA" with "Medicare" where

that appears.

On the first blush it does sound good, but I was

wondering if we could -- there is a way we can see it, take

 1    it home overnight?  Otherwise, I think the other

 2    instructions, the way they are now, are acceptable to us, the

 3    amended ones.  That would be the only one we leave open as to

 4    how that wording would go.

 5            THE COURT:  All right.  What says the Government?

 6            MR. TREZEVANT:  Your Honor, the Court cured one

 7    major concern with the Government where it said, "it was not

 8    a crime," it said, "it may not be a crime."

 9            I was a little bit confused at the beginning with

10    the civil statute just because I don't know that there are

11    civil statutes involved.

12            THE COURT:  There was some testimony about Florida

13    statutes.

14            MR. TREZEVANT:  Florida, yes.  Then, could the

15    Court simply say "Florida statutes?"  I just don't -- it's

16    asking the Jury to draw a fine line, but if I could see it, I

17    think I could maybe be fine with it, Judge.  It's hard to

18    hear it, for me, and make a decision that quickly without

19    looking at it.

20            THE COURT:  I'll get Leslie to type this up and

21    then bring it out and let you look at it, both sides look at

22    it.

23            MR. TREZEVANT:  Thank you, Judge.

24    (Brief interruption.)

25            THE COURT:  Ariana, give two to each side, please.

1           MADAM CLERK:  Okay.

2           THE COURT:  Is that satisfactory?

3           MR. TRAGOS:  If I may suggest some stylistic

4    changes?  On the fifth line up, above where the Court said,

5    "Medicare/FDA's," I think that we should say, "civil

6    statutes, civil rules," and the reason is, in the

7    applications they specifically refer to "civil statutes" and

8    violations of those statutes.  Remember the penalty phase

9    when it had it on the back of those regulations where it

10   talked about some of them were criminal and some of them were

11   civil violations.

12          THE COURT:  Of course this is the wording you

13   proposed.

14          MR. TRAGOS:  Yes, your Honor, but I didn't have the

15   statutes here?

16          THE COURT:  No?

17          MR. TRAGOS:  Well, then I'm bad.  You're right.

18   I'll stick with it.  You say "statutes" later on.

19          THE COURT:  You want me to insert the word

20   "statutes" after the word "civil" in the second line?

21          MR. TRAGOS:  Yes.

22          MR. TREZEVANT:  We have no objection to that, given

23   the language that you have here, Judge.

24          THE COURT:  Okay.  Anything else?

25          MR. TREZEVANT:  From the Government or just from

1    the Defense right now?

2              THE COURT:  Just the Defense.

3              MR. TRAGOS:  That's acceptable, your Honor.

4              THE COURT:  All right.  What says the Government?

5              MR. TREZEVANT:  Your Honor, we are fine with the

6    changes proposed by Mr. Tragos, but if we could simply

7    request that throughout there is one -- the representation of

8    the "ethical standards" and "standards of care," the

9    Government believes that really is more just words, not

10   necessarily applicable to this case, and Mr. Saltzman has

11   gone through it, simply marked where, so that it would say

12   "FDA civil statutes, rules and regulations, ethical, and

13   opinions regarding ethical standards, standards of care for

14   physicians."  This is not really that type of case.  The type

15   of case he was talking about where these came from are home

16   health, and this is not a med-mal where we're talking about

17   standard of care.  It's simply civil rules, civil statutes,

18   rules and regulations.  It seems to the Government that that

19   would cover everything we're talking about.  Now that we have

20   it as Medicare/FDA, there really isn't anything else relevant

21   to the case.

22             THE COURT:  Well, remember when the nurse was on

23   the stand?  The nurse practitioner/doctor?

24             MR. TREZEVANT:  Yes, sir.

25             THE COURT:  One of the questions asked at the very

```
 1    end was, "would she go or send any of her patients to a
 2    doctor who did not use FDA-approved drugs."
 3              MR. TREZEVANT:  That's correct, your Honor.  That
 4    was in response to the Defense's question, "did you refer
 5    patients to my client."
 6              THE COURT:  The question I'm talking about was a
 7    question by the Government.
 8              MR. TREZEVANT:  Yes, sir, and ours are responsive.
 9              THE COURT:  And the Jury could take that as a
10    standard-of-care issue.
11              MR. TREZEVANT:  From our perspective, your Honor,
12    it was all about the intent to mislead.  It wasn't about the
13    ethical standard, when we didn't ask her ethically or
14    anything about her ethics.  It was just simply, "would you
15    give somebody a non-FDA drug without telling them."
16              THE COURT:  I'm going to use these words.  Any
17    other objections?
18              MR. TREZEVANT:  No, sir.
19              THE COURT:  All right.  I'm going to insert this at
20    the beginning of the offense instructions, or I'm going to do
21    it right before the offense instructions.
22              Anything else from the Defense?
23              MR. TRAGOS:  No, your Honor.
24              THE COURT:  All right.  Now, I notice that had --
25    there are two instructions on 404(b) evidence, and I thought
```

1    both sides had agreed that there was no 404(b) evidence?

2            MR. TRAGOS:  There is not.

3            MR. SALTZMAN:  That's correct, your Honor, it was

4    put in prior to trial.

5            THE COURT:  All right.  So I should take both of

6    those out?

7            MR. SALTZMAN:  Yes, sir.

8            THE COURT:  Any others that I should take out?

9            MR. SALTZMAN:  Your Honor, the only other

10   instruction the Government would -- the Defense would agree,

11   depending on whether or not the Defendant testifies, there

12   are some instructions -- there are two options, jury -- the

13   first page B-21 and B-22.

14           THE COURT:  What page number?

15           MR. SALTZMAN:  It's on page 11 of the filed

16   instructions on 12.  It's page 11 and page 12 is one set.

17   That there should be only one of those, depending on what

18   happens, if the Defendant chooses to testify, if the Court

19   chooses that one.

20           THE COURT:  I've seen that one.  Is there another

21   one?

22           MR. SALTZMAN:  B6.1 and B6.3.  The second one is if

23   the Defendant testifies, where the first one is not.

24           THE COURT:  I know it's a deep dark secret, but if

25   the Defense would tell me one way or the other about whether

1    Dr. Norbergs is going to testify, Leslie could start working

2    on these.

3              MR. TRAGOS:  I think the odds are very, very good

4    that she will testify.

5              THE COURT:  I notice that some of your proposed

6    exhibits obviously will not come in, if she doesn't.

7              MR. TRAGOS:  That's also correct.

8              THE COURT:  Okay.  I'll see you tomorrow morning at

9    9:15 a.m.

10             (Court adjourned at 3:29 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF REPORTER

2

3    COUNTY OF HILLSBOROUGH     )

4                              )  SS.

5    STATE OF FLORIDA          )

6

7    I, MELISSA A. PIERSON, OFFICIAL COURT REPORTER, REGISTERED

8    PROFESSIONAL REPORTER, IN AND FOR THE UNITED STATES DISTRICT

9    COURT FOR THE MIDDLE DISTRICTS OF FLORIDA, DO HEREBY CERTIFY

10   THAT I REPORTED, STENOGRAPHICALLY, THE FOREGOING PROCEEDINGS

11   AT THE TIME AND PLACE HEREINBEFORE SET FORTH; THAT THE SAME

12   WAS THEREAFTER REDUCED TO TYPEWRITTEN FORM BY MEANS OF

13   COMPUTER-AIDED TRANSCRIPTION; AND I DO FURTHER CERTIFY THAT

14   THIS IS A TRUE AND CORRECT TRANSCRIPTION OF MY STENOGRAPHIC

15   NOTES.

16

17

18   DATE: 10/16/17

19

20   S:/MELISSA A. PIERSON

21   MELISSA A. PIERSON, CA/CSR 12499

22   IL/CSR 084.003138, RPR

23   FEDERAL OFFICIAL COURT REPORTER

24

25