1              UNITED STATES OF AMERICA
               UNITED STATES DISTRICT COURT
2               MIDDLE DISTRICT OF FLORIDA

3                        – – –

4            HONORABLE JAMES S. MOODY, JR.
          UNITED STATES DISTRICT JUDGE PRESIDING
5                        – – –

6    UNITED STATES OF AMERICA,    )
                                  )
7          PLAINTIFF,             )
                                  )
8    VS.                          ) NO. 8:15–cr–183–T–30AEP
                                  )
9    D. ANDA NORBERGS,            )
                                  )
10         DEFENDANT.             )
     _____)

11

12

13                     **SENTENCING**

14

             REPORTER'S TRANSCRIPT OF PROCEEDINGS
15                    **AUGUST 4, 2017**
                    TAMPA, FLORIDA

16

17

18          MELISSA A. PIERSON, CA CSR 12499,
                 IL CSR 084.003138, RPR
19          FEDERAL OFFICIAL COURT REPORTER
           801 N. FLORIDA AVENUE, 2ND FLOOR
20             TAMPA, FLORIDA 33602
                PH:  (813)301–5336
21           USDCtranscripts@gmail.com

22

23

24

25

```
 1    APPEARANCES OF COUNSEL:

 2    ON BEHALF OF PLAINTIFF:
              A. LEE BENTLEY, III
 3            UNITED STATES ATTORNEY
              BY:  MR. ADAM SALTZMAN, ESQ.
 4            BY:  MR. JAY TREZEVANT, ESQ.
              ASSISTANT UNITED STATES ATTORNEYS
 5            400 N. TAMPA STREET
              ST. 3200
 6            TAMPA, FL 33602
              (813) 274-6000
 7            ADAM.SALTZMAN@USDOJ.GOV
              JAY.TREZEVANT@USDOJ.GOV
 8

 9

10    ON BEHALF OF DEFENDANT:
              TRAGOS, SARTES & TRAGOS, PLLC
11            BY:  MR. GEORGE E. TRAGOS, ESQ.
              BY:  MR. PETER SARTES, ESQ.
12            601 CLEVELAND STREET
              ST. 800
13            CLEARWATER, FL 33755
              (727) 441-9030
14            george@greeklaw.com
              peter@greeklaw.com
15

16    ALSO PRESENT:

17       Ms. Gina Wetherald, AUSA Specialist
         Mr. Eric Larson, Special Agent with the FDA
18

19

20

21

22

23

24

25
```

1                    **I-N-D-E-X**

2   <u>**WITNESS:**</u>

3   Dr. Mitchell Kroungold

4       Direct Examination by Mr. Tragos:          30
        Cross-Examination by Mr. Saltzman:         34
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              TAMPA, FLORIDA; AUGUST 4, 2017

2                        – – –

3           (COURT IN SESSION AT 9:00 A.M.)

4                     *   *   *   *

5          THE COURT:  Good morning.

6          ALL COUNSEL:  Good morning.

7          THE COURT:  Identify yourselves for the record,

8   please.

9          MR. SALTZMAN:  Good morning, your Honor.  Adam

10  Saltzman on behalf of the United States, joined by AUSA Jay

11  Trezevant.

12         MR. TREZEVANT:  Good morning, your Honor.

13         MR. SALTZMAN:  Gina Wetherald is also at counsel

14  table, and Special Agent Eric Larson from the FDA.

15         MR. TRAGOS:  Good morning, your Honor.  George

16  Tragos along with Peter Sartis, and present is Dr. Norbergs.

17          THE COURT:  All right.  Swear Dr. Norbergs, please.

18         MADAM CLERK:  Please rise and raise your right

19  hand, please.

20          THE DEFENDANT:  I do.

21  (Defendant sworn.)

22         MADAM CLERK:  Please state your name, and spell

23  your first and last name for the record.

24          THE DEFENDANT:  Diana Anda Norbergs.  Diana,

25  D-I-A-N-A, Anda, A-N-D-A, Norbergs, N-O-R-B-E-R-G-S.
```

1      MADAM CLERK:  Thank you, ma'am.  You may have a

2  seat.

### D. ANDA NORBERGS

4  Called as a witness herein, having been first duly sworn

5  was examined and testified as follows:

### EXAMINATION

7  **BY THE COURT:**

8  **Q.**   Dr. Norbergs, on November 18, 2016, the Jury found you

9  guilty of Counts 1 through 45 of the Second Superseding

10  Indictment.

11      Counts 1 through 17 charged you with receipt and

12  delivery of misbranded drugs in violation of Title 21, United

13  States Code, Sections 331(c), 333(a)(2), and Title 18, United

14  States Code, Section 2.

15      Counts 18 through 29 charged you with smuggling

16  goods into the United States in violation of Title 18, United

17  States Code, Sections 545, and 2.

18      Counts 30 through 40 charged you with healthcare

19  fraud in violation of Title 18, United States Code, Sections

20  1347 and 2.

21      Counts 41 through 45 charged you with mail fraud in

22  violation of Title 18, United States Code, Sections 1341 and

23  2.

24      The Court has previously adjudged you guilty of

25  those offenses.  We have now reached the stage in the

1  proceedings where it's my duty to address certain questions

2  to you and your lawyer, as well as the lawyer for the

3  Government.

4        Have you had the opportunity to read and discuss

5  the pre-sentence report?

6  **A.**   Yes.

7  **Q.**   Do you have any objections to the factual accuracy of

8  the report?

9  **A.**   Yes.

10        THE COURT:  All right.  You may make your

11  objections now.

12        MR. TRAGOS:  Your Honor, as noted by the probation

13  officer --

14        THE COURT:  Go to the lectern, please.

15        MR. TRAGOS:  As noted by the probation officer,

16  with regards to objections by the Defendant at the end of the

17  probation report, the factual statements in paragraphs 39, 40

18  and 43, we understand and we have reviewed the Government's

19  position.  We understand that there was conflicting testimony

20  with regards to those particular areas.  We understand that

21  there was testimony that would support the probation

22  officer's indication of the -- what factual basis he based

23  his items on, but we do disagree with those factual

24  allegations.

25        I'm sorry, your Honor, we have reached an agreement

1    on 40.  Excuse me.

2            THE COURT:  All right.  I've reviewed the

3    paragraphs and find that they are supported by the evidence

4    at trial and deny those objections.  Are there any others?

5            MR. TRAGOS:  Not as to the factual allegations,

6    your Honor.

7            THE COURT:  All right.  Dr. Norbergs, do you or

8    your lawyer have any objections to the application of the

9    guidelines?

10           MR. TRAGOS:  Yes, your Honor.

11           THE COURT:  All right.

12           MR. TRAGOS:  Your Honor, if we could deal with the

13   loss amounts as the next issue?

14           THE COURT:  All right.

15           MR. TRAGOS:  The Court has four options, as I see

16   it, with regard to loss in this case.

17           The Court has the option of the Indictment, excuse

18   me, with the loss it would be $146,373.  The exhibit --

19   Defense Exhibit 1 is a breakdown of how that was figured.

20           Defense Exhibit 2 shows the drug profit, which is

21   $574,818.  That's the second option that the Court has

22   available to it.  This is the profit that the Defendant made

23   above what the Defendant paid for the drugs.

24           There is the $848,371.19, the third option, which

25   are the claims paid by Medicare.  We would dispute, in that

1    number, $61,578 which are the administrative fees that they

2    are adding on to the actual reimbursement for the drugs.

3         And then, the Government's position, which is

4    $1,807,224, which includes 77,000 in change for

5    administrative, on top of the payments for the drugs that

6    Medicare made.

7         The Defendant believes that because of the huge

8    disparity between the indictment amount, which is 146,000,

9    and the 1.8 million plus that the Government is seeking, that

10   at that point we are at a situation of clear and convincing

11   evidence because it's almost an astronomical difference

12   between what they indicted and what they are asking for as

13   the loss amount or the intended loss.

14        The aggregate dollar amount of the fraudulent

15   billing to Medicare is the $574,818, which was the profit

16   that the Doctor made.

17        We have a situation that is an anomaly when they

18   talk about -- when they used examples of loss because, in

19   most of the cases, and they are in the memo of the Defense,

20   most of those cases the service was not performed; or they

21   gave half the amount of the cancer drug; or they did not give

22   -- they gave a counterfeit cancer drug.  In this situation we

23   do not have that.  We have a situation where they actually

24   received a drug, not a counterfeit drug.  The drug was not

25   FDA approved because it came from a foreign source or

unlicensed distributor, and therefore, they received the
treatment.  That's also going to be relevant when we talk
about victims or vulnerable victims in this case.  Because
again, this case is an anomaly when you look at the other
cases and how those vulnerable victims were victimized as
compared to this particular case.

So the most likely amounts would be the $146,373,
which is the Indictment amount; or the $574,818, which is the
profit amount.  Even the Government's $848,371, which is what
Medicare paid, makes more sense, even under the Government's
scenario, because the Government admits that only about
60 percent of these were Medicaid patients.

We don't know what the third-party payers, if there
were third-party payers, would have paid Dr. Norbergs, and to
go beyond Medicare, considering, if you look at the
Government's memorandum, again, I cite to 2(b)1.1, note
3(f)8, which are the amount of fraudulent bills submitted as
a Medicare fraud regulation or Medicare fraud in -- within
the sentencing guidelines.

The Government's memo, and their arguments to the
Jury and the Court during the trial, was the fact that they
agreed to abide by Medicare regulations.  Over and over again
they cited her signature upon documents agreeing to "Medicare
regulations."  That was the fraud.  Non-FDA-approved drugs
being submitted to "Medicare" in violation of "Medicare"

1    regulations.

2         So to go beyond "Medicare," in this case, is to go

3    beyond the facts of the case, the evidence in the case, and

4    it is not a "clear and convincing" because there is no

5    evidence of the other items beyond "Medicare."

6         The insurance companies were notified by the

7    Government, had an opportunity to make presentations and have

8    not, other than complaining about how horrible drug fraud is.

9    But we do not have a situation where they are presenting, as

10   victims in this case, being defrauded and how much they

11   should receive.

12        So it really should only be limited, first off, to

13   Medicare and not beyond Medicare.  And in the worse case

14   scenario, the total Medicare claims paid, $848,371.19 is the

15   worst case scenario, and that includes, and we object to, the

16   administrative costs of $61,578, that's included in there.

17   We think it should be reduced by the administrative costs.

18        The Government's 1,800,000 is pure speculation with

19   no evidence, and certainly not clear and convincing.

20        So, your Honor, we would object to the amount that

21   is currently being used, the 1,800,000, and believe it should

22   be one of the lesser three amounts that the Defense has

23   presented, two by the Defense and one even by the Government

24   with regards to Medicare patients.  Again, they admit that

25   less than 60 percent of these billings were Medicare

1  patients.

2       This kind of rolls into victims, but I'll stop

3  there, if the Court just wants to deal with that issue.

4       THE COURT:  You can stop there.

5       MR. TRAGOS:  Okay.

6       THE COURT:  What says the Government?

7       MR. SALTZMAN:  Your Honor, the Government

8  sentencing Exhibit 1 basically provides a listing of all the

9  drugs that Dr. Norbergs' office purchased from unlicensed

10  distributors.  The stipulation that was signed by the parties

11  at Docket 156 establishes that fact.  That's not disputed.

12       It's also not disputed by the stipulation that

13  those drugs are not allowed for reimbursement under Medicare.

14  So we have established that fact already.

15       We never stipulated -- according to the Defendant's

16  sentencing memo, we never stipulated that the drugs that came

17  from these unlicensed sources are in any way the same.  We

18  presented at trial, in fact, how drugs that are distributed

19  outside of this closed supply chain could be tainted, could

20  basically not be effective in any way.  It's for that reason

21  that, um, Medicare wouldn't pay a cent for these drugs.  They

22  wouldn't pay for any of it.  Including also, the

23  administrative fee.

24       If the Court would like, I have -- I have a few

25  more statements to make, but I also have the expert,

1    Stephen Quindoza, here today who testified at trial, to also

2    testify about how the administration fee was calculated in

3    sentencing Exhibit 1, and how that was determined.

4            But, what he would tell you is that basically what

5    he did was he looked at all the claims that we're able to

6    establish --

7            THE COURT:  Let me focus you on the arguments.

8    First, he says there is no proof at trial that drugs that

9    were paid for by private insurance was fraudulent.

10           MR. SALTZMAN:  Your Honor, what we -- we used the

11   Medicare numbers as a benchmark, and so, what is not in

12   dispute is that all the drugs that came from unlicensed

13   distributors wouldn't be paid by Medicare.  We did not

14   present evidence, it's true, about the private insurance

15   payers, but we would submit that it is reasonable to assume

16   that if Medicare wouldn't pay for it, private insurance

17   companies wouldn't pay for it as well.

18           THE COURT:  Why is that reasonable to assume?

19           MR. SALTZMAN:  Simply because they are not

20   effective, your Honor.  The drugs themselves --

21           THE COURT:  Well, you haven't proven that they

22   weren't effective.  I mean, there is no proof that they were

23   effective.  There is no proof that they were not effective.

24           MR. SALTZMAN:  Your Honor, that is the case.  As an

25   alternative, the Government Sentencing Exhibit 3, which is

1    the -- what was used for purposes of calculating both

2    restitution and the number of victims, does provide all the

3    drugs that actually did make their way to Medicare patients.

4    And that is what Mr. Tragos was referring to as the

5    $848,000 that Medicare paid for those drugs.

6         As part of that number, that's only the 80 percent

7    portion that Medicare paid for.  There is the 20-percent

8    portion that was allowed that the supplemental insurance

9    company, or a private payer, or an individual would pay for,

10   but there is also, on top of that, what Dr. Norbergs billed

11   for those drugs, and that number exceeds $1.5 million, and

12   that's in Government's Exhibit 3.

13        So, as an alternative, we have that other theory,

14   and that's under Application Note 3(f)8, which was cited to

15   by Mr. Tragos, that the amount to calculate for intended loss

16   could be used as what is fraudulently billed to Medicare.

17        THE COURT:  It would seem appropriate that the loss

18   is the amount fraudulently billed to Medicare because

19   Medicare had the regulation that you cannot submit bills for

20   non-FDA-approved drugs.  We don't have that proof for private

21   insurance carriers.  So I will allow all bills to Medicare,

22   whether they were paid by Medicare or the patients, after

23   Medicare paid its portion.

24        Now, make your argument about the administrative

25   fee, because I don't understand why the administrative fee

1    should be tacked on.

2         MR. SALTZMAN:  Your Honor, Stephen Quindoza, he

3    could come in and testify, if the Court would like, but what

4    he would say is that if -- Medicare regulations say that if

5    the drug itself is not approved or -- if Medicare wouldn't --

6    if Medicare knew that the drug that was being provided to a

7    patient was from an unlicensed source, and Medicare then

8    would not pay for that drug, any related services to that

9    drug would also not be paid for by Medicare if they knew

10   about it.

11        So the administration fee is basically the charge

12   that is submitted by the office to infuse or to inject that

13   drug into a patient.  And so, if Medicare isn't going to pay

14   for the drug itself, then they are not going to pay for the

15   service related to that drug.  So that number --

16        THE COURT:  By "administrative fee," you mean,

17   then, not Medicare's overhead expense, you're talking about

18   what they paid to the doctor for either injecting or infusing

19   the drug?

20        MR. SALTZMAN:  That's correct.  "Administration

21   fee" might be a better term.

22        THE COURT:  Okay.  All right.  I will allow the

23   amount billed to Medicare, plus anything charged for giving

24   those drugs to a patient, which you call an "administrative

25   fee."  So what is that number?

1          MR. SALTZMAN:  Together, and that's at Sentencing

2    Exhibit 3, it is on page 56, at docket entry 156-3, the total

3    is at the bottom, $1,559,265.

4          THE COURT:  1,559,000 what?

5          MR. SALTZMAN:  $265.

6          THE COURT:  265.  All right.  It looks like that

7    does not change the guidelines, is that right?

8          MR. SALTZMAN:  That is correct, by my analysis.

9          THE COURT:  All right.

10          MR. TRAGOS:  May I be heard, your Honor?

11          THE COURT:  Yes.

12          MR. TRAGOS:  I guess what I'm not understanding is,

13    if they claim -- if they paid 848, and he is saying that

14    the -- they paid 80 percent, 1,559 --

15          THE COURT:  I understand the math.

16          MR. TRAGOS:  I don't understand the math.

17          THE COURT:  I understand.  Okay.  Explain the math.

18    If 800-and-something thousand dollars equals 80 percent of X,

19    X can't be over a million-five.

20          MR. SALTZMAN:  Your Honor, the math is explained

21    by:  That is 80 percent of what Medicare allows.  So 800,000

22    would be -- what Medicare allows for that claim is

23    $1,063,598.69, but that's not what Eastlake Oncology, and by

24    extension

25    Dr. Norbergs, submitted in billed amount as to what they

1    wanted to be reimbursed for the drugs.  What they billed to

2    Medicare for the reimbursement was the one million --

3    $1.5 million figure that we're talking about.

4           THE COURT:  All right.  That's the intended loss

5    then?

6           MR. SALTZMAN:  Correct, your Honor.

7           MR. TRAGOS:  If I might, your Honor?  Is -- if --

8    and I'm sure it's not a secret, Medicare reimburses X amount,

9    and when they submitted the bill, they did not intend that

10   Medicare was going to pay 100 percent of their bill.  That

11   was not the intent.  They knew that Medicare reduces it and

12   pays whatever it is.  And so, if I -- if I bill something

13   knowing I'm only going to get 80 percent, am I intending to

14   get 100 percent when I know I'm not getting 100 percent?

15          THE COURT:  No, you're missing a step in there.

16   When she submitted a bill, Medicare allowed a lesser amount,

17   and then paid 80 percent of the allowed amount.

18          MR. TRAGOS:  The allowed amount isn't

19   one-million-five.  The allowed amount is under

20   one-million-five.

21          THE COURT:  That's right, but the intended loss is

22   the amount of the bill.

23          MR. TRAGOS:  Okay.  I mean, I understand the

24   Court's ruling, but what I'm just saying is that even under

25   that theory, the allowed amount is under a million-five, and

1  that -- because everybody knows when you submit a bill, you

2  know what you are intending, and even if you submit a bill

3  for 80 million, but your intent is, cause you know they are

4  not going to pay 80 million, they are only going to pay a

5  million, then the intent is to get that million dollars.  Her

6  intent was to get that million, not the million-five, from

7  even the Government's argument.

8         THE COURT:  All right.  We spent 25 minutes on the

9  first objection.  What's your next objection.

10        MR. TRAGOS:  Probably one of the more complex ones.

11        Okay.  Your Honor, just for -- the final number is

12  $1,559,265?

13        THE COURT:  Yes.

14        MR. TRAGOS:  Next, your Honor, with regards to

15  victims in the case.  The Government is alleging that all of

16  her patients are victims, and when you look at the history of

17  the case law under this, and specifically the history of case

18  law with regards to doctors, treatments, submissions to

19  Medicare, you don't have a situation like this.  Those

20  situations are:  Didn't provide the service, provided half

21  the service, half the chemo drugs that they billed for.

22        We don't have any evidence here, and, in fact, why

23  it's so important with regards to Defense Exhibit 3, is that

24  there were no counterfeit drugs involved.  In fact, there is

25  no evidence of anything other than a legitimate drug that was

1    not FDA approved.  There is no evidence of any harm being

2    caused.  These patients were closely monitored for any of the

3    bad reactions that would happen with any kind of a false drug

4    or counterfeit drug.  So there is no indication that what we

5    have here is a victim of counterfeit or false drugs.

6              The only victim here is, really, Medicare.  And if

7    you stretch it, maybe the one lady, I think it was King is

8    her name, $300, but the victims in this case are Medicare,

9    and the individuals that were treated were not victimized in

10   this case.

11             If you go further, the next step, with regards to

12   the vulnerable victims, it's the same argument.  These people

13   came to her for treatment.  She did not treat them with these

14   drugs because they were vulnerable victims.  She treated them

15   because the other drugs that she was getting were just too

16   expensive, and she was trying to save money and stay afloat,

17   and that's why she got these other drugs because she couldn't

18   afford it, but it didn't mean that her treatment lagged

19   behind, or that her treatment was any less.  It didn't mean

20   that the patients got any less treatment, and there is no

21   evidence of any of that.

22             If you look at the victim letters that were

23   supplied, you'll see where the agents actually told the

24   victims that these were fake or counterfeit drugs, but as it

25   turns out they weren't.  Same manufacturing plant, same

1    manufacturer, they just stamped a different name on it.

2         For instance, Rituxan/MabThera are just different

3    names, but it was the same drug, and it was administered to

4    the patients.  None of that is consistent with any of the

5    cases in the past that were presented in the memo that were

6    -- that are similar in facts to these situations because that

7    fact just stands out.

8         So I think the only victim in this case can be

9    Medicare, and that these victims do not count as vulnerable

10   victims under the case law, and under the decisions with

11   regard to what is, in fact, a vulnerable victim.

12        THE COURT:  Well, you have two problems with that

13   argument.  First is, there was no evidence that these drugs

14   were not counterfeit.

15        MR. TRAGOS:  We have a stipulation.

16        THE COURT:  No.  You have a stipulation that she

17   never gave that particular counterfeit drug to her patients.

18   There is no evidence that the other drug that she gave were

19   or were not counterfeit, were or were not made by the same

20   manufacturer that was stamped on the package.  There is no

21   evidence either way.

22        MR. TRAGOS:  Your Honor, the stipulation reads:

23   "There is, in fact, no evidence that the Defendant ever

24   bought or used counterfeit Avastin or Altuzan, or other

25   counterfeit drugs.  There is no evidence that she used any

1    counterfeit drugs."

2         THE COURT:  I agree.  There is no evidence that she

3    used any counterfeit drugs.  There is no evidence that she

4    did not use counterfeit drugs.  The evidence was, she used

5    drugs that she bought from overseas, which may or may not

6    have been counterfeit.

7         You recall that one of the witnesses in the case

8    was a doctor herself, and she was very emotional about the

9    idea that she had received non-FDA drugs.  So I don't even

10   need to hear from the Government.  A patient has cancer is a

11   vulnerable victim and is looking for someone that they trust

12   to take care of them as best they can.  I find that they are

13   vulnerable victims.  There is no evidence that they received

14   counterfeit drugs, or that they received any treatment that

15   was less than 100 percent valid treatment, but there is no

16   evidence the other way either.  So I'm finding that the

17   individual patients that received non-FDA-approved drugs were

18   victims, along with Medicare.

19        MR. TRAGOS:  Does the Court find there were ten or

20   more victims, I am presuming?

21        THE COURT:  I will find there were many more than

22   ten victims.

23        MR. TRAGOS:  All right.  Your Honor, the next is

24   with regards to outside a scheme that substantially --

25        THE COURT:  Let me stop you a minute now.

1          MR. TRAGOS:  I'm sorry.

2          THE COURT:  It's not like I'm disregarding your

3  argument about counterfeit versus non-counterfeit, but I

4  think that comes into your 3553 argument --

5          MR. TRAGOS:  Okay.

6          THE COURT:  -- and how do I weigh that for an

7  appropriate sentence.  All right.

8          MR. TRAGOS:  Next, your Honor, if the Court will

9  look at, "outside the scheme, outside the United States,"

10  where a substantial part is from outside the United States, I

11  know that these drugs, the evidence is, they are from outside

12  the United States, but it's whether or not these

13  manufacturers were part of a scheme.  It was legal when they

14  -- for where they were.  They were -- under "relevant

15  conduct" it talks about jointly undertaking criminal

16  activity, and these manufacturers were not jointly

17  undertaking criminal activity with the Defendant.  The

18  Defendant was operating independently, ordering from a place

19  where she placed the order it was legal.  They didn't become

20  illegal until, frankly, apparently they are allowed in the

21  United States, just illegal when they were used and billed to

22  the FDA, but I don't believe that a substantial part of this

23  crime was committed outside the United States.

24          THE COURT:  Response?

25          MR. SALTZMAN:  Your Honor, she was convicted of

1    smuggling drugs into the United States, which by necessity

2    means that you are bringing drugs that are not supposed to be

3    in the United States from outside of the country.  She was

4    not -- we are not alleging that she was engaging in jointly

5    undertaking criminal activity as it relates to the

6    manufacturers of the drugs, but as it relates to the

7    distributors of the drugs.

8           The evidence in this case is that she placed her

9    orders, she was intending to contact folks outside the United

10   States.  The orders were placed to Canada.  The drugs were

11   shipped from the United Kingdom to the United States, to

12   Dr. Norbergs' office.  There's a clear connection

13   specifically as it relates to the smuggling counts, but also

14   as it relates to the other counts.  And she is -- and that

15   would be the foreign distributors' context would be within

16   the scope of the common scheme.

17          THE COURT:  So instead of ordering these drugs by

18   mail or independent shippers, had she just crossed the

19   Canadian border and brought the drugs and driven back into

20   the United States, she would still be guilty of smuggling,

21   right?

22          MR. SALTZMAN:  Correct.

23          THE COURT:  But there would be no foreign

24   conspiracy -- conspirators forming a substantial part of the

25   scheme?

1              MR. SALTZMAN:  I don't know that I would agree with

2       that statement, your Honor.  I would say that she is -- the

3       substantial part of the scheme is actually the folks who are

4       actually acquiring the drugs, getting them, allowing them to

5       be sold to folks in the United States.  She's actually taking

6       steps to actually go to a foreign country in that scenario.

7       So I think a substantial part of that scheme is the actual

8       contacts with the -- outside the United States.

9              Your Honor, if I could have a moment?

10      (Brief interruption.)

11             MR. SALTZMAN:  Mr. Trezevant just reminded me also

12      we have drugs here that were also mismarked as to what their

13      contents were.  The evidence at trial was that drugs were

14      declared as gifts in order to come into the United States.

15      So that's additional fraudulent activity that's occurring

16      outside the United States that were contributing to the

17      substantial nature of the conduct occurring outside the

18      United States.

19             I would also just point out, and it's not my

20      objection that we are addressing right now, but

21      2(b)1.1(b)(10) also has a sophisticated means as an

22      alternative way to find this enhancement.  If the Court wants

23      to hear from me on that now, I'm happy to address it,

24      otherwise I can address it at the appropriate time, or not at

25      all if the Court is inclined to find that this enhancement

1    applies.

2           THE COURT:  I'm trying to recall the evidence about

3    drugs being mismarked.  What are you referring to?

4           MR. SALTZMAN:  Your Honor, I could find the trial

5    exhibit, if you would like?

6           THE COURT:  No, just tell me.

7           MR. SALTZMAN:  There was a trial exhibit, um, I

8    believe it was in the early time when Dr. Norbergs had

9    started buying from Quality Specialty Products, the actual

10   Customs Declaration Form referred to "gifts" as the actual

11   items that were being included in the packaging, when it was

12   actually drugs.

13          There was also testimony --

14          THE COURT:  But the drugs themselves were not

15   mismarked.

16          MR. SALTZMAN:  That is correct.  You're right.  I

17   was referring to the actual packaging of the -- the actual

18   outer packaging.

19          THE COURT:  All right.  I sustain the objection.

20          MR. TRAGOS:  Next, your Honor, we would object to

21   the injury enhancement, Paragraph 64.

22          Your Honor, again, the Government is taking a leap

23   into speculation with regards to this.  There is no evidence

24   of any injury.  There is no evidence that the Defendant

25   intended any injury.  There is no evidence that these drugs

1    injured anyone.  There is no evidence that she intended that

2    these drugs injure anyone.  Therefore, I don't believe it's

3    -- under these facts, your Honor, with -- she didn't --

4    again, the cases, if you look at the cases again, we're

5    talking about cases where test results were misrepresented to

6    the clients.  Where, again, half-a-dose was given, but a full

7    dose was billed for, or no treatment at all was given.

8            So, your Honor, I don't believe in this case, under

9    these facts, that we have a situation that justifies an

10   injury increase.

11           THE COURT:  Response?

12           MR. SALTZMAN:  Your Honor, I would just incorporate

13   my arguments in the sentencing memo, but, essentially, what

14   we have is a letter from the FDA telling -- and other media

15   reports telling the Doctor that she's buying drugs from

16   unlicensed sources, and those drugs could cause serious harm

17   to patients, put patients at risk and are dangerous.  And the

18   guideline only requires that the Defendant act with a

19   conscious or reckless risk of death or serious bodily injury.

20           There's evidence in this case, although it is

21   agreed to, that she did not give those counterfeit drugs to

22   -- that were deemed to be counterfeit to these patients.  She

23   did buy drugs from that same distributor that had been

24   distributing counterfeit drugs, and then, after she had

25   notice of that she then continued to give those drugs to her

1    patients.

2         So for all she knew, those drugs that she had could

3    have also been counterfeit, could have been the functional

4    equivalent of water.  You have patients who have cancer who

5    are relying on that treatment and she could have been giving

6    them water.  I think that would be considered a conscious or

7    reckless risk of death or serious bodily injury to a

8    particular individual.

9         You also have the letter telling her that it

10   actually could cause serious harm to patients, from the FDA,

11   and she then continued to order drugs from that -- from other

12   unlicensed distributors, and also gave drugs to patients

13   after that, and so for those reasons, we would say this

14   enhancement applies.

15        THE COURT:  I will overrule the objection.  I'm

16   going to allow that one.

17        MR. TRAGOS:  The Court has already dealt with

18   "vulnerable victim" and the "large number of victims" in

19   paragraphs 65 and 66 of the pre-sentence report, over our

20   objection.

21        Then we move to 68, which is "position of trust."

22   Your Honor, in this case she was able to do what any doctor

23   could do, and that is, submit bills to Medicare.  She did not

24   violate a trust to her patients.  Her patients received the

25   drugs.  She treated the patients, and therefore, we would

1     object to an increase with regards to position of trust.

2                    THE COURT:  Response?

3                    MR. SALTZMAN:  Your Honor, again, I would

4     incorporate my sentencing memorandum, but that talks about

5     both that -- and I should say, either one of either abuse of

6     position of trust or special skill would allow this

7     enhancement to apply.  In both scenarios doctors are deemed

8     to be individuals in a position of trust and also to have a

9     special skill.  We don't know what these drugs are, and so we

10    don't know if these patients actually received appropriate

11    treatment.

12                   The Court already mentioned how there was the

13    doctor -- it was a nurse practitioner who was also a patient,

14    who clearly was upset and felt like the trust that she had

15    placed in Dr. Norbergs was betrayed by receiving drugs that

16    were misbranded.  They believed that they were getting

17    FDA-approved drugs, and this act of betrayal significantly

18    facilitated the offense.  They could not have received -- the

19    patients could not have received these drugs had she not

20    mislead them in what they were going to get.

21                   Also, she could not have billed Medicare without

22    actually being a doctor who was prescribing these drugs to

23    patients.

24                   In my Sentencing Memorandum I cite to an 11th

25    Circuit case, the *Liss* case, L-I-S-S, from 2001, that talks

1  about that doctors also occupy a position of trust as it

2  relates to Medicare.

3      And for the same reasons why the position of trust

4  significantly facilitated the offense her special skill as a

5  doctor also facilitated this offense.

6      She had to know, essentially, this crime,

7  essentially, in some ways is knowing which foreign drugs that

8  go by names that you and I would never recognize would be the

9  equivalent of an FDA-approved drug.  That takes a skill that

10  someone like a doctor would be able to use.  And so, either

11  one of these, the Government would submit, applies as to the

12  use -- abuse of position of trust or special skill.

13      THE COURT:  I find that Dr. Norbergs offered a

14  position of trust as to her patients and as to Medicare.  So

15  I overrule the objection.

16      MR. TRAGOS:  Your Honor, with regards to paragraph

17  69, the obstruction of justice.  Your Honor, the analysis of

18  paragraph 69 is long and detailed and I won't go into it

19  because the Court heard the testimony, and my experience has

20  been that this Court remembers the testimony, and therefore,

21  what the Court has to do is make a factual determination, at

22  this point, whether there was intentional misrepresentations

23  made by the Defendant in her testimony such that it would be

24  perjury and obstructed justice.

25      I think that, in most of those instances, what it

1    was, Dr. Norbergs saw things one way, the Government saw

2    things as something else.  There was a conflict in the

3    testimony, but not necessarily perjury or an obstruction of

4    justice.

5           At this time, your Honor, again, I don't know if

6    the Court would like to hear it for this, or for the 3553,

7    but we have testimony to present to the Court with regard to

8    a psychologist with regards to Dr. Norbergs' thought

9    processes, and how she thinks and analyzes items not in a

10   situation where it would be not knowing right from wrong, but

11   that her process of analyzing and seeing things may explain

12   some of the testimony she gave with regards to some of her

13   actions.

14          So would the Court like to hear that now or want to

15   wait until the 3553 on this particular point?

16          THE COURT:  Well, I guess it would be now as to

17   whether or not this two-level enhancement should be applied.

18          MR. TRAGOS:  Okay.  We call Dr. Cromwell.

19          THE COURT:  That is your position, right, that this

20   witness is going to testify, why I should not apply this

21   enhancement, Mr. Tragos?

22          MR. TRAGOS:  Yes, your Honor, as well as later on

23   it would be relevant to 3553 arguments.

24          THE COURT:  And he is going to somehow explain away

25   that when the FBI agents told her, "Quit buying non-approved

```
1    drugs," that she thought she wasn't buying non-approved
2    drugs?
3              MR. TRAGOS:  He might give us some insight into
4    that.
5              THE COURT:  Proceed.
6              MADAM CLERK:  Would you raise your right hand.
7              THE WITNESS:  I do.
8    (Witness sworn.)
9              MADAM CLERK:  Please state your name, and spell
10   your first and last name for the record.
11             THE WITNESS:  Dr. Mitchell Kroungold,
12   M-I-T-C-H-E-L-L, K-R-O-U-N-G-O-L-D.
13             MADAM CLERK:  Thank you, sir.  You may have a seat
14   in the witness box.
```

**DR. MITCHELL KROUNGOLD**

```
16   Called as a witness herein, having been first duly sworn
17   was examined and testified as follows:
```

**DIRECT EXAMINATION**

```
19   BY MR. TRAGOS:
20   Q.   Dr. Kroungold, state your name again, please.
21   A.   Dr. Kroungold.
22   Q.   Would you briefly tell us, with reference to your
23   qualifications and your occupation?
24   A.   I've been licensed as a psychologist since 1982.  Um, I
25   have a general practice, as well as a practice that focuses
```

1    on, um, court testimony and family situations, locational

2    evaluations, disability evaluations, attentional problems,

3    learning disability, as well as treating general depression,

4    anxiety and behavior disorders.

5    **Q.**   Have you testified as an expert in the Federal Courts in

6    the Middle District of Florida?

7    **A.**   Yes.

8    **Q.**   Okay.  Dr. Kroungold --

9         MR. TRAGOS:  Your Honor, as I understand the

10   current Rules, I do not have to actually submit him as an

11   expert?

12        THE COURT:  That's correct.

13   BY MR. TRAGOS:

14   **Q.**   Dr. Kroungold, have you had an opportunity to evaluate

15   Dr. Norbergs?

16   **A.**   Yes, I have.

17   **Q.**   When I say "evaluate her," tell us what you did?

18   **A.**   I conducted close to five hours of interviews with her.

19   I administered intelligence tests to her, as well as two

20   personality tests, life history questionnaire.  I reviewed

21   some medical and legal records and I spoke with her daughter.

22   **Q.**   And did those tests and interviews reveal anything to

23   you with regard to her mental state?

24   **A.**   Yes.  I was quite surprised that her overall IQ was in

25   the average range, with a full scale IQ of 108.  There seemed

1    to be significant weaknesses in the areas of working memory,

2    attention span, processing speed and verbal skills.  What I

3    thought was significant, was that her overall intelligence

4    was significantly lower than that which would be expected for

5    most practicing physicians.  I would estimate, given her

6    education and, um, career, that she would be functioning in

7    the superior to very superior range.

8    **Q.**   And did you note that, I guess, she -- she -- she

9    started medical school at a young age?

10   **A.**   I don't recall when she started medical school.  I know

11   she had honors in undergraduate school, so --

12   **Q.**   Did you make any determinations or diagnose any problems

13   with regards to Dr. Norbergs?

14   **A.**   Yes.

15   **Q.**   What kind of problems did you diagnose?

16   **A.**   The diagnoses include a mild neurocognitive disorder

17   that involves cognitive deficits involving attention, memory,

18   processing speed and verbal skills.

19          She also has characteristics of a compulsive and

20   dependent personality style, not to the point where we would

21   consider it to be a personality disorder.  That would be more

22   serious.

23          She also has major depressive -- major depression,

24   as well as a post traumatic stress disorder.

25   **Q.**   And do you know that post traumatic stress disorder,

1    what that or –– where that originated?

2    **A.**    Well, there were a couple of traumas that she

3    experienced.  One was in early childhood relating to some

4    significant family issues, and she has experienced the

5    investigation, and litigation, and incarceration as a trauma

6    as well.

7    **Q.**    And with regards to her ability when she was actually

8    functioning and running a practice, does this affect her

9    decision-making, what you diagnosed?

10   **A.**    I believe that it would affect her decision-making and

11   her judgment, and there are some additional significant

12   issues from her history that are consistent with my findings.

13   **Q.**    Would you explain that, please?

14   **A.**    No. 1, she's got numerous medical problems, one of which

15   is failed back syndrome.  She's had multiple back surgeries.

16   The most notable was in 2006, the medical records, as well as

17   her self-report indicate that she was placed in a medically

18   induced coma following that surgery.  She reports that she

19   was aware of the deterioration of her cognitive skills

20   following that surgery, and that the deterioration was sudden

21   rather than slow and gradual.  That was in 2006.

22          The following year in 2007, she fired her office

23   manager after discovering that her office manager stole

24   $2 million from the practice.  So she did not, um, provide

25   adequate attention and management of her medical practice

1     from that standpoint as well.

2              From 2007 to 2009, she was in Chapter 11 bankruptcy

3     as a result of the theft.

4              From 2011 and 2012, she was on partial disability.

5     The Medicare offenses occurred in 2011 and 2012.

6     **Q.**   The -- does it affect her ability, I guess, to

7     concentrate on certain items and not concentrate on other

8     items?

9     **A.**   Well, her personality style coupled with her cognitive

10    functioning, she is more of a detailed person and she misses

11    the big picture.  So she may exclude looking at the big

12    picture, as well as she lacks judgment in certain

13    circumstances in terms of adequate decision-making.

14              MR. TRAGOS:  That's all the questions I have, your

15    Honor.

16              THE COURT:  Cross?

17                        **CROSS-EXAMINATION**

18    **BY MR. SALTZMAN:**

19    **Q.**   Good morning, sir.

20    **A.**   Good morning.

21    **Q.**   Um, you said the source of your information was

22    Dr. Norbergs and her daughter, is that correct?

23    **A.**   My direct testing, as well as her medical records.

24    **Q.**   I didn't hear what you said before "medical records."

25    **A.**   My direct testing.  I evaluated her myself.

1    **Q.**    Okay.  So you didn't sit through the trial at all, did

2    you?

3    **A.**    No.

4    **Q.**    Did you interview any witnesses that testified in this

5    case?

6    **A.**    No.

7    **Q.**    Did you, um -- and you met with her only in 2017, is

8    that correct?

9    **A.**    Yes.

10   **Q.**    And so, you didn't evaluate her in 2011 or 2012, did

11   you?

12   **A.**    That's correct.

13   **Q.**    Um, and the medical records that you reviewed, did they

14   show that in 2006 she sought any treatment for the issues

15   that you are identifying here today?

16   **A.**    No, they did not.

17   **Q.**    And based on that, um, are you -- you're not able to say

18   how her symptoms progressed over time, is that correct?

19   **A.**    I can say that there's a significant likelihood that,

20   um, the -- testing her medical history and the records are

21   consistent with the deterioration cognitive functioning

22   following the 2006 surgery.

23   **Q.**    But in terms of how much those -- that deterioration

24   happened, if it happened, you're not able to say what the

25   scope of that situation is over time, are you?

 1    **A.**    I'm basing it on her self-report, as well as the current

 2    testing.

 3    **Q.**    And she was able to function as a doctor during this

 4    time period you were evaluating her, correct, from 2006 to

 5    20 --

 6    **A.**    Apparently, in many respects, but in some respects she

 7    did not function as well as she could have or should have.

 8    **Q.**    But she was able to meet with patients, though, correct?

 9    **A.**    As far as I know.

10    **Q.**    She was able to diagnose their diseases correctly?

11    **A.**    I don't know.  This is blinking.  Can I turn the power

12    of this off?  This is distracting me.

13    (Witness speaking of the computer screen on the witness

14    stand.)

15              THE COURT:  You can bend it down.  Push it down.

16              THE WITNESS:  It's off.

17    BY MR. SALTZMAN:

18    **Q.**    You have no indication that she wasn't diagnosing

19    patients correctly, correct?

20    **A.**    I have no indication either way.

21    **Q.**    You didn't interview any of her office staff, correct?

22    **A.**    Correct.

23    **Q.**    You didn't interview any nurses, correct?

24    **A.**    Correct.

25    **Q.**    The office manager?

1    **A.**    Correct.

2    **Q.**    Are you aware that she had those people in her practice?

3    **A.**    Yes.

4    **Q.**    And so, it sounds like you were probably also aware that

5    she was responsible for hiring and firing people, is that

6    correct?

7    **A.**    I believe so.  I don't know the details of her office

8    management and how it was set up.  I don't know those

9    details.

10   **Q.**    And so, if she needed assistance hiring -- you know,

11   based on any deficits in organization or otherwise, hiring

12   staff would be something you would think someone would do,

13   correct?

14   **A.**    Yes.

15   **Q.**    And she also -- were you aware she also hired another

16   doctor to assist her in her practice?

17   **A.**    No, I'm not aware of that.

18   **Q.**    Did you review the records of the medical practice, her

19   records for her treatment of patients?

20   **A.**    No.

21   **Q.**    Um, the practice functioned for a period of time, was

22   that your understanding?

23   **A.**    Yes.

24   **Q.**    So that's -- how to buy things for patients, like drugs,

25   correct?

1    **A.**    I'm not sure what you're asking.

2    **Q.**    She treated patients, correct?

3    **A.**    Yes.

4    **Q.**    In order to treat patients, for an oncologist, you need

5    to have chemotherapy drugs, correct?

6    **A.**    I don't know what the standard practice is.  I know

7    that's what she did.

8    **Q.**    Are you aware of any issues with patients not receiving

9    their medications?

10   **A.**    From her?  No.

11   **Q.**    And she was -- did your testing indicate that she had

12   any difficulty reading and understanding things?

13   **A.**    No.  Her verbal skills were in the average range.  So

14   she certainly was capable of reading, but it reflects an

15   expected deterioration from previous levels of functioning.

16   **Q.**    But she was under -- she was able to read, correct?

17   **A.**    Yes.

18   **Q.**    And could she follow directions if they were told to

19   her?

20   **A.**    Um, yes.

21   **Q.**    So if she was told to stop buying something, that's not

22   too complex for her to understand, is it?

23   **A.**    I think it would depend on the manner of how she was

24   told, the context, um, and -- the context, I think, would be

25   important.

1    **Q.**   If she was told to stop buying foreign and unapproved

2    drugs, is that too complicated for her to understand?

3    **A.**   Well, if somebody in authority came and said, "stop

4    doing that," that would be one thing.  If she was provided

5    with a 25-page

6    this-is-the-monthly-Medicare-update-of-what-you-need-to-be-

7    doing, and it was in there, embedded in there, that would be

8    a different kind of situation.  So I don't know what the

9    context was.

10   **Q.**   If two federal agents who are criminal investigators

11   were standing within feet of her and told her to stop buying

12   foreign drugs, is that too complicated to understand?

13              MR. TRAGOS:  Objection, your Honor, speculation.

14              THE COURT:  Overruled.

15   BY MR. SALTZMAN:

16   **Q.**   If two --

17   **A.**   Would that be too complicated for her to understand?

18   No.

19              MR. SALTZMAN:  I have no further questions, your

20   Honor.

21              THE COURT:  All right.  Any redirect?

22              MR. TRAGOS:  No, your Honor.

23              THE COURT:  Thank you, sir.  You may step down.

24              MR. TRAGOS:  May he be excused, your Honor?

25              THE COURT:  Yes.

```
 1              (Witness excused.)

 2              THE COURT:  The issue on this enhancement is

 3    whether she knew that her office was buying foreign

 4    non-approved drugs, and her testimony was that she didn't

 5    know her office was buying foreign non-approved drugs.

 6              In addition to the testimony from the two FBI (sic)

 7    agents, there was also testimony from, I believe it was,

 8    Ms. Krause, that all the drugs that she ordered, and she was

 9    the one who ordered the drugs, she would then put the bills

10    for those drugs in a package on the doctor's desk.  The

11    doctor who just testified said that she's a detail person,

12    not a big picture person.  A detail person looks at the bills

13    on their desk, particularly one with the past experience of

14    having the bookkeeper steal money from the practice.

15              Also, there was one of the employees, new employees

16    who worked only a matter of weeks and quit because she

17    realized the office was buying foreign non-approved drugs.

18              So I find that Dr. Norbergs knew her office was

19    buying foreign non-approved drugs, and, in fact, it was

20    buying those drugs at her direction, and I overrule the

21    objection.

22              MR. TRAGOS:  Okay.  May I have a moment, your

23    Honor, just to --

24    (Brief interruption.)

25              MR. TRAGOS:  Your Honor, I believe that concludes
```

1  our objections to the guidelines.  Okay.

2          THE COURT:  All right.  I will reduce the offense

3  level by two points.  So now we have a level 35, Category 1.

4          MR. SALTZMAN:  Your Honor, may I be heard on the

5  Government's objections?

6          THE COURT:  Yes.

7          MR. SALTZMAN:  Your Honor, the Government objects

8  to the PSR not including an enhancement for sophisticated

9  means.  The argument is largely similar to what was stated

10  for the drugs coming from outside the United States.  If I

11  may have a moment, your Honor?

12          MR. TRAGOS:  I thought the Court ruled on that when

13  we talked about "outside the United States."

14          THE COURT:  I made a comment.  I haven't ruled on

15  their specific objection.

16          MR. SALTZMAN:  Your Honor, one of the application

17  notes in the guidelines --

18          MADAM CLERK:  Just a second.  Something just went

19  down.

20          (We lost power in the courtroom.)

21          THE COURT:  It sounds like the power just went

22  down.  Let's take a 15-minimum break.

23          (Recess taken at 9:59 a.m.)

24          (Back on the record at 10:12 a.m.)

25          THE COURT:  The Government may proceed with their

1    objections.

2          MR. SALTZMAN:  Your Honor, what I was going to

3    point to is in application notes 2(b)1.1 for sophisticated

4    means, there was an example provided of what it means for --

5    to be a complex or especially intricate offense.  An example

6    given is a telemarketing scheme, this is, I should say,

7    application note nine, sub B, where the main office of the

8    scheme is in one jurisdiction, but the soliciting operations

9    are in another jurisdiction.  That ordinarily indicates

10   sophisticated means.

11         That is what -- that is one of the reasons why

12   "sophisticated means" would be appropriate to apply in this

13   case.  I already set out how operations for the actual

14   receipt of the orders of drugs was in Canada, and the

15   shipment of the drugs came from the United Kingdom.

16         In the case of the *United States vs. Feaster*, which

17   is from a copy, I'm just looking at my 11th Circuit manual,

18   but it's *798 F3d 1374.*  It talks about among the factors for

19   the Court to consider are the length of time of the scheme,

20   and the repetitive nature of the crimes.  In this case, this

21   scheme, based on how the Court ruled on the loss, I believe

22   began in 2008, continued through 2012, that's four years.  In

23   *Feaster* it was only a two-year scheme, and also talked about

24   the repetitive nature of the crimes.  Here we have the

25   repeated orders of drugs, the trial Exhibits 151 and 153 are

1    over 800 pages of orders of drugs.

2          We have the correlating of the foreign drugs to the

3    FDA-approved drugs, which is sophisticated in terms of being

4    able to know which drugs are appropriate ones to be providing

5    to patients.

6          We have the actual -- difficulty of actually

7    unearthing the crime because the distributors that the doctor

8    was buying from were constantly going out of business and

9    popping back up under new names, which made finding them more

10   difficult, but she was able to find them and continued to

11   order from them.

12         So collectively these factors or these aspects of

13   this case, the Government submits, would indicate

14   sophisticated means.

15         THE COURT:  Well, the distributors going out of

16   business and popping back up, as you put it, has nothing to

17   do with her.  She was just -- anybody can go on the internet

18   and order these drugs through the mail, right?

19         MR. SALTZMAN:  So she, under "Jointly Undertaking

20   Criminal Activity" would be held responsible for that conduct

21   because that is reasonably foreseeable through the course of

22   the scheme that they would engage in that conduct.  So it

23   would be sophisticated on their part and she would be held

24   responsible for that.

25         In terms of how she actually would find out about

```
 1    them, I think the testimony during trial was that they would
 2    reach out to her, but at times I think she was -- well, I
 3    should leave it there.  They would reach out to her.
 4            THE COURT:  All right.  I overrule that objection.
 5    Any others?
 6            MR. SALTZMAN:  Your Honor, there is only a minor --
 7    very minor factual objection, which is not opposed.
 8            It is in paragraph 40.  It was an objection that we
 9    made that was not opposed.  There are two sentences and the
10    paragraph at the end starts with, "For example, Government
11    Trial Exhibit 11E," that sentence and the next one that
12    begins with, "In part," it was misplaced in the paragraph.
13    It's a minor consequence, but it should have been placed
14    before the sentence, "In at least May of 2009," as opposed to
15    after the sentence.  I alerted both probation and Defense
16    Counsel to this change, and they have no objection as far as
17    I'm aware.  It matters in the sense that the example it's
18    providing is modifying the wrong sentence.
19            THE COURT:  Where is the sentence?
20            MR. SALTZMAN:  The sentence, "to move --"  two
21    sentences, "to move," it's in paragraph 40, the sixth line
22    from the bottom, "For example, Government Trial Exhibit 11E
23    is a note from Kraus to Norbergs," and the sentence is after
24    that, "In part."  It appears, based on the reading of this
25    paragraph as it speaks, that this example is modifying her
```

```
1   knowledge regarding the improper declaration of gifts,

2   whereas it's actually meant to provide an example of how

3   Dr. Norbergs was aware of drugs being shipped from foreign

4   countries.

5              THE COURT:  So are you saying the "comma" needs to

6   be moved?

7              MR. SALTZMAN:  No.  Those two sentences, the one

8   that starts with, "for example," and, "in part," those two

9   sentences should be moved before, "in at least May of 2009."

10             THE COURT:  Any objection?

11             MR. TRAGOS:  No, your Honor.

12             THE COURT:  All right.

13             MR. SALTZMAN:  The Government has no other

14  objections, your Honor.

15             THE COURT:  All right.  I'll grant that factual

16  objection and will amend paragraph 40.

17             The Court adopts the factual statements and

18  guideline applications as contained in the pre-sentence

19  report, except as to paragraph 63, concerning the two-point

20  enhancement because a substantial part of the scheme was

21  outside the United States.  I did not allow that.

22             Therefore, the Court determines that the advisory

23  guidelines are:

24             Total offense level 35, criminal history

25  Category 1, which calls for imprisonment of 168 to
```

1   210 months.  Supervised release of not more than one year as

2   to Counts 1 through 17; and 1 to 3 years as to Counts 18 to

3   45.  Restitution of $848,671.19.  A fine of $20,000 to

4   $200,000, and a $4,500 special assessment.

5           Are there any victims in the courtroom that wish to

6   make a statement?

7           MR. SALTZMAN:  There are two victims, your Honor.

8           THE COURT:  All right.

9           MR. SALTZMAN:  Two victims.  One is Lori Reed, the

10  daughter of Wanda Colgan, as well as Jack Colgan.

11  Mr. Colgan.

12          MADAM CLERK:  Do you want me to swear them in, and

13  do you want them to speak at the lectern?

14          THE COURT:  Yes.

15          MADAM CLERK:  Good morning.  Please raise your

16  right hand.

17          MR. JACK COLGAN:  Yes, ma'am.

18  (Witness sworn.)

19          MADAM CLERK:  Please state your name, and spell

20  your first and last name for the record.

21          MR. JACK COLGAN:  My name is Jack Colgan, J-A-C-K,

22  C-O-L-G-A-N.

23          MADAM CLERK:  Thank you.

24          MR. JACK COLGAN:  Good morning.

25          THE COURT:  Good morning.

1      JACK COLGAN:  Wanda was a long-time patient of

2  Dr. Norbergs, and Wanda and I were high school sweethearts,

3  and were married for 52 years.  Our business was as a

4  manufacturer's rep, and this consisted of selling electronic

5  components in Florida and the southeast, and Wanda was a

6  co-owner and vice president of the company.  It was just her

7  and I, and she basically was the office manager, and did a

8  lot of -- provided me with a lot of help.  Um, she was

9  instrumental in working with my customer base, which included

10  several 100 accounts.  Her responsibilities included anything

11  from answering the phone, to taking care of the accounting,

12  contacting some of my principals, as well as taking care of

13  the taxes and so on.  She had a very good business mind, and

14  together we were able to have a successful business.

15      The monetary impact both before and after her death

16  was significant, and my income has been greatly affected in

17  the three years since her death.

18      Thus far I believe, and this information was

19  previously provided, the monetary impact of her loss to the

20  business somewhere in the area of $84,000.  I would ask the

21  Court to consider this amount as restitution, and I thank you

22  very much.

23      THE COURT:  All right.  You realize, though, that

24  there was no proof at trial that these drugs were ineffective

25  or in any way contributed to the death of any of her

```
 1   patients.
 2            MR. JACK COLGAN:  I understand.
 3            THE COURT:  All right.  Thank you.
 4   (Witness excused.)
 5            MR. SALTZMAN:  Your Honor, I should have said that
 6   Jack Colgan was the wife (sic) of Wanda Colgan, who was a
 7   patient of Dr. Norbergs.  And her daughter, who would also
 8   like to speak, her name is Lori Reed, R-E-E-D.
 9            MADAM CLERK:  Good morning.
10            MS. LORI REED:  Good morning.
11            MADAM CLERK:  Please raise your right hand.
12            MS. LORI REED:  I do.
13   (Witness sworn.)
14            MADAM CLERK:  Please state your name and spell your
15   first and last name for the record.
16            MS. LORI REED:  Lori Reed, L-O-R-I, R-E-E-D.
17            MADAM CLERK:  Thank you.
18            MS. LORI REED:  My "non-victim," according to the
19   offense, was my mother.  Four months after she passed, we got
20   a letter that this was going on.  And I will spend the rest
21   of my life wondering if my mother would have lived longer if
22   my mother got the treatment that she so dearly deserved
23   fighting for her life.
24            You know, we make choices in this world, and
25   Dr. Norbergs chose what she chose to do, and my mom thought
```

1    the sun rose and fell on her.  And now, I'll spend the rest

2    of my life wondering if I would have had more time with my

3    mom if she got what she deserved.  And I just wanted somebody

4    to hear me say that my sunshine fell, and unfortunately, her

5    choices may have your sunshine fall a little bit too, and she

6    chose that for her family as well as mine.  Thank you very

7    much.

8              THE COURT:  All right.  Thank you.

9              MR. SALTZMAN:  Your Honor, I apologize.  I just

10   received a note that an additional patient's child of

11   Dr. Norbergs would like to speak.  His name is John Reed.  He

12   is the son of Marie Randazo.  I don't believe she's actually

13   been identified on our list as one of the victim's of the

14   offense.  So I'm not sure he has a right to speak, although I

15   do know under 18 USC 3661, the Court can hear from her, if it

16   chooses.  So I present that to the Court for consideration.

17             THE COURT:  I'll hear from the person.  Come

18   forward.

19             MADAM CLERK:  Good morning.

20             MR. JOHN REED:  Good morning.

21             MADAM CLERK:  Please raise your right hand.

22             MR. JOHN REED:  Yes.

23   (Witness sworn.)

24             MADAM CLERK:  Please state your name and spell your

25   first and last name for the record.

1          MR. JOHN REED:  John Reed, R-E-E-D, J-O-H-N.

2          Your Honor, thank you for letting me speak.  Um,

3     like the last other "non-victim," I lost my mom to a very

4     progressive disease.  It happened very quickly.  Um, but I

5     wanted the Court to know that I do feel like I'm a victim.  I

6     feel like I'm a victim because Dr. Norbergs violated my trust

7     that I had in her as a doctor.  As I have watched and read

8     everything about this trial, I can't help but wonder if we

9     were, in fact, victims, and things were used on my mother, I

10    don't know.  Um, I will say the same thing, that my mother

11    really thought that the sun did rise with Dr. Norbergs.  She

12    trusted her.  She listened to every word that she had to say,

13    and all the while I feel as though all of our rights were

14    just taken from us, because she is a doctor who made

15    unethical decisions.  I'm in healthcare, and I know what's

16    right and wrong, and I know that we don't do those things

17    because of money.  And I just wanted to be -- her to know and

18    everybody to know that I do feel like I'm a victim because

19    you violated my trust that I gave to you, that the referring

20    doctor gave, that they trusted in you, and I don't have my

21    mom any more, and I don't fully blame you for that, I don't.

22    But I do blame you for the decisions you made in that

23    practice.  You made the choices to buy those things.  You

24    kept telling them to buy those things, and that is wrong.

25    It's wrong.  Thank you.

```
 1                    THE COURT:  Thank you.
 2                    MR. TRAGOS:  Your Honor, may I just ask what years
 3      Dr. Norbergs treated his mother?
 4                    MR. JOHN REED:  It was 2013, and I know that I was
 5      not part of that, but I'm here just saying that I do feel
 6      like a victim.
 7                    THE COURT:  All right.
 8                    MR. JOHN REED:  That's what I wanted to say.
 9                    THE COURT:  Thank you.  Anything further from the
10      Government?
11                    MR. SALTZMAN:  Not as to victims, your Honor.
12                    THE COURT:  All right.  Dr. Norbergs, would you
13      like to say anything or present any information in mitigation
14      of the sentence?
15                    MR. TRAGOS:  Your Honor, at this time, with regards
16      to mitigation, and also, with regards to the issues of
17      18 USC 3553, we would like to, just briefly -- we know the
18      Court has received and read multiple letters, references,
19      friends, former patients.  We've sent the Court copies of
20      cards and letters, and they were included in the packet I
21      know that the probation office delivered to the Court.
22                    To talk about the history of Dr. Norbergs and her
23      caring for her patients, I know that the Government's
24      position is, "How could she care for her patients if she was
25      using non-FDA-approved drugs?"  But she did care for her
```

1    patients.  That's evident from what the Court has received.

2          We have a couple-dozen people here in the courtroom

3    to support her.  Again, most of them have already written

4    letters so there is no need for them to speak to the Court.

5    However, I would ask the Court to listen to at least two

6    individuals, two family members.

7          And I also know that the Court is well aware of

8    similar cases in this case.  The case of Dr. Porterham, where

9    the allegation is 1.3 million.  Dr. Porterham received

10   five-years probation, nine months of home detention,

11   community service, a fine, restitution.

12         Dr. Kinkade, two million billed to Medicare,

13   24 months in prison.

14         Dr. Nyzer, two years of probation, over a million

15   dollars in restitution to Medicare.

16         Dr. Berstein, 3.4 million, one year of probation.

17         Dr. Sen, three million, three years of probation.

18         Dr. Roy, whose -- that case has been cited, both by

19   the Prosecution and the Defense, and in his case, he did not

20   perform the respiratory services.  Restitution was

21   2.5 million, and he received 75 months.

22         If we go through the offense in this case and

23   compare those to other cases, what particularly jumps out,

24   are the fact that we don't have counterfeit drugs.  We don't

25   have any evidence that treatment wasn't received, and there

1    is nothing presented to show, other than, Dr. Norbergs paid

2    for foreign drugs and saved some money.

3            And her finances, as the Court can see from the

4    bankruptcies, certainly didn't improve greatly.  She tried to

5    stay afloat and she wasn't very good at it.

6            She currently is in a family situation.  The Court

7    will see from Exhibit 7, her license has been taken away.

8    She cannot practice physically because of the injuries that

9    she has received, and she now tries to take care of family

10   members.

11           I would ask, with the Court's permission, for her

12   mother to come forward.

13           THE COURT:  All right.

14           MADAM CLERK:  Good morning.  Please raise your

15   right hand.

16           MS. I. NORBERGS:  So help me God, yes.

17   (Witness sworn.)

18           MADAM CLERK:  Please state your name, and spell

19   your first and last name for the record.

20           MS. I. NORBERGS:  I. Norbergs.  Your Honor, ever

21   since my daughter Anda has been a little girl she's wanted to

22   be a doctor, and she followed through her high school time

23   graduating.  We lived in Kansas City.  They opened a new med

24   school.  And she thought, "maybe I can get in there."  They

25   took students after high school.  She was only 17.  She

 1    passed tests, and interviews, and she was accepted out of

 2    2500 students applied and she was one of the 72 accepted.

 3              She always tried to get good grades just so that

 4    she could be a good doctor, and did everything that she

 5    needed to do.

 6              Anda -- when we moved to Florida, she followed us

 7    and opened her own practice.  She cared about her patients so

 8    much.  She even scheduled them, now time apart, not putting

 9    them all together, 15 minutes because she wanted to talk to

10    them.  She said cancer patients get upset and she has to calm

11    them down and talk to them, and help them, and give them the

12    best medicine that she -- that was available, and she was a

13    great -- is a great doctor.

14              And, of course, we, her father and I, helped her.

15    We even took out an equity on our house so she could start

16    her new business.

17              And she's lost, now, everything, except for us, the

18    family, and we are a very close family.  And we have -- we

19    did decide a couple years ago to sell our house, and when the

20    house next door came on sale, we bought a house next door to

21    Anda so she could help me, and Neil, both of us, her

22    husband -- my husband and her.  Swooh, I'm nervous.

23              My husband and I have been married 65 years, and

24    he's 87, and tomorrow I will be 85.  We have always

25    celebrated together as a family and friends.

 1            And in addition to every other problem, we also --

 2    my husband has come down with dementia, and he has changed

 3    from a loving and tender, caring husband and father to a

 4    different person.  He is forgetful, mean and suspicious now.

 5    He screams, and I have a problem managing all that.  So I run

 6    to Anda, she calms me down.  She's upset about her father

 7    too.

 8            She also cooks for us many times because we are --

 9    I just don't have the energy in the afternoon.  We cry

10    together with Anda, and we've tried to cope.  I don't know.

11    And I was hoping that we would have happiness and joy

12    together, hopeful to spend our last years with Anda.

13            Please, your Honor, I respect and would request

14    could you consider leniency from incarceration?  Thank you.

15            THE COURT:  Thank you.

16            MR. TRAGOS:  At this time, your Honor, we would

17    like to call Dr. Norbergs' husband.

18            MADAM CLERK:  Good morning, sir.

19            MR. TIMOTHY SHANNON:  Good morning.

20            MADAM CLERK:  Please raise your right hand.

21            MR. TIMOTHY SHANNON:  Yes, I do.

22    (Witness sworn.)

23            MADAM CLERK:  Please state your name, and spell

24    your first and last name for the record.

25            MR. TIMOTHY SHANNON:  Timothy Shannon,

```
1    T-I-M-O-T-H-Y, S-H-A-N-N-O-N.

2              MADAM CLERK:  Thank you, sir.

3              MR. TRAGOS:  Mr. Shannon, before you start, have

4    you suffered any physical ailments?

5              MR. TIMOTHY SHANNON:  Approximately a year ago I

6    had a stroke in the brainstem.  I have a problem speaking,

7    balance.  So please forgive me.  I can't speak very well.

8              Your Honor, I'm here to ask for leniency for my

9    wife.  Anda has been my wife for over five years.  I have

10   known her for 12.  I met Anda through mutual friends and

11   neighbors.  They are friends of her parents and neighbors of

12   mine.

13             As a retired military officer, retired airline

14   captain, there has been many difficult things in my life, and

15   maybe some were even dangerous.  Forty-nine years I spent in

16   aviation, and this is probably the hardest thing I had to do.

17             Anda has been like a guardian angel to me for the

18   last 12 years.  There were many ups and downs, always giving

19   of herself and for many of my friends.  I'll give you a

20   little anecdote.

21             When I first met her, at the holidays there would

22   be a holiday get together.  It wasn't just family and

23   friends, it was many of her patients that were long-time

24   patients, 20/25 years, that she brought into her home and

25   shared the holidays with us.
```

1           Her advice and compassion to two of my squadron

2     members in the military, my band of brothers, helped them in

3     their few years of life they had remaining when they were

4     diagnosed with different types of very serious cancer.  One

5     she directed and got him into MD Anderson, the other one she

6     got into Moffit.  Their life was extended through her

7     helping.

8           She always could figure out what was going on and

9     gave of herself.  Never considered -- never considered profit

10    or money.  All she did was want to care for her patients.

11          You know, as Anda's mother said, they are in their

12    80's, they moved next to us so Anda could care for them.  Now

13    Anda also has to care for me.  And again, the stroke I had

14    was in my brainstem.  Nothing they could do about it.  At any

15    time it could be over.  I feel that when I had the stroke she

16    was there.  She saved my life.

17          So I ask for leniency for a woman that's

18    compassionate and loving.  That's all I have to say.  Thank

19    you, your Honor.

20          THE COURT:  Thank you.

21          MR. TRAGOS:  Your Honor, at this time, Dr. Norbergs

22    would like to make a statement.

23          THE COURT:  You can speak from there.

24          DEFENDANT NORBERGS:  Your Honor, thank you.  I'm

25    sorry.  (Defendant crying.)  First and foremost, I would like

1   to apologize to all my patients.  I am so sorry for the

2   stress that I may have caused for you and your family

3   members.  Those drugs that were given, I need to reassure

4   them, were not counterfeit drugs.  They were on -- oncology

5   drugs have predictable side effects and effects.  Oncology

6   drugs, you can tell, and I watch my patients very carefully

7   my whole -- I'm not a business person.  I'm a doctor.  And

8   being a doctor is watching your patient, making sure your

9   patient is doing well.

10          Um, these drugs had, like, hair loss, blood counts

11  that go down, severe nausea and vomiting.  Um, there are some

12  that have specific side effects, like, numbness, or a rash

13  that causes infections of the skin.  These are all specific

14  side effects known to these drugs.  If this drug did not have

15  it -- any side effects, or did not have anything go wrong

16  with them, they would be highly, highly suspect that these

17  drugs -- something is wrong.  The blood count -- we give

18  these drugs over, and over, and over again.  All cycles.

19          Some of these drugs were from the unlicensed

20  dealer, but some of these drugs were given to the same

21  patient that were licensed dealers.  They did not have any

22  difference in their side-effect profile.  They didn't have

23  any difference in their blood counts.

24          I had -- I made my patients come in every week just

25  to be checked, their blood counts checked by a nurse who is a

1    chemotherapy certified nurse that knew side effects as well.

2           In oncology, you have an option of giving an

3    injection to prevent the white count from going down.  I gave

4    Neupogen as opposed to Neulasta, which is a longer-acting

5    drug.  The reason being is that they had to come in and be

6    seen daily, and that way I could tell because I had a lot of

7    elderly patients who just wouldn't call.  They wouldn't tell

8    me when things were wrong.  I would find out at the

9    appointment that they were sick, they were shivering, or they

10   had some type of problems.  This way they interacted, they

11   felt good.  And I do apologize to John, even though, 2013 I

12   was not using unlabeled non-FDA drugs at all.

13          Um, I still care for people.  People are the -- my

14   patients are the most important in my life.  That was what I

15   wanted to do.  That was my career.  I would never, ever

16   intentionally harm anybody.  (Defendant crying.)  I'm sorry.

17          I also want to apologize to my staff members and

18   their family.  I know when they signed up to be my employees,

19   they certainly didn't expect to be witnesses on witness

20   stands or in Federal investigation.  We were a very small

21   office, and we worked closely together.  We had all competent

22   people.  We relied on each other.  I spent hours with my

23   patients, and I spent hours at night working on paperwork,

24   taking care, reviewing their tests, and I did not have a lot

25   of time for bookkeeping.  I did not have any time.  The time

1    period when all this occurred was when we were getting

2    electronic medical records.  I was spending four hours a day

3    extra, which I did not have, just to have all the electronic

4    records done.

5            I always believed as an oncologist I was a

6    specialist, and as a specialist, when I -- I always had

7    referring doctors, and when I referred -- when I saw these

8    patients, I wanted to communicate with the referring doctor

9    and explain exactly what's going on, and keep track of them

10   because they are a vital necessity to take care of the

11   patient with me.  So I am very detail oriented in my notes.

12           I've gone through a lot of Medicare audits after

13   this all started, and they couldn't find anything wrong

14   except for the fact that I misbilled and they owed me money,

15   and the money they owed me was too long of a length and I

16   wouldn't get it back.

17           Um, I also would like to apologize to my poor

18   family.  I want to thank them for being with me and

19   supporting me and still have faith in me, and my friends as

20   well. (Defendant crying.)

21           Your Honor, in front of you stands a broken woman.

22   I'm sorry.  My 40-plus years of an unblemished career, which

23   I loved, it was the calling for me, I would have never

24   jeopardized for financial reward.  This career has ended in

25   disgrace and embarrassment.  My license has been taken.  As a

1  matter of fact, today in Miami, they are deciding, and I

2  agreed to give up my license.  Because I am now a felon, I

3  will never be able to take care of patients again.

4      My husband and I are in significant debt.  We never

5  had huge amounts of money because most of it was either

6  stolen or I never profited from my office.  Our retirement

7  savings are both gone.  Both of our health are deteriorating.

8  And since my arrest, as you well know from my husband, he had

9  a brainstem stroke, and he has recovered, but he still has

10  moments and he doesn't watch himself.  He doesn't limit

11  himself.  He has -- he goes outside in the heat, and works,

12  and gets tired, and I'm so worried that the artery that is

13  half closed will go down again, and that stroke, when he has

14  another stroke like that, he's gone.  His life could go.

15      My father, he has progressive dementia from many

16  little strokes.  He can't talk.  Mostly it's mumbled.  He

17  understands and knows who we are.  His joy he has -- when

18  they moved next door to us, he's, like, rejuvenated a little

19  bit.  He loves being with us, and loves our cat, and he's,

20  like -- that is helping him.  Otherwise, he is very

21  frustrated, very angry, can't remember, blames all of us

22  because he can't remember, or we didn't tell him something.

23  He plays games with my mother and I see that.  He doesn't eat

24  or he pushes her food away, and he loves eating my food.  And

25  I'm worried because he's losing weight, and then I fatten him

1   up and give him stuff, and -- I'm sorry, tangents.

2           Anyway, they've been -- my mother, as she told you,

3   she'll be 85 years old tomorrow, and she can't take care of

4   him 100 percent because she, herself, has a bad back and

5   chronic pain.  She will not tell you.  She keeps on going.

6   She runs to church.  She is president of the church, and she

7   keeps on going, although, she does get exhausted and in pain

8   and never complains.

9           My daughter is a young public interest attorney and

10  she works in Houston.  This has been tough on her.  She comes

11  here all the time, as much as she can.  We've always been

12  very close.  Um, this is hurting her health.  She has a

13  health appointment set up and I can't even go see the

14  neurologist with her, and I can't be there for her, and

15  haven't been able to travel that much for two years.

16          My brother has had -- he survived a horrible auto

17  accident where he developed brain damage in the frontal lobes

18  and he can't see in his vision.  He has multiple serious

19  other problems also, some of them related to his frontal lobe

20  damage.  He has a hard time driving.  He won't drive at

21  night.  He's been in accidents.  He doesn't always make the

22  best health decisions.  He forgets his medicine or won't take

23  his insulin, and so my mother has been primarily helping him,

24  but she can't do it all either.  So I help and advise when he

25  needs insurance issues, which he hasn't been able to get

1    right or can't afford it.

2          So we're close.  As you can tell we have a close,

3    caring family and I think all of them would be severely

4    impacted if I was incarcerated.

5          I don't like to talk about myself.  I don't usually

6    want anybody to know that I have problems.  I guess I take

7    after my mother, but my health has also deteriorated.  I have

8    want ads at the front door because when I was taken out in

9    chains and shackled from my house and taken out of bed, taken

10   in a car and delivered to jail, shackled the whole time, not

11   able to have any water, I was offered a soggy boloney

12   sandwich, which I don't eat processed meat.  I couldn't eat

13   it.  I know -- and since then I have had nightmares.  I do

14   not sleep well.  I have clinical depression.  I'm on meds,

15   but they are not helping a lot.  I have not only a failed

16   lower back, I have a disc herniated in my neck, and every

17   three months I get injections from a specialized -- it's a

18   neurotoxin they put in my neck to paralyze the muscles, and

19   -- so I wouldn't have pain in my neck and shoulders, and this

20   has to be given every three months because the toxin wears

21   off, and it has to be given by a specialized, trained

22   neurologist.  They help me for almost two-and-a-half months

23   and then it starts hurting again.

24         I have migraines, which become more frequent with

25   stress.  I do not tolerate narcotics, nor do I want to take

them, however, I do take one or twice a year when I have

severe pain.

I've had multiple procedures and surgeries on my

lower back.  The last surgery I had left me with a foot drop

unable to walk.  As you can see, I'm walking now.  This is

years later.  It was two years of rehab.  I have numbness and

tingling in my lower legs.  Standing is hard for me.  I get

Charlie Horse Cramps in my legs that I have to jump out of

bed, and that's when I really have to take the medicine

because nothing will relieve it, and it's like your leg is

dying from lack of oxygen.

I also have an autoimmune disease which has really

run rampant these past two years because of my stress.

Enough about me.  Anyway, respectfully, your Honor,

please give me leniency.  No incarceration.  Thank you.  God

bless you.  Sorry.  (Defendant crying.)

MR. TRAGOS:  Your Honor, one other aspect of this,

the Court remembers hearing testimony about the largest

oncology group in Florida FCS.  The difference is, although

Dr. Norbergs was asked to join them, she always wanted to

have a more personal relationship with her clients so she

kept an independent practice.  Oncology practices like FCS

get almost a 30 to 40 percent discount because they buy these

chemo drugs at such a volume, where the small operation

cannot.

1          Going to 3553, the nature and circumstance of the

2     offenses and the history and characteristics of the

3     Defendant.  Again, as we pointed out before, this offense is

4     not -- does not fall into, for obvious reasons, the group of

5     offenses that are similar as far as the charges, and similar

6     as far as the restitution and the amounts involved.  It is

7     different.  It is different because there was no ineffective

8     treatment.  It was different because they received drugs that

9     were real and not counterfeit, and again, nothing to show --

10    that's why it's so different.  It really is so different than

11    these other ones.  It stands out for being that different.

12          She has had a law-abiding life.  The purpose for

13    sentencing is a need to protect the public.  There is no

14    longer a need to protect the public from Dr. Norbergs.

15          Correctional treatment, I don't know what kind of

16    correctional treatment that she would receive.  It's a

17    non-violent offense.

18          A sentence, no matter what the sentence is in this

19    case, will reflect the seriousness of the offense.  It will

20    be a continued message to doctors.  It will promote respect

21    for the law.

22          And the sentencing guideline range that we're

23    looking at here 168 to 210, I think it was, that is over --

24    overestimates the seriousness of the offense.

25          So, your Honor, I would ask the Court to -- and

1  take into consideration the 3553 criteria, and fashion a

2  sentence that properly reflects the seriousness of the

3  offense, and the offense characteristics and the

4  characteristics of this Defendant.

5          THE COURT:  Anything from the Government?

6          MR. SALTZMAN:  Yes, your Honor.  Your Honor, the

7  United States is asking for a guideline sentence, and would

8  not object to a sentence at the low end of the guidelines.

9          The purpose of having drugs approved by the FDA is

10  so that we, as citizens and patients can have confidence that

11  the drugs we're getting are safe, and effective, and are

12  approved.  And this type of consumer protection function of

13  our Government is not unique to drugs.  It's there every time

14  we go to a grocery store, we have approval, so we know that

15  the food that we are buying isn't tainted, it isn't spoiled.

16  When we go to a pharmacy we know that the drugs that we are

17  buying over-the-counter from a pharmacist are approved and

18  safe.

19          Most importantly in this case, when we go to a

20  doctor for either a flu shot, or vaccine or anything, that we

21  know the needle that's being stuck into our arm is an

22  approved drug because we don't see the packaging for that

23  drug.  We know nothing about that drug other than what is

24  told to us, and we trust the doctor or the nurse who gives it

25  to us.

1          Dr. Norbergs took advantage of that societal trust

2     that we have, and for the patients in particular in this

3     case, she shattered that trust, and she did that for an

4     extended period of time, with plenty of opportunity to

5     reconsider.  She did it for over four years.  She did it when

6     suppliers went out of business, and she did it despite being

7     warned over, and over, and over again that what she was doing

8     was wrong and that she should stop.

9          She was told straight out that it could cause

10    serious harm to patients, and she doesn't need to be told

11    that.  In fact, I believe one of the witnesses from the FDA

12    said that it's obvious to -- it seemed obvious they wouldn't

13    even need to share that information with doctors, and that's

14    particularly the case when you're dealing with cancer

15    patients.  And she, more than anyone else, should know having

16    seen patients day in and day out how precarious their health

17    is, and that they could succumb to their disease just by

18    getting FDA-approved drugs and drugs that have no problems.

19         But when she decided to buy drugs from unapproved

20    and unlicensed sources that were misbranded, she,

21    essentially, put her thumb on the scale on the side of cancer

22    and was willing to hurt her patients in the process.  Through

23    that, she distressed her patients.

24         You heard from patients here today, you saw the

25    letters, and you also heard from patients who testified about

the stress that that caused them.  And they wonder if they

lost extra time for the family members whose parents have

died as a result of their disease.  They wonder if they lost

extra time because of Dr. Norbergs.  There is one patient in

particular who wondered if there were side effects from the

drugs that she is suffering from here today.

I believe others are unsure if they -- I know that

Dr. Norbergs said that she monitored her patients, but there

are patients who reported that they didn't notice any impact

from the drugs that they received, and so it's possible that

those drugs were not effective.

At the same time that I read the letters from the

victims, I also read the letters of the Defendant's family

and friends, and they note the caring person that she is, and

they plead to you to be lenient so that they can have more

time with her, but there was no one for the victims to plead

with.  All the victims are pleading now that they wished they

had more time, but they didn't have the opportunity to talk

to her, to say please don't give my parents, or please don't

give my sister, or my husband, or my wife a drug that isn't

approved.  Give me what is approved because I know that will

work.

And it's true that we can't say that Dr. Norbergs

actually harmed any patients.  We don't know that.  But she

doesn't know whether or not she harmed anyone either.  What

1    she did know was that she could have harmed them.  She was

2    told that by buying these drugs from unlicensed sources could

3    cause serious harm, could cause serious risk and she just

4    ignored that.  She was told by an FDA agent to stop buying

5    the drugs.

6              We heard during the trial from one of the drop

7    shippers of the drugs, I believe his name was Mr. Zoubek from

8    Meiko, how he reacted when he was told that he was a part of

9    actually distributing unapproved drugs.  He felt absolutely

10   awful.  He remembered the exact day that it happened because

11   it was the worst day of his life, as he said.  It was not the

12   worst day of Dr. Norbergs' life because she continued on

13   without even reconsidering.

14             It's also telling what type of person she is based

15   on how she testified in this case.  Other than the Court

16   already finding that she lied, essentially, while on the

17   witness stand, one of the things that she said at the

18   conclusion of her cross-examination sticks out for me now, to

19   this day, and stuck out at the time.  My co-counsel asked her

20   what did she do -- I mean, she claimed that she only found

21   out in June of 2012 about the letter from April 2012 from the

22   FDA, and my co-counsel asked, "What did you do when you found

23   out?  Did you call Medicare?"  She said, "No, it wasn't on

24   the forefront of her mind.  Did she call the FDA?  No, that

25   wasn't on her mind either."  She said she didn't call her

1    patients, and when Mr. Trezevant asked why, she said she

2    didn't know which ones received FDA-approved drugs and which

3    ones did not.  Now, that took me by surprise because we

4    showed at trial it wasn't that hard to figure that out.  She

5    had the records.  She could have looked at the orders.  She

6    could have seen when she ordered these drugs, but she didn't

7    do that.  She didn't do that because she didn't care, and for

8    her to profess that she cares today is contrary to her

9    actions.  Her actions speak louder than her words.

10          This is not an offense of just substituting these

11   foreign drugs for approved drugs.  It may be the case that

12   some of them worked, it may not be, but she didn't know that

13   before she gave them to her patients.

14          We heard testimony from an FDA expert about how

15   these drugs could change if they are out of the range -- the

16   approved range, if they are supposed to be cold stored.  We

17   heard from Mr. Zoubek, again, on the fact that when he

18   received the drugs he didn't note that there was any sort of

19   tracking equipment to note whether or not the drugs were

20   actually stored properly.  He then, did not put anything into

21   the packaging to then send to doctors' offices to confirm for

22   the doctors that they never fell outside of that permissible

23   range, so you knew that the drugs wouldn't become tainted in

24   any way.

25          A guideline sentence is necessary in this case,

```
 1    your Honor, to -- for deterrence purposes, to speak to other
 2    healthcare professionals so that they know they cannot try to
 3    make more money at the expense of their patients' health.
 4           It's also because in this case, Dr. Norbergs has
 5    not accepted responsibility, clearly by going to trial.  She
 6    did not accept responsibility, and particularly, when she got
 7    on the stand and lied over and over again about what she knew
 8    and when she knew it.
 9           The cases that are cited by Defense in their
10    sentencing memo are not applicable in this case.  In those
11    cases you had situations where doctors plead guilty to
12    misdemeanors because the Government could couldn't prove that
13    they actually knew what they were doing was unlawful.
14           They have cases here of doctors who plead guilty
15    and didn't actually make the Government going to the burden
16    of proving their guilt at trial.  And I didn't see anything
17    in the memo -- and I'm somewhat familiar with some of those
18    cases, I didn't see anything in the memo about any of the
19    doctors in those cases knowing that they had received
20    counterfeit drugs.
21           The difference in this case, and the one that is
22    most striking --
23           THE COURT:  Yeah, but some of the cases he cited
24    involved doctors who billed for services they never provided
25    at all.
```

1          MR. SALTZMAN:  My plea to the Court relates to what

2     she could have done to the patients.  I mean, obviously the

3     harm to Medicare is one of the factors that the Court should

4     consider, but in this particular case I'm talking

5     specifically about the harm that she could have caused to

6     patients and may have caused, we just don't know.  And that's

7     really the problem, is that we don't know what impact this

8     had on patients.  We don't know anything about that.  No one

9     knows.

10          So for all those reasons, your Honor, the Court --

11     the Government is asking for a guideline sentence.

12          THE COURT:  Well, in a minute it will be my job to

13     impose a sentence that I think is fair after I've weighed all

14     the factors.  I first will have to ask the Defendant if they

15     have any reason why I should not impose a sentence, but once

16     they agree that it is time to impose a sentence, that will be

17     my job.

18          I've already found that the patients in this case

19     were victims because they received drugs that were not FDA

20     approved.  I've got to weigh that with the fact that at

21     trial, it was not shown that the drugs were ineffective.  It

22     was not shown that they were anything other than the same

23     chemical elements, just with a different name, manufactured

24     in Europe, or in some cases it was in Turkey by -- at least

25     the package was stamped -- Novartis, and the FDA-approved

```
 1    drug came from Turkey manufactured by Novartis.  Were I a

 2    patient who received non-approved FDA-approved drugs, I would

 3    be angry.  Because you would never know what you're getting,

 4    and whether or not its effective.  So I've got to impose a

 5    sentence that takes all that into account.

 6          I don't doubt that Dr. Norbergs thought these were

 7    the effective drugs, and were the same as the FDA-approved

 8    drugs, and that she was monitoring the symptoms of her

 9    patients.  And the reason I say that is, it came across

10    during trial that she was a caring doctor.  A couple of the

11    employees who had worked in other doctors' offices testified

12    of the doctors they worked for, she was the most caring.  So

13    I have to factor that into account.

14          We Judges have guidelines that help guide us what

15    kind of sentence we should give.  In this case the guidelines

16    call for imprisonment of 168 to 210 months.  So you're

17    talking about 14 years to, you know, over 19 years or

18    whatever.  That's a lot of time in a federal penitentiary.  I

19    can go above the guidelines or I can go below the guidelines.

20    They just are there to guide me for what the Sentencing

21    Commission thinks is an appropriate sentence.

22          But, I also am required to look at what other

23    Defendants in similar situations have received as sentences.

24    One of the main purposes of the guidelines is so that we

25    Judges give, hopefully, consistent sentences.  That a Judge
```

```
 1    in Nebraska would give about the same sentence as a Judge in

 2    Miami or in Tampa.  So we look at the guidelines, and we look

 3    at other cases that are similar to this one to see what those

 4    Defendants got, and I think you heard what some of the

 5    doctors got with similar conduct, when the Defense was making

 6    their argument.  Many got probation.  Several got

 7    two-and-a-half years to three years.  I think the highest I

 8    heard was 75 months.  But I assumed that the Defense is not

 9    going to give me the worst cases, so I'm going to assume that

10    there are some higher sentences than that.

11            Do I think that Court's like doctors and give them

12    low sentences on purpose?  I don't think that.  But I think

13    that Judges in other Court's have looked at what's happened

14    to doctors who are convicted, and they lose their license,

15    and it's destroyed their career, and it's altered their life

16    for the rest of their life, and that's taken into account,

17    along with their criminal background.  And, for example,

18    Dr. Norbergs has no criminal background.  She has a perfectly

19    clean record, never committed any other offenses.

20            So taking all that into account, I think the

21    appropriate sentence in this case is not probation, that it

22    will be prison time, and I think that 70 months in federal

23    prison is appropriate.

24            Do you know of any reason why I should not now

25    proceed with imposition of sentence?
```

1          MR. TRAGOS:  No, your Honor.

2          MR. SALTZMAN:  No, your Honor.

3          THE COURT:  The Court has asked the Defendant why

4   judgment should not now be pronounced and has heard no cause

5   to the contrary, and Dr. Norbergs and her witnesses, and her

6   attorney having made statements on her behalf, and the Court

7   having reviewed the pre-sentence report, and considered the

8   advisory guidelines, and the factors of 18 USC, Section 3553,

9   and the sentences rendered in other cases that are similar to

10  this one, it is now the judgment of the Court that the

11  Defendant, Dr. Anda Norbergs is hereby committed to the

12  custody of the Bureau of Prisons to be in prison for a term

13  of 70 months.  This term consists of terms of 36 months on

14  each of Counts 1 through 17; 100 -- I'm sorry, 70 months on

15  each of Counts 30 to 40; and 70 months on each of Counts 18

16  to 29; and 41 to 45, with all terms running concurrently.

17          Upon release from imprisonment, the Defendant shall

18  serve a three-year term of supervised release.  This term

19  consists of a one-year term as to each of Counts 1 through

20  17, and a three-year term as to Counts 18 through 45, with

21  all of those terms running concurrently.

22          While on supervised release, the Defendant shall

23  comply with the standard conditions adopted by the Court in

24  the Middle Districts of Florida.

25          As special conditions:

1       1)  The Defendant is prohibited from incurring new

2   credit charges, opening additional lines of credit, or

3   obligating herself for any major purchases without the

4   approval of the probation officer.

5       2)  The Defendant shall provide the probation

6   officer access to any requested financial information; and,

7       3)  The Defendant shall refrain from engaging in

8   employment as a physician.

9       The Defendant shall cooperate in the collection of

10  DNA as directed by the probation officer.

11      The mandatory drug testing requirements of the

12  Violent Crime Control Act are waived.

13      The Defendant shall pay restitution in the amount

14  of $848,671.19.  Of this amount, $848,371.19 is payable to

15  Medicare, and $300 is payable to the victim identified as --

16  by the initials "CK."

17      Restitution is payable to the Clerk of the US

18  District Court for distribution to the victims.

19      While in the Bureau-of-Prisons custody, the

20  Defendant shall either:

21      1)  Pay at least $25 quarterly if she has a

22  non-UNICOR job; or,

23      2)  Pay at least 50 percent of her monthly earnings

24  if she does have a UNICOR job.

25      Upon release from custody, the Defendant shall pay

restitution at the rate of $500 per month until altered by
this Court.

Based on the present financial status of the
Defendant the Court waives imposition of a fine.

A forfeiture money judgment has been previously
entered and will be made part of this final judgment.

The Defendant shall pay to the United States
special assessments totalling $4,500, which are due
immediately.

The Court finds that the sentence imposed is
sufficient, but not greater than necessary to comply with the
statutory purposes of sentencing.

The Court having pronounced sentence, does counsel
for the Defendant or the Government have any objections to
the sentence, or to the manner in which the Court pronounced
sentence, other than those previously stated for the record.

MR. TRAGOS:  No, your Honor.

MR. SALTZMAN:  Your Honor, to preserve the record,
the Government objects to the sentences being substantively
unreasonable.

I'd also just ask that the forfeiture money
judgment be amended.  It should match the figure on the
restitution that was filed previous to the modification of
the money judgment.

THE COURT:  All right.  We will do an amended

1   forfeiture money judgment.

2           MR. SALTZMAN:  Lastly, would the Court be inclined

3   to make a ruling under 3553 that -- depending on how things

4   are ruled on appeal, that the sentence imposed would have

5   been the sentence under the 3553(a) factors?

6           THE COURT:  I'm not exactly sure what you're asking

7   me.  I've already stated for the record --

8           MR. SALTZMAN:  I'm sorry.  Regardless of the

9   guideline calculation, the Court would have come to the

10  sentence under the 3553(a) factors.

11          THE COURT:  Well, I considered the guideline

12  calculation, and I took that into account, but taking that

13  into account together with the 3553 factors, and the

14  sentences received by similar Defendants, I came to the

15  sentence that I imposed.  I don't know how else to say it for

16  the record.

17          MR. SALTZMAN:  Thank you, your Honor.

18          THE COURT:  The Defendant may voluntarily surrender

19  at the institution designated by the Bureau of Prisons.

20          Dr. Norbergs, immediately following this sentencing

21  hearing I direct you to go to the Marshal's office and get

22  instructions about how to voluntarily surrender.

23          Does she have requests about where she would like

24  to be designated?

25          MR. SARTIS:  Your Honor, if the Court would make

1    the recommendation for the Coleman Women's Facility, and if

2    that is not available for her, the closest facility to her

3    home here in Pinellas County, Florida.

4             THE COURT:  I'll recommend Coleman.  As a backup, I

5    would suggest Pensacola.

6             MR. SARTIS:  Okay.  We appreciate that, your Honor.

7             THE COURT:  All right.  Then I'll also recommend

8    Pensacola secondary to Coleman.

9             Dr. Norbergs, you have the right to appeal this

10   sentence within 14 days from today.  Failure to appeal within

11   the 14 days would be a waiver of your right to appeal.

12            You should have in front of you a form entitled

13   Declaration of Intent to Appeal, together with a stamped

14   envelope addressed to the Clerk's office.  Does she have that

15   form?

16            MR. SARTIS:  She does, your Honor.

17            THE COURT:  That form states whether you do or do

18   not wish to file an appeal.  I direct you to complete the

19   form and mail it into the Clerk's office at the end of the

20   14-day appeal period.  If you do not return the form, I will

21   accept that as an acknowledgement that you do not wish to

22   file an appeal, and that that was an informed and voluntary

23   choice on your part.  The Government also has a right to file

24   an appeal from this sentence.

25            You're entitled to a lawyer in taking an appeal,

1   and if you are unable to afford a lawyer, one will be

2   provided for you.

3           If you are unable to afford the filing fee, the

4   Clerk of the Court would be directed to accept your notice of

5   appeal without such fee.

6           All right.  Good luck to you, Dr. Norbergs.  We are

7   adjourned.

8           MADAM CLERK:  How about the underlying Indictment,

9   dismiss that?

10          THE COURT:  I will order the underlying Indictment

11  to be dismissed.

12          MADAM CLERK:  Also, if their exhibits were not

13  admitted, to admit them, both sides.

14          THE COURT:  No.

15          MADAM CLERK:  Okay.

16          THE COURT:  Do you want your exhibits admitted that

17  you attached to your sentencing memorandum?

18          MR. SALTZMAN:  Yes, your Honor.

19          MR. TRAGOS:  For the Defense as well.

20          THE COURT:  All right.  Then we will admit those

21  exhibits.

22  (Discussion had off the record.)

23          THE COURT:  Yes, in addition to waiving the fine, I

24  will waive interest on the restitution amount.

25          Mr. Saltzman, if you would give that corrected

1    number to Ariana, we will do the amended forfeiture judgment.

2              MR. SALTZMAN:  Thank you, Judge.

3              THE COURT:  All right.

4              MR. SARTIS:  Your Honor, if I may, would the Court

5    consider the supersedeas bond for this Defendant, pending

6    appeal?  There's a possibility we might appeal the sentence,

7    obviously, but we will have that discussion with our client

8    also.

9              THE COURT:  Is she on her own recognizance bond now

10   or is she out on a monetary bond?

11             MR. TRAGOS:  I think she's out on a signature bond.

12             THE COURT:  Okay.  She can remain out on the same

13   bond pending appeal.

14             MR. TRAGOS:  Okay.  Thank you, your Honor.

15             THE COURT:  All right.

16             (Court adjourned at 11:25 a.m.)

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF REPORTER

 2

 3    COUNTY OF HILLSBOROUGH      )

 4                                )  SS.

 5    STATE OF FLORIDA            )

 6

 7    I, MELISSA A. PIERSON, OFFICIAL COURT REPORTER, REGISTERED

 8    PROFESSIONAL REPORTER, IN AND FOR THE UNITED STATES DISTRICT

 9    COURT FOR THE MIDDLE DISTRICTS OF FLORIDA, DO HEREBY CERTIFY

10    THAT I REPORTED, STENOGRAPHICALLY, THE FOREGOING PROCEEDINGS

11    AT THE TIME AND PLACE HEREINBEFORE SET FORTH; THAT THE SAME

12    WAS THEREAFTER REDUCED TO TYPEWRITTEN FORM BY MEANS OF

13    COMPUTER-AIDED TRANSCRIPTION; AND I DO FURTHER CERTIFY THAT

14    THIS IS A TRUE AND CORRECT TRANSCRIPTION OF MY STENOGRAPHIC

15    NOTES.

16

17

18    DATE:  10/23/17

19

20    S:/MELISSA A. PIERSON

21    MELISSA A. PIERSON, CA/CSR 12499

22    IL/CSR 084.003138, RPR

23    FEDERAL OFFICIAL COURT REPORTER

24

25
```